## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## FORT WORTH DIVISION

| | |
|---|---|
| WILLIAM T. MOCK; CHRISTOPHER LEWIS; MAXIM DEFENSE INDUSTRIES, LLC, a limited liability company; and FIREARMS POLICY COALITION, INC., a nonprofit corporation,<br><br>*Plaintiffs*,<br><br>v.<br><br>MERRICK GARLAND, in his official capacity as Attorney General of the United States; the UNITED STATES DEPARTMENT OF JUSTICE; STEVE DETTELBACH, in his official capacity as the Director of the Bureau of Alcohol, Tobacco, Firearms and Explosives; and the BUREAU OF ALCOHOL, TOBACCO, FIREARMS AND EXPLOSIVES,<br><br>*Defendants*. | Civil Action No. 4:23-cv-00095-O |

## FIRST AMENDED PETITION FOR JUDICIAL REVIEW AND REQUEST FOR VACATUR OF AGENCY ACTION, AND COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

Plaintiffs William T. Mock; Christopher Lewis; Maxim Defense Industries, LLC; and Firearms Policy Coalition, Inc., file this Petition for Judicial Review of Agency Action and Request for Vacatur of Agency Action, and Complaint for Declaratory and Injunctive Relief, against Defendants Merrick Garland, Attorney General of the United States, in his official capacity; the United States Department

1

of Justice; Steven Dettelbach, Director of the Bureau of Alcohol, Tobacco, Firearms and Explosives, in his official capacity; and the Bureau of Alcohol, Tobacco, Firearms and Explosives, and state the following:

## INTRODUCTION

1.      This lawsuit challenges, *inter alia*, the *Factoring Criteria for Firearms with Attached Stabilizing Braces* ("Final Rule"), 88 Fed. Reg. 6,478 (Jan. 31, 2023),[1] promulgated by the Department of Justice ("DOJ") and the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF," collectively "Agencies") to regulate "braced pistols" as "short-barreled rifles." In so doing, for the reasons set forth herein, the Agencies violate the Administrative Procedure Act ("APA"), 5 U.S.C. § 701, *et seq.*, and the United States Constitution.

2.      Even if the Final Rule does not violate the APA and is allowed to stand, the Agencies' National Firearms Act ("NFA"), 26 U.S.C. § 5801, *et seq.*, laws, regulations, policies, and enforcement practices with respect to "braced pistols" that the Agencies' have classified as "short-barreled rifles" violate the Second Amendment. Plaintiffs thus further seek declaratory and injunctive relief to secure their constitutionally protected right to keep and bear arms in the absence of vacatur of the Final Rule.

---

[1]      The Final Rule is available at: https://www.federalregister.gov/d/2023-01001.

## PARTIES

3.    Plaintiff William T. Mock is a United States citizen who lives in Weatherford, Texas within Parker County. He lawfully owns at least one braced pistol that will be subject to heightened legal requirements as a short-barreled rifle under the Agencies' Final Rule. Mr. Mock also has plans to purchase at least one more braced pistol within the next three to four months to use for lawful purposes including self-defense and target shooting, but for the additional requirements imposed by the Final Rule, including the heightened requirements under the NFA. Should the Final Rule stand, Mr. Mock would comply with its terms and register his firearm as a short-barreled rifle, but for the fact that the NFA process and requirements violate Mr. Mock's Second Amendment protected right to keep and bear arms by subjecting Mr. Mock to the NFA's application burdens, delays, and severe restrictions on the lawful possession and use of the firearm that Mr. Mock has already passed a background check pursuant to federal law to possess, absent any historical analogue. Mr. Mock is a member of Plaintiff FPC.

4.    Plaintiff Christopher Lewis is a United States citizen who lives in Aledo, Texas, within Parker County. Mr. Lewis lawfully owns at least one braced pistol that he purchased from an FFL in accordance with federal law that will newly be treated as a short-barreled rifle under the Agencies' Final Rule. Mr. Lewis has plans to purchase at least one more braced pistol within the next three to four months

to use for lawful purposes including self-defense and target shooting, but for the additional requirements imposed by the Final Rule, including the heightened requirements under the NFA. Should the Final Rule stand, Mr. Lewis would comply with its terms and register his firearm as a short-barreled rifle, but for the fact that the NFA process and requirements violate Mr. Lewis's Second Amendment protected right to keep and bear arms by subjecting Mr. Lewis to the NFA's application burdens, delays, and severe restrictions on the lawful possession and use of the firearm that Mr. Lewis has already passed a background check pursuant to federal law to possess, absent any historical analogue. Mr. Lewis is a member of Plaintiff FPC.

5.     Plaintiff Maxim Defense Industries, LLC ("Maxim Defense") is a firearms and firearms accessories manufacturer and retailer in good standing, registered in Florida, and based in St. Cloud, Minnesota. Maxim Defense has had sales within this district. Maxim Defense specializes in the manufacture and sale of stabilizing braces as well as braced pistols. Stabilizing braces comprised about 59% of Maxim Defense's annual non-firearm sales in 2022, while braced pistols comprised about 74% of its annual firearm sales in 2022. Maxim Defense has established a reputation and customer base for its stabilizing braces and its braced pistols (not for stocks nor short-barreled rifles). The Final Rule's new requirements, and its effective destruction of the stabilizing brace and braced pistol market, will

negatively impact Maxim Defense and may even put Maxim Defense out of business. At minimum, these new requirements will cost Maxim Defense a significant amount of monetary expenditures, including changes in business model, changes in product offerings, changes in and loss of staff, product loss, increased compliance costs, and a loss of customers. The Final Rule specifies that "[a]pproximately 4 manufacturers of 'stabilizing braces' will be significantly affected by more than 10 percent of their revenue," which includes Maxim Defense. Final Rule at 6,572. Further, the Final Rule notes that "Type 7 FFLs may also experience a range of costs from $738 to $13,344, to an unknown loss of revenue due to the inability to sell 'stabilizing braces[,]'" which again includes Maxim Defense, but is also dramatically lower than the actual costs and losses Maxim Defense will suffer as a result of the Final Rule. *Id*. Maxim Defense brings this action on behalf of itself and its customers. Maxim Defense is a member of Plaintiff FPC.

6.      Plaintiff Firearms Policy Coalition, Inc. ("FPC"), is a nonprofit organization incorporated under the laws of Delaware with its principal place of business in Clark County, Nevada, and members across the country. FPC's purposes include defending and promoting the People's rights—especially but not limited to First and Second Amendment protected rights—and advancing individual liberty and restoring freedom. FPC serves its members and the public through legislative advocacy, grassroots advocacy, litigation and legal efforts, research, education,

outreach, and other programs. FPC represents its members and supporters—who include gun owners, individuals who wish to acquire firearms and ammunition, individuals who wish to manufacture their own personal use firearms, licensed firearm retailers, shooting ranges, trainers and educators, and others—and brings this action on behalf its members and supporters who possess all the indicia of membership. Plaintiffs Mock, Lewis, and Maxim Defense are members of FPC.

7.     Plaintiffs Mock and Lewis (collectively, "Individual Plaintiffs") have standing because they lawfully possess firearms that will likely subject them to potential criminal liability or to costly and burdensome requirements under the Final Rule. *See Va. v. Am. Booksellers Ass'n, Inc.*, 484 U.S. 383, 392 (1988); *Franciscan All., Inc. v. Becerra*, 47 F.4th 368, 377 (5th Cir. 2022).

8.     Similarly, Plaintiff Maxim Defense has standing because the Final Rule will directly and negatively impact its business, which consists of selling stabilizing braces and braced pistols, both of which are newly regulated and/or negatively impacted by the Final Rule. Such economic harms confer standing to challenge the government actions that cause them. *See Tex. Ass'n of Mfrs. v. U.S. Consumer Prod. Safety Comm'n*, 989 F.3d 368, 377 (5th Cir. 2021); *Tex. Ent. Ass'n, Inc. v. Hegar*, 10 F.4th 495, 504 (5th Cir. 2021). Moreover, Plaintiff Maxim Defense has standing to assert the rights of its customers. *See Craig v. Boren*, 429 U.S. 190, 192–97 (1976).

9.     Plaintiff FPC has standing to bring this action because it meets the requirements for organizational standing: "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977). First, as mentioned above, several of FPC's individual members, including Plaintiffs Mock and Lewis, have standing to challenge the Final Rule in their own right because they lawfully possess firearms that will likely subject them to potential criminal liability or to costly and burdensome requirements under the Final Rule. Such threatened consequences under the Final Rule suffice to confer standing on both as individuals. *See Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014). Moreover, FPC's manufacturer and retailer members, including Plaintiff Maxim Defense, are also injured by the Final Rule by being subjected to non-recoverable compliance cost and lost revenue, up to and including loss of the entire business, which suffices to confer standing on them as a business. Second, this action seeks to protect lawful gun owners from unlawful action by the Agencies, including the violation and chilling of FPC's members' constitutionally protected rights, which is germane to FPC's mission of protecting the legal right to armed self-defense. Finally, FPC's claims in this action do not require participation of its individual members, since FPC seeks vacatur

alongside "declaratory and injunctive relief" based on a legal theory that does not depend on "individualized proof." *Hunt*, 432 U.S. at 344; *see also Int'l Union, United Auto., Aerospace & Agr. Implement Workers of Am. V. Brock*, 477 U.S. 274, 287 (1986).

10.     For all Plaintiffs, vacatur of the Final Rule would remedy the harms that flow therefrom. Indeed, in this Circuit, for APA violations that are unlawful, the default—and appropriate—remedy is vacatur. *See Data Mktg. P'ship, LP v. U.S. Dep't of Lab.*, 45 F.4th 846, 859–60 (5th Cir. 2022) ("'The ordinary practice is to vacate unlawful agency action.") (quoting *United Steel v. Mine Safety & Health Admin.*, 925 F.3d 1279, 1287 (D.C. Cir. 2019)). For example, "nearly every logical-outgrowth violation leads to vacatur." Nicholas Bagley, *Remedial Restraint in Administrative Law*, 117 COLUM. L. REV. 253, 275 (2017). Alternatively, if the Final Rule were to stand, declaratory and injunctive relief declaring the "short-barreled rifle" restrictions under the NFA unconstitutional and enjoining the Agencies from enforcing the same would remedy the harms that flow from the Final Rule and the NFA.

11.     Defendant Merrick Garland is the United States Attorney General. As the Attorney General, Defendant Garland leads DOJ. DOJ oversees ATF—the agency charged with enforcing the Gun Control Act ("GCA"), 18 U.S.C. § 921, *et*

*seq.*, the NFA, and other federal firearm laws. Attorney General Garland is sued in his official capacity.

12.    Defendant United States Department of Justice is a federal agency located at 950 Pennsylvania Avenue, NW, Washington, D.C., 20530.

13.    Defendant Steve Dettelbach is the Director of the Bureau of Alcohol, Tobacco, Firearms and Explosives. ATF is charged by Congress with enforcing the GCA, the NFA, and other federal firearms laws. Director Dettelbach is sued in his official capacity.

14.    Defendant the Bureau of Alcohol, Tobacco, Firearms and Explosives is a federal agency located at 99 New York Avenue, NE, Washington, D.C., 20226.

## JURISDICTION AND VENUE

15.    This Court has jurisdiction pursuant to 28 U.S.C. § 1331, because Plaintiffs' claims arise under federal law.

16.    This Court also has jurisdiction pursuant to 5 U.S.C. § 701, *et seq.*, because Plaintiffs' claims arise under the APA.

17.    The APA gives courts jurisdiction to "hold unlawful and set aside" agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" or that is "contrary to constitutional right, power, privilege, or immunity." 5 U.S.C. § 706(2)(A)–(B). Indeed, the APA creates a "basic

presumption of judicial review." *Dep't of Commerce v. New York*, 139 S. Ct. 2551, 2567 (2019).

18. This Court also has jurisdiction to grant preliminary relief pursuant to the APA. 5 U.S.C. § 705 ("[T]he reviewing court . . . may issue all necessary and appropriate process to postpone the effective date of an agency action or to preserve status or rights pending conclusion of the review proceedings.").

19. This Court has jurisdiction to grant the declaratory relief sought, pursuant to 28 U.S.C. § 2201, and additional relief pursuant to 28 U.S.C. § 2202.

20. Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(e)(1)(B) and (C) because Plaintiffs Mock and Lewis reside in this district; because Plaintiff Maxim Defense has had sales in this district; and because Plaintiff FPC has members (including Mock and Lewis) that reside—and whose rights are primarily being curtailed—in this district.

## STATEMENT OF FACTS

### I.   Historical Background

21. When reviewing a regulation of "Arms," whatever the context, it is important to start by recognizing that the "People" have a right to keep and bear arms, and that any regulation burdening that right must be measured against historical practices and understandings. "[I]t has always been widely understood that the Second Amendment . . . codified a *pre-existing* right." *N.Y. State Rifle & Pistol*

*Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111, 2127 (2022) (internal quotation and citation omitted). As relevant to this case, historical practice commonly included the use of pistols with large grips, which had enough surface area they could theoretically be fired from the shoulder, as well as the actual addition of stocks to pistols. For example, even before the Founding, highly angled dragoon pistols included large grips that assisted the shooter with firing by allowing the shooter to stabilize the pistol more effectively.[2] Similarly, when a gunowner wanted additional stability, pre-Founding pistols could be, and sometimes were, equipped with shoulder stocks.[3]

22.    Stabilizing braces are analogous to their Founding Era predecessors in that they allow gunowners to customize pistols to facilitate easier and more accurate one-handed shooting. The Final Rule makes what has been an unregulated historical practice for centuries nearly impossible for those individuals with a stabilizing brace.

23.    That technology and manufacturing have evolved since the Founding does not alter the fundamental constitutional backdrop. "Just as the First Amendment protects modern forms of communications, . . . the Second Amendment extends, prima facie, to all instruments that constitute bearable arms, even those that were not

---

[2]    *A Rare French & Indian War – American Revolutionary War Period British Military Pattern 1738 Heavy Dragoon Flintlock Pistol, Jordan, 1746*, TORTUGA TRADING, https://tortugatrading.com/products/copy-of-a-rare-french-indian-war-american-revolutionary-war-period-british-military-pattern-1738-heavy-dragoon-flintlock-pistol-tower-1738.

[3]    *Lot 3249: Silver Inlaid Kuchenreiter Flintlock Pistol with Stock Flintlock Pistol with Stock*, ROCK ISLAND AUCTION COMPANY, https://www.rockislandauction.com/detail/59/3249/silver-inlaid-kuchenreiter-flintlock-pistol-with-stock.

in existence at the time of the founding." *District of Columbia v. Heller*, 554 U.S. 570, 582 (2008); *see Bruen*, 142 S. Ct. at 2132 ("Thus, even though the Second Amendment's definition of 'Arms' is fixed according to its historical understanding, that general definition covers modern instruments that facilitate armed self-defense.") (citing *Caetano v. Massachusetts*, 577 U.S. 411, 411–12 (2016) (*per curiam*)).

## II.    Legal Background

### A.    National Firearms Act and Gun Control Act

24.    In 1934, Congress enacted the National Firearms Act ("NFA"), 26 U.S.C. § 5801 *et seq.*, and "imposed a tax on the making and transfer of firearms defined by the Act, as well as a special (occupational) tax on persons and entities engaged in the business of importing, manufacturing, and dealing in NFA firearms."[4] "Firearms subject to the 1934 Act included [short barreled] shotguns and rifles . . ., certain firearms described as 'any other weapons,' machine guns, and firearm mufflers and silencers."[5] The NFA specifically exempts "a pistol or a revolver having a rifled bore" from its coverage. 26 U.S.C. § 5845(e).

25.    Individuals seeking to engage in the purchase or manufacture of firearms as defined by the NFA are required to file an application, pay a tax, identify

---

[4]    *National Firearms Act*, ATF, https://www.atf.gov/rules-and-regulations/national-firearms-act (last visited Jan. 30, 2023).
[5]    *Id.*

the firearm, identify themselves by providing, among other things, fingerprints and a photograph, and obtain prior approval from ATF. 26 U.S.C. § 5822.

26.     The NFA imposes severe taxes, burdens, delays, and restrictions upon the acquisition, possession, and lawful use of the arms that fall within its purview. Indeed, those were the very purposes of the NFA; a point the Agencies concede: "As the legislative history of the law discloses, its underlying purpose was to curtail, if not prohibit, transactions in NFA firearms . . . The $200 making and transfer taxes on most NFA firearms were considered quite severe and adequate to carry out Congress' purpose to discourage or eliminate transactions in these firearms."[6]

27.     Congress then passed the GCA in 1968, which "amended the NFA definitions of 'firearm'" in a number of ways.[7]

28.     As Congress defined it in the GCA, and as it has stood since 1968, "[t]he term 'firearm' means (A) any weapon (including a starter gun) which will or is designed to or may readily be converted to expel a projectile by the action of an explosive; (B) the frame or receiver of any such weapon; (C) any firearm muffler or firearm silencer; or (D) any destructive device. Such term does not include an antique firearm." 18 U.S.C. § 921(a)(3).

---

[6]     *National Firearms Act*, ATF, https://www.atf.gov/rules-and-regulations/national-firearms-act (last visited Jan. 30, 2023).

[7]     *Id.*

13

29.     The GCA defines a "rifle" as a "weapon designed or redesigned, made or remade, and intended to be fired from the shoulder and designed or redesigned and made or remade to use the energy of an explosive to fire only a single projectile through a rifled bore for each single pull of the trigger."

30.     The GCA defines "short-barreled rifle" as "a rifle having one or more barrels less than sixteen inches in length and any weapon made from a rifle (whether by alteration, modification, or otherwise) if such weapon, as modified, has an overall length of less than twenty-six inches." 18 U.S.C. § 921(a)(8). The NFA includes a nearly identical provision within its definition of "firearm." 26 U.S.C. §§ 5845(a)(3)–(4).

31.     The GCA defines the term "handgun" as "(A) a firearm which has a short stock and is designed to be held and fired by the use of a single hand; and (B) any combination of parts from which a firearm described in subparagraph (A) can be assembled." 18 U.S.C. § 921(a)(30). The NFA does not have a similar definition, and specifically exempts "a pistol or a revolver having a rifled bore" from its coverage. 26 U.S.C. § 5845(e).

32.     Under federal law, it is "unlawful . . . for any person . . . except a licensed importer, licensed manufacturer, or licensed dealer to engage in the business of importing, manufacturing, or dealing in firearms, or in the course of such

business to ship, transport, or receive any firearm in interstate or foreign commerce[.]" 18 U.S.C. § 922(a)(1)(A).

33.    Violations of the GCA can carry criminal penalties, including fines and up to five years' imprisonment. 18 U.S.C. § 924(a)(1)(D) ("[W]hoever . . . willfully violates any other provision of this chapter, shall be fined under this title, imprisoned not more than five years, or both.").

34.    Violations of the NFA's strict requirements carry even harsher punishments, including fines and imprisonment up to ten years. 26 U.S.C. § 5871 ("Any person who violates or fails to comply with any provision of this chapter shall, upon conviction, be fined not more than $10,000, or be imprisoned not more than ten years, or both."). Further, firearms "involved in any violation" of the NFA "subject to seizure and forfeiture," *Id.* § 5872.

### B.    Congress's Delegation to the ATF

35.    The Attorney General has the authority to *enforce* the GCA and NFA, but lacks the authority to fill gaps or legislate. *See* 26 U.S.C. § 7801(a)(2)(A) ("The administration and enforcement of the following provisions of this title shall be performed by or under the supervision of the Attorney General[.]"); 26 U.S.C. § 7805(a) ("[T]he Secretary shall prescribe all needful rules and regulations for the enforcement of this title[.]").

36.     "The Attorney General has directed the Director of [ATF] to administer, enforce, and exercise the functions and powers of the Attorney General with respect to" both the GCA and NFA. *Gun Owners of Am., Inc. v. Garland*, 19 F.4th 890, 897 (6th Cir. 2021), *cert. denied*, 143 S. Ct. 83 (2022) (White, J., writing in support of affirming) (quoting 28 C.F.R. § 0.130).

### C.     ATF's Prior Classifications

37.     ATF maintains guides and images to convey and illustrate its treatment and classification of certain firearms and non-firearms for purposes of applying the provisions of the NFA and GCA.

38.     ATF has previously given contradictory and arbitrary guidance to questions of whether stabilizing braces transform a pistol into a rifle.

39.     On November 8, 2012, an FFL submitted the first forearm "stabilizing brace" to ATF asking if the addition of the prototype device to a heavy pistol, such as an AR-type pistol, would change that type of pistol's classification under federal firearms laws. The submitter described the "brace" device as designed to assist people with disabilities or limited strength or mobility with firing heavy pistols safely and comfortably, as these weapons can be "difficult to control with the one handed precision stance." Letter for John Spencer, Chief, Firearms Technology Branch, ATF, from Alex Bosco, NST Global (Nov. 8, 2012). The stabilizing brace

was designed to help disabled shooters with firing heavy pistols; it was not designed, made, nor intended to be fired from the shoulder.

40.    ATF's Firearms and Ammunition Technology Division ("FATD") found that attaching the brace would not alter the classification of the pistol or other firearm. Letter from ATF #2013-0172 (Nov. 26, 2012).

41.    That was not the end of ATF's inquiry into classification of stabilizing braces though, and over the next few years, ATF received and answered additional inquiries about a variety of braces. In a March 2014 letter, for example, FATD noted that it classifies firearms based on the "physical design characteristics," and that, while functionality indicates the intended design, it is not the sole criterion for determining the classification of a weapon. Letter from ATF #301737 (Mar. 5, 2014). FATD advised that it does not classify weapons based on how a particular individual uses a weapon and that merely firing an AR-type pistol from the shoulder did not reclassify it as a short-barreled rifle. *Id.* FATD further mentioned that some "brace" designs, such as the Sig Stability Brace, had not been classified as a shoulder stock and that, therefore, using those braces improperly would not constitute a design change or change the classification of the weapon. *Id*.

42.    Then, in an October 2014 letter, ATF momentarily reversed its position, stating that actions such as concealment on the person or the subjective use of a device as a shoulder stock, rather than the objective design criteria, *could* transform

the weapon's classification. Letter from ATF #302492 (Oct. 28, 2014). ATF

confusingly summarized this position in a January 2015 Open Letter, stating:

> ATF hereby confirms that if used as designed—to assist shooters in
> stabilizing a handgun while shooting with a single hand—the device is
> not considered a shoulder stock and therefore may be attached to a
> handgun without making a NFA firearm. However, ATF has received
> numerous inquiries regarding alternate uses for this device, including
> use as a shoulder stock. Because the NFA defines both rifle and shotgun
> to include any "weapon designed or *redesigned*, made or *remade,* and
> *intended to be fired from the shoulder*," any person who *redesigns* a
> stabilizing brace for use as a shoulder stock makes a NFA firearm when
> attached to a pistol with a rifled barrel under 16 inches in length or a
> handgun with a smooth bore under 18 inches in length.

Max M. Kingery, Acting Chief, FATD, *Open Letter on the Redesign of "Stabilizing*

*Braces"*, ATF (Jan. 6, 2015).[8]

43.    Later still, in a March 2017 letter, ATF reiterated that "stabilizing

braces are perfectly legal accessories for large handguns or pistols" but that, "when

employed as a shoulder stock with a firearm with a barrel less than 16 inches in

length, the result would be making an unregistered NFA firearm." Letter from

Marvin G. Richardson, Assistant Director of ATF (Mar. 21, 2017).[9] In that letter,

ATF formally and fully repudiated any interpretation of its prior letters that "h[e]ld

that incidental, sporadic, or situational 'use' of an arm-brace . . . equipped firearm

---

[8]      https://content.govdelivery.com/accounts/USATF/bulletins/ea3937
[9]      https://vpc.org/wp-content/uploads/2019/08/Pistol-brace-ATF-letter-March-21-2017.pdf

from a firing position at or near the shoulder was sufficient to constitute 'redesign.'"
*Id.* at 3.

44.    Based on these public statements and others issued by ATF, millions of law-abiding individuals have purchased stabilizing braces and braced pistols. Hundreds of firearm manufacturers produced pistols with stabilizing braces and several manufacturers of stabilizing braces were founded and exist today to meet the demand. Thousands of retailers have sold stabilizing braces and braced pistols.

45.    On June 16, 2020, seven members of the House of Representatives wrote to DOJ and ATF leaders expressing a "deep[] concern[]" about ATF's "practice of relying on arbitrary, non-public standards to promulgate general firearms policy hidden from public scrutiny and awareness." Letter from Matthew Gaetz, United States Representative, *et al.*, to William Barr, Attorney General, and Regina Lombardo, Acting Director, ATF (June 16, 2020).[10]

46.    In response, on June 10, 2021, the Agencies published in the Federal Register a Notice of Proposed Rulemaking titled, "Factoring Criteria for Firearms with Attached 'Stabilizing Braces,'" proposing changes to the definition of "rifle" in 27 CFR 478.11 and 479.11 to purportedly clarify when attaching a stabilizing brace will result in reclassifying a pistol as a "rifle." *Factoring Criteria for Firearms*

---

[10]    https://gaetz.house.gov/sites/gaetz.house.gov/files/wysiwyg_uploaded/For%20Web%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%20DOJ-ATF%20pistol%20brace%20letter%20final.pdf

*with Attached 'Stabilizing Braces'* ("Proposed Rule"), 86 Fed. Reg. 30,826 (June 10, 2021).

47.     The Proposed Rule included factors on a new, proposed worksheet, "ATF Worksheet 4999," that the Agencies proposed ATF rely on when making firearms classifications. That worksheet proposed assigning points to various criteria as an indicator of whether the "brace" device is suitable for shouldering and whether the firearm overall is designed and intended to be fired from the shoulder, thus purportedly rendering it a "rifle" and not a "pistol" or "handgun."

48.     Though that worksheet was far from perfect, it did provide objective measurement criteria for determining if a particular stabilizing brace has a "shoulder-fired design" that would be subject to the NFA and GCA. *See* Proposed Rule at 30,830–31. Among the considerations included in Worksheet 4999, for example, were whether the stabilizing brace included a secondary grip (indicating two-handed fire), whether the brace weighed more than 120 ounces, and whether the brace had been modified for shouldering or had the cuff of the brace removed. Proposed Rule at 30,834. In each section of the worksheet, if a brace equipped firearm failed to meet the requirements or received too many points, then the inquiry would end. *See* Proposed Rule at 30,830–31.

### D.    Campaign Statements, Announcement, and Rulemaking Process

49.    Before President Biden took office, one of his campaign pillars was an amorphous plan to combat "gun violence."

50.    Once elected, President Biden "urged Congress to swiftly pass gun control laws[.]"[11] When Congress did not act to the Biden Administration's liking, President Biden instead called upon the Agencies to dramatically expand their interpretation of the congressionally defined term "rifle" to accomplish the legislative agenda Congress itself declined to adopt.

51.    The Final Rule, inspired by the Biden Administration's promises, seeks to end run Congress and place restrictions on the ability of peaceable Americans to add minor modifications to their pistols.

### E.    The Final Rule

52.    On January 31, 2023, the Agencies published the Final Rule in the Federal Register. Final Rule at 6,478.

53.    Despite the length of the Final Rule, in effect, it amends two definitions of "rifle" contained in the Code of Federal Regulations—one pursuant to the GCA and one pursuant to the NFA. 27 C.F.R. §§ 478.11, 479.11.

---

[11]    *Biden Considers executive actions on guns, calls on Congress to pass weapons ban*, REUTERS (Mar. 23, 2021), https://www.reuters.com/article/usa-guns-idINKBN2BG0A5.

54.     Prior to the changes implemented by the Final Rule on January 31, 2023, 27 C.F.R. § 478.11 defined "rifle" as a "weapon designed or redesigned, made or remade, and intended to be fired from the shoulder, and designed or redesigned and made or remade to use the energy of an explosive to fire only a single projectile through a rifled bore for each single pull of the trigger." There were no subsections. This definition is identical to the definition of "rifle" established by Congress in the GCA. *See* 18 U.S.C. § 921(a)(7).

55.     Prior to the changes implemented by the Final Rule on January 31, 2023, 27 C.F.R. § 479.11 defined "rifle" as "[a] weapon designed or redesigned, made or remade, and intended to be fired from the shoulder and designed or redesigned and made or remade to use the energy of the explosive in a fixed cartridge to fire only a single projectile through a rifled bore for each single pull of the trigger, and shall include any such weapon which may be readily restored to fire a fixed cartridge." There were no subsections. This definition is identical to the definition of "rifle" established by Congress in the NFA. 26 U.S.C. § 5845(c).

56.     As a result of the Final Rule, both 27 C.F.R. §§ 478.11 and 479.11 add two new subsections to the definition "rifle" as follows:

> (1) For purposes of this definition, the term "designed or redesigned, made or remade, and intended to be fired from the shoulder" shall include a weapon that is equipped with an accessory, component, or other rearward attachment (*e.g.,* a "stabilizing brace") that provides surface area that allows the weapon to be fired from the shoulder,

provided other factors, as described in paragraph (2), indicate that the weapon is designed, made, and intended to be fired from the shoulder.

(2) When a weapon provides surface area that allows the weapon to be fired from the shoulder, the following factors shall also be considered in determining whether the weapon is designed, made, and intended to be fired from the shoulder:

> (i) Whether the weapon has a weight or length consistent with the weight or length of similarly designed rifles;

> (ii) Whether the weapon has a length of pull, measured from the center of the trigger to the center of the shoulder stock or other rearward accessory, component or attachment (including an adjustable or telescoping attachment with the ability to lock into various positions along a buffer tube, receiver extension, or other attachment method), that is consistent with similarly designed rifles;

> (iii) Whether the weapon is equipped with sights or a scope with eye relief that require the weapon to be fired from the shoulder in order to be used as designed;

> (iv) Whether the surface area that allows the weapon to be fired from the shoulder is created by a buffer tube, receiver extension, or any other accessory, component, or other rearward attachment that is necessary for the cycle of operations;

> (v) The manufacturer's direct and indirect marketing and promotional materials indicating the intended use of the weapon; and

> (vi) Information demonstrating the likely use of the weapon in the general community.

Final Rule at 6,574–75.

57.    The congressionally established definitions of "rifle" in the GCA and

NFA remain unchanged. *See* 18 U.S.C. § 921(a)(7); 26 U.S.C. § 5845(c).

58.     The Final Rule went into effect immediately upon publication. Final Rule at 6,480 ("This revised definition . . . is immediately effective.") (citation omitted).

59.     The Agencies, "in exercising [their] enforcement discretion, . . . provide[] affected persons options that they can choose from by May 31, 2023 to comply" with the Final Rule. *Id.* These options include: (1) registration of the firearm as an NFA item, (2) "modifying affected weapons to remove them from the definition of a short-barreled rifle," (3) "destroying the firearm," or (4) "surrendering the firearm to law enforcement." *Id.* at 6,481. If an individual does not comply, they would be in violation of the NFA and subject to felony charges that bear fines, up to 10 years' imprisonment, and forfeiture of the firearm.

60.     These "affected persons" include Plaintiffs Mock and Lewis, as well as many of Plaintiff Maxim Defense's customers and Plaintiff FPC's other individual members.

61.     The Final Rule does not provide any grace period for individuals seeking to purchase pistols with stabilizing braces attached if they meet the Agencies' new definition of "rifle" and have a barrel of less than 16-inches in length, absent complying with the NFA-mandated process. Final Rule at 6,481 ("Notwithstanding the 120-day compliance period, discussed above, the rule is immediately effective in that the Department may seek to enforce the NFA's

requirements with respect to any new making or new transfer of a weapon with an attached 'stabilizing brace' that constitutes a short-barreled rifle under the NFA.").

62.     The Final Rule does not provide any grace period for manufacturers or producers, which are now prohibited from transferring or manufacturing pistols with stabilizing braces attached if they meet the Agencies' new definition of "rifle" and have a barrel of less than 16-inches in length, absent complying with the NFA-mandated process. *Id.*

63.     The affected manufacturers and producers include Plaintiff Maxim Defense and many of Plaintiff FPC's other manufacturer and producer members.

### FACTS COMMON TO ALL CLAIMS

64.     The Executive Branch is not Congress. Congress maintains "All legislative Powers," U.S. CONST. ART. I, § 1, and the president and his subordinate agencies may neither enact nor legislatively "interpret" statutes to advance desired outcomes not provided for in a law as passed by Congress.

65.     Despite this fundamental tenet of the separation of powers, President Biden has both expressed and advanced his plan to expand federal firearm regulations regardless of whether Congress concurs, in direct contravention of the constitutional limits on his Executive authority.[12]

---

[12]     THE WHITE HOUSE, https://www.whitehouse.gov/briefing-room/speeches-remarks/2021/04/08/remarks-by-president-biden-on-gun-violence-prevention/ (last visited Jan.

66.     The Final Rule not only greatly departs from the Proposed Rule, but misconstrues the NFA and GCA; ignores the congressional purpose conveyed by the text of the NFA and GCA; and defies long-standing agency application of those statutes by redefining what constitutes a "short-barreled rifle," which application millions of Americans have relied on in acquiring braced pistols.

67.     The Final Rule unlawfully abandons the centerpiece of the Proposed Rule: a worksheet setting forth objective criteria for identifying "rifles," "short-barreled rifles," and "firearms" for purposes of various federal laws. Instead, the Final Rule adopts a six-factor "balancing" test that relies on far more subjective considerations in defining these terms. Nothing in the Agencies' notice of proposed rulemaking telegraphed that such a change was being contemplated, and thus the public was not given adequate opportunity to comment on the criteria that the Agencies ultimately adopted. This discrepancy alone warrants vacatur of the Final Rule.

68.     Beyond the bait-and-switch, the Final Rule violates the APA, the statutory authority granted to the Agencies by Congress, and the United States Constitution in many other ways.

---

30, 2023) ("I asked the Attorney General and his team to identify for me immediate, concrete actions I could [] take now without having to go through the Congress.").

69.     The Agencies claim that by providing surface area which *can* be used to facilitate shoulder firing, the stabilizing brace transforms the pistol or handgun into a rifle. And yet, Congress is presumed to include and exclude language knowingly and intentionally, and merely making it more possible to fire from the shoulder does not negate the fact that the weapon is still both *designed* to be fired with one hand and conveniently *capable* of being fired with one hand, nor does it change the fact that it is a "pistol or revolver" and thus exempt from regulation under the NFA.

70.     That is how such language would have more naturally been understood by legislators and the public when it was adopted. And in the context of a statute imposing criminal liability, fundamental principles of statutory interpretation and the equally fundamental due process and separation of powers concerns driving the rule of lenity forbid the Agencies' efforts to broaden the reach of the definition of "firearm" or "rifle" while ignoring the definition of "handgun" and the common meaning of "pistol or revolver."

71.     The Final Rule defies the plain language of the GCA and NFA and longstanding agency application and enforcement, all of which support the fact that a stabilizing brace does not transform a pistol into a rifle. Agency application and enforcement that millions of peaceable individuals and business have relied on in structuring and conducting their personal and business practices.

72.     In the process, the Final Rule announces new criteria for what constitutes a "rifle" and a "short-barreled rifle" under the Gun Control Act ("GCA"), *see* 18 U.S.C. § 921(a)(7), (8), and a "firearm" under the National Firearms Act ("NFA"), *see* 26 U.S.C. § 5845(a)(3)–(4); 18 U.S.C. § 921(a)(8). These redefinitions of statutory terms have tangible consequences.

73.     The GCA makes it unlawful for any person—other than a licensed importer, licensed manufacturer, licensed dealer, or licensed collector—to transport in interstate or foreign commerce any "short-barreled rifle" except as authorized by the Attorney General; and further makes it unlawful for any federal firearms licensee to sell or deliver a "short-barreled rifle" to any person except as authorized by the Attorney General. 18 U.S.C. § 922 (a)(4), (b)(4).

74.     Firearms falling under the purview of the NFA, including a "short-barreled rifle," must be registered in the National Firearms Registration and Transfer Record to a person entitled to possess the firearm, 26 U.S.C. § 5841; require approval by the Attorney General before their transfer or making, 26 U.S.C. §§ 5812, 5822; and are subject to transfer and making taxes, 26 U.S.C. §§ 5811, 5821. Additionally, any person engaged in the business of importing, manufacturing, or dealing NFA firearms must register with the Attorney General and pay a special occupational tax. 26 U.S.C. §§ 5801, 5802.

75.     If the NFA applies to a particular firearm, that firearm is heavily regulated. 26 U.S.C. § 5861 (enumerating what acts are prohibited with respect to an NFA firearm). Anyone who engages in any of the prohibited acts faces a fine and up to ten years in prison. 26 U.S.C. § 5871.

76.     Additionally, the Final Rule is void for vagueness because it assesses, in an undefined multi-factor balancing test, both "objective design features and other factors," the latter of which are frequently subjective. *See, e.g.*, Final Rule at 6,478, 6,479, 6,500. Included in these other factors, confusingly, are actions by third parties, which—of course—may not be knowable or known to the end user. Final Rule at 6,512–13. For example, other factors include the "manufacturer's direct and indirect marketing or promotional materials." Final Rule at 6,552.

77.     The inclusion of marketing and promotional materials not only raises concerns with vagueness and fair warning to any given owner of a stabilizing brace, it also raises First Amendment concerns from imposing liability on the manufacturer and customers based on speech.

78.     The void for vagueness test is particularly stringent where the vagueness can chill the exercise of core constitutionally protected rights, such as those protected by the First and Second Amendments. *Smith v. Goguen*, 415 U.S. 566, 572–73 (1974).

79.    And this Final Rule itself is especially vague given the possibility that gun owners could be found to have "constructive possession" of a short-barreled rifle simply by owning a handgun and anything which could function as a brace and has enough surface area that *could* be pressed against a shoulder. Speculative and hypothetical combinations of a constitutionally protected handgun and an unknown set of other items, along with the other unknowable criteria that cause a gun owner to run afoul of this new reinterpretation of the law, leaves gun owners with no meaningful way to know if, overnight, they have become felons.

80.    Moreover, given the range of objects that could *potentially* qualify as stabilizing braces, this chills possession of handguns in any home with a variety of other objects, thus violating *District of Columbia v. Heller*. *See* 554 U.S. at 576.

81.    Lastly, as the Agencies themselves acknowledge, braced pistols are exceedingly common today, numbering at least 3 million by the Agencies' own estimate (although the actual number is likely higher, which a full review of the record in this case may reveal). Final Rule at 6,560. By prohibiting Plaintiffs from possessing, selling, and purchasing popular braced pistols absent NFA registration, the Final Rule directly infringes Plaintiffs' ability to "keep and bear Arms" within the meaning of the Second Amendment's text. U.S. CONST. AMEND. II. As a result, "[t]o justify its regulation, the government . . . must demonstrate that the regulation is consistent with this Nation's tradition of firearm regulation." *Bruen*, 142 S. Ct. at

2126. The firearms at issue in this case are the sorts of bearable arms in common use for lawful purposes that law-abiding individuals possess at home by the millions. They are, therefore, neither dangerous nor unusual and they cannot be banned nor subjected to heightened regulation, beyond the standard background check, absent some historical analogue, which does not exist here.

82.     The Agencies' Final Rule defies the APA, other federal statutes, and the United States Constitution. Accordingly, the vacatur, declaratory, injunctive, and other relief Plaintiffs request is necessary to prevent the implementation and enforcement of this unconstitutional, illegal regulation that will directly impact the current and longstanding personal and business practices of Plaintiffs, including Plaintiff FPC's individual and business members, and many other similarly situated individuals and businesses.

## CLAIMS FOR RELIEF

### COUNT I
### VIOLATION OF THE APA
### 5 U.S.C. § 706
(Regulation Exceeding the Agencies' Statutory Jurisdiction and Authority)

83.     Plaintiffs incorporate the preceding paragraphs by reference as if fully set forth herein.

84.     Under 5 U.S.C. § 706(2)(c), "[t]he reviewing court shall . . . hold unlawful and set aside agency action, findings, and conclusions found to be . . . in

excess of statutory jurisdiction, authority, or limitations, or short of statutory right[.]"

85.    If an agency's regulation is not consistent with a statutory definition established by Congress, the agency has gone outside the bounds of its authority since it derives its authority from Congress. *See Peyton v. Reynolds Assocs.*, 955 F.2d 247, 251 (4th Cir. 1992) ("If a regulation reflects an administrative interpretation which is inconsistent with the plain language of the statute under which it is promulgated, we do not defer to the agency's interpretation.").

86.    "An administrative agency's authority is necessarily derived from the statute it administers and may not be exercised in a manner that is inconsistent with the administrative structure that Congress has enacted." *United States v. Transocean Deepwater Drilling, Inc*., 767 F.3d 485, 489 (5th Cir. 2014); *see West Virginia v. EPA*, 142 S. Ct. 2587, 2609 (2022) ("Agencies have only those powers given to them by Congress, and enabling legislation is generally not an open book to which the agency may add pages and change the plot line.").

87.    The "traditional tools of construction," include "text, structure, history, and purpose." *Kisor v. Wilkie*, 139 S. Ct. 2400, 2415 (2019); *see United States v. Bittner*, 19 F.4th 734, 749 (5th Cir. 2021) (the Fifth Circuit considers "[t]he text, structure, history, and purpose of the relevant statutory and regulatory provisions" in its layered approach to statutory interpretation); *J&J Sports Prods., Inc. v.*

*Mandell Family Ventures, LLC*, 751 F.3d 346, 352 (5th Cir. 2015) (considering "the plain meaning of [the statute] and the statutory framework" in its statutory interpretation analysis).

88.     "When interpreting a statute, we begin with the text." *Bittner*, 19 F.4th at 743.

89.     "[I]n interpreting a statute a court should always turn first to one, cardinal canon before all others. We have stated time and again that courts must presume that a legislature says in a statute what it means and means in a statute what it says there." *Conn. Nat'l Bank v. Germain*, 503 U.S. 249, 253–54 (1992).

90.     The traditional tools do not include *Chevron* deference here, because the statute is unambiguous, and even if it were, the Fifth Circuit does not apply *Chevron* deference to interpretations of statutes carrying criminal penalties. *Cargill v. Garland*, No. 20-51016, 2023 WL 119435, at *14 (5th Cir. Jan. 6, 2023) (*en banc*).

91.     The GCA defines a "rifle" as a "weapon designed or redesigned, made or remade, and intended to be fired from the shoulder and designed or redesigned and made or remade to use the energy of an explosive to fire only a single projectile through a rifled bore for each single pull of the trigger."

92.     The GCA defines "short-barreled rifle" as "a rifle having one or more barrels less than sixteen inches in length and any weapon made from a rifle (whether by alteration, modification, or otherwise) if such weapon, as modified, has an overall

length of less than twenty-six inches." 18 U.S.C. § 921(a)(8). The NFA includes a nearly identical provision in its definition of "firearm." 26 U.S.C. §§ 5845(a)(3)–(4).

93.     And the GCA defines the term "handgun" as "(A) a firearm which has a short stock and is designed to be held and fired by the use of a single hand; and (B) any combination of parts from which a firearm described in subparagraph (A) can be assembled." 18 U.S.C. § 921(a)(30). The NFA does not have a similar definition, and specifically exempts "a pistol or a revolver having a rifled bore" from its coverage. 26 U.S.C. § 5845(e).

94.     Under traditional canons of construction, a "pistol or revolver" thus cannot be a "rifle."

95.     Congress granted the Agencies the limited authority to regulate short-barreled rifles more stringently that pistols under the NFA. SBRs, as a specific, congressionally defined category of firearms, are presently subject to the enhanced requirements of the NFA; pistols, including those with stabilizing braces, are not.

96.     But the Final Rule "amends the definition of 'rifle' under 27 CFR 478.11 and 479.11" to include "a weapon that is equipped with an accessory, component, or other rearward attachment . . . that allows the weapon to be fired from the shoulder, provided other factors, as listed in the amended regulations . . . , indicate that the weapon is designed, made, and intended to be fired from the shoulder." Final Rule at 6,480. Among these six factors are such subjective

criteria as "whether the weapon has a weight or length consistent with the weight or length of similarly designed rifles," "whether the weapon has a length of pull . . . that is consistent with similarly designed rifles," "the manufacturer's direct and indirect marketing and promotional materials indicating the intended use of the weapon," and "information demonstrating the likely use of the weapon in the general community." Final Rule at 6,574–75.

97.    None of this can overcome the plain meaning of the text of the law, which clearly differentiates "pistols or revolvers" from "rifles."

98.    Here, the Agencies exceed their authority by regulatorily treating pistols as if they were rifles, despite the fact that braced pistols do not meet the statutory definition of "rifle" established by Congress.

99.    The Final Rule purports to establish a regulation to "guide" the Agencies' administration of the NFA and GCA, but instead regulates new items Congress explicitly left out of any reasonable definition of "rifle" and would grant the Agencies new, additional authority in excess of that proposed, considered, debated, or passed by Congress.

100.   The Agencies are attempting to regulate weapon parts Congress explicitly left out of the statute and impose felony charges for violations thereof. *See* 26 U.S.C. § 5871 ("Any person who violates or fails to comply with any provision of this chapter shall, upon conviction, be fined not more than $10,000, or be

imprisoned not more than ten years, or both."). Further, firearms "involved in any violation" of the NFA "subject to seizure and forfeiture." *Id.* § 5872.

101.   The Final Rule thus exceeds the Agencies' congressionally mandated jurisdiction and authority.

## COUNT II
## VIOLATION OF THE APA
## 5 U.S.C. § 706
(Failure to Observe Legally Required Procedures)

102.   Plaintiffs incorporate the preceding paragraphs by reference as if fully set forth herein.

103.   Under 5 U.S.C. § 706(2)(D), "[t]he reviewing court shall . . . hold unlawful and set aside any action, findings, and conclusions found to be . . . without observance of procedure required by law[.]"

104.   The APA's rulemaking requirements include a mandate for federal agencies to provide the public with a meaningful opportunity to comment on the elements of a rule and the materials that form the basis for the rule. *See*, *e.g.*, 5 U.S.C. § 553(c); *Idaho Farm Bureau Fed'n v. Babbitt*, 58 F.3d 1392, 1404 (9th Cir. 1995) ("The purpose of the notice and comment requirement is to provide for meaningful public participation in the rule-making process.").

105.   The Administrative Procedure Act ("APA") provides that, whenever an agency undertakes to promulgate, amend, or repeal a regulation, it must first issue a "notice of proposed rule making . . . in the Federal Register"—which must include,

among other information, "either the terms or substance of the proposed rule or a description of the subjects and issues involved." 5 U.S.C. § 553(b). A corollary of this requirement is that "the final rule the agency adopts must be a logical outgrowth of the rule proposed. The object, in short, is one of fair notice." *Long Island Care at Home, Ltd. v. Coke*, 551 U.S. 158, 174 (2007) (cleaned up). Even if a "final rule d[oes] not amount to a complete turnaround from the [proposed rule]," the notice of proposed rulemaking is inadequate if it does not "indicate[] that the [agency] was contemplating a particular change" that appears in the final rule. *CSX Transp., Inc. v. Surface Transp. Bd.*, 584 F.3d 1076, 1081–82 (D.C. Cir. 2009); *see also Tex. Ass'n of Mfrs. v. U.S. Consumer Prod. Safety Comm'n*, 989 F.3d 368, 382 (5th Cir. 2021).

106.   Here, the centerpiece of the Agencies' Proposed Rule was Worksheet 4999 ("Worksheet"), which would have allocated points to firearms with certain objective characteristics; a score of at least 4 would have meant that a gun qualified as a "rifle" (and as a "short-barreled rifle" if the attached barrel is also less than 16 inches) under the GCA or NFA. *See* Exhibit 1, reproduced below:

**U.S. DEPARTMENT OF JUSTICE**
BUREAU OF ALCOHOL, TOBACCO, FIREARMS AND EXPLOSIVES

**FACTORING CRITERIA FOR RIFLED BARREL WEAPONS WITH
ACCESSORIES\* commonly referred to as "STABILIZING BRACES"**

**SUMMARY:** This chart lists the factors ATF considers when evaluating a firearm with an accessory (commonly referred to as a "stabilizing braces") for classification under the National Firearms Act (NFA) or the Gun Control Act (GCA).

NOTE:   The Bureau of Alcohol, Tobacco, Firearms and Explosives reserves the right to preclude classification as a pistol with a "stabilizing braces" for any firearm that achieves an apparent qualifying score but is an attempt to make a "short-barreled rifle" and circumvent the GCA or NFA.

\*As used in this worksheet, the term "accessory" is intended as a general term to describe the marketing of items commonly known as "stabilizing braces" and does not affect any ATF determinations whether such items when attached to a handgun are, in fact, "accessories" not necessary for the operation of the handgun, but which enhance its usefulness or effectiveness, or whether they are component parts necessary to properly operate a weapon, such as a rifle.  Furthermore, use of that term does not affect any determinations whether such items are "defense articles" under the Arms Export Control Act. Please direct all inquiries as to possible liability for the firearms and ammunition excise tax, 26 U.S.C. sections 4181-4182 to the United States Department of Treasury, Alcohol and Tobacco Tax and Trade Bureau (TTB).

| Weapon: | | | Explanation: |
|---|---|---|---|
| Manufacturer/Model | | | |
| **SECTION I - PREREQUISITES** | | | [Suitability of "Brace" use] |
| 1. The weapon must weigh at least 64 ounces. | | | \* Weighed with magazine - unloaded / accessories removed |
| 2. The weapon must have an overall length between 12 and 26 inches. | | | \* Length measured with all non-operational accessories removed |
| Weapon must meet both Prerequisites in order to proceed to Section II. | | | |
| INDIVIDUAL CHARACTERISTICS | POINT VALUE | POINT SUB TOTAL | |

| **SECTION II - Accessory Characteristics** | | [Determination of use as a "Brace" vs. Stock] |
|---|---|---|
| **ACCESSORY DESIGN** | | |
| Not based on a known shoulder stock design | 0 | |
| Incorporates shoulder stock design feature(s) | 1 | |
| Based on a known shoulder stock design | 2 | |
| | | |
| **REAR SURFACE AREA** | | |
| Device incorporates features to prevent use as a shouldering device | 0 | |
| Minimized Rear Surface lacking features to discourage shouldering | 1 | |
| Rear Surface useful for shouldering the firearm | 2 | |
| Material added to increase Rear Surface for shouldering | 3 | |
| | | |
| **ADJUSTABILITY** | | |
| Non-adjustable, fixed design | 0 | |
| Adjustable or telescoping attachment designed for shouldering | 2 | |
| | | |
| **STABILIZING SUPPORT** | | |
| Counterbalance Design - Non-Folding | 0 | |
| Counterbalance Design that Folds creating Rear Contact Surface | 1 | |
| OR: | | |
| "Fin- type" design WITH Arm Strap | 0 | |
| "Fin- type" design WITHOUT Arm Strap | 2 | |
| OR: | | |
| "Cuff-type" design that FULLY wraps around arm | 0 | |
| "Cuff-type" design that PARTIALLY wraps around arm | 1 | |
| "Cuff-type" design that FAILS to wrap around arm | 2 | |
| "Split-stock" configuration not designed to wrap around shooter's arm | 3 | |
| **SECTION II SCORE ACHIEVED:** | | SCORE |
| Section II Must Score LESS than 4 in order to proceed to Section III | | |

ATF WORKSHEET 4999 (5330.5) (5-21)

| SECTION III - Configuration of Weapon | | [Determination if weapon is shoulder fired] |
|---|:---:|---|
| **LENGTH OF PULL** - w/Accessory in Rear most "Locked Position" | | * Measured from the center of the trigger to the center of the |
| Less than 10-1/2 Inches | 0 | shoulder device / "stabilizing brace" |
| 10-1/2 but under 11-1/2 Inches | 1 | |
| 11-1/2 but under 12-1/2 Inches | 2 | |
| 12-1/2 but under 13-1/2 Inches | 3 | |
| 13-1/2 Inches and Over | 4 | |
| | | |
| **ATTACHMENT METHOD** | | |
| Standard AR-type Pistol Buffer Tube (6-6-1/2 Inches) | 0 | |
| AR-type Pistol Buffer Tube with Adjustment Notches (KAK-type) | 1 | |
| Adjustable Rifle Buffer Tube | 1 | |
| Adjustable PDW-type guide rails | 1 | |
| Extended AR-type Pistol Buffer Tube | 2 | |
| Inclusion of Folding Adapter extending length of pull | 2 | |
| Use of "Spacers" to extend length of pull | 2 | |
| Modified shoulder stock with rear replaced by "stabilizing brace" | 3 | |
| Attachment method creates an unusable aim-point (slant) | 3 | |
| | | |
| **"STABILIZING BRACE" MODIFICATIONS / CONFIGURATION** | | |
| "Cuff-type" or "fin-type" design with strap too short to function | 2 | |
| "Cuff-type" or "fin-type" design with strap made out of elastic material | 2 | |
| "Fin-type" lacking an arm strap | 2 | |
| "Cuff-type" design with strap **REMOVED** | 4 | |
| "Brace" accessory modified for shouldering | 4 | |
| Modified Shoulder Stock (originally a Shoulder Stock) | 4 | |
| | | |
| **PERIPHERAL ACCESSORIES** | | |
| Presence of a Hand Stop | 2 | |
| Presence of a Secondary Grip (indicating two-handed fire) | 4 | |
| Presence of Rifle-type Back-up / Flip-up Sights / Or no sights | 1 | |
| Presence of Reflex Sight with FTS Magnifier w/ Limited Eye-Relief | 2 | |
| Presence of a Sight/Scope with Eye Relief Incompatible with one-handed fire | 4 | |
| Presence of a bipod / monopod | 2 | |
| Weapon as configured weighing more than 120 ounces | 4 | * Weighed with magazine - unloaded |
| | | |
| **SECTION III SCORE ACHIEVED:**<br>*(A SCORE OF 4 POINTS OR MORE INDICATES A SHOULDER-FIRED DESIGN)* | SCORE | |
| ***CLASSIFICATION:*** | | ***Rifle or "Braced" Handgun***<br>ATF WORKSHEET 4999 (5330.5) (5-21) |

107.   The Proposed Rule explained:

Worksheet 4999 *is necessary to enforce the law consistently*, considering the diversity of firearm designs and configurations. . . . The ATF Worksheet 4999 will provide the public and the firearms industry with a detailed methodology for ensuring legal compliance. By using ATF Worksheet 4999, ATF is ensuring uniform consideration and application of these criteria when evaluating firearm samples with attached 'stabilizing braces.'

Proposed Rule at 30,826–01, 30,829 (emphasis added).

108.   The Final Rule, by contrast, significantly departs from the Proposed Rule. The Final Rule completely scraps "the Worksheet 4999 and its point system." Final Rule at 6,480. Instead, the Final Rule "amends the definition of 'rifle' under 27 CFR 478.11 and 479.11" to include "a weapon that is equipped with an accessory, component, or other rearward attachment . . . that allows the weapon to be fired from the shoulder, provided other factors, as listed in the amended regulations . . ., indicate that the weapon is designed, made, and intended to be fired from the shoulder." Final Rule at 6,480, 6,574–75. Among these six factors are such subjective criteria as "whether the weapon has a weight or length consistent with the weight or length of similarly designed rifles," "whether the weapon has a length of pull . . . that is consistent with similarly designed rifles," "the manufacturer's direct and indirect marketing and promotional materials indicating the intended use of the weapon," and "information demonstrating the likely use of the weapon in the general community." *Id*. Importantly, however, nothing in the Final Rule or the Agencies' accompanying explanation thereof makes clear how these various factors are weighted, weighed, or how many of the six need to be met for a firearm to qualify as a "rifle."

109.   In announcing the Final Rule, the Agencies remarked that, among the comments received on its Proposed Rule, "[t]here was general dissatisfaction with the proposed Worksheet 4999." Final Rule at 6,510. "[N]umerous commenters

critiqued the factoring criteria, claiming they were either arbitrary or too complicated to understand . . . commenters questioned whether the worksheet could provide uniform consideration and application because it contains ambiguous terms that are subject to interpretation and no measurable standards for many of the criteria." Final Rule at 6,513. The Agencies "agree[d] with commenters that the factoring criteria with a point system as proposed in Worksheet 4999 were not easily understood or applied," and "that some of the terms from the . . . worksheet were ambiguous and subject to interpretation." *Id*. The Agencies "concluded the proposed Worksheet 4999 [wa]s unworkable." *Id*. Instead, the Agencies adopted the six-factor test set forth in Final Rule, explaining that "the objective design features adopted in this rule provide a more definitive method to determine when a firearm is designed, made, and intended to be fired from the shoulder." *Id*.

110.   The Agencies' abandonment of Worksheet 4999 in favor of six-factor "balancing" test violates the APA's requirement that notice be given of a proposed regulation's substance so that the public may comment on the proposal. An agency's "notice must adequately frame the subjects for discussion such that the affected party should have anticipated the agency's final course in light of the initial notice." *Huawei Techs. USA, Inc. v. FCC*, 2 F.4th 421, 447 (5th Cir. 2021) (cleaned up). Here, nothing in the Proposed Rule or the Agencies' accompanying explanation thereof "gave [any] indication that [the agency] was contemplating a potential

change" as drastic as scrapping the entire point-based worksheet regime that formed the centerpiece of the Proposed Rule. *See Mid Continent Nail Corp. v. United States*, 846 F.3d 1364, 1376 (Fed. Cir. 2017).

111.   On the contrary, the Proposed Rule explained that "[t]he ATF Worksheet 4999 is *necessary to enforce the law consistently*, considering the diversity of firearm designs and configurations.'" Proposed Rule at 30,826–01, 30,829 (emphasis added). Having read such language in the Agencies' Proposed Rule, commenters could not have reasonably foreseen that the Final Rule would adopt what appears to be a balancing-type test based on six factors that, if anything, are *more* subjective than those of the Worksheet—such as "whether the weapon has a weight or length consistent with the weight or length of similarly designed rifles," "whether the weapon has a length of pull . . . that is consistent with similarly designed rifles," "the manufacturer's direct and indirect marketing and promotional materials indicating the intended use of the weapon," and "information demonstrating the likely use of the weapon in the general community." Final Rule at 6,480, 6,574–75.

112.   Moreover, in the section of the Proposed Rule entitled, "Comments Sought," the Agencies gave no hint that it might abandon Worksheet 4999, or the worksheet approach entirely; indeed, the word "worksheet" did not appear in that section. The closest this section of the Proposed Rule came to addressing the issue

was in asking for comments on whether "ATF [had] selected the most appropriate criteria for determining whether a stabilizing brace has made a firearm subject to the NFA," and whether "commenters ha[d] additional criteria that should be considered." Proposed Rule at 30,826–01, 30,850. These issues are quite different from that of whether the Worksheet system should be scrapped altogether. Realistically, there was "no way that commenters here could have anticipated which particular aspects of [the Agencies'] proposal were open for consideration." *See CSX Transp.*, 584 F.3d at 1082 (cleaned up).

113.   Further reinforcing the point that the Agencies' Proposed Rule differed substantially from its Final Rule, the Agencies more than doubled its estimate of the Rule's economic impact on affected societal groups (namely the manufacturers, dealers, and owners of firearms). The Proposed Rule estimated the cost of the rule over a ten-year period at $114.7 million at a 3% discount rate and $125.7 million at a 7% discount rate, *see* Proposed Rule at 30,826–01, 30,845 Tbl. 2; the explanation of the Final Rule, by contrast, put the corresponding figures at $242.4 million and $263.6 million, respectively, *see* Final Rule at 6,573, Tbl. 2. Such a drastic change in the "estimated financial impact of [an agency's] proposal . . . supports [the] conclusion" that the Final Rule was not a logical outgrowth of the Proposed Rule. *See Allina Health Servs. v. Sebelius*, 746 F.3d 1102, 1108 (D.C. Cir. 2014).

114.   Due to the substantial discrepancy between the Agencies' Proposed Rule and its Final Rule, the public were denied the chance to comment on the substance of the latter. That denial violates the APA and warrants vacatur of the Final Rule. *See CSX Transp.*, 584 F.3d at 1083; *Ass'n of Priv. Sector Colls. & Univs. v. Duncan*, 681 F.3d 427, 462 63 (D.C. Cir. 2012).

**COUNT III**
**VIOLATION OF THE APA**
**5 U.S.C. § 706**
(Arbitrary, Capricious, and Not in Accordance with Law)

115.   Plaintiffs incorporate the preceding paragraphs by reference as if fully set forth herein.

116.   Under 5 U.S.C. § 706(2)(A), "[t]he reviewing court shall . . . hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law[.]" The Final Rule is arbitrary, capricious, and not in accordance with law.

117.   The APA requires federal agencies, including Defendants, to (a) give general notice of proposed rulemaking in the Federal Register and thereafter (b) "give interested persons an opportunity to participate in the rule making through submission of written data, views, or arguments." 5 U.S.C. § 553(c).

118.   An agency action is not reasonable if the agency "entirely failed to consider an important aspect of the problem[.]" *See Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

119.   "An agency must consider and respond to significant comments received during the period for public comment." *Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92, 96 (2015).

120.   "An agency need not respond to every comment, but it must respond in a reasoned manner to the comments received, to explain how the agency resolved any significant problems raised by the comments." *Action on Smoking & Health v. C.A.B.*, 699 F.2d 1209, 1216 (D.C. Cir.), supplemented, 713 F.2d 795 (D.C. Cir. 1983) (internal quotations omitted).

121.   The House and Senate reports with regard to this provision state that "the agency must analyze and consider all relevant matter presented." S. Rep. No. 752, 796 Cong., 1st Sess. 15 (Nov. 19,1945); H. Rep. No. 1980, 79th Cong., 1st Sess. 25 (May 3,1946) "[Public] participation . . . in the rule-making process is essential in order to permit administrative agencies to inform themselves. . . ." Report submitted by Pat McCarran, Chairman, U.S. Senate Committee on the Judiciary, Administrative Procedure Act, Legislative History 1944–46, 79th Cong. (July 26,1946).

122.   "[I]t is 'arbitrary or capricious' for an agency not to take into account all relevant factors in making its determination." *Hanly v. Mitchell*, 460 F.2d 640, 648 (2d Cir. 1972).

123.   Courts have recognized the importance of the public comment process, which is designed to prevent a person from being required to resort to, or be adversely affected by, significant rulemaking without having the opportunity to participate in that rulemaking. *See Shell Offshore Inc. v. Babbitt*, 238 F.3d 622, 630 (5th Cir. 2001); *Ober v. U.S. Environmental Protection Agency*, 84 F.3d 304, 312–15 (9th Cir. 1996); *Idaho Farm Bureau Fed'n*, 58 F.3d at 1401–06; *Wilderness Society v. Rey*, 180 F. Supp. 2d 1141, 1143 (D. Mont. 2002).

124.   In addressing comments to the Proposed Rule, the Agencies did not address the various ways in which the Final Rule will harm disabled individuals seeking to exercise their Second Amendment protected rights. From the beginning, stabilizing braces have been enormously helpful to those with physical disabilities. And while the Final Rule takes pains to explain that it would not violate the Americans with Disabilities Act, because it allegedly does not deny a benefit or access to a program, its focus on the narrow legal issue of the ADA instead of the overall impact on physically disabled individuals gives lip service to the statutory rights of disabled Americans without actually considering how they will be directly impacted by the Rule, including the Final Rule's impact on their Second Amendment protected rights.

125.   Moreover, the Final Rule fails to adequately consider the Supreme Court's opinions in *Heller*, *Caetano,* and *Bruen*. In promulgating a Final Rule that

directly impacts constitutionally protected firearms that are in common use, the Agencies should have engaged in the court-mandated text and history analysis. Instead, the Final Rule merely pays lip service to *Bruen*.

126. Based on information and belief, a full review of the record in this case will evidence that the Agencies failed to adequately consider comments that demonstrate that the Agencies' estimate of affected firearms in circulation is drastically low and thus the Agencies fail to adequately consider the full extent of the Final Rule's effect on the public and the firearms industry writ large.

127. Based on information and belief, a full review of the record in this case will evidence that the Agencies failed to adequately consider comments that demonstrate that the Agencies' estimate of the financial impact on businesses is fatally low, and thus the Agencies fail to adequately consider the full extent of the Final Rule's effect on certain regulated businesses, including but not limited to Plaintiff Maxim Defense and Plaintiff FPC's other manufacturer and retailer members.

**COUNT IV**
**VIOLATION OF THE APA**
**5 U.S.C. § 706**
**VIOLATION OF THE U.S. CONSTITUION**
**U.S. CONST. AMEND. I**
(Abridgment of Free Speech)

128. Plaintiffs incorporate the preceding paragraphs by reference as if fully set forth herein.

47

129.   Under   the   First   Amendment,   "Congress   shall   make   no law . . . abridging the freedom of speech[.]" U.S. CONST. AMEND. I.

130.   The Final Rule chills the exercise of protected speech by threatening to reclassify a "pistol" or "handgun" as a "rifle" if the manufacturer, or another even a third party, speaks or publishes materials in such a manner that violates the newly established factor test. For example, some factors to be evaluated include the "manufacturer's direct and indirect marketing and promotional materials." Final Rule at 6,574–75.

131.   Regulations that chill or compel speech, like prohibitions on speech, "abridge" the freedom protected by the Free Speech Clause. *See R.A.V. v. City of St. Paul*, 505 U.S. 377, 382 (1992) ("The First Amendment generally prevents government from proscribing speech . . . because of disapproval of the ideas expressed.")

132.   And "'the First Amendment goes beyond protection of the press and the self-expression of individuals to prohibit government from limiting the stock of information from which members of the public may draw.'" *Turner v. Driver*, 848 F.3d 678, 688 (5th Cir. 2017) (quoting *First Nat'l Bank of Boston v. Bellotti*, 435 U.S. 765, 783 (1978)); *In re Tam*, 808 F.3d 1321, 1339 (Fed. Cir. 2015), as corrected (Feb. 11, 2016), *aff'd sub nom. Matal v. Tam*, 137 S. Ct. 1744 (2017) (applying strict

scrutiny to a content-based regulation that significantly chills private speech, even though it did not ban speech).

133.   This warrants strict scrutiny, which the regulation cannot pass. "We apply strict scrutiny to facially content-based regulations of speech, in keeping with the rationales just described, when there is any 'realistic possibility that official suppression of ideas is afoot.'" *Reed v. Town of Gilbert*, 576 U.S. 155, 182 (2015) (Kagan, J., concurring) (quoting *Davenport v. Wash. Ed. Ass'n*, 551 U.S. 177, 189 (1995)).

134.   Additionally, the government is prohibited from regulating speech based on the speaker and on the content. *See Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 340 (2010) ("Speech restrictions based on the identity of the speaker are all too often simply a means to control content.").

135.   "Speaker-based laws run the risk that 'the state has left unburdened those speakers whose messages are in accord with its own views.'" *Nat'l Inst. of Family and Life Advocs. v. Becerra*, 138 S. Ct. 2361, 2378 (2018) (quoting *Sorrell v. IMS Health, Inc.*, 564 U.S. 552, 580 (2011)); *Citizens United*, 558 U.S. at 340 ("Prohibited, too, are restrictions distinguishing among different speakers, allowing speech by some but not others.").

136.   And this regulation not only targets certain speakers, but also the content of their speech. "[T]he First Amendment stands against attempts to disfavor

certain subjects or viewpoints." *Citizens United*, 558 U.S. at 340; *Heller v. City of El Paso*, 861 Fed. Appx. 836, 839 (5th Cir. 2021) (quoting *Reed v. Town of Gilbert*, 576 U.S. at 163).

137.   While Agencies may attempt to argue that the Final Rule is not intended to chill speech, that does not save it. "A regulatory scheme that requires the government to 'examine the content of the message that is conveyed' is content-based regardless of its motivating purpose." *Serv. Emps. Int'l Union, Local 5 v. City of Hous.*, 595 F.3d 588, 596 (5th Cir. 2010) (quoting *Ark. Writers' Project, Inc. v. Ragland*, 481 U.S. 221, 230 (1987)).

138.   And it must still pass strict scrutiny. "Content based restrictions on protected First Amendment expression are presumptively unconstitutional and subject to strict scrutiny . . . . 'Government regulation of speech is content based if a law applies to particular speech because of the topic discussed or the idea or message expressed.'" *Tex. Entm't Ass'n, Inc. v. Hegar*, 10 F. 4th 495, 509 (5th Cir. 2021) (quoting *Reed v. Town of Gilbert*, 576 U.S. at 163).

139.   The Final Rule, in so far as it allows the Director to consider "[t]he manufacturer's direct and indirect marketing and promotional materials indicating the intended use of the weapon," chills the speech of a specific type of speakers: manufacturers.

140.   The Final Rule, in so far as it allows the Director to consider "[i]nformation demonstrating the likely use of the weapon in the general community," chills speech based on the content.

141.   The Final Rule implicates both content and speaker-based restrictions and cannot pass the demanding test for strict scrutiny.

**COUNT V**
**VIOLATION OF THE APA**
**5 U.S.C. § 706**
**VIOLATION OF THE U.S. CONSTITUTION**
**U.S. CONST. AMEND. V**
(Void for Vagueness)

142.   Plaintiffs incorporate the preceding paragraphs by reference as if fully set forth herein.

143.   "No person shall . . . be deprived of life, liberty, or property, without due process of law." U.S. CONST. AMEND. V.

144.   Agency regulations bear the "'force and effect of law.'" *Perez*, 575 U.S. at 96 (quoting *Chrysler Corp.*, 441 U.S. at 302–03).

145.   Thus, agency regulations are subject to the same constitutional limits on vagueness as is legislation. *See FCC v. Fox Television Stations, Inc.*, 567 U.S. 239, 253, 254–55 (2012) (indicating that the void for vagueness doctrine applies to agency regulations).

146.   "A law is unconstitutionally vague if people of common intelligence must guess at its meaning and differ as to its application." *Shamloo v. Miss. State Bd. of Trustees of Insts. of Higher Learning*, 620 F.2d 516, 523 (5th Cir. 1980).

147.   The "doctrine prohibiting the enforcement of vague laws rests on the twin constitutional pillars of due process and separation of powers." *United States v. Davis*, 139 S. Ct. 2319, 2325 (2019); *accord Sessions v. Dimaya*, 138 S. Ct. 1204, 1212 (2018).

148.   A law must provide "'fair notice' of the conduct a statute proscribes," in order to "guard[] against arbitrary or discriminatory law enforcement[.]" *Sessions*, 138 S. Ct. at 1212; *see Fox Television Stations, Inc.*, 567 U.S. at 253 (judicial vagueness inquiries ensure that regulated parties know what is required of them and that enforcement of the law will not be arbitrary and discriminatory).

149.   This clarity requirement is even more robust when a law bears criminal consequences. *See Davis*, 139 S. Ct. at 2323 ("Only the people's elected representatives in Congress have the power to write new federal criminal laws.*"); cf. Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 498–99 (1982). ("The [Supreme] Court has also expressed greater tolerance of enactments with civil rather than criminal penalties because the consequences of imprecision are qualitatively less severe.").

150.   Courts also require greater clarity in a law that "threatens to inhibit the exercise of constitutionally protected rights." *Village of Hoffman Estates*, 455 U.S. at 499; *Goguen*, 415 U.S. at 572–73.

151.   The Final Rule uses a vague and undefinable factor-test, incorporating both "objective design features and other factors" which are presumably subjective. Final Rule at 6,480, 6,574–75. And this even includes actions by third parties, not necessarily knowable to the end user, such as the "manufacturer's direct and indirect marketing and promotional materials." *Id*. This is unduly vague for both the manufacturers, who are exercising their First Amendment protected rights, and firearm owners, exercising their Second Amendment protected rights.

152.   The void for vagueness test is particularly stringent where the vagueness can chill exercise of constitutionally protected rights, such as rights protected under the First and Second Amendments.

153.   And this is particularly vague given the possibility of "constructive possession" of a short-barreled rifle by owning a handgun and anything which could function as a brace and has enough surface area that *could* be pressed against a shoulder, combined with other unknowable criteria, that would run afoul of this new re-interpretation of the law.

154.   Indeed, given the range of objects that could qualify, this significantly chills possessions of handguns in any home with a variety of other objects, thus

violating *Heller*, 554 U.S. at 576. And this vagueness is particularly egregious because the NFA and GCA are criminal statutes.

155.   The GCA imposes heavy consequences—up to five years in prison and/or the imposition of criminal fines—for willful violations. 18 U.S.C. § 924(a)(1)(D). And the NFA provides for significant fines and up to 10 years in prison. 26 U.S.C. § 5871.

156.   Both the NFA and GCA concern constitutionally protected Arms, and impact individual's exercise of their constitutionally protected right to keep and bear arms.

157.   The law is thus unduly vague and would violate the void for vagueness doctrine even in a normal case. But it is particularly troublesome here, because it imposes criminal penalties and chills exercise of constitutionally protected rights. Because it is unconstitutional, it also violates the APA. *See* 5 U.S.C. § 706(2)(B).

**COUNT VI**
**VIOLATION OF THE APA**
**5 U.S.C. § 706**
**VIOLATION OF THE U.S. CONSTITUTION**
**U.S. CONST. ART. I**
(Separation of Powers & The Delegation Doctrine)

158.   Plaintiffs incorporate the preceding paragraphs by reference as if fully set forth herein.

159.   Article I, Section 1 of the U.S. Constitution provides: "All legislative Powers herein granted shall be vested in a Congress of the United States."

160.   Article I, Section 3 of the U.S. Constitution directs that the president "shall take Care that the Laws be faithfully executed[.]"

161.   A "fundamental precept" of "another strand of [] separation-of-powers jurisprudence, the delegation doctrine," "is that the lawmaking function belongs to Congress, U.S. CONST. ART. I, § 1, and may not be conveyed to another branch or entity." *Loving v. United States*, 517 U.S. 748, 758 (1996).

162.   "Even before the birth of this country, separation of powers was known to be a defense against tyranny," and "it remains a basic principle of our constitutional scheme that one branch of the Government may not intrude upon the central prerogatives of another." *Id.* at 756–57.

163.   "'The fundamental precept of the delegation doctrine is that the lawmaking function belongs to Congress[.]'" *Brackeen v. Haaland*, 994 F.3d 249, 420 (5th Cir. 2021) (quoting *Loving*, 517 U.S. at 758).

164.   As the Fifth Circuit has noted, "the Constitution's first substantive word" places all lawmaking power in Congress and therefore "Congress's statutes define the scope of agencies' power." *Forrest Gen Hosp. v. Azar*, 926 F.3d 221, 228 (5th Cir. 2019).

165.   Government actions, including agency rules, "are 'legislative' if they have 'the purpose and effect of altering the legal rights, duties, and relations of

persons . . . outside the legislative branch.'" *Jarkesy v. SEC*, 34 F.4th 446, 461 (5th Cir. 2022) (quoting *INS v. Chada*, 462 U.S. 919, 952 (1983)).

166.   Congress may not "abdicate or [] transfer to others the essential legislative functions with which it is thus vested." *A.L.A. Schecter Poultry Corp. v. United States*, 295 U.S. 495, 529 (1935).

167.   Neither the president nor his subordinates, therefore, may exercise, Congress' legislative power to declare entirely "what circumstances . . . should be forbidden" by law. *Panama Refining Co. v. Ryan*, 293 U.S. 388, 418–19 (1935).

168.   The Final Rule, by re-writing and significantly expanding the definition of "rifle," exercised legislative powers.

169.   A violation of the Constitution is always a violation of the APA. 5 U.S.C. § 706(2)(B).

170.   Thus, agencies violate the APA by exercising legislative powers.

171.   The agency's claim it is acting within delegated authority is false because it is not a reasonable construction of statutory terms.

172.   The Supreme Court has "reaffirm[ed] the core administrative-law principle that an agency may not rewrite clear statutory terms to suit its own sense of how the statute should operate." *Util. Air Reg. Grp. v. EPA*, 573 U.S. 302, 328 (2014).

173.   Agencies, therefore, "cannot manufacture statutory ambiguity with semantics to enlarge their congressionally mandated border." *Tex. Pipeline Ass'n v. FERC*, 661 F.3d 258, 264 (5th Cir. 2011); *id.* ("'Ambiguity is a creature not of definitional possibilities but of statutory context.'") (quoting *Brown v. Gardner*, 513 U.S. 115, 118 (1994)).

174.   Further, an agency cannot create implicit questions "left unresolved" in a statute, "merely because a statute's 'authors did not have the forethought expressly to contradict any creative contortion that may later be constructed to expand or prune its scope.'" *Calix v. Lynch*, 784 F.3d 1000, 1005 (5th Cir. 2015) (quoting *Moore v. Hannon Food Serv. Inc.*, 317 F.3d 489, 497 (5th Cir. 2003)).

175.   Delegation must be express; courts cannot "presume that a power is delegated if Congress does not expressly withhold it, as then agencies would enjoy virtually limitless hegemony, a result plainly out of keeping with Chevron and quite likely with the Constitution as well." *Contender Farms, L.L.P. v U.S. Dep't of Agric.*, 779 F.3d 258, 269 (5th Cir. 2015) (internal citation omitted); *see also Gulf Fishermens Ass'n v. Nat'l Marine Fisheries Serv.*, 968 F.3d 454, 461 (5th Cir. 2020), as revised (Aug. 4, 2020).

176.   Congress cannot delegate authority to an agency absent an "intelligible principle" to guide and limit the delegation. *See Jarkesy*, 34 F.4th at 460–61 (citing *Mistretta v. United States*, 276 U.S. 394, 409 (1989)).

177.   There was no delegation to the Agencies to more broadly define "rifle" to exceed the limits of their congressionally established authority, nor is there any intelligible principle by which such authority could have been delegated.

178.   The Final Rule is therefore unconstitutional under the non-delegation doctrine, and thus was passed in violation of the APA.

179.   Even if there were valid delegation, this may be unconstitutional because the regulation carries criminal penalties. As the Fifth Circuit noted, "the question of Congress's delegating legislative power to the Executive in the context of criminal statutes raises serious constitutional concerns." *Cargill*, No. 20-51016, 2023 WL 119435, at *19 (*en banc*).

180.   The Final Rule is not merely a regulatory change that allows the Agencies to enforce the NFA and GCA. The Final Rule would give the Agencies new power over new items that are not contemplated nor regulated under federal law. This rulemaking constitutes an executive branch agency making new law, bearing potential criminal penalties, in violation of the Delegation Doctrine as established by the structure of the U.S. Constitution and elucidated by the U.S. Supreme Court.

## COUNT VII
## VIOLATION OF THE APA
## 5 U.S.C. § 706
## VIOLATION OF THE U.S. CONSTITUTION
## U.S. CONST. ART. II
(Violation of the Take Care Clause)

181.   Plaintiffs incorporate the preceding paragraphs by reference as if fully set forth herein.

182.   Article I, Section 1 of the U.S. Constitution provides: "All legislative Powers herein granted shall be vested in a Congress of the United States."

183.   Article I, Section 7, Clauses 2 and 3 of the U.S. Constitution require that "Every Bill" shall be passed by both the House of Representatives and the Senate and signed by the President "before it [may] become a Law."

184.   Article II, Section 3 of the U.S. Constitution directs that the President "shall take Care that the Laws be faithfully executed[.]"

185.   A violation of the Constitution is always a violation of the APA. *See* 5 U.S.C. § 706(2)(B).

186.   "In the framework of our Constitution, the President's power to see that the laws are faithfully executed refutes the idea that he is to be a lawmaker." *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 587 (1952).

187.   The Executive Branch cannot create new policies to be enforced with the force of federal law in the guise of enforcing a congressional enactment. *Id.* at 587–88 ("The President's order does not direct that a congressional policy be

executed in a manner prescribed by Congress—it directs that a presidential policy be executed in a manner prescribed by the President."); s*ee Kendall v. U.S. ex rel. Stokes*, 37 U.S. (12 Pet.) 524, 613 (1838) (rejecting the notion that "the obligation imposed on the President to see the laws faithfully executed, implies a power to forbid their execution").

188.   "[W]here Congress pass[es] a law for the guidance and government of the executive, in m[a]tters properly concerning the executive department, it belongs to the President to take care that this law be faithfully executed[.]" *Kendall*, 37 U.S. 524 at (1838).

189.   "The Supreme Court has also invoked the Take Care Clause as the textual source of the President's duty to abide by and enforce the laws enacted by Congress—that is, as the instantiation of the President's duty to respect legislative supremacy and not to act c*ontra legem*." Jack Goldsmith & John F. Manning, *The Protean Take Care Clause*, 164 U. PA. L. REV. 1835, 1848 (2016).

190.   "Separate opinions by members of the *Youngstown* majority expressed a like sentiment about the Take Care Clause—that it obliges the President to respect the means and ends of statutory policy power specified by Congress. In his famous concurrence, Justice Jackson wrote that the clause confers on the President 'a governmental authority that reaches so far as there is law,' thereby

'signify[ing] . . . that ours is a government of laws, not of men, and that we submit ourselves to rulers only if under rules.'" *Id.* at 1849–50.

191.   "To similar effect, Justice Frankfurter quoted Justice Holmes for the proposition that '[t]he duty of the President to see that the laws be executed is a duty that does not go beyond the laws or require him to achieve more than Congress sees fit to leave within his power.' Likewise, in Justice Douglas's words, any authority conferred by the clause 'starts and ends with the laws Congress has enacted.'" *Id.* at 1850.

192.   The Final Rule is not a faithful execution of congressionally enacted law. Instead, it is an executive-created law offered under the guise of enforcing the NFA and GCA. But it is not truly based on a reasonable reading of any ambiguous passage in the text of either law. The Final Rule violates the prohibition on the Executive of making law and violates the President's duty to ensure the laws are faithfully executed. And because the Final Rule violates the Constitution, it was not legitimately passed under the APA.

**COUNT VIII**
**VIOLATION OF THE APA**
**5 U.S.C. § 706**
**VIOLATION OF THE U.S. CONSTITUTION**
**U.S. CONST. AMEND. II**
(Violation of the Right to Keep and Bear Arms—Chilling Effect)

193.   Plaintiffs incorporate the preceding paragraphs by reference as if fully set forth herein.

194.   The Second Amendment to the United States Constitution states: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. CONST. AMEND. II.

195.   A violation of the Constitution is always a violation of the APA. 5 U.S.C. § 706(2)(B).

196.   When reviewing a regulation of "Arms," whatever the context, it is important to start by recognizing that the "People" have a right to keep and bear arms, and that any regulation burdening that right must be measured against historical practices and understandings. "[I]t has always been widely understood that the Second Amendment . . . codified a *pre-existing* right." *Bruen*, 142 S. Ct. at 2127 (internal quotation and citation omitted).

197.   As relevant to this case, historical practice commonly included the use of pistols with large grips, which had enough surface area they could theoretically be fired from the shoulder, as well as the actual addition of stocks to pistols. For example, even before the Founding, highly angled dragoon pistols included large grips that assisted the shooter with firing by allowing the shooter to more effectively stabilize the pistol.[13] Similarly, when a gunowner wanted additional stability, pre-

---

[13]   *A Rare French & Indian War – American Revolutionary War Period British Military Pattern 1738 Heavy Dragoon Flintlock Pistol, Jordan, 1746*, TORTUGA TRADING, https://tortugatrading.com/products/copy-of-a-rare-french-indian-war-american-revolutionary-war-period-british-military-pattern-1738-heavy-dragoon-flintlock-pistol-tower-1738.

Founding pistols could even be equipped with shoulder stocks.[14] The Agencies'
laws, regulations, policies, and enforcement practices challenged herein would make
such historical practice nearly impossible, and certainly a risk with respect to
criminal liability, for those individuals.

198.   That technology and manufacturing have evolved since the Founding
does not alter the fundamental constitutional backdrop. "Just as the First Amendment
protects modern forms of communications, . . . the Second Amendment extends,
prima facie, to all instruments that constitute bearable arms, even those that were not
in existence at the time of the founding." *Heller*, 554 U.S. at 582; *see Bruen*, 142 S.
Ct. at 2132 ("Thus, even though the Second Amendment's definition of 'arms' is
fixed according to its historical understanding, that general definition covers modern
instruments that facilitate armed self-defense.") (citing *Caetano*, 577 U.S. at 411–
12).

199.   The Second Amendment protects the right to possess handguns in the
home. *Heller*, 554 U.S. at 576.

200.   Because the Defendants' Final Rule uses a nebulous multi-factor test,
the Agencies could essentially declare any item that could feasibly be attached to a
pistol a "stabilizing brace," thereby converting the pistol into a rifle under the

---

[14]     *Lot 3249: Silver Inlaid Kuchenreiter Flintlock Pistol with Stock Flintlock Pistol with Stock*,
ROCK ISLAND AUCTION COMPANY, https://www.rockislandauction.com/detail/59/3249/silver-
inlaid-kuchenreiter-flintlock-pistol-with-stock.

Agencies' new definitions. Thus, virtually anyone possessing a handgun and any variety of objects could be charged with constructive possession of an unregistered short-barreled rifle. Constructive possession, without proper NFA registration, bears significant fines and prison time, alongside forfeiture of the firearm. In effect, because the Final Rule operates as a discretionary conversion of some pistols into rifles when possessed with unknown objects, it will chill the exercise of individual's Second Amendment protected right to own and possess a handgun in the home for self-defense, the direct issue in *Heller*.

201.   The "braced pistol" Arms regulated and restricted by the Agencies, like all other non-automatic firearms, fire only one round for each pull of the trigger. They are not machine guns. *Staples*, 511 U.S. at 602 n.1.

202.   The "braced pistol" Arms regulated and restricted by the Agencies are particularly suited for self-defense, especially but not limited to in the home. And their length also allows for safe transportation, including in a hiking pack, an ATV, or a boat, and for use in temporary dwellings, such as a tent or an RV.

203.   The stabilizing brace on a "braced pistol" also allows the accompanying firearm to be better fitted to and handled by an individual shooter, thereby enhancing the ability of an individual to use the firearm safely and effectively.

204.   Pistols, including those with and without a brace device, are common arms "in common use" and cannot be banned or restricted as they are under the Agencies' NFA-based laws, regulations, policies, and their enforcement thereof.

205.   If the Arms subject to the Final Rule are indeed "braced pistols," the Final Rule, alongside Agencies' laws, regulations, policies, and their enforcement thereof, chills and otherwise suppresses and restricts the unalienable and fundamental Second Amendment protected rights of millions of Americans, including Plaintiffs, Plaintiff Maxim's customers, and Plaintiff FPC's members, and thus violates the Second Amendment.

### COUNT IX
### VIOLATION OF THE U.S. CONSTITUTION
### U.S. CONST. AMEND. II
(Violation of the Right to Keep and Bear Arms—The NFA)

206.   Plaintiffs incorporate the preceding paragraphs by reference as if fully set forth herein.

207.   In the alternative, if the Final Rule is allowed to stand, the Agencies' laws, regulations, policies, and their enforcement of the NFA's requirements as to "braced pistols" or "short-barreled rifles"[15] violate the Second Amendment.

---

[15]   Plaintiffs maintain that the firearms at issue under the Final Rule are pistols with stabilizing braces and not short-barreled rifles. If, however, the Final Rule stands, then the Agencies will retroactively and prospectively treat most, if not all, pistols with stabilizing braces as if they are and always were "short-barreled rifles." Thus, for the purposes of this count, Plaintiffs refer to the items at issue as "'braced pistols' or 'short-barreled rifles.'"

208.   The Second Amendment to the United States Constitution states: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. CONST. AMEND. II.

209.   The NFA imposes severe taxes, burdens, delays, and restrictions upon the acquisition, possession, and lawful use of common, constitutionally protected arms. Indeed, those were the very purposes of the NFA; a point ATF concedes: "As the legislative history of the law discloses, its underlying purpose was to curtail, if not prohibit, transactions in NFA firearms . . . The $200 making and transfer taxes on most NFA firearms were considered quite severe and adequate to carry out Congress' purpose to discourage or eliminate transactions in these firearms."[16]

210.   The government "may not impose a charge for the enjoyment of a right granted by the federal constitution." *Murdock v. Pennsylvania*, 319 U.S. 105, 113 (1943). But that is what the Agencies' laws, regulations, policies, and enforcement practices do. The NFA fee operates as a charge for the privilege of exercising a fundamental right. As such, the NFA is unconstitutional for this reason alone.

211.   On information and belief, the Agencies commonly impose delays of many months to over one year with respect to acquiring the government's permission

---

[16]   *National Firearms Act*, ATF, https://www.atf.gov/rules-and-regulations/national-firearms-act (last visited Jan. 30, 2023).

to take possession of constitutionally protected arms in common use for lawful purposes.

212.   Plaintiffs have already been subject to and passed a background check, and they have at all times been and remain law-abiding individuals who have a constitutionally protected, pre-existing right to keep and bear arms for lawful purposes.

213.  By imposing and enforcing the NFA's costs and delays on the acquisition and lawful use of common firearms, the Agencies violate the rights of Individual Plaintiffs, Plaintiff Maxim's customers, and Plaintiff FPC's members.

214.   Moreover, by imposing and enforcing the NFA's restrictions on possession, travel with, and use of regulated arms by law-abiding individuals, the Agencies violate the rights of Individual Plaintiffs, of Plaintiff Maxim's customers, and Plaintiff FPC's members.

215.   When reviewing a regulation of "Arms," whatever the context, it is important to start by recognizing that the "People" have a right to keep and bear arms, and that any regulation burdening that right must be measured against historical practices and understandings. "[I]t has always been widely understood that the Second Amendment . . . codified a *pre-existing* right." *Bruen*, 142 S. Ct. at 2127 (internal quotation and citation omitted).

216.   As relevant to this case, and as previously stated, historical practice commonly included the use of pistols with large grips,[17] and pistols equipped with shoulder stocks[18]—the latter of which would, on information and belief, qualify as a "short-barreled rifle" under the Final Rule. The Agencies' laws, regulations, policies, and enforcement practices challenged herein would thus make that historical practice nearly impossible, and certainly a risk with respect to criminal liability.

217.   That technology and manufacturing have evolved since the Founding does not alter the fundamental constitutional backdrop. "Just as the First Amendment protects modern forms of communications, . . . the Second Amendment extends, prima facie, to all instruments that constitute bearable arms, even those that were not in existence at the time of the founding." *Heller*, 554 U.S. at 582; *see Bruen*, 142 S. Ct. at 2132 ("Thus, even though the Second Amendment's definition of 'arms' is fixed according to its historical understanding, that general definition covers modern instruments that facilitate armed self-defense.") (citing *Caetano*, 577 U.S. at 411–12).

---

[17]    *A Rare French & Indian War – American Revolutionary War Period British Military Pattern 1738 Heavy Dragoon Flintlock Pistol, Jordan, 1746*, TORTUGA TRADING, https://tortugatrading.com/products/copy-of-a-rare-french-indian-war-american-revolutionary-war-period-british-military-pattern-1738-heavy-dragoon-flintlock-pistol-tower-1738.

[18]    *Lot 3249: Silver Inlaid Kuchenreiter Flintlock Pistol with Stock Flintlock Pistol with Stock*, ROCK ISLAND AUCTION COMPANY, https://www.rockislandauction.com/detail/59/3249/silver-inlaid-kuchenreiter-flintlock-pistol-with-stock.

218.   By prohibiting Plaintiffs from possessing, selling, and purchasing popular "braced pistols" or "short-barreled rifles," absent NFA registration, the Final Rule directly infringes Plaintiffs' ability to "keep and bear Arms" within the meaning of the Second Amendment's text. U.S. CONST. AMEND. II. As a result, "[t]o justify its regulation, the government . . . must demonstrate that the regulation is consistent with this Nation's tradition of firearm regulation." *Bruen*, 142 S. Ct. at 2126.

219.   Non-automatic firearms, including but not limited to single-shot, bolt action, lever action, pump action, and semiautomatic firearms, "traditionally have been widely accepted as lawful possessions." *Staples v. United States*, 511 U.S. 600, 612 (1994) (so categorizing an AR-15 semiautomatic rifle).

220.   There is no constitutionally relevant difference between a "braced pistol" or "short-barreled rifle" and a common pistol, shotgun, and rifle. While some exterior physical attributes may differ—the number and/or location of stocks/grips, different barrel lengths, etc.—they are, in all relevant respects, the same.

221.   Indeed, they are all common firearms that insert cartridges into a firing chamber, burn powder to expel projectiles through barrels, and are functionally non-automatic in nature. They are all common firearms that have the same cyclical rate of fire: one round fired per pull of the trigger pull until ammunition is exhausted or the firearm or feeding device malfunctions. They are common due to their

overwhelming popularity among law-abiding gun owners. And they are all common under a jurisdictional analysis.

222.   "Braced pistols" or "short-barreled rifles," like rifles with folding and telescoping stocks, increase the likelihood of successful home defense by permitting safe storage of defense instruments in accessible spaces and making the rifle maneuverable in confined spaces.

223.   Moreover, as of 2012, while "[h]undreds of thousands of Tasers and stun guns ha[d] been sold to private citizens" who "may lawfully possess them in 45 States," *Caetano*, 577 U.S. at 420 (Alito, J., concurring) (quoting *People v. Yanna*, 824 N.W.2d 241, 245 (Mich. Ct. App. 2012)), according to the ATF's own report, "Firearms Commerce in the United States – Annual Statistical Update 2021," there were 532,725 registered short-barreled rifles possessed throughout the fifty United States as of May 2021. *Firearms Commerce in the United States – Annual Statistical Update 2021*, ATF, 15–17 Ex. 8.[19]

224.   On information and belief, due to high consumer demand for short-barreled rifles and more efficient ATF electronic application forms, there are more than 532,725 registered short-barreled rifles possessed for lawful purposes in the United States today.

---

[19]    https://www.atf.gov/firearms/docs/report/2021-firearms-commerce-report.

225.   Additionally, if the Agencies are correct and the braced pistols owned by law-abiding individuals are actually short-barreled rifles, then, based on the Agencies' estimate, there are at least 3 million more short-barreled rifles that are owned by law-abiding individuals for lawful purposes. *See* Final Rule at 6,560.

226.   This Court's task, under Supreme Court precedent, is therefore a simple one: it must merely determine whether these weapons are "dangerous and unusual." "[T]his is a conjunctive test: A weapon may not be banned unless it is *both* dangerous *and* unusual." *Caetano*, 577 U.S. at 417 (Alito, J., concurring). Thus, a firearm that is in common use for lawful purposes, by definition, does not fall within this category and cannot be regulated outside of the historical scope of regulation allowable under the Second Amendment. *Bruen*, 142 S. Ct. at 2143.The Agencies' laws, regulations, and policies, and their enforcement thereof, are individually and collectively a ban and/or restriction on a type of arm and as such, the Court must assess whether it violates the test set forth by the Supreme Court in *Heller*, *Caetano*, and *Bruen*.

227.   The arms regulated and restricted as "braced pistols" or "short-barreled rifles" are not both dangerous *and* unusual.

228.   "Braced pistols" or "short-barreled rifles" are common arms "in common use" and cannot be banned or restricted as they are under the Agencies' NFA-based laws, regulations, and policies, and their enforcement thereof.

229.  Moreover, even Arms that are not "in common use" cannot be banned so long as they are no more dangerous than arms that are in common use.

230.  If the arms subject to the Final Rule are "short-barreled rifles," the Agencies' laws, regulations, policies, and their enforcement thereof, violate the Second Amendment.

231.  The Agencies' "short-barreled rifle" and "braced pistol" laws, regulations, and policies, and their enforcement thereof, have no support in the constitutionally relevant history and tradition of firearm ownership regulations.

232.  By subjecting common firearms and their law-abiding possessors to the extraordinary and burdensome requirements of, and restrictions under, the NFA, the Agencies' laws, regulations, and enforcement practices violate the Second Amendment.

233.  The firearms at issue in this case are the sorts of bearable arms in common use for lawful purposes that law-abiding individuals possess at home by the millions. They are, therefore, neither dangerous nor unusual and they cannot be banned, nor can they be regulated outside of text and history of the Second Amendment.

* * *

234.   Only one of two things can be true. If the firearms at issue in the Final Rule are "pistols" or "handguns," then the Agencies' are acting outside their authority in treating them as "rifles," (Count I) and have violated several provisions of the APA (Counts II–III) and the United States Constitution (Counts IV-VIII) in promulgating the Final Rule. Alternatively, if the firearms at issue in the Final Rule are "short-barreled rifles," then those rifles are commonly possessed by law-abiding individuals for lawful purposes, the Agencies' have admitted they are in common use, and, under the Supreme Court's own analysis, those rifles cannot be regulated outside of the Founding Era's history of acceptable regulation and their modern analogues. As relevant here, the NFA's heightened requirements applying to "short-barreled rifles" have no basis in history and the Agencies' cannot point to an analogous historical regulation to justify their modern law, thus rendering the NFA's regulation of commonly owned "short-barreled rifles" by law-abiding individuals for lawful purposes unconstitutional (Count IX).

## **PRAYER FOR RELIEF**

Plaintiffs request the following relief from this Honorable Court:

1.   Holding unlawful and setting aside the Final Rule;

2.   Vacatur of the Final Rule;

3.   Alternatively, or additionally, postponing the effective date of the Final Rule;

4.   Issuing preliminary and permanent injunctive relief enjoining Defendants from enforcing and/or implementing the Final Rule;

5.   In the alternative, declaring that the Final Rule with respect to "short-barreled rifles" and Defendants' "short-barreled rifle" laws, regulations, and policies, and their enforcement thereof, violate the Second Amendment;

6.   In the alternative, issuing preliminary and permanent injunctive relief enjoining Defendants from enforcing or implementing the National Firearms Act against common rifles with a barrel length of less than 16 inches;

7.   Awarding Plaintiffs the costs of this action and reasonable attorney's fees; and

8.   Awarding Plaintiffs such other legal and equitable relief as is just and appropriate.


Respectfully submitted,

*/s/R. Brent Cooper*
R. Brent Cooper
TX Bar No. 04783250
brent.cooper@cooperscully.com
Benjamin D. Passey
TX Bar No. 24125681
ben.passey@cooperscully.com

COOPER & SCULLY, P.C.
900 Jackson Street, Suite 100
Dallas, Texas 75202
Telephone: (214) 712-9500
Telecopy: (214) 712-9540

Cody J. Wisniewski*
CO Bar No. 50415
cwi@fpchq.org

FIREARMS POLICY COALITION
5550 Painted Mirage Road, Suite 320
Las Vegas, NV 89149
Telephone: (916) 378-5785
Telecopy: (916) 476-2392

* Admitted *pro hac vice*

*Attorneys for Plaintiffs*