**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION**

| | |
|---|---|
| WILLIAM T. MOCK; CHRISTOPHER LEWIS; MAXIM DEFENSE INDUSTRIES, LLC, a limited liability company; and FIREARMS POLICY COALITION, INC., a nonprofit corporation, | |
| *Plaintiffs*, | |
| v. | |
| MERRICK GARLAND, in his official capacity as Attorney General of the United States; the UNITED STATES DEPARTMENT OF JUSTICE; STEVE DETTELBACH, in his official capacity as the Director of the Bureau of Alcohol, Tobacco, Firearms and Explosives; and the BUREAU OF ALCOHOL, TOBACCO, FIREARMS AND EXPLOSIVES, | Civil Action No. 4:23-cv-00095-O |
| *Defendants*. | |

**<u>PLAINTIFFS' BRIEF IN SUPPORT OF THEIR MOTION FOR A PRELIMINARY INJUNCTION OR, IN THE ALTERNATIVE, FOR POSTPONEMENT OF THE EFFECTIVE DATE OF THE FINAL RULE</u>**

**TABLE OF CONTENTS**

Page

TABLE OF CONTENTS..................................................................................................... i

TABLE OF AUTHORITIES ............................................................................................... ii

INTRODUCTION ............................................................................................................... 1

STATEMENT OF FACTS .................................................................................................. 3

I.     THE NATIONAL FIREARMS ACT AND THE GUN CONTROL ACT ...................... 3

II.    THE FINAL RULE REDEFINES VARIOUS HANDGUNS AND BRACED
HANDGUNS AS SHORT-BARRELED RIFLES AND HAS AN UNLAWFUL AND
UNNECESSARILY EXPEDITED EFFECTIVE DATE................................................. 5

     A.     The Biden Administration.................................................................................. 5

     B.     ATF's Previous Classification of Stabilizing Braces........................................ 6

     C.     The Final Rule.................................................................................................... 8

III.    THE ADMINISTRATIVE PROCEDURE ACT.......................................................... 9

STANDARD...................................................................................................................... 10

ARGUMENT ..................................................................................................................... 11

I.     PLAINTIFFS ARE LIKELY TO PREVAIL ON THE MERITS ................................ 11

     A.     The Final Rule Violates the United States Constitution .................................. 11

          1.     The Final Rule Infringes on the Right to Keep and Bear Arms............... 11

          2.     The Final Rule Violates the First Amendment ........................................ 16

          3.     The Final Rule is Void for Vagueness ...................................................... 19

     B.     The Final Rule Violates the Constitution's Structural Protections...................... 22

     C.     The Final Rule Violates Multiple Provisions of the APA .................................. 25

          1.     The Final Rule Exceeds the Agencies' Statutory Jurisdiction and
Authority ................................................................................................... 25

          2.     The Final Rule was not a Logical Outgrowth of the Proposed Rule ........ 29

     D.     Alternatively, if the Final Rule is Upheld, then the Agencies' Regulation of
Commonly owned Braced Pistols or Short-Barreled Rifles under the National
Firearms Act violates the Second Amendment................................................ 33

II.    PLAINTIFFS WILL SUFFER IRREPARABLE INJURY IF preliminary RELIEF IS
NOT GRANTED ......................................................................................................... 36

III.   PLAINTIFFS' INJURY OUTWEIGHS ANY HARM TO DEFENDANTS OR THE
PUBLIC—AND AN INJUNCTION WOULD LIKELY BENEFIT THE PUBLIC ....... 39

IV.   THE COURT SHOULD ENTIRELY ENJOIN ENFORCEMENT OF THE FINAL
RULE OR, IN THE ALTERNATIVE, POSTPONE ITS EFFECTIVE DATE.............. 41

CONCLUSION.................................................................................................................. 45

# TABLE OF AUTHORITIES

**Case**                                                                                          **Page(s)**

*Ala. Ass'n of Realtors v. Dep't of Health & Human Servs.*,
   141 S. Ct. 2485 (2021) .......................................................................... 37

*Allina Health Servs. v. Sebelius*,
   746 F.3d 1102 (D.C. Cir. 2014) ........................................................... 33

*Ark. Writers' Project, Inc. v. Ragland*,
   481 U.S. 221 (1987) ............................................................................. 18

*Ashcroft v. Am. C.L. Union*,
   542 U.S. 656 (2004) ............................................................................. 40

*BST Holdings, LLC v. OSHA*,
   17 F.4th 604 (5th Cir. 2021) ................................................................ 36

*Caetano v. Massachusetts*,
   577 U.S. 411 (2016) ....................................................................... 12, 34

*Califano v. Yamasaki*,
   442 U.S. 682 (1979) ............................................................................. 42

*Calix v. Lynch*,
   784 F.3d 1000 (5th Cir. 2015) ............................................................. 23

*Cargill v. Garland*,
   57 F.4th 447 (5th Cir. 2023) ........................................................... 25, 26

*Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*,
   467 U.S. 837 (1984) ............................................................................. 24

*Chocolate Mfrs. Ass'n of U.S. v. Block*,
   755 F.2d 1098 (4th Cir. 1985) ............................................................. 32

*Citizens United v. Fed. Election Comm'n*,
   558 U.S. 310 (2010) ....................................................................... 18, 19

*City of Dallas, Texas v. Hall*,
   2008 WL 11350041 (N.D. Tex. July 28, 2008) .................................... 41

*City of El Cenizo v. Texas*,
   890 F.3d 164 (5th Cir. 2018) ............................................................... 11

*City of El Paso,*
    861 Fed. Appx. 836 (5th Cir. 2021) ...................................................................... 19

*Colorado v. EPA,*
    989 F.3d 874 (10th Cir. 2021) ............................................................................ 11

*Conn. Nat'l Bank v. Germain,*
    503 U.S. 249 (1992) ........................................................................................... 26

*Contender Farms, L.L.P. v U.S. Dep't of Agric.,*
    779 F.3d 258 (5th Cir. 2015) .............................................................................. 23

*Cook Cnty. v. Wolf,*
    962 F.3d 208 (7th Cir. 2020) .............................................................................. 11

*CSX Transp., Inc. v. Surface Transp. Bd.,*
    584 F.3d 1076 (D.C. Cir. 2009) .......................................................................... 32

*District of Columbia v. Heller,*
    554 U.S. 570 (2008) ....................................................................... 12, 13, 15, 33, 34

*Elrod v. Burns,*
    427 U.S. 347 (1976) ........................................................................................... 36

*Envtl. Integrity Project v. EPA,*
    425 F.3d 992 (D.C. Cir. 2005) ............................................................................ 10

*FCC v. Fox Television Stations, Inc.,*
    567 U.S. 239 (2012) ........................................................................................... 19

*Franciscan All., Inc. v. Burwell,*
    227 F. Supp. 3d 660 (N.D. Tex. 2016) ................................................................ 42

*Friedman v. City of Highland Park,*
    577 U.S. 1039 (2015) ......................................................................................... 12

*Gulf Fishermens Ass'n v. Nat'l Marine Fisheries Serv.,*
    968 F.3d 454 (5th Cir. 2020) .............................................................................. 23

*Gun Owners of Am. v. Garland,*
    19 F.4th 890 (6th Cir. 2021) ................................................................................. 4

*Hirschfeld v. Bureau of Alcohol, Firearms, Tobacco & Explosives,*
    14 F.4th 322 (4th Cir. 2021) ............................................................................... 41

*Huawei Techs. USA, Inc., v. FCC*,
  2 F.4th 421 (5th Cir. 2021) ............................................................................ 29, 31

*In re Tam*,
  808 F.3d 1321 (Fed. Cir. 2015), as corrected (Feb. 11, 2016), aff'd sub nom. *Matal v. Tam*,
  137 S. Ct. 1744 (2017) ................................................................................. 16

*Jacksonville Port Auth. v. Adams*,
  556 F.2d 52 (D.C. Cir. 1997) ........................................................................ 40, 41

*Janvey v. Alguire*,
  647 F.3d 585 (5th Cir. 2011) ........................................................................ 36

*Kisor v. Wilkie*,
  139 S. Ct. 2400 (2019) ................................................................................. 26

*Long Island Care at Home, Ltd. v. Coke*,
  551 U.S. 158 (2007) ..................................................................................... 29

*Loving v. United States*,
  517 U.S. 748 (1996) ..................................................................................... 23

*Luis v. United States*,
  578 U.S. 5 (2016) ......................................................................................... 12

*Moore v. Hannon Food Serv. Inc.*,
  317 F.3d 489 (5th Cir. 2003) ........................................................................ 23

*Murdock v. Pennsylvania*,
  319 U.S. 105 (1943) ..................................................................................... 35

*N. Carolina State Conf. of the NAACP v. Raymond*,
  981 F.3d 295 (4th Cir. 2020) ........................................................................ 39

*N. Mariana Islands v. United States*,
  686 F. Supp. 2d 7 (D.D.C. 2009) .................................................................. 40

*N.Y. State Rifle & Pistol Ass'n, Inc. v. Bruen*,
  142 S. Ct. 2111 (2022) .............................................................. 11, 12, 33, 34, 35

*Nat'l Fed'n of Indep. Bus. v. Perez*,
  2016 WL 3766121 (N.D. Tex. June 27, 2016) .............................................. 42, 43

*Nat'l Inst. of Family and Life Advocs. v. Becerra*,
  138 S. Ct. 2361 (2018) ................................................................................. 18

*Ne. Md. Waste Disposal Auth. v. EPA,*
   358 F.3d 936 (D.C. Cir. 2004) ....................................................... 29, 31

*Nevada v. U.S. Dep't of Labor,*
   218 F. Supp. 3d 520 (E.D. Tex. 2016) ................................................ 42

*Nken v. Holder,*
   556 U.S. 418 (2009) .................................................................. 40

*People v. Yanna,*
   824 N.W.2d 241 (Mich. Ct. App. 2012) ............................................. 34

*Perez v. Mortgage Bankers Ass'n,*
   575 U.S. 92 (2015) ................................................................... 10

*Peyton v. Reynolds Assocs.,*
   955 F.2d 247 (4th Cir. 1992) ........................................................ 25

*Porter v. Califano,*
   592 F.2d 770 (5th Cir. 1979) ........................................................ 10

*R.A.V. v. City of St. Paul,*
   505 U.S. 377 (1992) .................................................................. 16

*Reed v. Town of Gilbert, Ariz.,*
   576 U.S. 155 (2015) .................................................................. 16

*SD Voice v. Noem,*
   987 F.3d 1186 (8th Cir. 2021) ....................................................... 41

*Sector Colls. & Univs. v. Duncan,*
   681 F.3d 427 (D.C. Cir. 2012) ....................................................... 32

*Serv. Emps. Int'l Union, Local 5 v. City of,*
   595 F.3d 588 (5th Cir. 2010) ........................................................ 18

*Sessions v. Dimaya,*
   138 S. Ct. 1204 (2018) ............................................................... 19

*Shamloo v. Miss. State Bd. of Trustees of Insts. of Higher Learning,*
   620 F.2d 516 (5th Cir. 1980) ........................................................ 19

*Siemens USA Holdings Inc v. Geisenberger,*
   17 F.4th 393 (3d Cir. 2021) ......................................................... 36

*Small Refiner Lead v. EPA*,
    705 F.2d 500 (1983) ........................................................................... 32

*Smith v. Goguen*,
    415 U.S. 566 (1974) ........................................................................... 20

*Tex. Entm't Ass'n, Inc. v. Hegar*,
    10 F. 4th 495 (5th Cir. 2021) ............................................................. 16

*Tex. Pipeline Ass'n v. FERC*,
    661 F.3d 258 (5th Cir. 2011) ............................................................. 23

*Texas v. EPA*,
    829 F.3d 405 (5th Cir. 2016) ............................................................. 37

*Texas v. United States*,
    201 F. Supp. 3d 810 (N.D. Tex. 2016) .............................................. 43

*Texas v. United States*,
    809 F.3d 134 (5th Cir. 2015) ............................................................. 43

*Thunder Basin Coal Co. v. Reich*,
    510 U.S. 200 (1992) ........................................................................... 37

*Turner v. Driver*,
    848 F.3d 678 (5th Cir. 2017) ............................................................. 16

*U.S. Bancorp Mortg. Co. v. Bonner Mall P'ship*,
    513 U.S. 18 (1994) ............................................................................. 41

*United States v. Bittner*,
    19 F.4th 734 (5th Cir. 2021) ............................................................. 26

*United States v. Davis*,
    139 S. Ct. 2319 (2019) ................................................................ 19, 20

*United States v. One TRW, Model M14, 7.62 Caliber Rifle*,
    441 F.3d 416 (6th Cir. 2006) ............................................................. 15

*United States v. Transocean Deepwater Drilling, Inc.*,
    767 F.3d 485 (5th Cir. 2014) ............................................................. 25

*Util. Air Reg. Grp. v. EPA*,
    573 U.S. 302 (2014) ........................................................................... 23

*VanDerStok v. Garland*,
    __ F. Supp. 3d __, 2022 WL 4809376 (N.D. Tex. Oct. 1, 2022) ............................................. 36

*Vill. of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*,
    455 U.S. 489 (1982) ................................................................................................................ 20

*Wages and White Lion Invs., LLC v. FDA*,
    16 F.4th 1130 (5th Cir. 2021) ............................................................................................... 37

*West Virginia v. EPA*,
    142 S. Ct. 2587 (2022) ........................................................................................................... 23

*Youngstown Sheet & Tube Co. v. Sawyer*,
    343 U.S. 579 (1952) ............................................................................................................... 22

**<u>Statutes</u>**                                                                                                            **<u>Page(s)</u>**

5 U.S.C. § 551 ...................................................................................................................................... 9

5 U.S.C. § 551(5) ............................................................................................................................... 10

5 U.S.C. § 553(b) ............................................................................................................................... 29

5 U.S.C. § 553(d) ............................................................................................................................... 45

5 U.S.C. § 702 .................................................................................................................................... 10

5 U.S.C. § 705 .................................................................................................................................... 42

5 U.S.C. § 706 .................................................................................................................................... 42

5 U.S.C. § 706(2)(B) ......................................................................................................................... 10

5 U.S.C. § 706(2)(C) .................................................................................................................... 10, 26

5 U.S.C. § 706(2)(D) ......................................................................................................................... 10

18 U.S.C. § 921 .................................................................................................................................... 3

18 U.S.C. § 921(a)(3) ........................................................................................................................... 3

18 U.S.C. § 921(a)(7) ............................................................................................................... 4, 24, 26

18 U.S.C. § 921(a)(8) ............................................................................................................... 4, 24, 26

18 U.S.C. § 921(a)(30) ............................................................................................................... 3, 26

18 U.S.C. § 921(a)(30)(A) ............................................................................... 24

18 U.S.C. § 924(a)(1)(D) .......................................................................... 22, 29

18 U.S.C. § 926(a) .......................................................................................... 4

26 U.S.C. § 5845(c) .................................................................................... 4, 26

26 U.S.C. § 5845(e) .................................................................................... 4, 27

26 U.S.C. § 5871 ........................................................................................... 22

26 U.S.C. § 7801(a)(2)(A) ............................................................................... 4

26 U.S.C. §§ 5845(a)(3)-(4) ....................................................................... 4, 26

U.S. Const. Amend. I .................................................................................... 16

U.S. Const. Amend. II .................................................................................... 11

U.S. Const. Amend. V .................................................................................... 19

U.S. Const. Art. I .......................................................................................... 22

U.S. Const. Art. I, § 1 .................................................................................... 22

U.S. CONST. Art. I, § 3 .................................................................................. 22

U.S. Const. Art. III, § 1 .................................................................................. 43

**Regulations**                                                                 **Page(s)**

*Factoring Criteria for Firearms with Attached 'Stabilizing Braces'*,
   88 Fed. Reg. 6,478 (Jan. 31, 2023) ........................................................ 5

*Factoring Criteria for Firearms with Attached 'Stabilizing Braces'*,
   86 Fed. Reg. 30,826 (June 10, 2021) ...................................................... 8

**Other Authorities**                                                          **Page(s)**

BLACK'S LAW DICTIONARY 560 (Bryan A. Garner ed., 11th ed. 2019) ...................... 27

*Biden Considers executive actions on guns, calls on Congress to pass weapons ban*,
   REUTERS (Mar. 23, 2021), https://www.reuters.com/article/usa-guns-idINKBN2BG0A5 ......... 5

Joseph G.S. Greenlee, *The American Tradition of Self-Made Arms*,
   54 St. Mary's L.J. 35, 16 (Apr. 11, 2022) ............................................... 14

Letter from ATF #2013-0172 (Nov. 26, 2012) .............................................................. 6

Letter from ATF #302492 (Oct. 28, 2014) .................................................................... 7

S. Rep. No. 90-1097 (1968), *as reprinted in* 1968 U.S.C.C.A.N. 2112 ........................................ 3

MERRIAM-WEBSTER.COM DICTIONARY, https://www.merriam-webster.com/dictionary/design
(last visited Feb. 21, 2023) ................................................................................ 27

MERRIAM-WEBSTER.COM DICTIONARY, https://www.merriam-webster.com/dictionary/intended
(last visited Feb. 21, 2023) ................................................................................ 27

Mila Sohoni, *The Power to Vacate a Rule*,
88 Geo. Wash. L. Rev. 1121 (2020) .......................................................................... 42

## INTRODUCTION

Handguns and pistols are commonly owned by law-abiding individuals for lawful purposes and are protected by the Second Amendment. Stabilizing braces, which attach to many handguns and pistols to improve stability and control when firing with one hand, were designed to help gun owners with disabilities and have been adopted by millions of gun owners. Federal law treats handguns and pistols, including those with stabilizing braces, differently from rifles—that is, until recently. On January 31, 2023, the Department of Justice ("DOJ") and the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") (collectively, "Agencies"), published a rule redefining "rifles" and expanding the more regulated category of "short-barreled rifles" in a way that now includes a large, indeterminate class of braced pistols and even many handguns and pistols lacking a brace that could, alone or with a brace, be rested against and fired from the shoulder.

The Agencies' new regulatory definitions go beyond the statutory definitions of "rifle," severely burden the Second Amendment protected rights of law-abiding individuals who desire or need stabilizing braces to assist then in holding and firing handguns, are unconstitutionally vague, and suffer from many other legal infirmities. And the onerous obligations and restrictions imposed by these regulations severely burden the rights of law-abiding firearms manufacturers and retailers who are required to immediately comply with a series of onerous regulations that will impose non-recoverable costs and significant burdens on their businesses.

Because the Agencies have acted beyond their statutory authority, failed to abide by the rulemaking requirements of the Administrative Procedure Act ("APA"), and imposed new regulatory directives that violate the United States Constitution, Plaintiffs William T. Mock; Christopher Lewis; Maxim Defense Industries, LLC ("Maxim Defense"); and Firearms Policy Coalition, Inc. ("FPC") move this Court for a preliminary injunction, asking this Court to enjoin

Defendants from implementing and enforcing the Final Rule in its entirety, or, alternatively, to delay the effective date of the Final Rule under the APA until this case reaches final judgment.

Absent a preliminary injunction, Maxim Defense and FPC's other corporate members will continue to face irreparable injury because the Final Rule requires immediate compliance, preventing those entities from, *inter alia*, continuing to sell braced pistols as pistols, which has been the case for a decade, on pain of criminal liability. Such requirements, and the loss of business that has and will continue to result, not to mention the infringement on the constitutionally protected rights of Maxim Defense and its customers, cannot adequately be compensated after the fact. Similarly, while there is a short grace period for individuals to comply, at the close of that period, Plaintiffs Mock and Lewis, along with FPC's other individual members too will have to destroy, dispose of, modify, or register otherwise lawful and protected firearms and braces, or to satisfy onerous regulatory burdens as to a broad, and indeed indeterminate, category of handguns to the great detriment of their constitutionally protected right to armed self-defense. Moreover, individuals, including Plaintiffs, are already subject to ongoing injuries due to the constitutional violations of the Final Rule.

Given the Final Rule's breadth, the only way to afford Plaintiffs protection to mitigate the harm suffered is to enjoin the Agencies' enforcement of the Final Rule. Because the items at issue must be sold, purchased, and transferred through the existing federal background check system for firearms, the only way to ensure Plaintiffs are not further damaged by the Final Rule is to offer protection to every party in the chain from the manufacturer to the end purchaser. An injunction of this nature would maintain the status quo that has been in place for a decade and imposes no harm on the Agencies.

## STATEMENT OF FACTS

I.   **THE NATIONAL FIREARMS ACT AND THE GUN CONTROL ACT**

Congress enacted the National Firearms Act ("NFA") of 1934 "[t]o provide for the taxation of manufacturers, importers, and dealers in certain firearms and machine guns, to tax the sale or other disposal of such weapons, and to restrict importation and regulate transportation thereof." Ch. 757, 48 Stat. 1236 (1934). "Firearms subject to the 1934 Act included [short barreled] shotguns and rifles . . . , certain firearms described as 'any other weapons,' machine guns, and firearm mufflers and silencers."[1]

Congress then enacted the Gun Control Act ("GCA") in 1968, which amended the NFA and established a four-part definition of what constitutes a "firearm." *See* 18 U.S.C. § 921, *et seq.* "The term 'firearm' means (A) any weapon (including a starter gun) which will or is designed to or may readily be converted to expel a projectile by the action of an explosive; (B) the frame or receiver of any such weapon; (C) any firearm muffler or firearm silencer; or (D) any destructive device. Such term does not include an antique firearm." 18 U.S.C. § 921(a)(3).

The GCA defines "handgun" as "(A) a firearm which has a short stock and is designed to be held and fired by the use of a single hand; and (B) any combination of parts from which a firearm described in subparagraph (A) can be assembled." 18 U.S.C. § 921(a)(30). The GCA definition superseded the previous federal definition where "any part or parts of such a weapon [were] included. It [was] [] found that it [was] impractical to have controls over each small part of a firearm. Thus, the revised definition substitute[d] only the major parts of the firearm (that is, frame or receiver) for the words 'any part or parts.'" S. Rep. No. 90-1097 (1968), *as reprinted in*

---

[1]      *National Firearms Act*, ATF, https://www.atf.gov/rules-and-regulations/national-firearms-act (last visited Feb. 21, 2023).

1968 U.S.C.C.A.N. 2112, 2200. The NFA does not have a similar definition, and specifically exempts "a pistol or a revolver having a rifled bore" from its coverage. 26 U.S.C. § 5845(e).

As for rifles, the NFA defines a "rifle" as "[a] weapon designed or redesigned, made or remade, and intended to be fired from the shoulder and designed or redesigned and made or remade to use the energy of the explosive in a fixed cartridge to fire only a single projectile through a rifled bore for each single pull of the trigger, and shall include any such weapon which may be readily restored to fire a fixed cartridge." 26 U.S.C. § 5845(c). Likewise, the GCA defines a "rifle" as a "weapon designed or redesigned, made or remade, and intended to be fired from the shoulder and designed or redesigned and made or remade to use the energy of an explosive to fire only a single projectile through a rifled bore for each single pull of the trigger." 18 U.S.C. § 921(a)(7). The GCA defines a "short-barreled rifle" as "a rifle having one or more barrels less than sixteen inches in length and any weapon made from a rifle (whether by alteration, modification, or otherwise) if such weapon, as modified, has an overall length of less than twenty-six inches." 18 U.S.C. § 921(a)(8). The NFA includes a nearly identical provision. 26 U.S.C. §§ 5845(a)(3)-(4).

Congress delegated the Attorney General authority to enforce both the NFA and GCA. *See* 26 U.S.C. § 7801(a)(2)(A) ("The administration and enforcement of the following provisions of this title shall be performed by or under the supervision of the Attorney General[.]"); *and* 18 U.S.C. § 926(a) ("The Attorney General may prescribe only such rules and regulations as are necessary to carry out the provisions of this chapter[.]"). The Attorney General then delegated this power to the ATF "to administer, enforce, and exercise the functions and powers of the Attorney General with respect to" both statutes. *Gun Owners of Am. v. Garland*, 19 F.4th 890, 897 (6th Cir. 2021). As demonstrated below, that authority is narrowly confined to the "Execution" of the NFA and GCA and does not encompass the authority to redefine or expand their terms or restrictions. At all

4

times, that authority is subject to constitutional restrictions as well as the ancient doctrine of the rule of lenity given the criminal penalties that accompany most violations of the NFA and GCA.

## II. THE FINAL RULE REDEFINES VARIOUS HANDGUNS AND BRACED HANDGUNS AS SHORT-BARRELED RIFLES AND HAS AN UNLAWFUL AND UNNECESSARILY EXPEDITED EFFECTIVE DATE

On January 31, 2023, the Agencies published a Final Rule titled "*Factoring Criteria for Firearms with Attached 'Stabilizing Braces*.'" 88 Fed. Reg. 6,478 (Jan. 31, 2023) ("Final Rule").[2] The Final Rule took effect "immediately . . . in that the Department may seek to enforce the NFA's requirements with respect to any new making or new transfer of a weapon with an attached 'stabilizing brace[,]'" Final Rule at 6,481; but allows individuals until May 31, 2023, to destroy, dispose of, modify, or register existing braced pistols, *id.* at 6,498. The Final Rule reflects the ongoing hostility of the Biden Administration towards lawful and constitutionally protected firearm ownership. It embodies a strategy of regulating first and hoping that review is sufficiently delayed, thus functionally suppressing the rights of gun owners and manufacturers while litigation drags out in an end-run around Congress and the Constitution. And it shows a capricious lack of concern for clarity, certainty, or legal authority while chilling lawful gun ownership and sales.

### A. The Biden Administration

Before President Biden took office, one of his campaign pillars was an amorphous plan to combat "gun violence." Once elected, President Biden "urged Congress to swiftly pass gun control laws[.]"[3] When Congress did not act to the Biden Administration's liking, President Biden instead directed the Agencies to dramatically expand their interpretation of the congressionally defined term "rifle" to accomplish the legislative agenda Congress declined to adopt. The Final Rule,

---

2 The Final Rule is available at: https://www.federalregister.gov/d/2023-01001.

3 *Biden Considers executive actions on guns, calls on Congress to pass weapons ban*, REUTERS (Mar. 23, 2021), https://www.reuters.com/article/usa-guns-idINKBN2BG0A5.

inspired by the Biden Administration's promises, seeks to end run Congress and place restrictions on the ability of peaceable Americans to add minor modifications to their pistols and even to possess lawful firearms themselves to the extent they are or can be so modified.

**B.    ATF's Previous Classification of Stabilizing Braces**

Prior ATF regulations and guidance largely understood federal firearms law to permit a broad range of stabilizing braces and handguns with substantial grips that, while designed to facilitate firing with one hand, *could* be fired from the shoulder.

On November 8, 2012, an FFL submitted the first forearm "stabilizing brace" to ATF asking if the addition of their prototype device to a heavy pistol, such as an AR-type pistol, would change that type of pistol's classification under federal firearms laws. The submitter described the brace device as designed to assist people with disabilities or limited strength or mobility with firing heavy pistols safely and comfortably, as these weapons can be "difficult to control with the one handed precision stance." Letter for John Spencer, Chief, Firearms Technology Branch, ATF, from Alex Bosco, NST Global (Nov. 8, 2012). The stabilizing brace was not designed nor intended to be fired from the shoulder. ATF's Firearms and Ammunition Technology Division ("FATD") found that attaching the brace would not alter the classification of the pistol or other firearms. Letter from ATF #2013-0172 (Nov. 26, 2012).

Over the next few years, ATF received and answered additional inquiries about several braces. In a March 2014 letter, for example, FATD noted that it classifies firearms based on the "physical design characteristics," and that, while functionality indicates the intended design, it is not the sole criterion for determining a weapon's classification. Letter from ATF #301737 (Mar. 5, 2014). FATD advised that it does not classify weapons based on how a particular individual uses a weapon and that firing an AR-type pistol from the shoulder did not reclassify it as a short-barreled rifle. *Id.* FATD further noted that some brace designs had not been classified as a shoulder

stock and, therefore, using those braces improperly would not constitute a design change or change the classification of the weapon. *Id.*

Then, in an October 2014 letter, ATF momentarily reversed its position, stating that actions such as concealment on the person or use of a device as a shoulder stock, rather than the objective design criteria, *could* transform the weapon's classification. Letter from ATF #302492 (Oct. 28, 2014). ATF confusingly summarized this position in a January 2015 Open Letter stating:

> ATF hereby confirms that if used as designed—to assist shooters in stabilizing a handgun while shooting with a single hand—the device is not considered a shoulder stock and therefore may be attached to a handgun without making a NFA firearm. However, ATF has received numerous inquiries regarding alternate uses for this device, including use as a shoulder stock. Because the NFA defines both rifle and shotgun to include any "weapon designed or redesigned, made or remade, and intended to be fired from the shoulder," any person who redesigns a stabilizing brace for use as a shoulder stock makes a NFA firearm when attached to a pistol with a rifled barrel under 16 inches in length or a handgun with a smooth bore under 18 inches in length.

Max M. Kingery, Acting Chief, FATD, *Open Letter on the Redesign of "Stabilizing Braces,"* ATF (Jan. 6, 2015).[4]

Later still, in a March 2017 letter, ATF reiterated that "stabilizing braces are perfectly legal accessories for large handguns or pistols" but that, "when employed as a shoulder stock with a firearm with a barrel less than 16 inches in length, the result would be making an unregistered NFA firearm." Letter from Marvin G. Richardson, Assistant Director of ATF (Mar. 21, 2017).[5] In that letter, ATF formally repudiated any interpretation of its prior letters that "h[e]ld that incidental, sporadic, or situational 'use' of an arm-brace … equipped firearm from a firing position at or near the shoulder was sufficient to constitute 'redesign.'" *Id.* at 3.

---

[4]    https://content.govdelivery.com/accounts/USATF/bulletins/ea3937
[5]    https://vpc.org/wp-content/uploads/2019/08/Pistol-brace-ATF-letter-March-21-2017.pdf.

On June 10, 2021, the Agencies' published a Notice of Proposed Rulemaking planning changes to the definition of "rifle" in 27 CFR 478.11 and 479.11 to 'clarify' when attaching a stabilizing brace would transmute a "pistol" into "rifle." *Factoring Criteria for Firearms with Attached 'Stabilizing Braces'* ("Proposed Rule"), 86 Fed. Reg. 30,826 (June 10, 2021).[6] The Proposed Rule included factors on a new, proposed worksheet, "ATF Worksheet 4999," that the Agencies proposed ATF rely on when making firearms classifications. Worksheet 4999 proposed assigning points to various criteria as an indicator of whether the "brace" device is suitable for shouldering and whether the firearm overall is capable of being fired from the shoulder, thus purportedly rendering it a "rifle." Though Worksheet 4999 was far from perfect, it provided objective measurement criteria for determining whether a particular firearm with stabilizing brace has a "shoulder-fired design" that would be subject to the NFA. Among the considerations, for example, were whether the firearm included a secondary grip (indicating two-handed fire), whether the firearm weighed more than 120 ounces, and whether the brace had been modified for shouldering or had the cuff of the brace removed.

C.    **The Final Rule**

The Final Rule was published on January 31, 2023, and replaces the Agencies' prior application of federal law with a subjective and undefined multi-factor balancing test, without providing any mechanism for weighing the factors. The Agencies claim that by providing surface area which *can* be used to facilitate shoulder firing, based on their vague multi-factor test, a stabilizing brace remakes a handgun into a rifle. Final Rule at 6,503. The Final Rule, however, ignores the statutory definitions of exempt and lawful handguns and pistols—weapons both

---

[6]    The Proposed Rule is available at: https://www.federalregister.gov/d/2021-12176.

*designed* to fire with one hand and conveniently *capable* of being fired with one hand—by regulating handguns that *may* be fired from the shoulder under the NFA.

The Final Rule is not saved merely because the Agencies have now adopted various factors, of uncertain weight and priority, to determine whether a handgun (with or without a brace) is supposedly designed to be fired from the shoulder. Many of those factors are not merely arbitrary but are also subjective and indeterminate. The factors are:

> (i) whether the weapon has a weight or length consistent with the weight or length of similarly designed rifles;

> (ii) whether the weapon has a length of pull, measured from the center of the trigger to the center of the shoulder stock or other rearward accessory, component or attachment (including an adjustable or telescoping attachment with the ability to lock into various positions along a buffer tube, receiver extension, or other attachment method) that is consistent with similarly designed rifles;

> (iii) whether the weapon is equipped with sights or a scope with eye relief that require the weapon to be fired from the shoulder in order to be used as designed;

> (iv) whether the surface area that allows the weapon to be fired from the shoulder is created by a buffer tube, receiver extension, or any other accessory, component, or other rearward attachment that is necessary for the cycle of operations;

> (v) the manufacturer's direct and indirect marketing and promotional materials indicating the intended use of the weapon; and

> (vi) information demonstrating the likely use of the weapon in the general community

Final Rule at 6,480. This vague regulation harms Plaintiffs. Declaration of William T. Mock ("Mock Decl.") ¶ 11; Declaration of Christopher Lewis ("Lewis Decl.") ¶ 10; Declaration of David Dahl ("Dahl Decl.") ¶¶ 17–19; Declaration of Brandon Combs ("Combs Decl.") ¶¶ 9–12.

## III.    THE ADMINISTRATIVE PROCEDURE ACT

The Administrative Procedure Act ("APA"), among other things, sets forth specific requirements for Executive Branch agencies to follow for those agencies to establish or amend federal regulations. *See* 5 U.S.C. § 551, *et seq*. Individuals and entities can challenge an agency's

rulemaking to ensure it complies with the APA in federal court. 5 U.S.C. § 702. Rulemaking is an "agency process for formulating, amending, or repealing a rule[,]" 5 U.S.C. § 551(5), and there are two types of rules—non-legislative and legislative. "Rules issued through the notice-and-comment process are often referred to as 'legislative rules' because they have the 'force and effect of law.'" *Perez v. Mortgage Bankers Ass'n*, 575 U.S. 92, 96 (2015) (citation omitted).

There are several ways an agency can violate the APA, as relevant here. *First*, a violation of the Constitution is always a violation of the APA. 5 U.S.C. § 706(2)(B). *Second*, courts must set aside agency action that is "contrary to constitutional right [or] power." 5 U.S.C. § 706(2)(B). "The intent of Congress in 5 U.S.C. § 706(2)(B) was that courts should make an independent assessment of a citizen's claim of constitutional right when reviewing agency decision-making." *Porter v. Califano*, 592 F.2d 770, 780 (5th Cir. 1979). *Third*, a reviewing court shall "hold unlawful and set aside agency action, findings, and conclusions found to be . . . in excess of statutory jurisdiction, authority, or limitations, or short of statutory right[.]" 5 U.S.C. § 706(2)(C). *Finally*, a reviewing court shall "hold unlawful and set aside agency action" promulgated "without observance of procedure required by law." 5 U.S.C. § 706(2)(D). To comply with the notice and comment requirements of the APA, "an agency's proposed rule and its final rule may differ only insofar as the latter is a 'logical outgrowth' of the former." *Envtl. Integrity Project v. EPA*, 425 F.3d 992, 996 (D.C. Cir. 2005).

## STANDARD

To obtain a preliminary injunction, "the applicants must show (1) a substantial likelihood that they will prevail on the merits, (2) a substantial threat that they will suffer irreparable injury if the injunction is not granted, (3) their substantial injury outweighs the threatened harm to the party whom they seek to enjoin, and (4) granting the preliminary injunction will not disserve the

public." *City of El Cenizo v. Texas*, 890 F.3d 164, 176 (5th Cir. 2018). "These four factors also determine when a court should grant a stay of agency action under section 705 of the APA." *Colorado v. EPA*, 989 F.3d 874, 883 (10th Cir. 2021); *accord Cook Cnty. v. Wolf*, 962 F.3d 208, 221 (7th Cir. 2020).

## ARGUMENT

The Final Rule threatens Plaintiffs' livelihoods and liberty, and a preliminary injunction is needed to protect them from its unconstitutional and unlawful requirements. Plaintiffs are likely to prevail on the merits and will be irreparably harmed absent an injunction. Further, because of the significant harms that will flow to lawful gun owners, manufacturers, and distributors if the Final Rule is allowed to stand, the merged public interest and balance of the equities favor an injunction. Plaintiffs request that this Court enter an injunction against the Final Rule or, at a minimum, postpone its effective date until 120 days after this Court decides this case on the merits.

## I. PLAINTIFFS ARE LIKELY TO PREVAIL ON THE MERITS

The Final Rule violates Plaintiffs' constitutionally protected rights, was adopted contrary to the Constitution's structure, and violates multiple provisions of the APA. Plaintiffs are thus likely to succeed on the merits.

### A. The Final Rule Violates the United States Constitution

#### 1. The Final Rule Infringes on the Right to Keep and Bear Arms

The Final Rule impermissibly infringes on the "right of the people to keep and bear Arms[.]" U.S. CONST. AMEND. II. When determining whether a firearm regulation violates the Second Amendment, courts consider the "text, as informed by history." *N.Y. State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111, 2127 (2022).

The Supreme Court has explained that "[j]ust as the First Amendment protects modern forms of communications, . . . the Second Amendment extends, prima facie, to all instruments that constitute bearable arms, even those that were not in existence at the time of the founding." *District of Columbia v. Heller*, 554 U.S. 570, 582 (2008); *see Bruen*, 142 S. Ct. at 2132 ("Thus, even though the Second Amendment's definition of 'arms' is fixed according to its historical understanding, that general definition covers modern instruments that facilitate armed self-defense.") (citing *Caetano v. Massachusetts*, 577 U.S. 411, 411–12 (2016) (*per curiam*)). "[A]ll instruments that constitute bearable arms," are presumptively protected. *Bruen*, 142 S. Ct. at 2143. This protection extends not just to braced pistols, but to the braces themselves. *See Luis v. United States*, 578 U.S. 5, 26 (2016) (Thomas, J., concurring in judgment) (constitutional protections "implicitly protect those closely related acts necessary to their exercise"). And although ordinarily that presumption could only be overcome by the government "demonstrating that [the challenged law] is consistent with the Nation's historical tradition of firearm regulation," in the case of the Final Rule's regulation of a category of Arms like this one, the Supreme Court has already done the necessary historical work and concluded that, in light of "the historical tradition of prohibiting the carrying of 'dangerous and unusual weapons,'" arms that are "in common use at the time" are protected and cannot be regulated outside of historical tradition. *Id.* at 2130.

In *Caetano*, Justice Alito explained that the "relevant statistic is that hundreds of thousands of Tasers and stun guns have been sold to private citizens, who it appears may lawfully possess them in 45 states." 577 U.S. at 420 (2016) (Alito, J., concurring) (cleaned up). And when analyzing an "assault weapons" ban, Justice Thomas said "the ban is thus highly suspect because it broadly prohibits common semiautomatic firearms used for lawful purposes. Roughly five million Americans own AR-style semiautomatic rifles." *Friedman v. City of Highland Park*, 577 U.S.

1039 (2015) (Thomas, J., dissenting from the denial of certiorari). In both cases the touchstone for "common use" was ownership. In light of this standard, the Final Rule violates the principles established by the Supreme Court in its cases.

First, despite predicating the Final Rule on braced pistols being "unusual weapons[,]" Final Rule at 6,481, the Agencies concede they are anything but.[7] They admit "the variety of available 'stabilizing braces' or similar 'brace' devices and pistols equipped with 'braces' has grown significantly" since 2012. *Id.* at 6,479. And they do not dispute comments that there are "millions of 'braces' in use[,]" *id.* at 6,566, or that braced pistols are "commonly used by millions of law-abiding Americans for various reasons[,]" *id.* at 6,556. Supreme Court precedent makes clear that when firearms are "in common use at the [present] time," they cannot be banned. *Heller*, 554 U.S. at 627. Thus, the entire test is largely conceded.

Second, even if the Agencies maintain, despite *Heller*, *Caetano*, and *Bruen*, that the historical work is not done here and point to other historical justifications for the Final Rule, there is no historical practice of regulating gunsmithing. To the contrary, the pre-existing right and historical practice regarding pistols and handguns long encompassed the practice of gunsmithing—the production and modification of firearms by private individuals. The act of self-manufacturing, repairing, and improving weapons at home is not novel—in fact, this tradition pre-dates our Founding and helped secure America's freedom in the Revolutionary War.[8] "Privately made

---

[7]    The Agencies do not even attempt to back up their argument they are "primarily weapons of war and have no appropriate sporting use or use for personal protection." Final Rule at 6,499 (quotation omitted). The Agencies do not list a single example of military use, and the widespread civilian use that the Agencies do acknowledge speaks to the contrary.

[8]    During the Revolutionary War, "[t]o sustain themselves against a large and well-supplied British military throughout the eight-year war, the Americans relied on gunsmiths, individuals with knowhow from working on their own arms, and Americans who were willing to learn the art of

firearms have been in existence since the first ignition system was developed close to 500 years ago, in the 1400s."[9]

The act of individuals self-manufacturing and repairing or improving firearms for personal, lawful uses is a tradition steeped in our natural right to self-defense. [10] And historical practice commonly included the use and modification of pistols with large grips, which had enough surface area they could theoretically be fired from the shoulder, as well as the actual addition of stocks to pistols. For example, highly angled dragoon pistols included large grips that assisted the shooter with firing by allowing the shooter to stabilize the pistol more effectively.[11] Similarly, when a gun owner wanted greater stability, pre-Founding pistols could even be equipped with shoulder stocks.[12] Stabilizing braces are analogous to their Founding Era predecessors in that they allow gun owners to modify pistols to facilitate easier and more accurate one-handed shooting. The Final Rule makes what has been an unregulated historical practice nearly impossible for those individuals with a stabilizing brace. That technology and manufacturing have evolved since the Founding does not alter the fundamental constitutional backdrop.

---

arms manufacturing." Joseph G.S. Greenlee, *The American Tradition of Self-Made Arms*, 54 ST. MARY'S L.J. 35, 16 (Apr. 11, 2022).

[9]     Senate Judiciary Subcommittee Hearing on Gun Violence Prevention, *Stop Gun Violence: Ghost Guns* 4 (May 11, 2021) (testimony of Ashley Hlebinsky), https://tinyurl.com/3z4anbjb.

[10]     Greenlee, *American Tradition of Self-Made Arms*, at 1 ("[T]he tradition of building arms for personal use is deeply rooted in American history, and [] there is no tradition of regulating self-built arms.")

[11]     *A Rare French & Indian War – American Revolutionary War Period British Military Pattern 1738 Heavy Dragoon Flintlock Pistol, Jordan, 1746*, TORTUGA TRADING, https://tortugatrading.com/products/copy-of-a-rare-french-indian-war-american-revolutionary-war-period-british-military-pattern-1738-heavy-dragoon-flintlock-pistol-tower-1738.

[12]     *Lot 3249: Silver Inlaid Kuchenreiter Flintlock Pistol with Stock Flintlock Pistol with Stock*, ROCK ISLAND AUCTION COMPANY, https://www.rockislandauction.com/detail/59/3249/silver-inlaid-kuchenreiter-flintlock-pistol-with-stock.

Third, the Final Rule's vague language threatens owners of even unbraced pistols if they possess any items that might allow the handgun to be fired from the shoulder, chilling exercise of the Second Amendment protected right to possess handguns in the home for self-defense. *Heller*, 554 U.S. at 576. This is because an individual could be charged with constructive possession of a short-barreled rifle if their handgun *could* be combined with any number of objects that the Agencies now considers to show that the pistol is designed to be fired from the shoulder, based on the Agencies' subjective, undefined criteria. *See* Final Rule at 6,574–75; *United States v. One TRW, Model M14, 7.62 Caliber Rifle*, 441 F.3d 416, 421 (6th Cir. 2006) (collecting cases on constructive possession of machine guns as violating the NFA). Creating and attaching a device that facilitates firing from the shoulder is so simple—requiring at most some glue, wood, and some woodworking skills—that virtually anyone can constructively possess a braced pistol. *Id.* at 422–24 (ease of creation supports constructive possession charge).[13]

Because the Final Rule regulates firearms in common use, has no support in the history and tradition of firearm ownership regulations, and because it constitutes an impermissible chilling of Plaintiffs', including Maxim Defense's customers and FPC's members' Second Amendment protected rights, the Final Rule violates the Second Amendment and, thus, the APA.

---

[13]     This is no hypothetical—ATF has a decades-long practice of employing constructive possession arguments to short-barreled rifles and shotguns. For instance, a Florida man was charged with possession—and sale—of a short-barreled rifle for selling a pistol along with an unattached stock and vertical foregrip. *See* Joshua Prince, *Florida Man Arrested For Constructive Possession of an SBR* (Sept. 1 2009), https://blog.princelaw.com/2009/9/1/florida-man-arrested-for-constructive-possession-of-an-sbr/; Naples Daily News, *Craig's List crime: Naples man charged    with    trying    to    sell    short-barreled    rifle* (Aug.    29    2009), https://archive.naplesnews.com/news/crime/craigs-list-crime-naples-man-charged-with-trying-to-sell-short-barreled-rifle-ep-397076593-343746452.html/.

## 2.      The Final Rule Violates the First Amendment

The Final Rule also violates Plaintiffs', including Maxim Defense's customers' and FPC's members' First Amendment protected rights by allowing the Agencies to more stringently regulate firearms based on statements made by manufacturers and other third parties, thus chilling speech.

Under the First Amendment, "Congress shall make no law . . . abridging the freedom of speech[.]" U.S. CONST. AMEND. I. Regulations that chill or compel speech, like outright prohibitions on speech, "abridge" the freedom protected by the Free Speech Clause. *See R.A.V. v. City of St. Paul*, 505 U.S. 377, 382 (1992) ("The First Amendment generally prevents government from proscribing speech . . . because of disapproval of the ideas expressed."). The Fifth Circuit has recognized that "the First Amendment goes beyond protection of the press and the self-expression of individuals to prohibit government from limiting the stock of information from which members of the public may draw." *Turner v. Driver*, 848 F.3d 678, 688 (5th Cir. 2017) (cleaned up). "Content-based laws—those that target speech based on its communicative content—are presumptively unconstitutional and may be justified only if the government proves that they are narrowly tailored to serve compelling state interests." *Reed v. Town of Gilbert, Ariz.*, 576 U.S. 155, 163 (2015); *accord id.* at 182 (Kagan, J., concurring) ("We apply strict scrutiny to facially content-based regulations of speech, in keeping with the rationales just described, when there is any realistic possibility that official suppression of ideas is afoot." (cleaned up)). This is so even if the regulation merely chills the exercise of Free Speech rights. *In re Tam*, 808 F.3d 1321, 1339 (Fed. Cir. 2015), as corrected (Feb. 11, 2016), aff'd sub nom. *Matal v. Tam*, 137 S. Ct. 1744 (2017). "Government regulation of speech is content based if a law applies to particular speech because of the topic discussed or the idea or message expressed." *Tex. Entm't Ass'n, Inc. v. Hegar*, 10 F. 4th 495, 509 (5th Cir. 2021) (quoting *Reed*, 576 U.S. at 163).

The Final Rule chills the exercise of protected speech by threatening to reclassify pistols as rifles if the manufacturer, or another entity, speaks or publishes materials in a way that runs afoul of the Agencies' newly established, indefinite, factor test. For example, to determine whether a firearm is "designed, made, and intended to be fired from the shoulder," ATF will now evaluate the "manufacturer's direct and indirect marketing and promotional materials" and "[i]nformation demonstrating the likely use of the weapon in the general community." Final Rule at 6,480. But the treatment of any statements is left entirely to the discretion of the Agencies, without any knowable or predictable limitation. If the marketing material indicates a pistol has a "large grip for easy handling," will that be enough to infer illegal potential for shoulder firing? What about a "stable brace with secure and comfortable attachment points"? It matters not that those statements each have an innocuous and perfectly lawful interpretation if the Agencies 'decide' to balance the factors otherwise. Worse, the Agencies have empowered themselves to make the same determination if an unrelated and unknown third party makes statements that could also be construed to indicate an item *could* facilitate shoulder firing. Such uncertainty will force manufacturers, and the public writ large, to be doubly cautious with anything they say about protected arms, and even avoid speaking altogether, lest the Agencies come after them based on the content of their speech having somehow converted a lawful handgun into a short-barreled rifle.

Because the Final Rule considers certain types of speech of manufacturers and third parties when deciding whether a particular object is a now-regulated brace, it chills speech based on content and is subject to strict scrutiny, which it fails. There is no compelling interest at stake— the Agencies have permitted stabilizing braces and braced pistols for over a decade and have

17

shown no overwhelming need to regulate them now.[14] And the Final Rule is far from the least restrictive means of addressing any concerns the Agencies might have—indeed, the Proposed Rule's Worksheet 4999 was more narrowly tailored. But more obviously, the Agencies could have avoided speech concerns altogether by removing the speech component of the multifactor test, relying instead on objective physical aspects of a firearm or brace. That manufacturers and purchasers will instead be subject to the vagaries of the Agencies' interpretation of marketing statements, some of which many purchasers may not even have seen or heard, confirms that the Final Rule will chill far more speech than necessary to address any supposed government interests.

Nor can the Final Rule be saved if the Government argues that it did not mean to chill speech when it passed the Final Rule. "A regulatory scheme that requires the government to 'examine the content of the message that is conveyed' is content-based regardless of its motivating purpose." *Serv. Emps. Int'l Union, Local 5 v. City of Hous.*, 595 F.3d 588, 596 (5th Cir. 2010) (quoting *Ark. Writers' Project, Inc. v. Ragland*, 481 U.S. 221, 230 (1987)).

The government is also prohibited from regulating speech "based on the identity of the speaker." *See Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 340 (2010). "Speaker-based laws run the risk that the state has left unburdened those speakers whose messages are in accord with its own views." *Nat'l Inst. of Family and Life Advocs. v. Becerra*, 138 S. Ct. 2361, 2378 (2018) (cleaned up); *Citizens United*, 558 U.S. at 340 ("Prohibited, too, are restrictions distinguishing among different speakers, allowing speech by some but not others."). As the

---

[14]    The Agencies justified this expanded regulation by noting braced pistols were used in two specific crimes along with a vague statement that ATF "traced numerous firearms equipped with a 'stabilizing brace' in connection with crimes in recent years[.]" Final Rule at 6,508. But identifying some small number of crimes where braced pistols were used, when millions of braced pistols are in circulation, does not support the Agencies' assertions that braced pistols pose "a greater risk to public safety as 'gangster-type' weapons of an especially unusual and dangerous nature." *Id.* at 6,566.

Supreme Court has consistently explained, "the First Amendment stands against attempts to disfavor" not only certain "viewpoints," but also certain "subjects." *Citizens United*, 558 U.S. at 340; *accord Heller v. City of El Paso*, 861 Fed. Appx. 836, 839 (5th Cir. 2021). The Final Rule decrees that "manufacturers' direct and indirect marketing and promotional materials" will be considered in some unknowable way. Final Rule at 6,511. It could also feasibly include any speech on other manufacturers' products—perhaps the comparison helps the manufacturer market its own. And it could include speech on braces in the abstract. Thus, the Final Rule discourages any speech whatsoever by manufacturers, lest it lead to the Agencies suddenly declaring their products to be short-barreled rifles and their customers to be felons. By targeting the speech of manufacturers in its attempt to regulate stabilizing braces, ATF thus violates this prohibition too.

Because the Final Rule is both a content- and speaker-based restriction on speech that cannot pass strict scrutiny, it violates the First Amendment, and, thus, the APA.

### 3.     The Final Rule is Void for Vagueness

The many questions related to enforcement above also acutely demonstrate that the Final Rule is unconstitutionally vague in violation of the Due Process Clause. U.S. CONST. AMEND. V.

The void for vagueness doctrine is grounded in principles of fair notice. "A law is unconstitutionally vague if people of common intelligence must guess at its meaning and differ as to its application." *Shamloo v. Miss. State Bd. of Trustees of Insts. of Higher Learning*, 620 F.2d 516, 523 (5th Cir. 1980). The "doctrine prohibiting the enforcement of vague laws rests on the twin constitutional pillars of due process and separation of powers." *United States v. Davis*, 139 S. Ct. 2319, 2325 (2019). A law must provide "'fair notice' of the conduct a statute proscribes" to "guard[] against arbitrary or discriminatory law enforcement[.]"*Sessions v. Dimaya*, 138 S. Ct. 1204, 1212 (2018); *accord FCC v. Fox Television Stations, Inc.*, 567 U.S. 239, 253 (2012).

Clarity is even more necessary when a law bears criminal consequences. *See Davis*, 139 S. Ct. at 2323 ("Only the people's elected representatives in Congress have the power to write new federal criminal laws*."); cf. Vill. of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 498–99 (1982) ("The [Supreme] Court has also expressed greater tolerance of enactments with civil rather than criminal penalties because the consequences of imprecision are qualitatively less severe."). And that already heightened clarity requirement is further heightened when interpreting laws that "threaten[] to inhibit the exercise of constitutionally protected rights." *Vill. of Hoffman Estates*, 455 U.S. at 499; *Smith v. Goguen*, 415 U.S. 566, 572–73 (1974).

The Final Rule provides no meaningful clarity on what constitutes a stabilizing brace or what other items may convert a pistol into a rifle under the Final Rule's discretion-laden and unconstitutionally vague factor test. Instead, the newly adopted undefinable factor test incorporates both "objective design features" and "other factors," the latter of which are inherently subjective. Final Rule at 6,500. Worse, included in the "other factors" are actions by third parties not necessarily knowable to the end user, such as the "manufacturer's direct and indirect marketing and promotional materials." *Id.* at 6,480. At least the manufacturers' statements could be tracked, but worse yet, the Final Rule also considers "[i]nformation demonstrating the likely use of the weapon in the general community[,]" thus criminalizing gun owners based on actions of a mass of unknown, unaffiliated, and uncontrollable third parties. *Id.*

But even the "objective" factors provide no useful guidance. For instance, "[w]hether the weapon has a weight or length consistent with the weight or length of similarly designed rifles" would favor treating numerous unbraced pistols as rifles. *Id.* A common Kalashnikov pistol, the Draco, has a standard barrel length of 10.5" and weighs about 6.3 pounds, while a common Kalashnikov rifle, the AKS-74, has a standard barrel length of around 16.3" and weighs about 6.5

pounds.[15] The Final Rule says nothing about how the Agencies will reconcile the fact that, while the weight of these two firearms is similar, the length is significantly different. Which is more important? Do they cancel each other out? Likewise, "[w]hether the weapon has a length of pull, . . . consistent with similarly designed rifles" is uselessly vague as it fails to address when the Agencies would consider a rifle "similarly designed." Final Rule at 6,480. For an AR pistol, would "similarly designed" rifles be all rifles of the same caliber or just other full-length AR-style rifles? The Agencies give no answer and instead include a useless table of measurements of a variety of rifles, *id.* at 6,514–18, that the Agencies admit "are not themselves determinative," *id.* at 6,518.

"Whether the weapon is equipped with sights or a scope with eye relief that require the weapon to be fired from the shoulder in order to be used as designed" is perhaps the worst factor, *id.*, as it means every time the owner changes the sights or scope on their firearm, they might be unwittingly manufacturing a short-barreled rifle. And it makes ATF guidance useless, as even if a given brace with a given pistol was ruled to be a pistol, this could be changed by any variation in sights. This unduly vague standard fails to provide clarity to either manufacturers or to firearm owners attempting to lawfully exercise their Second Amendment protected rights.

As mentioned, the void-for-vagueness test is particularly stringent where the vagueness can chill the exercise of constitutionally protected rights, such as rights under the First and Second Amendments. As discussed above, the Final Rule does just that. Moreover, its already vague provisions are made even more confusing given the possibility that the Agencies will consider gun owners to be in "constructive possession" of a short-barreled rifle by owning a handgun and anything that *could* be pressed against a shoulder when firing. Couple the possibility of

---

[15]   https://www.rkguns.com/century-arms-draco-7-62x39mm-semi-automatic-30rd-10-5-pistol-hg4257-n.html   (last visited Feb. 21, 2023); https://modernfirearms.net/en/assault-rifles/russia-assault-rifles/ak-74-ak74m-eng/   (last visited Feb. 21, 2023).

constructive possession with other unknowable criteria, and the Agencies have a perfect recipe for selective enforcement of a regulation whose violation could result in upwards of ten years in prison. 26 U.S.C. § 5871 (violation of the NFA); 18 U.S.C. § 924(a)(1)(D) (violation of the GCA). Further, the Agencies could target and arrest any manufacturer of braces or pistols at will, given the subjective nature of the individual factors and how they are subjectively balanced. Not even clearing a design with ATF before manufacturing it would save them; the Agencies could always claim that even if the design had not changed, the "indirect marketing or promotional materials" had—magically—created a short-barreled rifle. And these myriad vagueness concerns are amplified further by the fact that regulated parties stand to lose their FFLs—and their entire businesses—if they misunderstand, and thus fail to comply with the Final Rule's requirements. And even owners of explicitly approved pistol-and-brace combinations would always need to fear that some new marketing material or information "in the general community" had transformed it into a short-barreled rifle. That fear then further harms brace manufacturers by chilling sales.

Even in a normal case, then, the Final Rule is vague. But it is particularly troublesome here because it imposes criminal penalties and chills the exercise of constitutionally protected rights.

### B.    The Final Rule Violates the Constitution's Structural Protections

Beyond violating the constitutionally protected rights of gun owners, manufacturers, and retailers alike, the Final Rule also violates the Constitution's structural protections.

The power to craft legislation and create law rests solely with Congress. *See* U.S. CONST. Art. I, § 1. On the other hand, the President, and by extension the Executive Branch agencies under his purview, "shall take Care that the Laws be faithfully executed." U.S. CONST. Art. I, § 3. "In the framework of our Constitution, the President's power to see that the laws are faithfully executed refutes the idea that he is to be a lawmaker." *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S.

579, 587 (1952). This separation of powers is "a basic principle of our constitutional scheme" under which "one branch of the Government may not intrude upon the prerogatives of another." *Loving v. United States*, 517 U.S. 748, 757 (1996).

The Supreme Court has repeatedly "reaffirm[ed] the core administrative-law principle that an agency may not rewrite clear statutory terms to suit its own sense of how the statute should operate." *Util. Air Reg. Grp. v. EPA*, 573 U.S. 302, 328 (2014). As the Fifth Circuit has explained, this limitation means agencies "cannot manufacture statutory ambiguity with semantics to enlarge their congressionally mandated border." *Tex. Pipeline Ass'n v. FERC*, 661 F.3d 258, 264 (5th Cir. 2011). If agencies are given authority to create legislative rules, that authority requires "a *clear delegation*" from Congress. *West Virginia v. EPA*, 142 S. Ct. 2587, 2616 (2022) (emphasis added).

The clear-delegation rule refutes the idea that agencies can answer questions "left unresolved" in a statute, "merely because a statute's 'authors did not have the forethought expressly to contradict any creative contortion that may later be constructed to expand or prune its scope.'" *Calix v. Lynch*, 784 F.3d 1000, 1005 (5th Cir. 2015) (quoting *Moore v. Hannon Food Serv. Inc.*, 317 F.3d 489, 497 (5th Cir. 2003)). Indeed, it forbids courts from "presume[ing] that a power is delegated if Congress does not expressly withhold it, as then agencies would enjoy virtually limitless hegemony, a result plainly out of keeping with Chevron and quite likely with the Constitution as well." *Contender Farms, L.L.P. v U.S. Dep't of Agric.*, 779 F.3d 258, 269 (5th Cir. 2015) (internal citation omitted); *see also Gulf Fishermens Ass'n v. Nat'l Marine Fisheries Serv.*, 968 F.3d 454, 461 (5th Cir. 2020), as revised (Aug. 4, 2020).

Applying those principles here, the Final Rule is an unreasonable construction of statutory terms and a clear example of the Agencies unlawfully creating law. Indeed, through the Final Rule, the Agencies rewrote the definition of rifle to include firearms neither designed nor intended to be

fired from the shoulder. And they did so without any delegated authority to so broadly re-define what constitutes a rifle that it encompasses NFA-exempted pistols and handguns.

Starting with the statutory text, the law defines a "short-barreled rifle" as "a rifle having one or more barrels less than sixteen inches in length and any weapon made from a rifle (whether by alteration, modification, or otherwise) if such weapon, as modified, has an overall length of less than twenty-six inches." 18 U.S.C. § 921(a)(8). This incorporates the statutory definition of "rifle," which is "a weapon designed or redesigned, made or remade, and intended to be fired from the shoulder . . ." 18 U.S.C. § 921(a)(7). In contrast, a "handgun" is "a firearm which has a short stock and is designed to be held and fired by the use of a single hand[.]" 18 U.S.C. § 921(a)(30)(A). This is not the sort of ambiguous language that would indicate "Congress has delegated policy-making responsibilities" to the Agencies. *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 865 (1984). And the Final Rule's new factor analysis is not only detached from the ultimate question of whether the weapon is designed to be fired from the shoulder or from a hand, it actively ignores it. For example, although one identified factor is "weight . . . consistent with the weight . . . of similarly designed rifles," Final Rule at 6,480; weight may be similar for a large caliber handgun as for a similar caliber rifle and is irrelevant to the question of shoulder-firing in any event.[16] The factors in the Final Rule thus are unrelated to the statute's language.

As if the departure from the statute were not enough, the Final Rule is also constitutionally infirm because it carries the possibility of criminal penalties. As the Fifth Circuit has recognized, "the question of Congress's delegating legislative power to the Executive in the context of criminal

---

[16]     For example, the Magnum Research BFR revolver in .30-30 Winchester weighs 5.5 pounds when loaded. *See* Bill Battles, *Magnum Research BFR .30-30 Win. Bisley Revolver*, ON-TARGET MAGAZINE (Nov. 2017), https://www.ontargetmagazine.com/2017/11/magnum-research-bfr-30-30-win-bisley-revolver/3/ (last visited Feb. 21, 2023).

statutes raises serious constitutional concerns." *Cargill v. Garland*, 57 F.4th 447, 472 (5th Cir. 2023) (*en banc*). And in the context of a statute imposing criminal liability, fundamental principles of statutory interpretation and the equally fundamental due process and separation of powers concerns driving the rule of lenity forbid the Agencies' efforts to broaden the reach of the definition of "firearm" or "rifle" while ignoring the definition of "handgun" and the common meaning of "pistol or revolver" even if this Court were to conclude that the statutory definition of a "firearm" or a "rifle" were ambiguous enough to include a braced pistol. *Cargill*, 57 F.4th at 469–71.

In short, the Final Rule creates new law, gives the Agencies new power over new items not regulated by statute, and carries the possibility of criminal sanctions. For these reasons, it exceeds executive authority and violates the Delegation Doctrine and the Take Care Clause.

### C.    The Final Rule Violates Multiple Provisions of the APA

#### 1.    The Final Rule Exceeds the Agencies' Statutory Jurisdiction and Authority

The Final Rule exceeds the Agencies' statutory authority because the definitions of "rifle," "handgun," and similar terms in the NFA and GCA are clear enough that authority to interpret them was not delegated to the Agencies, and even if it were, the definitions used in the Final Rule are incompatible with those used in the statutes.

Under 5 U.S.C. § 706(2)(c), "[t]he reviewing court shall . . . hold unlawful and set aside agency action, findings, and conclusions found to be . . . in excess of statutory jurisdiction, authority, or limitations, or short of statutory right[.]" If an agency's regulation is "inconsistent with the [statute's] plain language," the agency exceeds its authority, *Peyton v. Reynolds Assocs.*, 955 F.2d 247, 251 (4th Cir. 1992), which "is necessarily derived from the statute . . . and may not be exercised in a manner that is inconsistent with the administrative structure that Congress has enacted," *United States v. Transocean Deepwater Drilling, Inc.*, 767 F.3d 485, 489 (5th Cir. 2014).

Like any statute, a statute authorizing regulations is to be interpreted with the "traditional tools of construction," which include "text, structure, history, and purpose." *Kisor v. Wilkie*, 139 S. Ct. 2400, 2415 (2019); *accord United States v. Bittner*, 19 F.4th 734, 749 (5th Cir. 2021). The traditional tools do not include *Chevron* deference here, because the Fifth Circuit does not apply *Chevron* to interpretations of statutes carrying criminal penalties. *Cargill*, 57 F.4th at 466–67.

"When interpreting a statute, we begin with the text." *Bittner*, 19 F.4th at 743; *see also Conn. Nat'l Bank v. Germain*, 503 U.S. 249, 253–54 (1992). ("[I]n interpreting a statute a court should always turn first to one, cardinal canon before all others. We have stated time and again that courts must presume that a legislature says in a statute what it means and means in a statute what it says there."); *Cargill,* 57 F.4th at 460–61 (a statute should be interpreted according to "the plain language" with the aid of "grammar" and "context [which] is a primary determinant of meaning.") (cleaned up). Turning to the text, the GCA defines a "rifle" as a "weapon designed or redesigned, made or remade, and intended to be fired from the shoulder and designed or redesigned and made or remade to use the energy of an explosive to fire only a single projectile through a rifled bore for each single pull of the trigger." 18 U.S.C. § 921(a)(7). The NFA includes a nearly identical definition. 26 U.S.C. § 5845(c). And the GCA defines "short-barreled rifle" as "a rifle having one or more barrels less than sixteen inches in length and any weapon made from a rifle (whether by alteration, modification, or otherwise) if such weapon, as modified, has an overall length of less than twenty-six inches." 18 U.S.C. § 921(a)(8). The NFA includes a nearly identical provision in its definition of "firearm." 26 U.S.C. §§ 5845(a)(3)–(4). Finally, the GCA defines "handgun" as "(A) a firearm which has a short stock and is designed to be held and fired by the use of a single hand; and (B) any combination of parts from which a firearm described in subparagraph (A) can be assembled." 18 U.S.C. § 921(a)(30). The NFA does not have a similar

26

definition, and specifically exempts "a pistol or a revolver having a rifled bore" from its coverage. 26 U.S.C. § 5845(e). Under plain meaning, a "pistol or revolver" thus cannot be a "rifle."

The Agencies are granted the limited authority to regulate short-barreled rifles more stringently than pistols. Short-barreled rifles, as a specific, congressionally defined category of firearms, are subject to the heightened requirements imposed by the NFA; pistols, including those with stabilizing braces, are not. But the Final Rule "amends the definition of 'rifle' under 27 CFR 478.11 and 479.11" to include "a weapon that is equipped with an accessory, component, or other rearward attachment . . . that *allows* the weapon to be fired from the shoulder, provided other factors, as listed in the amended regulations . . ., indicate that the weapon is designed, made, and intended to be fired from the shoulder." Final Rule at 6,480 (emphasis added). But these six factors, either individually or in their uncertain and arbitrary combination, do not actually "indicate" that a particular firearm is "designed, made, and intended to be fired from the shoulder."

Black's Law Dictionary defines "design" as "[a] plan or scheme [or a] [p]urpose or intention combined with a plan." BLACK'S LAW DICTIONARY 560 (Bryan A. Garner ed., 11th ed. 2019). It defines "intend" as "[t]o have in mind a fixed purpose to reach a desired objective; to have as one's purpose[.]" *Id.* at 964. Merriam-Webster's Dictionary defines "designed" as "to create, fashion, execute, or construct according to plan," "to conceive and plan out in the mind," "to have as a purpose," and "to devise for a specific function or end." *Design*, MERRIAM-WEBSTER.COM DICTIONARY, https://www.merriam-webster.com/dictionary/design (last visited Feb. 21, 2023). It defined "intended" as "expected to be such in the future." *Intended*, MERRIAM-WEBSTER.COM DICTIONARY, https://www.merriam-webster.com/dictionary/intended (last visited Feb. 21, 2023).

And these definitions are nothing new. An 1828 version of Webster's Dictionary defined "design," in relevant part as "[t]o plan; to form an outline or representation of any thing[,]" and "[t]o purpose or intend[.]" 1 NOAH WEBSTER, AMERICAN DICTIONARY OF THE ENGLISH LANGUAGE (1828) (unpaginated). It also defined "intend" as "[t]o mean; to design; to purpose, that is, to stretch or to set forward in mind." *Id.*

The plain meaning of the NFA and GCA do not encompass subjective statements from a manufacturer or unknown third parties, nor do they include discretionary, undefined factors to assess the *possible* function of a firearm. The NFA and GCA do not allow for the regulation of a firearm that *can* or *may be* fired from the shoulder, or even one that *actually is* fired from the shoulder *unless* that firearm was designed and intended to be fired from the shoulder. This is not a narrow reading of the statutes—it is a plain reading of the statutes' text.

Instead, the Agencies ignore design and intent—in other words, the plain text of the NFA and GCA—in favor of subjective and undefined criteria that the Agencies' may consider and give unspecified weight to, thus potentially classifying any number of pistols as if they were rifles, often without notice to the owners or manufacturers. Among these six factors are such subjective criteria as "whether the weapon has a weight or length consistent with the weight or length of similarly designed rifles," "whether the weapon has a length of pull . . . that is consistent with similarly designed rifles," "the manufacturer's direct and indirect marketing and promotional materials indicating the intended use of the weapon," and "information demonstrating the likely use of the weapon in the general community." Final Rule at 6,480.

As discussed above in relation to the separation of powers, none of this can overcome the plain meaning of the text, which differentiates "pistols or revolvers" from "rifles." Here, the Agencies exceed their authority by regulatorily treating pistols as if they were rifles, despite the

fact that braced pistols do not meet the statutory definition of a rifle established by Congress. The Final Rule purports to establish a regulation to "guide" the Agencies' administration of the NFA and GCA, but instead regulates new items Congress explicitly left out of any reasonable definition of rifle and would grant the Agencies new, additional authority in excess of that proposed, considered, debated, or passed by Congress. The Agencies are attempting to regulate firearms and firearm parts that Congress explicitly left out of the statute and impose felony charges for violations. *See* 18 U.S.C. § 924(a)(1)(D) ("[W]hoever . . . willfully violates any other provision of this chapter, shall be fined under this title, imprisoned not more than five years, or both."). The Final Rule thus exceeds the Agencies' congressionally established jurisdiction and authority.

### 2.    The Final Rule was not a Logical Outgrowth of the Proposed Rule

Because the Final Rule differed from the Proposed Rule in a significant way that was unpredictable from the Proposed Rule and public comments, the Agencies promulgated the Final Rule, without providing it for additional public comment, in violation of the APA.

The APA provides that, whenever an agency plans to promulgate, amend, or repeal a regulation, it must first issue a "notice of proposed rule making … in the Federal Register"—which must include, among other information, "either the terms or substance of the proposed rule or a description of the subjects and issues involved." 5 U.S.C. § 553(b). A corollary of this requirement is that "the final rule the agency adopts must be a logical outgrowth of the rule proposed. The object, in short, is one of fair notice." *Long Island Care at Home, Ltd. v. Coke*, 551 U.S. 158, 174 (2007)(cleaned up). An agency's "notice [of proposed rulemaking] must adequately frame the subjects for discussion such that [an] affected party should have anticipated the agency's final course," *Huawei Techs. USA, Inc., v. FCC*, 2 F.4th 421, 447 (5th Cir. 2021) (cleaned up); and reasonably could "have filed [its] comments on the subject during the notice-and-comment period[,]" *Ne. Md. Waste Disposal Auth. v. EPA*, 358 F.3d 936, 952 (D.C. Cir. 2004). In this case,

given the substantial discrepancy between the Agencies' Proposed Rule and their Final Rule, the public (including Plaintiffs) were denied the chance to comment on the substance of the latter.

The centerpiece of the Agencies' Proposed Rule was Worksheet 4999, which would have allocated points to firearms with certain objective characteristics. *See* Exhibit 1 to Plaintiff's Petition for Judicial Review, ECF No. 1-1. The Proposed Rule explained that "Worksheet 4999 is *necessary to enforce the law consistently* considering the diversity of firearm designs and configuration" because "will provide the public and the firearms industry with a detailed methodology for ensuring legal compliance." Final Rule at 30,826–01, 30,829 (emphasis added).

The Final Rule, by contrast, completely scraps "Worksheet 4999 and its point system." Final Rule at 6,480. Instead, the Final Rule "amends the definition of 'rifle' under 27 C.F.R. §§ 478.11" and 479.11 as "a weapon that is equipped with an accessory, component, or other rearward attachment . . . that allows the weapon to be fired from the shoulder, provided the other factors, as listed in the amended regulations . . ., indicate that the weapon is designed, made, and intended to be fired from the shoulder." Final Rule at 6,480, 6,574–75. Among these six "other factors" are such subjective criteria as "whether the weapon has a weight or length consistent with the weight or length of similarly designed rifles," "whether the weapon has a length of pull . . . that is consistent with similarly designed rifles," "the manufacturer's direct and indirect marketing and promotional materials indicating the intended use of the weapon," and "information demonstrating the likely use of the weapon in the general community." *Id.* Nothing in the Final Rule or the Agencies' accompanying explanation thereof makes clear how these various factors are weighed, or how many factors need to be met to qualify as a "rifle."

In announcing the Final Rule, the Agencies remarked that, among the comments received on the Proposed Rule, "[t]here was general dissatisfaction with the proposed Worksheet 4999." *Id.*

at 6,510. The Agencies "agree[d] with commenters that the factoring criteria with a point system as proposed in the Worksheet 4999 were not easily understood or applied," and "that some of the terms from the . . . worksheet were ambiguous and subject to interpretation." *Id.* at 6,513. The Agencies "concluded the proposed Worksheet 4999 [wa]s unworkable" and instead adopted the six-factor test. *Id.*

The Agencies' abandonment of the Worksheet in favor of a "balancing" test violates the APA's requirement that notice be given of a proposed regulation's substance so that the public may comment on the proposal. An agency's "notice [of proposed rulemaking] must adequately frame the subjects for discussion such that the affected party should have anticipated the agency's final course in light of the initial notice," *Huawei Techs.*, 2 F.4th at 447 (cleaned up), "and thus reasonably should have filed [its] comments on the subject during the notice-and-comment period." *Ne. Md. Waste Disposal Auth.*, 358 F.3d at 952 (quotation omitted). Here, nothing in the Proposed Rule or the Agencies' accompanying explanation "gave [any] indication that [the agency] was contemplating a potential change" as drastic as scrapping the entire point-based Worksheet regime that formed the centerpiece of the Proposed Rule. On the contrary, the Proposed Rule explained that "[t]he ATF Worksheet 4999 is *necessary to enforce the law consistently*, considering the diversity of firearm designs and configurations.'" Proposed Rule at 30,826–01, 30,829 (emphasis added). Having read such language, commenters could not have reasonably foreseen that the Final Rule would cast aside the Worksheet that the Agencies had deemed "necessary" in favor of a balancing-type test based on six factors that, if anything, seem *more* subjective than those of the Worksheet.

It may be true, as the Agencies' explanation accompanying the Final Rule states, that commenters criticized various aspects of the Proposed Rule's Worksheet. But "[a]n

agency . . . does not have carte blanche to establish a rule contrary to its original proposal simply because it receives suggestions to alter it during the comment period." *Chocolate Mfrs. Ass'n of U.S. v. Block*, 755 F.2d 1098, 1104 (4th Cir. 1985). Moreover, in the section of the Proposed Rule entitled, "Comments Sought," the Agencies gave no hint that it might abandon the Worksheet and never even used the word "worksheet." The closest this section came to addressing the issue was in asking for comments on whether "ATF [had] selected the most appropriate criteria for determining whether a stabilizing brace has made a firearm subject to the NFA," and whether "commenters ha[d] additional criteria that should be considered." Proposed Rule at 30,826–01, 30,850. But whether the Worksheet model should be scrapped altogether is an entirely different issue. "Agency notice must describe the range of alternatives being considered with reasonable specificity." *Small Refiner Lead v. EPA*, 705 F.2d 500, 549 (1983).

Even if the Final Rule had "not amount[ed] to a complete turnaround" from the Proposed Rule, it was still inadequate because it did not "indicate[] that [the Agencies were] contemplating [the] particular change[.]" *See CSX Transp., Inc. v. Surface Transp. Bd.*, 584 F.3d 1076, 1081–82 (D.C. Cir. 2009); *see also Ass'n of Priv. Sector Colls. & Univs. v. Duncan*, 681 F.3d 427, 462 (D.C. Cir. 2012). Realistically, there was "no way that commenters here could have anticipated which particular aspects of [the Agenices'] proposal were open for consideration." *See CSX Transp.*, 584 F.3d at 1082 (cleaned up).

The Worksheet was not the only major and unpredictable difference. Further highlighting the substantial differences between the Proposed Rule and the Final Rule is the fact that, in issuing the latter, the Agencies more than doubled the estimate they had reported in the Proposed Rule of the Rule's economic impact on affected societal groups—namely, the manufacturers, dealers, and owners of firearms (such as Plaintiffs in this case). The Proposed Rule estimated the cost of the

Rule over a ten-year period at $114.7 million at a 3% discount rate and $125.7 million at a 7% discount rate, *see* Proposed Rule at 30,826–01, 30,845 Tbl. 2; the explanation of the Final Rule, by contrast, put the corresponding figures at $242.4 million and $263.6 million, respectively, *see* Final Rule at 6,573 Tbl. 2. Such a substantial change in the "estimated financial impact of [an agency's] proposal … supports [the] conclusion" that the Final Rule was not a logical outgrowth of the Proposed Rule. *See Allina Health Servs. v. Sebelius*, 746 F.3d 1102, 1108 (D.C. Cir. 2014).

Due to the substantial discrepancy between the Proposed Rule and the Final Rule, the public was denied the chance to comment on the Final Rule's substance and thus the Final Rule violated the APA.

> **D.    Alternatively, if the Final Rule is Upheld, then the Agencies' Regulation of Commonly owned Braced Pistols or Short-Barreled Rifles under the National Firearms Act violates the Second Amendment**

If this Court determines it is likely that the Final Rule will stand, then Plaintiffs are likely to win on their claim that the Final Rule and the NFA are thus unconstitutional given they regulate commonly owned and possessed—and constitutionally protected—braced pistols or short-barreled rifles[17] more stringently than allowed for based on the text and history of the Second Amendment.

In interpreting "Arms," the Supreme Court explained that "[j]ust as the First Amendment protects modern forms of communications, and the Fourth Amendment applies to modern forms of search, the Second Amendment extends, prima facie, to *all instruments that constitute bearable arms*." *Heller*, 554 U.S. at 582 (citations omitted); *see also Bruen*, 142 S. Ct. at 2132. The Second Amendment's text unquestionably extends to braced pistols or short-barreled rifles.

---

[17]    Plaintiffs maintain that the firearms at issue under the Final Rule are pistols with stabilizing braces and not short-barreled rifles. If, however, the Final Rule stands, then the Agencies will retroactively and prospectively treat most, if not all, pistols with stabilizing braces as if they are and always were "short-barreled rifles." Thus, for the purposes of this count, Plaintiffs refer to the items at issue as "braced pistols or short-barreled rifles."

Moreover, as noted above, the required historical work has already been done here. *See* Argument, Section I(A)(1). In *Heller*, the Supreme Court held that the Second Amendment protected the right to "keep and bear" "those [Arms] 'in common use at the time.'" *Heller*, 554 U.S. at 627. "That limitation is fairly supported by the historical tradition of prohibiting the carrying of 'dangerous and unusual weapons.'" *Id*. This Court's task is therefore a simple one: it must merely determine whether these weapons are "dangerous and unusual." "[T]his is a conjunctive test: A weapon may not be banned unless it is *both* dangerous *and* unusual." *Caetano*, 577 U.S. at 417 (Alito, J., concurring). A firearm that is in common use for lawful purposes, by definition, does not fall within this category and cannot be regulated outside of the historical scope of regulation allowable under the Second Amendment. *Bruen*, 142 S. Ct. at 2143.

There can be no question that braced pistols or short-barreled rifles are in common use, and thus not both "dangerous *and* unusual." As of 2012, "[h]undreds of thousands of Tasers and stun guns ha[d] been sold to private citizens" who "may lawfully possess them in 45 States." *Caetano*, 577 U.S. at 420 (Alito, J., concurring) (quoting *People v. Yanna*, 824 N.W.2d 241, 245 (Mich. Ct. App. 2012)). Those hundreds of thousands of stun guns were deemed to constitute "in common use" in *Caetano*. Here, according to the ATF's own report, there were 532,725 registered short-barreled rifles possessed throughout the country as of May 2021. *Firearms Commerce in the United States – Annual Statistical Update 2021*, ATF, 15–17 Ex. 8.[18] Due to high consumer demand for short-barreled rifles and more efficient electronic application forms, there are likely more than that registered today. Moreover, if the Agencies are correct and braced pistols are actually short-barreled rifles, then, based on the Agencies' own estimate, there are at least 3 million more short-barreled rifles that are owned by law-abiding individuals for lawful purposes. *See* Final

---

[18]   https://www.atf.gov/firearms/docs/report/2021-firearms-commerce-report.

Rule at 6,560. Just as hundreds of thousands of stun guns constitute "in common use" in *Caetano*, millions of braced pistols or short-barreled rifles should be considered to constitute "in common use" here. Notably, the Agencies do not dispute comments that there are "millions of 'braces' in use[,]" Final Rule at 6,566, or that braced pistols are "commonly used by millions of law-abiding Americans for various reasons[,]" Final Rule at 6,556.

Even if the Agencies argue that historical work is not done here, despite *Heller*, *Caetano*, and *Bruen*, the burden is still on the Agencies to demonstrate that their laws and regulations are sufficiently analogous to an allowable historical regulation of Arms at the time of the ratification of the Second Amendment. *See Bruen*, 142 S. Ct. at 2130. But here, the Agencies cannot. The NFA imposes severe taxes, burdens, delays, and restrictions upon the acquisition, possession, and lawful use of common, constitutionally protected Arms. Indeed, the ATF concedes that was the purpose of the NFA: "As the legislative history of the law discloses, its underlying purpose was to curtail, if not prohibit, transactions in NFA firearms . . . The $200 making and transfer taxes on most NFA firearms were considered quite severe and adequate to carry out Congress' purpose to discourage or eliminate transactions in these firearms."[19] And yet, the government "may not impose a charge for the enjoyment of a right granted by the federal constitution." *Murdock v. Pennsylvania*, 319 U.S. 105, 113 (1943). But that is exactly what the NFA does. The NFA fee operates as a charge for the privilege of exercising a fundamental right. As such, the NFA is unconstitutional for this reason alone. Additionally, the Agencies commonly impose delays of many months to over one year with respect to acquiring the government's permission to take possession of the firearms at issue. By imposing and enforcing the NFA's costs and delays on the

---

[19] *National Firearms Act*, ATF, https://www.atf.gov/rules-and-regulations/national-firearms-act (last visited Feb. 21, 2023).

acquisition and lawful use of common firearms, and by imposing and enforcing the NFA's restrictions on possession, travel with, and use of regulated arms by law-abiding individuals, the Agencies violate Plaintiffs' rights including Maxim Defense's customers and FPC's members. And importantly, the Agencies cannot point to a single historical analogue that allows them to impose these NFA requirements, including an additional background check, registration, fingerprinting, a tax, travel restrictions, storage restrictions, or any of the NFA's other heightened requirements on the acquisition and possession of commonly owned firearms. Absent any such historical antecedent, the Agencies' enforcement of the NFA with respect to commonly owned, constitutionally protected braced pistols or short-barreled rifles violates the Second Amendment.

## II.   PLAINTIFFS WILL SUFFER IRREPARABLE INJURY IF PRELIMINARY RELIEF IS NOT GRANTED

Plaintiffs will suffer irreparable harm if the Final Rule is not enjoined or delayed. "[H]arm is irreparable" "where there is no adequate remedy at law, such as . . . damages." *Janvey v. Alguire*, 647 F.3d 585, 600 (5th Cir. 2011). For starters, the impairment of constitutional freedoms like those addressed above, "for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 374–75 (1976) (citation omitted). But the harm may also be financial—like the burdens that the Final Rule will impose on Plaintiffs Mock, Lewis, and Maxim Defense—or it may take the form of the loss of freedom resulting from a choice between compliance with an unlawful mandate and incurring stiff penalties—the sort of "choice" that the Final Rule would force upon Plaintiffs Mock, Lewis, and FPC's members. *See BST Holdings, LLC v. OSHA*, 17 F.4th 604, 618 (5th Cir. 2021); *Siemens USA Holdings Inc v. Geisenberger*, 17 F.4th 393, 410 n.22 (3d Cir. 2021); *VanDerStok v. Garland*, __ F. Supp. 3d __, 2022 WL 4809376, at *5 (N.D. Tex. Oct. 1, 2022) ("A showing of irreparable harm" may be based on "deprivations of constitutional or procedural rights," an agency's "action in excess of statutory authority," or "APA

violations[.]"). "Indeed, 'complying with a regulation later held invalid almost always produces the irreparable harm of nonrecoverable compliance costs,'" *Texas v. EPA*, 829 F.3d 405, 433 (5th Cir. 2016) (quoting *Thunder Basin Coal Co. v. Reich*, 510 U.S. 200, 220–21 (1992) (Scalia, J., concurring in part)), since "federal agencies" such as DOJ and ATF "generally enjoy sovereign immunity for any . . . damages," *Wages and White Lion Invs., LLC v. FDA*, 16 F.4th 1130, 1142 (5th Cir. 2021). In sum, Plaintiffs' "lack of a 'guarantee of eventual recovery'" for the threated harms described earlier make those "harm[s] . . . irreparable." *Id.* (quoting *Ala. Ass'n of Realtors v. Dep't of Health & Human Servs.*, 141 S. Ct. 2485, 2489 (2021)).

The Final Rule directly, severely, and irreparably impacts Plaintiff  Maxim Defense's business, which consists in substantial part of selling items targeted by the Final Rule. Dahl Decl. ¶¶ 6–7, 11. Maxim Defense's stabilizing braces are designed, manufactured, and intended to allow individuals to fire large and heavy pistols better and more safely by stabilizing the pistol on the operator's forearm. Dahl Decl. ¶ 6. Maxim Defense is the second largest stabilizing brace manufacturer in the United States. Dahl Decl. ¶ 7. Stabilizing braces comprised about 59% of Maxim Defense's annual non-firearm sales in 2022, which made up over $5 million in sales, and braced pistols comprised about 74% of its annual firearm sales in 2022, which also made up over $5 million in sales. Dahl Decl. ¶ 6. Maxim Defense's reputation extends to the veteran and Tier 1/special operations community, including those that are disabled and rely on Maxim Defense's braces and braced pistols to safely operate their firearms. Dahl Decl. ¶ 7. Should nothing change, Maxim Defense will lose the ability to operate as a business and be stripped of the goodwill that it has developed over the course of the last decade as a manufacturer of stabilizing braces and braced pistols. Dahl Decl. ¶ 11.

Due to the Final Rule, Maxim Defense has already seen a huge decline in sales. Dahl Decl. ¶¶ 10–13. Absent an injunction, Maxim Defense anticipates that it could lose more than $6 million in sales after one month and will continue to lose millions of dollars over the next few months. Dahl Decl. ¶ 12. These harms are far from speculative—Maxim Defense has pending orders for hundreds of thousands of dollars' worth of product it can no longer transfer to buyers because of the Final Rule. Dahl Decl. ¶ 13. It also has manufacturing orders for thousands of braces that are being canceled because of the Final Rule and more than $1 million of materials that it purchased in anticipation of its sales in 2023 that it can no longer use for their intended purposes. Dahl Decl. ¶ 13. As Maxim Defense loses revenue from its inability to sell its braced pistol, it will also lose the ability to continue to employ as much as 50% of its current staff. Dahl Decl. ¶ 14. It has already parted ways with three full-time and one part-time employees because of the loss of revenue from the impact of the Final Rule. Dahl Decl. ¶ 14. Maxim Defense anticipates more layoffs will have to occur within 30 days if it does not receive relief from the Final Rule. Dahl Decl. ¶ 14.

Similarly, Plaintiffs Mock and Lewis currently lawfully possess firearms that will likely subject them either to potential criminal liability or to costly and burdensome requirements under the Final Rule. *See* Mock Decl. ¶¶ 5–11; Lewis Decl. ¶¶ 5–10.[20] If the Final Rule is not enjoined, they will be required to subject themselves to NFA *registration* requirements including purchasing and submitting passport photos and fingerprints, which costs are unrecoverable, and will be required to disclose sensitive personal information. *See* Mock Decl. ¶¶ 6–9; Lewis Decl. ¶ 5–8. Once registered, their constitutionally protected firearms will be forever included on a national registry—without any legal mechanism allowing them to unregister their firearms. Further, they

---

[20]   Paradoxically, among the burdens that come from compliance are the need to submit a background check for property they already own and passed a background check to purchase. *See* Mock Decl. ¶ 7; Lewis Decl. ¶ 6.

will be subjected to numerous delays imposed by the Agencies that will, among other things, burden their ability to travel interstate with their constitutionally protected firearm and leave them in a state of limbo—having given evidence to the Agencies of possession of what the Agencies classify as a short-barreled rifle but without the legally required NFA Tax Stamp. *See* Mock Decl. ¶ 6–9; Lewis Decl. ¶ 5–8. And, for the first time, they will be exposed to greater criminal liability for even an accidental violation of federal firearm laws because of the impact of the NFA. *See* Mock Decl. ¶ 7–9; Lewis Decl. ¶ 6–8. Faced with these regulatory requirements and the possibility of criminal liability, they and others will simply avoid engaging in constitutionally protected activities such as keeping braced pistols they purchased in reliance of the Agencies' prior interpretations or even purchasing a new braced pistol, both activities which implicate the Second Amendment's protection on the right to keep and bear arms for self-defense in the home.[21]

Plaintiff FPC's members will sustain irreparable injury in the absence of preliminary relief as well, since many of its members (including Mock and Lewis) lawfully possess firearms that will likely subject them either to potential criminal liability or to costly burdensome requirements under the Final Rule and many of its corporate members (including Maxim Defense) will be negatively impacted in their inability to continue what have been lawful business practices for the past decade. *See* Combs Decl. ¶ 3–10; *N. Carolina State Conf. of the NAACP v. Raymond*, 981 F.3d 295, 311 n.9 (4th Cir. 2020).

### III.   PLAINTIFFS' INJURY OUTWEIGHS ANY HARM TO DEFENDANTS OR THE PUBLIC—AND AN INJUNCTION WOULD LIKELY BENEFIT THE PUBLIC

---

[21]   Moreover, as discussed in detail above, due to the vague nature of the Final Rule discussed above, neither Individual Plaintiffs nor FPC's members can know exactly how to comply with the Final Rule by the current effective date.

Finally, the injury Plaintiffs and other gun owners and manufacturers would face if they were subject to the law outweighs any harm to the Agencies or the general public.

The factors of "harm to the opposing party and weighing the public interest" "merge when the Government is the opposing party[.]" *Nken v. Holder*, 556 U.S. 418, 435 (2009). Both the actual infringement on constitutionally protected rights and a chilling effect on their exercise constitute "extraordinary harm." *Ashcroft v. Am. C.L. Union*, 542 U.S. 656, 670–71 (2004). Moreover, "the public interest is served when administrative agencies comply with their obligations under the APA." *N. Mariana Islands v. United States*, 686 F. Supp. 2d 7, 21 (D.D.C. 2009); *accord Jacksonville Port Auth. v. Adams*, 556 F.2d 52, 58–59 (D.C. Cir. 1997).

Here, Plaintiffs face "extraordinary harm" in the form of violations of, and a chilling effect on, the exercise of their rights as protected by the First, Second, and Fifth Amendments. Thus, Individual Plaintiffs, Maxim Defense's customers, and FPC's members all have a strong interest that justifies granting an injunction.

In addition, as fully demonstrated above, manufacturers and retailers, such as Plaintiff Maxim Defense will continue to be seriously harmed by the Final Rule not only because they are a regulated entity, but also because of the harms the Final Rule imposes on their customers, similar to those of Individual Plaintiffs. The market for braced pistols and pistol braces will not simply shift into compliance—the industry will more likely die. The purpose of braced pistols and stabilizing braces is to provide stabilization for heavy or long pistols, not to acquire a short-barreled rifles subject to the NFA.

Plaintiffs' interests further weigh in favor of an injunction because their interests merge with those of the public. *Nken*, 556 U.S. at 435. And the public, given its strong interest in ensuring government agencies follow the law, has an interest in an injunction. *N. Mariana Islands*, 686 F.

Supp. 2d at 21; *Jacksonville Port Auth. v. Adams*, 556 F.2d at 58–59. Furthermore, the "constitutional interests implicated and the short timeframe in which to challenge the restrictions mean there is a strong public interest in this precedent" that would accompany the order. *Hirschfeld v. Bureau of Alcohol, Firearms, Tobacco & Explosives*, 14 F.4th 322, 327 (4th Cir. 2021) (subsequent history omitted). In such circumstances, the public benefits from a chance to have this Court address the issue on the merits, because "[j]udicial precedents are . . . valuable to the legal community as a whole." *Id.* at 327 (quoting *U.S. Bancorp Mortg. Co. v. Bonner Mall P'ship*, 513 U.S. 18, 25-26 (1994)); *see also SD Voice v. Noem,* 987 F.3d 1186, 1190-91 (8th Cir. 2021) (reasoning that protection of constitutional rights serves public interest).

The Agencies, on the other hand, will not suffer significant harm by maintenance of the decade-long status quo regarding what constitutes a "rifle" while this Court considers the merits of the Final Rule. The Agencies have not identified any substantial harm, much less "extraordinary harm," that would result from an injunction. Indeed, the Final Rule itself contains a delay in enforcement. Final Rule at 6,553 ("The Department, in its enforcement discretion, has determined that current possessors of these affected firearms have until 120 days after this rule is published to take the necessary actions, as described in this rule, to comply with Federal law to avoid civil and criminal penalties."). Granting a preliminary injunction during the pendency of this litigation serves the public interest by allowing the Court to provide clarity on the validity of the Final Rule while "ensur[ing] the status quo is maintained so the legal system can resolve [an] important dispute." *City of Dallas, Texas v. Hall*, 2008 WL 11350041, at *3 (N.D. Tex. July 28, 2008).

## IV.   THE COURT SHOULD ENTIRELY ENJOIN ENFORCEMENT OF THE FINAL RULE OR, IN THE ALTERNATIVE, POSTPONE ITS EFFECTIVE DATE

The APA empowers this Court to "issue *all necessary and appropriate process* to *postpone the effective date of an agency action* or *to preserve status or rights* pending conclusion of the

review proceedings[,]" 5 U.S.C. § 705 (emphases added); and to "hold unlawful and set aside agency action, findings, and conclusions[.]" 5 U.S.C. § 706. The plain language of these sections indicates the APA empowers a court to enter relief against the unlawful agency action itself. The purpose of section 705 is not just to preserve the rights of the parties before the court, but to "preserve status *or* rights," and it empowers a court to "postpone the effective date of an agency action," both of which apply to the full breadth of an agency action. *Id.* And if this Court has the final authority to set aside a rule completely, which it does pursuant to section 706, it follows that this Court has the authority to preliminarily enjoin a rule to the same extent. *See* Mila Sohoni, *The Power to Vacate a Rule*, 88 GEO. WASH. L. REV. 1121, 1126 (2020).

In APA cases, "'the scope of injunctive relief is dictated by the extent of the violation established, not by the geographical extent of the plaintiff class.'" *Nevada v. U.S. Dep't of Labor*, 218 F. Supp. 3d 520, 533–34 (E.D. Tex. 2016) (quoting *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979)). "Where a party brings a facial challenge alleging that agency action violated APA procedures, a nationwide injunction is appropriate." *Nat'l Fed'n of Indep. Bus. v. Perez*, No. 16-cv-00066, 2016 WL 3766121, at *46 (N.D. Tex. June 27, 2016) (citation omitted); *see Franciscan All., Inc. v. Burwell*, 227 F. Supp. 3d 660, 695 (N.D. Tex. 2016) ("A nationwide injunction is appropriate when a party brings a facial challenge to an agency action under the APA.").

In *Nevada v. United States Department of Labor*, for example, the Eastern District of Texas reviewed a final rule issued by the Department of Labor that sought to "modernize and streamline the existing overtime regulations for executive, administrative, and professional employees." 218 F. Supp. 3d at 524. After determining that the rule likely exceeded the scope of defendants' authority, predominately because it departed from the plain meaning of the authorizing statute, the court turned to the scope of the injunction. *Id.* at 527–33. It explained that the Final Rule applies

"to all states," so that harm will "extend[] nationwide" if the injunction does not protect everyone, regardless of their location. *Id.* at 534.

Broadly applicable injunctions have also been granted in this District where an agency's final rule has general applicability nationwide and the court has determined the rule is likely unlawful. *See Texas v. United States*, 201 F. Supp. 3d 810, 836 (N.D. Tex. 2016); *Nat'l Fed'n of Indep. Bus.*, 2016 WL 3766121 at *46. The Fifth Circuit has approved this practice, specifically in the context of preliminary injunctions issued pursuant to APA challenges. *Texas v. United States*, 809 F.3d 134, 188 (5th Cir. 2015) ("[T]he Constitution vests the District Court with 'the judicial Power of the United States.' That power is not limited to the district wherein the court sits but extends across the country. It is not beyond the power of a court, in appropriate circumstances, to issue a nationwide injunction.") (quoting U.S. CONST. Art. III, § 1).

Plaintiffs do not argue that broad injunctions are appropriate in all contexts. But given the nationwide scope of the harm, such an injunction is appropriate—and indeed necessary—here to afford Plaintiffs relief. First, as demonstrated above, the Final Rule violates the Constitution and thus threatens everyone who has or would like braced pistols, meaning that, even with a narrow injunction in place, Plaintiffs cannot engage in activities that they would have been free to with others before the Final Rule such as transfer their braced pistols to individuals or FFLs not subject to the injunction's protections or to purchase new braced pistols.

Second, an injunction limited to Maxim Defense will not afford Maxim Defense any practical relief. Because the braced pistols would remain firearms, just not NFA items, Maxim Defense is still required to follow all applicable federal laws in the sale and transfer of those items. That includes transferring its braced pistols to dealers, retailers, wholesalers, and other third parties across the United States. Dahl Decl. ¶¶ 9–10. If only Maxim Defense is covered by an injunction,

then as soon as it attempts to transfer a braced pistol to another FFL, that FFL would immediately be in possession of an unregistered short-barreled rifle, since that FFL would not be covered under a narrow injunction, and that FFL would then be exposed to civil and criminal liability. Moreover, it is unlikely that FFL could even legally receive the item since it would be transferred off Maxim Defense's FFL records as a pistol but would have to be received by the other FFL as a short-barreled rifle.[22] And, of course, an FFL that does not have an ATF issued Special Occupational Tax license cannot receive a transferred NFA item. The next step in the purchase chain presents the same problem. Even if an injunction extends to Maxim Defense *and* its customers, the intermediate FFL would still be prohibited from transferring an NFA item to an individual purchaser without complying with the NFA's requirements, including submitting an ATF Form 4 and waiting to transfer the item until it was approved. Maxim Defense's ability to continue selling the items at issue here cannot be revived by an injunction simply extending to Maxim Defense and its customers, because of the expansive number of third parties necessarily involved in a firearm transaction. The requirements of federal firearms law similarly hinder Individual Plaintiffs. Indeed, because of the necessary involvement of third parties, even if both Maxim Defense and the Individual Plaintiffs were covered by an injunction, Individual Plaintiffs still would not be able to purchase a braced pistol directly from Maxim Defense.

And, of course, Individual Plaintiffs and Maxim Defense are representative of FPC's many other members across the United States, all of whom would have standing to bring this suit in their own right and are equally impacted and injured by the Final Rule. FPC brings this suit on behalf of those members to vindicate its members' constitutionally and statutorily protected rights, which

---

[22]    Another issue is that non-NFA items can be listed on an FFL's books as multi-caliber, whereas NFA items must have an associated caliber.

are directly germane to FPC's mission. And, finally, FPC's members individual participation in this suit is not necessary, given this Court can afford the full scope of relief necessary to protect their rights and mitigate their injuries pursuant to the APA.

At the very least, this Court should delay the Final Rule's effective date to preserve the status quo during the pendency of this litigation. If this Court does delay the effective date of the Final Rule, then Plaintiffs request that order postpone the effective date until 120 days after this Court issues a final judgment and mandate, thereby allowing this Court to address the merits of this case and any appeals to be resolved. And, should the Agencies prevail, it would give individuals and businesses adequate time to comply with the upheld rule.

The relief Plaintiffs request is expansive, but the Agencies have brought this on themselves. It is the Agencies that decided to transmute the status of braced pistols by decree, that unlawfully sought to make the Final Rule immediately applicable,[23] that decided to retroactively change their decade-long position and treat all braced pistols as if they are and have always been short-barreled rifles, that chose to violate the constitutionally protected rights of at least 1.5 million Americans, and that failed to abide by their legal obligations under the APA. To prevent the suffering and irreparable injury that will immediately befall lawful gun owners, businesses, and manufacturers, the Agencies must be prevented from enforcing the Final Rule in its entirety or be delayed from implementing the Final Rule and its reclassification of braced pistols until 120 days after a final judgment and mandate is issued by this Court.

**CONCLUSION**

---

[23]     *See* 5 U.S.C. § 553(d) ("The required publication or service of a substantive rule shall be made not less than 30 days before its effective date[.]").

45

For these reasons, Plaintiffs ask this Court to enjoin the Agencies' enforcement of the Final Rule in its entirety or, alternatively, to postpone the effective date of the Final Rule until a decision can be reached on the merits and this Court issues a final judgment.

Respectfully submitted,

R. Brent Cooper
TX Bar No. 04783250
brent.cooper@cooperscully.com
Benjamin D. Passey
TX Bar No. 24125681
Ben.passey@cooperscully.com

COOPER & SCULLY, P.C.
900 Jackson Street, Suite 100
Dallas, TX  75202
Telephone: (214) 712-9500
Telecopy: (214) 712-9540

*/s/ Cody J. Wisniewski*
Cody J. Wisniewski*
CO Bar No. 50415
cwi@fpchq.org

FIREARMS POLICY COALITION
5550 Painted Mirage Road, Suite 320
Las Vegas, NV  89149
Telephone: (916) 378-5785
Telecopy: (916) 476-2392

*Admitted *pro hac vice*

*Attorneys for Plaintiffs*