## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## FORT WORTH DIVISION

| | |
|---|---|
| WILLIAM T. MOCK; CHRISTOPHER LEWIS; MAXIM DEFENSE INDUSTRIES, LLC, a limited liability company; and FIREARMS POLICY COALITION, INC., a nonprofit corporation, | |
| *Plaintiffs*, | |
| v. | |
| MERRICK GARLAND, in his official capacity as Attorney General of the United States; the UNITED STATES DEPARTMENT OF JUSTICE; STEVE DETTELBACH, in his official capacity as the Director of the Bureau of Alcohol, Tobacco, Firearms and Explosives; and the BUREAU OF ALCOHOL, TOBACCO, FIREARMS AND EXPLOSIVES, | Civil Action No. 4:23-cv-00095-O |
| *Defendants*. | |

## PLAINTIFFS' REPLY IN SUPPORT OF THEIR MOTION FOR A PRELIMINARY INJUNCTION OR, IN THE ALTERNATIVE, FOR POSTPONEMENT OF THE EFFECTIVE DATE OF THE FINAL RULE

The Agencies' Response to Plaintiffs' Motion is nothing of the sort. Instead of rebutting Plaintiffs' actual arguments, the Agencies manufacture their own version of Plaintiffs' Motion. Despite the Agencies' strawmen, it remains evident that Plaintiffs are likely to succeed in this matter, are irreparably injured, and that the balance of interests weighs in favor of an injunction.

## I.      THE FINAL RULE IS A SUBSTANTIVE RULE, NOT AN INTERPRETIVE RULE

As an initial matter, the Agencies, in several instances, attempt to lessen their burden and mitigate the impact of the Final Rule by claiming it is an interpretive rule, and not a substantive or legislative rule. But the Agencies characterization is flawed.

*First*, the Agencies engaged in a years' long notice and comment period to promulgate the Final Rule. *See* Proposed Rule, 86 Fed. Reg. 30,826 (June 10, 2021). If the Final Rule is merely interpretive, and not subject to notice and comment requirements, the Agencies fail to explain why they engaged in that process at all.

*Second*, the Final Rule is a "binding" substantive rule that creates new "rights and obligations." *See Texas v. United States*, 809 F.3d 134, 171 (5th Cir. 2015), *aff'd* 577 U.S. 1101 (2016). The Final Rule is a "substantive change in existing law or policy," *Texas v. United States*, 86 F. Supp. 3d 591, 670 (S.D. Tex. 2015), evidenced by the fact that the Final Rule changes the legal status of at least 3 million firearms, the legal process on how corporations may sell, and how individuals may acquire those Arms. Final Rule, 88 Fed. Reg. 6,478, 6,478–81 (Jan. 31, 2023). And it imposes additional requirements on the possession, storage, and transportation of those Arms once acquired. *Id*. The Agencies' claim that the Final Rule "does not impose any new legal obligations," is thus misplaced. *Compare Defendants' Opposition to Plaintiffs' Motion* ("Feds' Resp."), ECF No. 37, at 19 (quoted) *with id.* at 14 ("After completing the notice-and-comment process, the agency issued the Rule to amend its existing regulations . . . .") (citation omitted).

## II.    PLAINTIFFS ARE LIKELY TO PREVAIL ON THE MERITS

### A.    The Agencies' Arguments in Favor of Constitutionality are Unavailing[1]

#### 1.    The Final Rule Infringes on Plaintiffs' Right to Keep and Bear Arms

The Agencies' Response *assumes* the firearms at issue are rifles, *see* Feds' Br. at 22–31, and blends Plaintiffs' challenge to the Final Rule based on braced pistols and Plaintiffs' alternative claim, if the Final Rule is upheld, into a single argument, *cf. Plaintiffs' Brief in Support* ("Pls. Br."), ECF No. 36, at 11–15, 33–36. The Agencies' arguments as to *pistols* are unavailing.

*First*, braced pistols are in common use. The Agencies admit there are (at least) 3 million lawfully possessed braced pistols. Final Rule at 6,560.[2] In *Caetano v. Massachusetts*, Justice Alito explained that the "relevant statistic is that hundreds of thousands of Tasers and stun guns have been sold to private citizens, who it appears may lawfully possess them in 45 states." 577 U.S. 411, 420 (2016) (Alito, J., concurring) (cleaned up).[3] Justice Alito cited a party brief acknowledging that "'approximately 200,000 civilians owned stun guns' as of 2009." *Id*. Considering "the historical tradition of prohibiting the carrying of 'dangerous and unusual weapons,'" arms "in common use at the time" are protected and cannot be regulated outside of historical tradition, *New York State Rifle & Pistol Ass'n v. Bruen*, 142 S. Ct. 2111, 2130 (2022), 3 million braced pistols are "in common use" and garner the same protection, *see* Pls. Br. at 11–15.

---

[1] Plaintiffs' rest on their First Amendment argument as articulated in their Preliminary Injunction Brief, along with any other arguments not specifically addressed herein. *See* Pls. Br. at 15–19.

[2] That number is likely higher. *See Handguns, Stabilizing Braces, and Related Components*, CONGRESSIONAL RESEARCH SERVICE, https://bit.ly/3yKPSlt (Apr. 19, 2021).

[3] The Agencies attempt to make this "common use" test a conjunctive test rather than alternative one. *See* Feds' Resp. at 26. *Bruen* does not support a determination that firearms must be common in number *and* common in jurisdiction. *See Bruen*, 142 S. Ct. at 2143. In so far as *Hollis* controls, it is overruled, in relevant part, by *Bruen*. *See United States v. Rahimi*, __ F.4th __, 2023 WL 2317796, at *3 (5th Cir. 2023) ("Bruen clearly 'fundamentally change[d]' our analysis . . . rendering our prior precedent obsolete.") (citation omitted). Even if the Agencies were correct, *braced pistols* are common in both regards. *Cf.* Feds' Br at 23–31.

Even if this Court goes further, each case the Agencies cite was decided before *Bruen*, and addresses NFA items, not pistols. Feds' Br. at 23. Specifically, *Hollis v. Lynch* addressed "175,977 pre–1986 civilian-owned machineguns" that are heavily regulated across the United States, 827 F.3d 436, 449–50 (5th Cir. 2016); not millions of pistols that are broadly legal across the country.

*Second*, a tax on the exercise of a constitutionally protected right, required registration of firearms, a prohibition on travel, and heightened criminal liability all implicate the Second Amendment. *See* Pls. Br. at 11–15, 33–36; Declaration of William T. Mock ("Mock Decl."), ECF No. 36-4, ¶¶ 7–8, 10–11; Declaration of Christopher Lewis ("Lewis Decl."), ECF No. 36-3, ¶¶ 6–7, 9–10. Moreover, because a braced pistol is *not* a rifle under the plain meaning of the NFA and GCA, the Final Rule unconstitutionally limits Plaintiffs'—including Maxim Defense's customers and FPC's members'—constitutionally protected right to possess a pistol in the home. Pls. Br. at 11–14; 25–29. The Agencies have not met their burden in establishing that such regulation is historically permissible. *See Bruen*, 142 S. Ct. at 2130. The only historical statutes the Agencies offer to support are four states that levied taxes "on pistols, and in certain [unspecified] cases other firearms" during the 19th century.[4] Feds. Br. at 29. But both *Heller* and *Bruen* make clear that a few outlier laws are inadequate. *See District of Columbia v. Heller*, 554 U.S. 570, 632 (2008); *Bruen*, 142 S. Ct. at 2142. And these outlier laws from the late 19th century are too modern to benefit the government. *See Bruen*, 142 S. Ct. at 2154, 2154 n.28.

Also, because the Final Rule is unclear and overly broad, it also unconstitutionally chills the exercise of Plaintiffs'—including Maxim Defense's customers' and FPC's members'—constitutionally protected right to possess a pistol because individuals will be dissuaded from exercising their rights for fear of criminal prosecution for constructively possessing a short-

---

[4] If this Court deems the other statutes relevant here, Plaintiffs address those in Section II(C).

3

barreled rifle if they possess a pistol and anything that *may* be able to be attached to it to convert it into a rifle under the Final Rule. Pls. Br. at 14–15; Mock Decl. ¶ 11; Lewis Decl. ¶ 10.[5]

*Third*, the other cases the Agencies cite are distinguishable. *Bezet v. United States* was a *pro se* challenge brought by an individual who sought to convert a semiautomatic pistol into a fully automatic silenced rifle. 714 F. App'x 336, 338 (5th Cir. 2017). Neither machineguns nor silencers are at issue here. *Lane v. Holder* addressed the prohibition on Washington D.C. residents acquiring handguns directly from states and was dismissed for want of standing. 703 F.3d 668, 670 (4th Cir. 2012). Interstate transfer is not at issue here and any discussion as to the propriety of the government's regulations is out-of-circuit *dicta*. Last, the Agencies cannot draw a line between Justice Kavanaugh's discussion of a license to carry a firearm concealed in public and the ability of an individual to possess a pistol in the home for self-defense, the most basic understanding of the Second Amendment's protections. *Compare* Feds' Br. at 24–25, *with Heller*, 554 U.S. at 630.[6]

## 2. The Agencies' Final Rule is Unconstitutional for Several Reasons

Plaintiffs limit their Reply to addressing specific flaws with the Agencies' Response as to the Final Rule's constitutionality. *First*, Plaintiffs never argue that *the NFA* violates the non-delegation doctrine. *See* Feds' Br. at 31–32. Plaintiffs argue *the Final Rule*, and the federal regulations that it amends, exceeds any congressionally delegated authority. Pls. Br. 25–29.

---

[5] The Agencies incorrectly assert that Plaintiffs "do not aver" that they are chilled from exercising their Second Amendment protected rights, Feds' Br. at 31; but both Mock and Lewis *specifically* state as much. Mock Decl. ¶ 11; Lewis Decl. ¶ 10.

[6] The Agencies' argument that stabilizing braces do not enjoy any protection mistakes Supreme Court precedent. "Thus, even though the Second Amendment's definition of 'arms' is fixed according to its historical understanding, that general definition covers modern *instruments* that *facilitate* armed self-defense." *Bruen*, 142 S. Ct. at 2132 (emphases added) (citation omitted). Stabilizing braces *facilitate* armed self-defense for millions of Americans that use them on self-defense tools, including those that cannot operate large and heavy pistols but for their braces.

*Second*, while Plaintiffs agree that the statutes are unambiguous, Fed's Br. at 33—insofar as they unambiguously prevent the Agencies from promulgating the Final Rule—should this Court find ambiguity, that ambiguity cannot be resolved in favor of the Agencies. *See Cargill v. Garland*, 57 F.4th 447, 464–65 (5th Cir. 2023) (*en banc*).

*Third*, the Agencies' response to Plaintiffs' example demonstrating the vagueness of the Final Rule further underscores Plaintiffs' point. The Agencies argue that their test is not wholly subjective, and that the Final Rule provides fair notice, Feds' Br. at 34–36, but immediately argue that Plaintiffs' argument as to sights and scopes is unavailing because "this factor is, of course, just one to be considered in the totality and not itself determinative," Feds' Br. at 37.

**B.     The Plaintiffs Are Likely to Succeed on Their Claims that the Final Rule Violates Multiple Provisions of the APA**

**1.     The Final Rule Exceeds the Agencies' Jurisdiction and Authority**

Plaintiffs do not argue the Agencies cannot issue rules, *contra* Feds' Br. at 12–13, but that the Final Rule is broader than any congressionally-delegated authority and regulates NFA-exempt items, Pls. Br. at 25–29. The Agencies incorrectly assert "Plaintiffs begin by suggesting that, if a "brace"-equipped weapon is created from a *pistol*, it cannot be a "rifle" under § 5845(c) and § 921(a)(7)." Feds' Br. at 15. If someone remakes a pistol into a rifle by swapping a brace (not designed to be fired from the shoulder) for a stock (designed to be fired from the shoulder), then the firearm may become a short-barreled rifle. But a brace is not a stock, no matter how the Agencies now try to conflate the two. And the Agencies cannot ignore objective design criteria, including the manufacturer's design and intent required under the NFA and GCA's plain meaning.

Additionally, while the Agencies argue that they are within their power to consider "a manufacturer's description of the weapon in marketing materials and information indicating its likely use, for purposes of determining whether the weapon is designed and intended to be fired

from the shoulder," the Agencies provide examples where they simply ignore those representations in favor of other factors. Feds' Br. at 16 (citation omitted).

### 2. The Final Rule is not a Logical Outgrowth of the Proposed Rule

All one must do to see the folly of the Agencies' argument is set the Proposed Rule's Worksheet 4999 next to the Final Rule's redefinition of federal regulation to demonstrate that the Final Rule is not a logical outgrowth. *Compare* Proposed Rule at 30,830–31, *with* Final Rule at 6,574–75. Interested parties could not anticipate the Final Rule would evolve from Worksheet 4999. *See Texas v. EPA*, 389 F. Supp. 3d 497, 503–04 (S.D. Tex. 2019). The Final Rule abandoned any objective guidance from the Proposed Rule, and includes new subjective factors, including third party use of a product. Final Rule at 6,574–75.

The Agencies' assertion that "[t]he factors discussed in the [Proposed Rule] will, under the final rule, continue to help determine whether a weapon meets the statutory definition of a 'rifle," Feds' Br. at 21 (quoting Final Rule at 6,494), is meaningless, given the Final Rule did not adopt the objective assessment criteria from the Proposed Rule and the Final Rule fully imbues the Agencies with discretion to consider whatever they want, whenever they want.

### C. Alternatively, the Agencies' Regulation of Commonly owned Braced Pistols or Short-Barreled Rifles under the NFA violates the Second Amendment

If the Final Rule is upheld, the Agencies' enforcement of the NFA against braced-pistols and/or short-barreled rifles is unconstitutional. *See* Pls. Br. at 33–36. The Second Amendment protects these arms, which are commonly owned, and the required historical work has already been done. *See* Section II(A)(1); Pls. Br. at 33–35. But, if this Court looks to the Agencies' recitation of history, they fail to establish historical regulation consistent with the NFA. *See* Feds' Br. at 27. The Agencies provide four types of laws. 17th- and 18th-century militia laws allowing militia officers to ensure that militiamen had the requisite arms. *Id.* at 28. Two 19th-century laws requiring

6

firearms be tested before being sold to ensure that the barrel would not explode. *Id.* Five laws over the course of nearly 250 years (from 1651 to 1899) requiring "[l]icenses or inspection" for random activities ranging from gunpowder exportation to participating in "sporting" activities—including one from Hawaii three decades before it was a U.S. territory. And four state taxation statutes from the 19th century that are addressed above. *See* Section II(A)(1).

Neither the militia nor barrel-testing laws burdened anyone's ability to possess any type of arm. Laws requiring that gunpowder be inspected before exportation are entirely irrelevant, as are laws requiring a license to engage in sporting activities, especially considering that one was from a foreign territory, and another was from 1899. At base, a few outlier laws are inadequate to meet the Agencies' burden. *See supra* Section II(A)(1); *Heller*, 554 U.S. at 632; *Bruen*, 142 S. Ct. at 2142. And laws falling outside of the period surrounding the Second Amendment's ratification are too late to benefit the Agencies. *See Bruen*, 142 S. Ct. at 2154, 2154 n.28. Thus, the Agencies cannot point to a historical analogue that permits them to enforce the NFA's onerous requirements on the acquisition and possession of commonly owned firearms. Absent such a showing, the Agencies have failed to meet their burden under *Bruen*.

## III.   PLAINTIFFS ARE CURRENTLY AND WILL CONTINUE TO SUFFER IRREPARABLE INJURY WITHOUT PRELIMINARY RELIEF

Plaintiffs are suffering and will continue to suffer irreparable harm if the Final Rule is not enjoined or delayed, and "it is no answer to say that [Plaintiffs] may avoid the harm by complying with an unlawful agency rule." *See VanDerStok*, 2022 WL 4809376, at *9. Additionally, despite the Agencies' cursory argument, *see* Feds' Br. at 11–12, Plaintiffs have standing to bring this suit.[7]

_____

[7] The Agencies' argument that "a facial APA challenge to the Rule is ill-suited to redressing Plaintiffs' alleged injuries," misunderstands the APA. Feds' Br. at 11–12. The Final Rule is a final agency action, subject to this Court's review, that has harmed all Plaintiffs. *See* 5 U.S.C. § 704;

The Agencies' argument that Mock and Lewis cannot establish harm because they have not received classification of their firearms is misplaced, since the Final Rule treats their firearms as short-barreled rifles according to the Agencies' guidance documents. *Compare* Mock Decl. ¶ 6; *with Common weapon platforms with attached "stabilizing brace" designs that are short-barreled rifles*, ATF;[8] and *compare* Lewis Decl. ¶ 5, *with Commercially available firearms equipped with a "stabilizing brace" that are short-barreled rifles*, ATF.[9] Mock and Lewis both alleged they do not wish to be subject to the NFA's heightened requirements, Mock Decl. ¶¶ 7–8, Lewis Decl. ¶¶ 6–7; they have concrete plans to purchase braced pistols in the future, but for the Final Rule's requirement they comply with the NFA or face criminal charges, Mock Decl. ¶ 7; Lewis Decl. ¶ 6; and that the Final Rule's chills the exercise of their rights because they "cannot know exactly how to comply[.]" Mock Decl. ¶ 11; Lewis Decl. ¶ 10. Thus, they have demonstrated a "credible threat of a potential felony indictment" and have "sufficiently demonstrated irreparable harm." *See VanDerStok v. Garland*, __ F. Supp. 3d __, 2022 WL 4809376, at *5 (N.D. Tex. Oct. 1, 2022).

Maxim Defense ceased the sale of braced pistols after the Final Rule went into effect, Dahl Decl. ¶ 10; Supplemental Declaration of David Dahl ("Dahl Supp. Decl.") ¶ 3; has lost millions of dollars and has been forced to lay off 5 employees due to the Final Rule, Dahl Supp. Decl. ¶¶ 5, 7; lost total sales of over $900,000 in February 2023, and of almost $1.2 million from March 1st through 14th, 2023, compared to the same periods in 2022, Dahl Supp. Decl. ¶ 5; and based on Maxim Defense's projections, it will continue to lose over $400,000 per month on braced pistols sales, for a total of over $4.5 million in 2023, Dahl Supp. Decl. ¶ 6. Absent an injunction, Maxim

---

Pls. Br. at 36–39. Because that action fails to comply with the APA and the Constitution, Plaintiffs challenge its lawfulness and constitutionality. *See* First Amended Petition, ECF No. 13.
[8] https://bit.ly/3YWKxCc (last visited Mar. 17, 2023).
[9] https://bit.ly/3n30uK9 (last visited Mar. 17, 2023).

Defense will have to continue to strategically restructure and reorganize its operations to mitigate the impact of the Final Rule including attempting to liquidate millions of dollars of inventory and parting ways with 12 to 14 employees over the next few months. Dahl Supp. Decl. ¶¶ 8–9.

Finally, as to FPC, because Mock, Lewis, and Maxim Defense have standing, are injured, and because the interests FPC seeks to protect are germane to its purpose, FPC's burden as to associational standing is met. *See Warth v. Seldin*, 422 U.S. 490, 511 (1975) (explaining associational standing); *Ass'n of Am. Physicians & Surgeons, Inc. v. Tex. Med. Bd.*, 627 F.3d 547, 550 (5th Cir. 2010) (test for associational standing). More, it is unnecessary to require individual participation of FPC's members here, given the relief sought is injunctive in nature and would simply return federal regulation to the status quo as of January 30, 2023.[10]

## IV. THE AGENICES' CURSORY TREATMENT OF THE BALANCE OF HARMS DEMONSTRATES THE BALANCE WEIGHS IN PLAINTIFFS' FAVOR

The Agencies undermine their own argument that the balance weighs in their favor. While the Agencies claim the Final Rule will provide better clarity than the "prior system of *ad hoc* classification," Feds' Br. at 43, they inform the Court (and Plaintiffs) that "ATF is . . . drafting classification letters that it will send directly to manufacturers to notify them of how ATF has formally classified their weapons[,]" and that "an individual may request a classification determination from ATF for additional clarity[,]" Fed's Br. at 35.

The Agencies will not suffer significant harm by maintenance of a decade-long status quo while this Court considers the merits of the Final Rule. Indeed, there is no public benefit in

---

[10] The third prong is "prudential" and, while an association's action for damages running solely to its members would be barred, equitable claims of relief are not. *Ass'n of Am. Physicians & Surgeons, Inc. v. Tex. Med. Bd.*, 627 F.3d 547, 551, 553 (5th Cir. 2010) (quotation omitted). This District has already determined that FPC has met this test in a similar context. *See Firearms Policy Coal., Inc. v. McCraw*, No. 4:21-cv-1245-P, 2022 WL 3656996, at *2 (N.D. Tex. Aug. 25, 2022).

allowing the Agencies to enforce an unlawful and unconstitutional Final Rule. *See VanDerStok v. Garland*, __ F. Supp. 3d __, 2022 WL 4009048, at *10 (N.D. Tex. Sept. 2, 2022) ("Defendants' enforcement of the rule strips Plaintiffs of freedoms they lawfully enjoyed until just last week.").

## V.   THE SCOPE OF RELIEF IS DICTATED BY THE IMPACT OF THE RULE AND THE EXTENT NECESSARY TO AFFORD PLAINTIFFS' FULL RELIEF

In APA cases, "the scope of injunctive relief is dictated by the extent of the violation established, not by the geographical extent of the plaintiff class." *Nevada v. U.S. Dep't of Labor*, 218 F. Supp. 3d 520, 533–34 (E.D. Tex. 2016) (quotation omitted). Given Fifth Circuit precedent recognizes the APA, specifically section 706, "empowers courts to 'set aside'—i.e., formally nullify and revoke—an unlawful agency action," this Court has equal power to broadly, preliminarily enjoin enforcement of the Final Rule. *Data Mktg. P'ship, LP v. U.S. Dep't of Labor*, 45 F.4th 846, 859 (5th Cir. 2022) (quotation omitted); *see* Mila Sohoni, *The Power to Vacate a Rule*, 88 Geo. Wash. L. Rev. 1121, 1126 (2020).

Most telling, however, is that while the Agencies claim that broad relief is not "warranted or appropriate" here, Feds' Br. at 44, they do not offer *any* narrower construction of an injunction that would actually alleviate the harm suffered by Maxim Defense, its customers, Individual Plaintiffs, and FPC's members, while still allowing Maxim Defense to comply with the federal firearms regulations in selling its products. Contrary to the Agencies' assertion, Plaintiffs did not make this case an emergency, the Agencies did. The Agencies could have set a reasonable effective date. Instead, they chose to upend a decade of precedent immediately, with the stroke of a pen. The Agencies have no room to invoke the principle of "restraint" in this matter.

## CONCLUSION

Plaintiffs respectfully request this Court grant Plaintiffs' Motion, ECF No. 33.

Respectfully submitted,

R. Brent Cooper
TX Bar No. 04783250
brent.cooper@cooperscully.com
Benjamin D. Passey
TX Bar No. 24125681
Ben.passey@cooperscully.com

COOPER & SCULLY, P.C.
900 Jackson Street, Suite 100
Dallas, TX  75202
Telephone: (214) 712-9500
Telecopy: (214) 712-9540

*/s/ Cody J. Wisniewski*
Cody J. Wisniewski*
CO Bar No. 50415
cwi@fpchq.org

FIREARMS POLICY COALITION
5550 Painted Mirage Road, Suite 320
Las Vegas, NV  89149
Telephone: (916) 378-5785
Telecopy: (916) 476-2392

*Admitted *pro hac vice*

*Attorneys for Plaintiffs*

## **CERTIFICATE OF SERVICE**

I hereby certify that, on March 17, 2023, a true and correct copy of the foregoing document was served via the Court's CM/ECF system to all counsel of record.

/s/ *Cody J. Wisniewski*
Cody J. Wisniewski
FIREARMS POLICY COALITION