# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## FORT WORTH DIVISION

|  |  |
|---|---|
| WILLIAM T. MOCK; CHRISTOPHER LEWIS; MAXIM DEFENSE INDUSTRIES, LLC, a limited liability company; and FIREARMS POLICY COALITION, INC., a nonprofit corporation, <br><br> *Plaintiffs*, <br><br> v. <br><br> MERRICK GARLAND, in his official capacity as Attorney General of the United States; the UNITED STATES DEPARTMENT OF JUSTICE; STEVE DETTELBACH, in his official capacity as the Director of the Bureau of Alcohol, Tobacco, Firearms and Explosives; and the BUREAU OF ALCOHOL, TOBACCO, FIREARMS AND EXPLOSIVES, <br><br> *Defendants*. | Civil Action No. 4:23-cv-00095-O |

## PLAINTIFFS' BRIEF IN SUPPORT OF THEIR
## MOTION FOR INJUNCTION PENDING APPEAL

# TABLE OF CONTENTS

**Page**

TABLE OF CONTENTS ............................................................................... ii

TABLE OF AUTHORITIES ......................................................................... iii

INTRODUCTION ......................................................................................... 1

BACKGROUND ........................................................................................... 2

STANDARD OF REVIEW ............................................................................ 5

ARGUMENT ................................................................................................. 6

I.     CONTRARY TO THIS COURT'S CONCLUSIONS, PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS ................................ 6

    A.     The Agencies' Final Rule is a Substantive Rule, Not an Interpretive One ...................................................................... 6

    B.     Under *Bruen*, the Government, not Plaintiffs, Bears the Burden of Demonstrating a Historical Analog ....................... 7

    C.     Because the Government Failed to Carry its Burden Here, the Final Rule is Presumptively Unconstitutional ..................... 10

    D.     Plaintiffs are Likely to Succeed on the Merits of their Other Claims ........................................................................... 13

II.     PLAINTIFFS WILL BE IRREPARABLY HARMED ABSENT AN INJUNCTION PENDING APPEAL ................................................... 15

III.     THE BALANCE OF THE EQUITIES AND THE PUBLIC INTEREST, WHICH MERGE HERE, ALSO FAVOR AN INJUNCTION PENDING APPEAL .................................................... 16

CONCLUSION ............................................................................................ 18

CERTIFICATE OF SERVICE .................................................................... 20

## TABLE OF AUTHORITIES

<u>CASES</u>                                                                                           <u>PAGE</u>

*Bd. of Cnty. Comm'rs, Wabaunsee Cnty., Kan. v. Umbehr,*
    518 U.S. 668 (1996) ............................................................................. 11

*Bennett v. Spear,*
    520 U.S. 154 (1997) ............................................................................. 6

*Caetano v. Massachusetts,*
    577 U.S. 411 (2016) ............................................................................. 8

*Cardoni v. Prosperity Bank,*
    No. 14-cv-1946, 2015 WL 410589 (S.D. Tex. Jan. 29, 2015) ............................... 5

*Cargill v. Garland,*
    57 F.4th 447 (5th Cir. 2023).................................................................. 14

*Chicago & Southern Air Lines, Inc. v. Waterman S.S. Corp.,*
    333 U.S. 103 (1948) ............................................................................. 6

*City of Dallas, Texas v. Hall,*
    2008 WL 11350041 (N.D. Tex. July 28, 2008).................................................... 18

*District of Columbia v. Heller,*
    554 U.S. 570 (2008) ......................................................................... 8, 10

*Elrod v. Burns,*
    427 U.S. 347 (1976) ................................................................... 12, 15, 17

*Farmhand Inc. v. Anel Eng'g Indus., Inc.,*
    693 F.2d 1140 (5th Cir. 1982) .................................................................. 5

*Jacksonville Port Auth. v. Adams,*
    556 F.2d 52 (D.C. Cir. 1997)................................................................... 17

*Murdock v. Pennsylvania,*
    319 U.S. 105 (1943) ............................................................................ 11

*N. Mariana Islands v. United States,*
    686 F. Supp. 2d 7 (D.D.C. 2009)............................................................... 17

*N.Y. State Rifle & Pistol Ass'n, Inc. v. Bruen,*
    142 S. Ct. 2111 (2022) .................................................................. *passim*

*SD Voice v. Noem,*
    987 F.3d 1186 (8th Cir. 2021) ................................................................. 17

*Texas v. United States*,
    86 F. Supp. 3d 591 (S.D. Tex. 2015)....................................................................... 6–7

*Texas v. United States*,
    809 F.3d 134 (5th Cir. 2015) ................................................................................. 6

*United States v. Rahimi*,
    61 F.4th 443 (5th Cir. 2023)................................................................................ *passim*

*U.S. Navy SEALs 1-26 v. Biden*,
    578 F. Supp. 3d 822 (N.D. Tex. 2022) ................................................................. 12, 15

*VanDerStok v. Garland*,
    __ F. Supp. 3d __, 2022 WL 4009048 (N.D. Tex. Sept. 2, 2022)........................ 18

*VanDerStok v. Garland*,
    __ F. Supp. 3d __, 2022 WL 4809376 (N.D. Tex. Oct. 1, 2022) ......................... 15, 16

*Waterfall Victoria Master Fund Ltd. v. Avery*,
    No. 3:16-cv-0173-B, 2018 WL 8261598 (N.D. Tex. Nov. 5, 2018) ..................... 5

*Weingarten Realty Investors v. Miller*,
    661 F.3d 904 (5th Cir. 2011) ................................................................................. 5

*West Virginia v. EPA*,
    142 S. Ct. 2605 (2022) ......................................................................................... 7

**Statutes**

28 U.S.C. § 5845 ........................................................................................................... 3

National Firearms Act of 1934,
    Ch. 757, Pub. L. 73-474, 48 Stat. 1236 (1934)...................................................... 3

**Rules**

Fed. R. Civ. P. 62 ......................................................................................................... 5

**Regulations**

*Factoring Criteria for Firearms with Attached 'Stabilizing Braces'*,
    86 Fed. Reg. 30,826 (June 10, 2021)..................................................................... 4, 6

*Factoring Criteria for Firearms with Attached 'Stabilizing Braces'*,
    88 Fed. Reg. 6,478 (Jan. 31, 2023)........................................................................ *passim*

**<u>Other Authorities</u>**

Letter from ATF #2013-0172 (Nov. 26, 2012)..............................................................   3

*National Firearms Act*, ATF.......................................................................................   3

## INTRODUCTION

On January 31, 2023, the Department of Justice and the Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF," collectively "Agencies"), published a final agency action that purportedly reclassified at least 3 million firearms that, prior to the rule, were lawfully sold, purchased, and possessed across the United States. *Factoring Criteria for Firearms with Attached 'Stabilizing Braces'* ("Final Rule"), 88 Fed. Reg. 6,478 (Jan. 31, 2023).[1] With the stroke of that pen, the Agencies immediately prohibited Plaintiff Maxim Defense Industries, LLC ("Maxim Defense") from selling those firearms as it had been able to do for a decade—and instead requires Maxim Defense to comply with the onerous requirements of the National Firearms Act ("NFA"), which it has never had to do with regard to its pistols with stabilizing braces ("braced pistols"). Moreover, the Agencies are requiring Plaintiffs Mock and Lewis, and the other lawful owners of those 3 million affected firearms, to either destroy or dispose of their property, or to register their firearms under the NFA, which requires them to comply with a series of onerous requirements, such as passing an additional background check, submitting additional personal information (fingerprints, passport-style photographs, etc.), and subjects their firearms to additional limitations on how they can be transported, stored, bought, and sold. More simply put, the Final Rule completely alters the legal landscape surrounding constitutionally protected Arms, namely braced pistols, and vastly expands the Agencies' authority to interpret and enforce criminal law against 3 million additional firearms that the Agencies previously did not treat as subject to the NFA.

Plaintiffs recognize that preliminary relief, including an injunction pending appeal, is extraordinary relief, but this situation warrants exactly that. Absent relief, Maxim Defense will likely go out of business or be forced to declare bankruptcy. In other words, without an injunction,

---

[1] The Final Rule is available at https://www.federalregister.gov/d/2023-01001.

Maxim Defense and its 28 employees may not be around to test the legitimacy of their claims through more robust briefing on the merits. And this is true of many of Plaintiff Firearms Policy Coalition, Inc.'s ("FPC") corporate members, all of whom had their entire business practices upended immediately upon publication of the Final Rule—with no grace period or delayed effective date to allow them any room to adjust or even to challenge the Final Rule before its crushing weight was already felt. Plaintiffs' Mock and Lewis will also face choices that cannot be changed after the fact. If Mock and Lewis register their constitutionally protected Arms under the NFA, that cannot be undone. While a firearm can purportedly be removed from the National Firearms Registration and Transfer Record ("NFRTR"), they cannot un-disclose their personal information to the Agencies, nor can the undo the registration process. And it is not enough to simply remove their stabilizing braces, the Agencies require Mock and Lewis, and upwards of 3 million other peaceable citizens, to render the brace or firearm so that it cannot be reattached.

In light of this extreme scenario, Plaintiffs renew their request for this Court to press pause. Pause the Agencies' enforcement of the Final Rule. Prevent Maxim Defense from going out of business so it may have its day in court. Prevent Mock and Lewis from being forced to comply with an extreme registration requirement until they may have the same. And prevent Maxim Defenses' customers and FPC's members from the similar fates. Plaintiffs are more than willing to litigate this matter on an expedited basis, but they must be around to do so.

## BACKGROUND

Given the posture of this case and need for brevity, Plaintiffs' will not restate the entire background of this matter here.[2] But a few points of background are in order. Congress enacted

---

[2]    Plaintiffs refer this Court to their Brief in Support of their Motion for Preliminary Relief ("Pls. Br."), ECF No. 36, at 3–10, for a detailed background of this matter.

the NFA "[t]o provide for the taxation of manufacturers, importers, and dealers in certain firearms and machine guns, to tax the sale or other disposal of such weapons, and to restrict importation and regulate transportation thereof." Ch. 757, 48 Stat. 1236 (1934). The NFA imposes severe taxes, burdens, delays, and restrictions upon the acquisition, possession, and lawful use of the Arms it regulates, including short-barreled rifles ("SBR"). An SBR is an NFA-regulated "firearm" defined as "a rifle having a barrel or barrels of less than 16 inches in length; [or] a weapon made from a rifle if such weapon as modified has an overall length of less than 26 inches or a barrel or barrels of less than 16 inches in length[.]" 28 U.S.C. § 5845(a)(3)–(4). Indeed, ATF concedes that the purpose of the NFA was to stop individuals from purchasing certain Arms: "As the legislative history of the law discloses, its underlying purpose was to curtail, if not prohibit, transactions in NFA firearms . . . The $200 making and transfer taxes on most NFA firearms were considered quite severe and adequate to carry out Congress' purpose to discourage or eliminate transactions in these firearms."[3]

And yet, since their initial classification by ATF on November 26, 2012, Letter from ATF #2013-0172 (Nov. 26, 2012); until the Agencies' publication of the Final Rule on January 31, 2023, stabilizing braces, which are designed to assist people with disabilities or limited strength or mobility with firing heavy pistols safely and comfortably, have broadly been treated as to not alter the classification of a pistol, designed to be fired with one hand, into a rifle, designed to be shouldered. *See* Pls. Br. at 6–8. While the Agencies indicated their regulatory changes may have such an impact on federal firearms law, their Notice of Proposed Rulemaking did not truly foreshadow the actual impact or contents of the Final Rule, nor did it indicate that the Final Rule

---

[3]    *National Firearms Act*, ATF, https://www.atf.gov/rules-and-regulations/national-firearms-act (last visited Mar. 30, 2023).

would go into effect immediately. *See Factoring Criteria for Firearms with Attached 'Stabilizing Braces'* ("Proposed Rule"), 86 Fed. Reg. 30,826 (June 10, 2021).[4] After abandoning the proposed Worksheet 4999, Proposed Rule at 30,830–31; the Agencies instead amended the federal regulatory definitions of "rifle" to include an open-ended, discretionary, six-factor test to purportedly allow the Agencies to determine a firearms' design and the intent of the manufacturer. Final Rule at 6,574–75. Those factors are:

> (i) whether the weapon has a weight or length consistent with the weight or length of similarly designed rifles;
>
> (ii) whether the weapon has a length of pull, measured from the center of the trigger to the center of the shoulder stock or other rearward accessory, component or attachment (including an adjustable or telescoping attachment with the ability to lock into various positions along a buffer tube, receiver extension, or other attachment method) that is consistent with similarly designed rifles;
>
> (iii) whether the weapon is equipped with sights or a scope with eye relief that require the weapon to be fired from the shoulder in order to be used as designed;
>
> (iv) whether the surface area that allows the weapon to be fired from the shoulder is created by a buffer tube, receiver extension, or any other accessory, component, or other rearward attachment that is necessary for the cycle of operations;
>
> (v) the manufacturer's direct and indirect marketing and promotional materials indicating the intended use of the weapon; and
>
> (vi) information demonstrating the likely use of the weapon in the general community

Final Rule at 6,480. In so doing, the Agencies effectively reclassified at least 3 million lawfully possessed pistols with stabilizing braces as SBRs and made it seemingly illegal to possess both a stabilizing brace and a pistol capable of having that brace attached without also running afoul of federal firearms law and the NFA.

---

[4]   The Proposed Rule is available at: https://www.federalregister.gov/d/2021-12176.

Given that, for many, the Final Rule went into effect immediately upon publication, Plaintiffs initiated this lawsuit on January 31, 2023. ECF No. 1. Plaintiffs then filed an Amended Petition on February 7, 2023, to add Plaintiff Maxim Defense—which could go out of business any day now—to the litigation and to clarify Plaintiffs' Second Amendment claims. ECF No 13. To protect Plaintiffs, including Maxim Defense's customers and FPC's members, from continued irreparable injury, Plaintiffs sought a preliminary injunction, or postponement of the Final Rule, on February 21, 2021, ECF No. 33, which this Court denied on March 30, 2023, ECF No. 40. Thereafter, Plaintiffs filed this motion.[5]

## STANDARD OF REVIEW

Under Federal Rule of Civil Procedure 62, a court may "grant injunctions pending appeal of an order denying injunctive relief." *Cardoni v. Prosperity Bank*, No. 14-cv-1946, 2015 WL 410589, at *1 (S.D. Tex. Jan. 29, 2015) (citing Fed. R. Civ. P. 62(c)). To obtain an injunction pending appeal, a party must show: (1) a substantial likelihood of success on the merits; (2) a substantial threat of irreparable injury if the injunction is not issued; (3) that the threatened injury outweighs the threatened harm to the party whom it seeks to enjoin; and (4) that granting the injunction will not disserve the public interest. *See Weingarten Realty Investors v. Miller*, 661 F.3d 904, 910 (5th Cir. 2011).

---

[5]    Plaintiffs intend to file a notice of appeal of this Court's order, ECF No. 40, because of the immediacy of the harm that Plaintiffs are suffering, but that does not alter this Court's jurisdiction to decide this Motion. Although a notice of appeal generally divests a district court of jurisdiction, *see Farmhand Inc. v. Anel Eng'g Indus., Inc.*, 693 F.2d 1140, 1145 (5th Cir. 1982), "this rule is not absolute and district courts retain jurisdiction as to matters not involved in the appeal," including "grant[ing] an injunction," *Waterfall Victoria Master Fund Ltd. v. Avery*, No. 3:16-cv-0173-B, 2018 WL 8261598, at *2 (N.D. Tex. Nov. 5, 2018).

**ARGUMENT**

I.  **CONTRARY TO THIS COURT'S CONCLUSIONS, PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS**

A.  **The Agencies' Final Rule is a Substantive Rule, Not an Interpretive One**

As an initial matter, the Agencies' Final Rule is a substantive rule that imposes and alters the legal obligations of millions of Americans and a multitude of businesses across the United States. The Agencies' attempt to characterize it otherwise is misplaced.

*First*, as addressed in Plaintiffs' Reply, ECF No. 38, at 1; the Agencies engaged in a years' long notice and comment period in order to draft and publish the Proposed Rule, solicit comments, review those comments, and then to draft and publish the Final Rule. *See* Proposed Rule at 30,826; Final Rule at 6,478. The Agencies offer no explanation as to why, if the Final Rule is merely interpretive, and not subject to notice-and-comment requirements, the Agencies engaged in that process at all. If the Final Rule was merely interpretive, the Agencies seemingly could have issued a general guidance letter as to stabilizing braces, as they have several times in the past. *See* Pls. Br. at 6–8. And yet, the Agencies' adherence to the legal requirements of the notice-and-comment processes demonstrates the Agencies were aware that the Final Rule in this matter would be substantive. *See Bennett v. Spear*, 520 U.S. 154, 156 (1997) (classifying an action as a "final agency action for APA purposes," in part, when it "marks the consummation of the agency's decisionmaking process") (citing *Chicago & Southern Air Lines, Inc. v. Waterman S.S. Corp.*, 333 U.S. 103, 113 (1948)).

*Second*, the Final Rule is a "binding" substantive rule that creates new "rights and obligations," as to braced pistols, which the Final Rule now formally reclassifies as SBRs. *See Texas v. United States*, 809 F.3d 134, 171 (5th Cir. 2015), *aff'd* 577 U.S. 1101 (2016). The Final Rule is a "substantive change in existing law or policy," *Texas v. United States*, 86 F. Supp. 3d

6

591, 670 (S.D. Tex. 2015), evidenced by the fact that the Final Rule changes a decade long status quo as to the legal status of at least 3 million firearms, as well as the legal process on how corporations may sell formerly "braced pistols", and how individuals may acquire those same Arms. Final Rule at 6,478–81. And the Final Rule imposes additional requirements on the possession, storage, and transportation of those formerly "braced pistols" once acquired. *Id*. The Agencies' claim that the Final Rule "does not impose any new legal obligations," is thus misplaced. *Compare Defendants' Opposition to Plaintiffs' Motion*, ECF No. 37, at 19 (quoted) *with id.* at 14 ("After completing the notice-and-comment process, the agency issued the Rule to amend its existing regulations . . . .") (citation omitted). Such an earthshattering agency action— bearing potential criminal penalties for millions of Americans—is of vast "political significance" and of "highly consequential power," not only evidencing the substantive nature of the rule, but also likely implicating the major question doctrine and thus dooming the Final Rule. *See West Virginia v. EPA*, 142 S. Ct. 2587, 2,608–09 (2022).

Regardless, even if the Final Rule is interpretive, the Agencies' Final Rule, in so far as it interprets and allows for the enforcement of federal firearms law, is still a violation of Plaintiffs' Second Amendment protected rights, or, at minimum, is vague and chills the exercise of Plaintiffs' constitutionally protected rights. Even an "interpretive" rule of this type establishes a threat of prosecution to Plaintiffs, including Maxim Defense's customers and FPC's members, which threat is directly traceable to the Final Rule's amendment to the federal regulatory definitions of "rifle." *See* Final Rule at 6,574–75.

**B.    Under *Bruen*, the Government, not Plaintiffs, Bears the Burden of Demonstrating a Historical Analog**

The clearest reason, however, for this Court to enter an injunction pending appeal here is that this Court's decision flipped the burden of proof to the Plaintiffs even though the burden is on

the government to demonstrate an appropriate historical analogue to its modern regulation, not Plaintiffs. *United States v. Rahimi*, 61 F.4th 443, 453 (5th Cir. 2023).

The Supreme Court has explained that "[j]ust as the First Amendment protects modern forms of communications, . . . the Second Amendment extends, prima facie, to all instruments that constitute bearable arms, even those that were not in existence at the time of the founding." *District of Columbia v. Heller*, 554 U.S. 570, 582 (2008); *see N.Y. State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111, 2132 (2022) ("Thus, even though the Second Amendment's definition of 'arms' is fixed according to its historical understanding, that general definition covers modern instruments that facilitate armed self-defense.") (citing *Caetano v. Massachusetts*, 577 U.S. 411, 411–12 (2016) (*per curiam*)). "[A]ll instruments that constitute bearable arms," are presumptively protected. *Bruen*, 142 S. Ct. at 2143; *accord Rahimi*, 61 F.4th at 453 (If the "Second Amendment's plain text covers an individual's conduct" then the "Constitution presumptively protects the conduct."). The Second Amendment's text unquestionably extends to pistols and rifles, thus both braced pistols and short-barreled rifles are presumptively protected under the Second Amendment.

That presumption can only be overcome by *the government* proving that its law is "consistent with this Nation's historical tradition of firearm regulation," not Plaintiffs. *Bruen*, 142 S. Ct. at 2126. Thus, when considering whether "history" and "tradition" support a restriction on "arms," the burden is on *the government* to "affirmatively prove that its firearms regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms." *Id.* at 2127; *accord Rahimi*, 61 F.4th at 453 (The government "must justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation.").  It is the government—not Plaintiffs—that is charged with "demonstrating that [the challenged law] is consistent with the Nation's historical tradition of firearm regulation." *Id.* at 2130. "Only then

may a court conclude that the individual's conduct falls outside the Second Amendment's unqualified command." *Id.* at 2130.[6]

Even if *Bruen* left open any ambiguity about who carries the burden of showing a historical analogue, the Fifth Circuit removed it entirely earlier this month in *Rahimi*. There, the Fifth Circuit expressly overruled its pre-*Bruen* precedent, 61 F.4th at 450–51, and emphasized, as Plaintiffs did in their briefing, *see* Pls. Br. at 35, that *Bruen* placed "the burden of proffering 'relevantly similar' historical regulations" squarely on the government, 61 F.4th at 455. And the Fifth Circuit then followed its own guidance and invalidated the challenged statute not because the criminal defendant had established a historical treatise on the Nation's firearm laws, but instead because *the government failed to demonstrate* that the challenged law "fits within our Nation's historical tradition of firearm regulation." *Id.* at 460.

Contrary to *Bruen* and *Rahimi*, in denying the preliminary injunction, this Court faulted *Plaintiffs* for what it deemed their "minimal historical analysis." ECF No. 40 at 15. This gets the analysis exactly backwards. And to the extent there was "minimal historical analysis" in the government's briefing, it is the government's failure to carry its burden and rebut the "presumptive" protections of the Second Amendment. *Rahimi*, 61 F.4th at 450, 453, 454; *accord id.* at 461 (Ho, J., concurring).

---

[6] Nor, as Plaintiffs have fully argued in their prior briefing, is *Bruen* silent about how the text-and-history test applies in the context of bans or regulations on the possession of commonly possessed arms. Both *Bruen* and *Heller* identified only one aspect of our history and tradition that is sufficiently analogous to—and therefore capable of justifying—a broad ban or regulation: the tradition, dating back to the Founding, of restricting "dangerous and unusual weapons" that are not "in common use at the time." *Bruen*, 142 S. Ct. at 2128. By contrast, where a type of arm is in "common use," there is no and can be no historical tradition justifying strict regulations or bans. For this type of restriction, then, the Supreme Court has already analyzed the relevant historical tradition and established its scope: "dangerous and unusual" weapons may be restricted, but arms "in common use at the time" may not. *Id.* Given Plaintiffs fully address this issue in their prior briefing, they will not address it further here. *See* Pls. Br. at 12–13, 33–35; Pls. Reply at 2–3, 6.

9

**C.      Because the Government Failed to Carry its Burden Here, the Final Rule is Presumptively Unconstitutional**

Proper application of *Bruen*'s "analytical steps," *Rahimi*, 61 F.4th at 453, shows that the Final Rule—which prohibits Plaintiffs from owning either braced pistols or SBRs without first announcing themselves to the government—violates Plaintiffs' constitutionally protected right to keep and bear arms. Because of the Final Rule, Plaintiffs cannot sell or possess those arms, absent the NFA's requirements. And not only are pistols specifically exempted from the NFA, but the Agencies have failed to carry their burden in establishing a historical analogue to justify the constitutionality of the NFA in this matter—as the Agencies are required to do under *Bruen*.

Pistols are unquestionably protected by the Second Amendment. *See Heller*, 554 U.S. at 628–35. Rifles, which are also in common use, are protected for the same reason. Moreover, whether this Court treats them as "braced pistols" under Plaintiffs' Count VIII, or as SBRs under Plaintiffs' alternative Count IX, the Arms at issue are both "in common use" and presumptively protected by the Second Amendment. *See Bruen*, 142 S. Ct. at 2128. While that should end this Court's inquiry, given this Court proceeded to the historical analysis, the burden is on the government to justify its regulation of Arms that are protected by the Second Amendment based on historical analogues.[7]

This Court sidestepped this question by concluding that because the Final Rule "does not ban stabilizing braces, nor firearms equipped with them," but instead requires only "regulated individuals and entities" to "register[] the weapons with ATF or permanently detach[] the brace from the pistol." ECF No. 40 at 14. But this ignores two points raised in Plaintiffs' briefing.

---

[7]      While the braces themselves are protected even if they are not attached to a firearm, Pls. Br. at 12, that matter is distinct from Plaintiffs' claims regarding the Agencies treatment of braced pistols and/or SBRs via the Final Rule and the NFA.

First, the registration requirement imposes a $200 tax,[8] onerous compliance requirements, and enhanced criminal penalties expressly designed to discourage or even eliminate transactions in firearms even though the Supreme Court has made clear that the government cannot "impose a charge for the enjoyment of a right granted by the federal constitution." *See* Pls. Br. at 34 (quoting *Murdock v. Pennsylvania*, 319 U.S. 105, 113 (1943)). No court would ever uphold a statute that required a Twitter user to pay the government $200 and be placed on a government database before accessing the website. Nor would any court uphold a requirement that those subject to a search pay $200 to avail themselves of the warrant requirement. To find no infringement of Plaintiffs' Second Amendment protected rights despite identical circumstances is to do exactly what *Bruen* told courts not to do—treat the constitutionally protected right to bear arms as a "second-class right, subject to an entirely different body of rules than the other Bill of Right guarantees." *Bruen*, 142 S. Ct. at 2156.

Second, Plaintiffs demonstrated to this Court, Pls. Br. at 35, that the government often takes months to over a year to grant permission to possess NFA-regulated firearms. The Second Amendment—co-equal in the panoply of protected rights—recognizes no less than other constitutional rights that "constitutional violations may arise from the deterrent, or 'chilling,' effect of governmental efforts that fall short of a direct prohibition." *Bd. of Cnty. Comm'rs, Wabaunsee Cnty., Kan. v. Umbehr*, 518 U.S. 668, 674 (1996). For these reasons, the Court was wrong to find no violation of the Second Amendment just because the Final Rule graciously declines to impose an outright prohibition on the right to own braced pistols or SBRs.

Given the Arms at issue are presumptively protected, according to *Bruen*, *even at this*

---

[8]     The Agencies decision to temporarily waive the $200 tax might is irrelevant to the question of the constitutionality of the Final Rule and/or the NFA, given the waiver is temporary in nature.

*preliminary stage*, the absence of historical justification in this case must fall against the Agencies. It is of no comfort to Plaintiffs that this Court reasoned that the government may fail to do on the merits what it already failed to do here, particularly facing the ruinous harms they face. Thus, the fact that "the historical record may support such a result at the summary judgment stage," does not relieve the government of its burden now, ECF No. 40 at 15, particularly as the "loss of constitutional rights for even minimal periods of time, unquestionably constitutes irreparable injury." *U.S. Navy SEALs 1-26 v. Biden*, 578 F. Supp. 3d 822, 834 (N.D. Tex. 2022); *accord Elrod v. Burns*, 427 U.S. 347, 374–75 (1976).[9] Put simply, if "the briefing presently before the Court is not sufficient to justify the extraordinary remedy of preliminary injunctive relief," then the Agencies failed to carry their burden, and the ones who will suffer for their failure are Plaintiffs and the millions of other law-abiding citizens who are forced to comply with the Final Rule, and thus the NFA's onerous requirements, or to abandon their Second Amendment protected rights. ECF No. 40 at 15. And the little history the Agencies did cite, as Plaintiffs thoroughly addressed in their Reply, *see* Pls. Reply at 3, 6–7, was not "'relevantly similar'" to the Final Rule—an issue that *Rahimi* considered the "core question" after *Bruen*. 61 F.4th at 454. By finding the briefing on this issue insufficient at this stage, this Court necessarily reached the same conclusion—that the Agencies had not shown that the Final Rule "impose[d] a comparable burden on the right of self-defense" as "historical regulations." *Bruen*, 142 S. Ct. at 2133. The Agencies thus failed—as they ultimately will fail on the merits, given the lack of any historical analogue to the Final Rule—to establish a historical record necessary to justify their regulations, meaning that Plaintiffs that

---

[9]      It is no answer that the *Seals* and *Elrod* opinions address First Amendment protected rights because, again, the Second Amendment is equal in importance and cannot be treated as a "second-class right, subject to an entirely different body of rules than the other Bill of Right guarantees." *Bruen*, 142 S. Ct. at 2156.

are likely to succeed.

Accordingly, because the Arms at issue are protected by the Second Amendment even if they are not completely banned, and because the Agencies did not and cannot carry their burden in establishing a historical analogue, Plaintiffs are likely to succeed on the merits of their Second Amendment claim, whether the Arms at issue are pistols or SBRs.

### D.    Plaintiffs are Likely to Succeed on the Merits of their Other Claims

Plaintiffs are likely to succeed on their other claims too. To the extent that the federal definition of "rifle" can bear the Agencies' interpretation as given in the Final Rule, then the definition itself is unconstitutionally vague, and any ambiguity must, under the rule of lenity given the criminal penalties violation of the Final Rule imposes, be resolved in Plaintiffs' favor.[10]

While the confusion is understandable because of the dizzying impact of the Final Rule, Plaintiffs, and similarly situated Americans, cannot simply "still purchase [braces] without being affected by the Final Rule." ECF No. 40 at 15. Because of the Agencies' treatment of braced pistols and their reliance on constructive possession, if an individual possesses a pistol that is *capable of accepting* a stabilizing brace, and that individual does purchase a stabilizing brace (from Maxim Defense or otherwise), that individual could then be in constructive possession of an unregistered SBR, and thus subject to criminal fines and prison time. The same is true of braces that individuals already possess. The Agencies specifically note that if individuals remove a stabilizing brace from their firearm, the individual must "dispose of, *or alter*, the 'stabilizing brace' such that it cannot be reattached, thereby removing the weapon from regulation as a 'firearm' under the NFA." Final

---

[10]    Plaintiffs recognize this Court has already denied Plaintiffs' prior motion, and thus Plaintiffs will not rehash their entire analysis as to their likelihood of success. Instead, Plaintiffs point to key concerns evidenced by this Court's Order and incorporate the remainder of their arguments with the belief that, through this clarified framework, the Court will agree that Plaintiffs are likely to succeed on the merits of several of their claims.

Rule at 6,570. This is why the Final Rule is not only vague, but it constitutes a chilling effect on the exercise of Plaintiffs' constitutionally protected rights. While Plaintiffs may know that a stabilizing brace meets the Agencies' six-factor analysis, they cannot possibly know what other items may fit that analysis. And possession of *any item* that the Agencies determine may be capable of converting a pistol into a rifle subjects those individuals to potential criminal liability for unlawful constructive possession of an unregistered SBR. This applies to possession of any item that may be classified at any time by the Agencies, and that may be classified not just by design criteria, but by use of the item by third parties. Final Rule at 6,480. Federal law cannot possibly bear this level of uncertainty for both regulated parties and for laypeople alike, especially when that law bears criminal penalties.

And in the context of a statute imposing criminal liability, fundamental principles of statutory interpretation and the equally fundamental due process and separation of powers concerns driving the rule of lenity forbid the Agencies' efforts to broaden the reach of the definition of "firearm" or "rifle" while ignoring the definition of "handgun" and the common meaning of "pistol or revolver," even if this Court were to conclude that the statutory definition of a "firearm" or a "rifle" were ambiguous enough to include a braced pistol. *Cargill v. Garland*, 57 F.4th 447, 469–71 (5th Cir. 2023) (*en banc*). In other words, even if the statute or Final Rule is vague, then it must be read narrowly under the rule of lenity. And such a narrow construction would preclude the Agencies' broader regulation under the Final Rule based on their own pre-narrowing construction of the statute prior to the Final Rule's promulgation.

Of course, the question of vagueness and the effect of the rule of lenity also further bolster Plaintiffs' likelihood of success as to their other constitutional claims and their statutory authority claims. *See* Pls. Br. at 15–29; Pls. Reply at 4–6.

14

## II.   PLAINTIFFS WILL BE IRREPARABLY HARMED ABSENT AN INJUNCTION PENDING APPEAL

Although the Court did not reach this factor in its analysis, Plaintiffs' irreparable injury is beyond dispute. Plaintiffs are suffering and will continue to suffer irreparable harm if the Final Rule is not enjoined pending appeal, and it remains "no answer to say that [Plaintiffs] may avoid the harm by complying with an unlawful agency rule." *See VanDerStok v. Garland*, __ F. Supp. 3d __, 2022 WL 4809376, at *9 (N.D. Tex. Oct. 1, 2022).

At the outset, if this Court concludes, as it should, that Plaintiffs are likely to succeed on the merits of their Second Amendment claim when *Bruen* is properly applied, the irreparable injury prong flows directly from that conclusion, as the "loss of constitutional rights for even minimal periods of time, unquestionably constitutes irreparable injury." *U.S. Navy SEALs 1-26*, 578 F. Supp. 3d at 834; *accord Elrod*, 427 U.S. at 374–75.

But the harms go further than even the significant constitutional harms that flow from government infringement of an inalienable, fundamental right. Plaintiff Maxim Defense's injury can be summed up into a single sentence—absent an injunction against the Final Rule, Maxim Defense will either go out of business, or be forced to file for bankruptcy. While this Court is correct that Maxim Defense can continue to sell stabilizing braces, there remain two problems. *First*, there is no viable market for stabilizing braces under the Final Rule. Individuals purchase stabilizing braces precisely because they aid in the firing of large and heavy pistols but do not convert those pistols into rifles. If individuals wanted an SBR, they would buy a stock not a brace. *Second*, the Final Rule reclassifies braced pistols, which constitute the vast majority of Maxim Defense's firearms sales and account for millions of dollars of sales every year. Declaration of David Dahl ("Dahl Decl."), ECF No. 36-2, at ¶ 6. Because of the Final Rule, Maxim Defense can no longer sell braced pistols as it has for years, absent the NFA's requirements. Maxim Defense's

entire business is structured around the production and sale of stabilizing braces and braced pistols. Without an injunction, and the ability to continue conducting business as it has in reliance on the Agencies' long-standing guidance, Maxim Defense faces the end of its ability to operate, and its 28 employees face the end of their livelihoods.

Plaintiffs Mock and Lewis fair no better. Both will be forced to either subject themselves to the NFA's heightened requirements against their wishes or to destroy or divest themselves of their constitutionally protected property, or potentially face criminal prosecution and prison. *See* Declaration of William T. Mock ("Mock Decl."), ECF No. 36-4, ¶¶ 7–8; Declaration of Christopher Lewis ("Lewis Decl."), ECF No. 36-3, ¶¶ 6–7. Both are prohibited from pursuing their concrete plans to purchase braced pistols in the future, but for the Final Rule's requirement they comply with the NFA or face criminal charges. Mock Decl. ¶ 7; Lewis Decl. ¶ 6. And both still fear criminal prosecution for exercising their constitutionally protected right to keep and bear arms because the Final Rule, and the Agencies' use of constructive possession, is so unclear that they "cannot know exactly how to comply[.]" Mock Decl. ¶ 11; Lewis Decl. ¶ 10. Thus, they have demonstrated a "credible threat of a potential felony indictment" and have "sufficiently demonstrated irreparable harm." *See VanDerStok*, 2022 WL 4809376, at *5.

Plaintiffs Mock, Lewis, and Maxim Defense are representative of not just Plaintiff FPC's members, but also the millions of Americans and dozens of businesses that the Agencies acknowledged would be impacted by the Final Rule, with costs of the Final Rule estimated in the hundreds of millions of dollars. *See* Final Rule at 6,572–73.

## III.   THE BALANCE OF THE EQUITIES AND THE PUBLIC INTEREST, WHICH MERGE HERE, ALSO FAVOR AN INJUNCTION PENDING APPEAL

The irreparable injury Plaintiffs and other gun owners and manufacturers face because of the Final Rule outweighs any harm to the Agencies or the public and further militates in favor of

an injunction pending appeal.

Not only would an injunction merely maintain the status quo that has been in place for the past decade, "the public interest is served when administrative agencies comply with their obligations under the APA." *N. Mariana Islands v. United States*, 686 F. Supp. 2d 7, 21 (D.D.C. 2009); *accord Jacksonville Port Auth. v. Adams*, 556 F.2d 52, 58–59 (D.C. Cir. 1997). And there is, of course, "an overriding public interest . . . in the general importance of an agency's faithful adherence to its statutory mandate." *Jacksonville Port Auth.*, 556 F.2d at 59. Finally, as addressed above, this case is about more than just enforcing the APA; this case is about protecting the constitutionally protected rights of millions of affected Americans. *See Elrod*, 427 U.S. at 374–75 (the impairment of constitutional freedoms like those addressed above, "for even minimal periods of time, unquestionably constitutes irreparable injury") (citation omitted); *SD Voice v. Noem,* 987 F.3d 1186, 1190–91 (8th Cir. 2021) (reasoning that protection of constitutional rights serves public interest). Plaintiffs merely request the ability to survive and retain lawful possession of their constitutionally protected braced pistols through the pursuit of their appeal and this case.

The Agencies, on the other hand, will not suffer significant harm by maintenance of the decade-long status quo regarding what constitutes a "rifle." The Agencies have not identified any substantial harm, much less "extraordinary harm," that would result from an injunction. Indeed, the Final Rule itself contains a delay in enforcement. Final Rule at 6,553 ("The Department, in its enforcement discretion, has determined that current possessors of these affected firearms have until 120 days after this rule is published to take the necessary actions, as described in this rule, to comply with Federal law to avoid civil and criminal penalties."). In the face of putting Plaintiff Maxim Defense out of business, and requiring Mock and Lewis and millions of other Americans to comply with onerous provisions of the NFA to continue possessing their constitutionally

17

protected pistols, the Agencies' purported harms bear little weight.

Granting a preliminary injunction pending Plaintiffs' appeal serves the public interest by "ensur[ing] the status quo is maintained so the legal system can resolve [an] important dispute." *City of Dallas, Texas v. Hall*, 2008 WL 11350041, at *3 (N.D. Tex. July 28, 2008). There can be no public benefit in allowing the Agencies to enforce an unlawful and unconstitutional Final Rule. *See VanDerStok v. Garland*, __ F. Supp. 3d __, 2022 WL 4009048, at *10 (N.D. Tex. Sept. 2, 2022) ("Defendants' enforcement of the rule strips Plaintiffs of freedoms they lawfully enjoyed until just last week.").

## CONCLUSION

Based on the foregoing, Plaintiffs respectfully request that this Court reconsider its conclusion that Plaintiffs are unlikely to succeed on their claims by properly placing the burden of establishing historical analogues on the government—even in this preliminary stage. Plaintiffs are facing serious, irreparable injuries that warrant this Court granting Plaintiffs' Motion for an Injunction Pending Appeal to prevent the harms to their constitutionally protected rights, which this Court expressly recognized may be shown at the summary judgment stage. By doing so, this Court will ensure that it will be able to issue meaningful and full relief at the conclusion of this case. Without an injunction, Plaintiffs will continue to suffer irreparable injuries for which this Court will not be able to provide adequate relief later.

DATED this the 30th day of March 2023.

Respectfully submitted,

R. Brent Cooper
Texas Bar No. 04783250
brent.cooper@cooperscully.com
Benjamin David Passey
Texas Bar No. 24125681
ben.passey@cooperscully.com

COOPER & SCULLY PC
900 Jackson Street, Suite 100
Dallas, TX 75202
Telephone: (214) 712-9500
 Facsimile: (214) 712-9540

*/s/ Cody J. Wisniewski*
Cody J. Wisniewski*
Colorado Bar No. 50415
cwi@fpchq.org

FIREARMS POLICY COALITION, INC.
5550 Painted Mirage Road, Suite 320
Las Vegas, NV 89149
Telephone: (916) 378-5785
Facsimile: (916) 476-2392

* Admitted *pro hac vice*

*Attorneys for Plaintiffs*

**CERTIFICATE OF SERVICE**

I hereby certify that, on March 30, 2023, a true and correct copy of the foregoing document was served via the Court's CM/ECF system to all counsel of record.

> */s/ Cody J. Wisniewski*
> Cody J. Wisniewski
> FIREARMS POLICY COALITION