**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION**

| | |
|---|---|
| WILLIAM T. MOCK, *et al.*,<br><br>                                        *Plaintiffs*,<br><br>    v.<br><br>MERRICK GARLAND, in his official capacity as<br>Attorney General of the United States, *et al.*,<br><br>                                        *Defendants*. | Civil Action No. 4:23-cv-00095-O |

<u>**PLAINTIFFS' SUPPLEMENTAL BRIEF IN SUPPORT OF THEIR**</u>

<u>**MOTION FOR PRELIMINARY INJUNCTION**</u>

# TABLE OF CONTENTS

TABLE OF AUTHORITIES .................................................................................................. ii

I.      INTRODUCTION ................................................................................................... 1

II.     ARGUMENT ........................................................................................................... 4

        A.      Plaintiffs Have Suffered, And Will Continue To Face, Irreparable Injury If
                Preliminary Injunctive Relief Is Not Granted ......................................... 4

        B.      The Balance Of The Equities And The Public Interest Favor Injunctive Relief .. 13

        C.      The Court Should Universally Enjoin The Defendants From Enforcing The
                Final Rule Given The Nature of the Claims Being Asserted and the Difficulty
                of Crafting a Narrower Injunction that Would Truly Maintain the
                *Status Quo Ante* ..................................................................................... 15

III.    CONCLUSION ...................................................................................................... 23

        CERTIFICATE OF SERVICE ................................................................................ 25

# TABLE OF AUTHORITIES

**Cases**

*Alabama Ass'n of Realtors v. Dep't of Health & Hum. Servs.*,
   141 S. Ct. 2485 (2021)..............................................................................5

*All. for the Wild Rockies v. Cottrell*,
   632 F.3d 1127 (9th Cir. 2011)...................................................................13

*Amoco Prod. Co. v. Village of Gambell*,
   480 U.S. 531 (1987)..................................................................................13

*Atwood Turnkey Drilling, Inc. v. Petroleo Brasilero, S.A.*,
   875 F.2d 1174 (5th Cir. 1989)....................................................................4

*Benisek v. Lamone*,
   138 S. Ct. 1942 (2018)...............................................................................4

*Califano v. Yamasaki*,
   442 U.S. 682 (1979)............................................................................3, 18

*Canal Auth. of Fla. v. Callaway*,
   489 F.2d 567 (5th Cir. 1974)..................................................................2, 14

*Cargill v. Garland*,
   57 F.4th 447 (5th Cir. 2023).....................................................................16

*City of Dallas, Texas v. Hall*,
   2008 WL 11350041 (N.D. Tex. July 28, 2008)..........................................15

*District of Columbia v. U.S. Dep't of Agric.*,
   444 F.Supp.3d 1 (D.D.C. 2020)....................................................16, 17, 21

*E. Bay Sanctuary Covenant v. Garland*,
   994 F.3d 962 (9th Cir. 2020).....................................................................13

*Elrod v. Burns*,
   427 U.S. 347 (1976)....................................................................................4

*Enter. Int'l, Inc. v. Corporacion Estatal Petrolera Ecuatoriana*,
   762 F.2d 464 (5th Cir. 1985).....................................................................10

*Feds for Med. Freedom v. Biden*,
   63 F.4th 366 (5th Cir. 2023)...........................................................19, 20, 21

*Franciscan All., Inc. v. Burwell*,
   227 F.Supp.3d 660 (N.D. Tex. 2016).........................................................16

*Humana, Inc. v. Jacobson*,
   804 F.2d 1390 (5th Cir. 1986).....................................................................4

*Janvey v. Alguire*,
   647 F.3d 585 (5th Cir. 2011).......................................................................4

ii

*League of Women Voters of U.S. v. Newby*,
   838 F.3d 1 (D.C. Cir. 2016) ............................................................................................... 14

*Med-Cert Home Care, LLC v. Azar*,
   365 F.Supp.3d 742 (N.D. Tex. 2019) .................................................................................. 1

*Meis v. Sanitas Serv. Corp.*,
   511 F.2d 655 (5th Cir. 1975) ............................................................................................ 14

*Mock v. Garland*,
   No. 23-10319, 2023 WL 4882763 (5th Cir. Aug. 1, 2023) ............................................ passim

*N. Carolina State Conf. of the NAACP v. Raymond*,
   981 F.3d 295 (4th Cir. 2020) ............................................................................................ 12

*Nat'l Fed'n of Indep. Bus. v. Perez*,
   No. 16-cv-00066, 2016 WL 3766121 (N.D. Tex. June 27, 2016) .................................... 16, 18

*Nat'l Mining Ass'n v. U.S. Army Corps of Eng'rs*,
   145 F.3d 1399 (D.C. Cir. 1998) ........................................................................................ 16

*Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*,
   886 F.3d 803 (9th Cir. 2018) ............................................................................................ 12

Nevada v. United States Dep't of Labor,
   218 F.Supp.3d 520 (E.D. Tex. 2016) ................................................................................ 18

*Nken v Holder*,
   556 U.S. 418 (2009) ...................................................................................................... 1, 13

*Open Communities All. v. Carson*,
   286 F.Supp.3d 148 (D.D.C. 2017) .................................................................................. 2, 15

*Prof. Ass'n of Coll. Educators, TSTA/NEA v. El Paso Cnty. Cmty. Coll. Dist.*,
   730 F.2d 258 (5th Cir. 1984) ............................................................................................ 18

*R.J. Reynolds Vapor Co. v. Food & Drug Admin.*,
   65 F.4th 182 (5th Cir. 2023) .......................................................................................... 4, 5

*Rai v. Biden*,
   567 F.Supp.3d 180 (D.D.C. 2021) .................................................................................... 17

*Rest. L. Ctr. v. United States Dep't of Lab.*,
   66 F.4th 593 (5th Cir. 2023) ............................................................................................ 10

*Sierra Club v. Trump*,
   963 F.3d 874 (9th Cir. 2020) ............................................................................................ 13

*State of Tex. v. Seatrain Int'l, S. A.*,
   518 F.2d 175 (5th Cir. 1975) ............................................................................................. 1

*State v. Biden*,
   10 F.4th 538 (5th Cir. 2021) .......................................................................................... 2, 14

*Sugar Cane Growers Co-op. of Fla. v. Veneman*,
   289 F.3d 89 (D.C. Cir. 2002) ............................................................................................ 17

*Tesfamichael v. Gonzales*,
   411 F.3d 169 (5th Cir. 2005) ................................................................. 1

*Texas v. EPA*,
   829 F.3d 405 (5th Cir. 2016) ........................................................ 4, 5, 10

*Texas v. United States*,
   201 F.Supp.3d 810 (N.D. Tex. 2016) .................................................. 18

*Texas v. United States*,
   809 F.3d 134 (5th Cir. 2015) .............................................................. 18

*Thunder Basin Coal Co. v. Reich*,
   510 U.S. 200 (1994) ............................................................................. 5

*VanDerStok v. Garland*,
   625 F.Supp.3d 570 (N.D. Tex. 2022) ............................................. 9, 10

*VanDerStok v. Garland*,
   633 F.Supp.3d 847 (N.D. Tex. 2022) .................................................. 10

*Wages & White Lion Invs., L.L.C. v. United States Food & Drug Admin.*,
   16 F.4th 1130 (5th Cir. 2021) ...................................................... 4, 5, 14

*Whitman-Walker Clinic, Inc. v. U.S. Dep't of Health & Hum. Servs.*,
   485 F.Supp.3d 1 (D.D.C. 2020) .......................................................... 17

*Winter v. Natural Resources Defense Council, Inc.*,
   555 U.S. 7 (2008) ............................................................................... 13

**Statutes**

18 U.S.C. § 923(a) ..................................................................................... 22

26 U.S.C. § 5801 ....................................................................................... 22

5 U.S.C. § 702 ............................................................................................. 5

5 U.S.C. § 705 ...................................................................................... 3, 15

5 U.S.C. § 706 ........................................................................................... 16

**Other Authorities**

Mila Sohoni, The Power to Vacate a Rule,
   88 GEO. WASH. L. REV. 1121 (2020) ................................................ 17

**Constitutional Provisions**

U.S. CONST. Art. III, § 1 ........................................................................... 18

Pursuant to the Court's August 4, 2023 Order, ECF No. 65, Plaintiffs submit the following supplemental brief on the irreparable-harm, balance-of-harms, and public-interest factors in support of Plaintiffs' motion for a preliminary injunction, along with the appropriate scope of an injunction:

## I.  INTRODUCTION

The Fifth Circuit held that Plaintiffs "have a substantial likelihood of success" on the merits of their claim that the Final Rule violates the Administrative Procedure Act. *Mock v. Garland*, No. 23-10319, 2023 WL 4882763, at *11 (5th Cir. Aug. 1, 2023). As that Court recognized, "[t]here is authority that the first factor—likelihood of success on the merits—is the most important of the preliminary injunction factors." *Id.* at 19 n.60; *see also Tesfamichael v. Gonzales*, 411 F.3d 169, 176 (5th Cir. 2005); *Nken v Holder*, 556 U.S. 418, 434 (2009) (likelihood of success and irreparable harm are "the most critical" factors).

That said, "none of the four prerequisites [for a preliminary injunction] has a fixed quantitative value," but "[r]ather, a sliding scale is utilized, which takes into account the intensity of each in a given calculus." *State of Tex. v. Seatrain Int'l, S. A.*, 518 F.2d 175, 180 (5th Cir. 1975); *see Mock*, 2023 WL 4882763, at *19. "This requires 'a delicate balancing of the probabilities of ultimate success at final hearing with the consequences of immediate irreparable injury that possibly could flow from the denial of preliminary relief.'" *Med-Cert Home Care, LLC v. Azar*, 365 F.Supp.3d 742, 749 (N.D. Tex. 2019) (citation omitted).

The balance is not "delicate" in this case, however; it is lopsided: Each of the remaining preliminary injunction factors weighs strongly in Plaintiffs' favor. The evidence demonstrates overwhelmingly that Plaintiff Maxim Defense, as well as everyone in the chain of commerce with it, has and will continue to suffer irreparable harm if the Final Rule is not enjoined. The market for

stabilizing braces and pistols with stabilizing braces ("braced pistols") has essentially evaporated. Assuming Maxim Defense can even survive if the Final Rule is *not* enjoined, Maxim Defense and the rest of the industry will continue to lose countless millions of dollars that cannot be recouped. So too have the individual Plaintiffs and the members of Firearms Policy Coalition been irreparably harmed: Their options for "compliance" with the Final Rule—namely, destroying or surrendering their braced pistols or stabilizing braces or spending time and money to register their braced pistols under the National Firearms Act ("NFA")[1]—constitute classic forms of irreparable harm.

The balance of equities and public interest—which "merge when the Government is the opposing party," *Mock*, 2023 WL 4882763, at *11—both decisively favor injunctive relief. The public has a strong interest in ensuring that federal agencies follow the law, including the APA. Indeed, the public interest is disserved by "the perpetuation of unlawful agency action." *State v. Biden*, 10 F.4th 538, 560 (5th Cir. 2021) (citation omitted). Given the severe harm faced by Plaintiffs—including Maxim Defense, who faces the very real prospect of losing its business—a preliminary injunction is essential to preserve the status quo long enough to obtain a "meaningful decision on the merits." *Canal Auth. of Fla. v. Callaway*, 489 F.2d 567, 576 (5th Cir. 1974). Defendants, on the other hand, will not be harmed by maintaining the decade-long status quo regarding what constitutes a "rifle" while this Court considers the merits of the Final Rule. Indeed, the government "cannot suffer harm from an injunction that merely ends an unlawful practice." *Open Communities All. v. Carson*, 286 F.Supp.3d 148, 179 (D.D.C. 2017) (citation omitted).

---

[1] An avenue which, notably, is no longer open to individuals upon the expiration of the Final Rule's 120-day non-enforcement period. *See* Final Rule, 88 Fed. Reg. at 6.481.

Finally, the circumstances here require a universal injunction that prevents the Defendants from enforcing the Final Rule. Because this case arises under the APA, this Court has the express statutory authority to "issue all necessary and appropriate process . . . to preserve status or rights pending conclusion of the review proceedings." 5 U.S.C. § 705. Enjoining the Final Rule to preserve the status quo prior to its publication is essential to give the parties relief from the harm caused by the Final Rule. Plaintiff Maxim Defense sells—or, prior to the publication of the Final Rule, sold—braced pistols or stabilizing braces into all 50 states. Given the extensive reach of the Final Rule across all steps of the commercial chain, the market disruption caused by the Final Rule will not truly ease unless and until the Final Rule is universally enjoined across the country.

At a minimum, the scope of the injunction should continue at least as far as instituted by the Fifth Circuit: Enjoining enforcement of the Final Rule against the individual Plaintiffs and their families; Maxim Defense and its customers (including all direct consumer purchasers and intermediary distributors, dealers, retailers, and OEM purchasers of Maxim Defense stabilizing braces and braced pistols that still must comply with federal firearms law, as well as their customers); and all of FPC's active members.[2] That is the only path allowing Maxim Defense and its customers to resume operating as they did before the Final Rule's publication and it ensures full protection for the individual Plaintiffs and FPC's members. This is necessary "to provide complete relief" here. *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979).

---

[2] This is Plaintiffs' understanding of the scope of the Fifth Circuit's injunction. If the Court is not inclined to enter a universal injunction preventing enforcement of the Final Rule as to anyone in the nation, Plaintiffs request that the Court, at a minimum, maintain the scope of the Fifth Circuit's injunction and specify that the injunction cover these persons and entities.

## II. ARGUMENT

**A.    Plaintiffs Have Suffered, And Will Continue To Face, Irreparable Injury If Preliminary Injunctive Relief Is Not Granted.**

The Fifth Circuit's precedents and prior rulings from this Court confirm that Plaintiffs will suffer irreparable injury if an injunction is not issued. "To show irreparable injury if threatened action is not enjoined, it is not necessary to demonstrate that harm is inevitable and irreparable." *Humana, Inc. v. Jacobson*, 804 F.2d 1390, 1394 (5th Cir. 1986). Rather, a movant must only show that they are "likely to suffer irreparable harm in the absence of preliminary relief." *Benisek v. Lamone*, 138 S. Ct. 1942, 1944 (2018). There are nevertheless two independent bases for finding irreparable harm here.[3]

First, the Fifth Circuit has consistently held that "substantial financial injury" may be "sufficient to show irreparable injury" in the APA context, particularly where financial costs "threaten[] the very existence of [a plaintiff's] business." *Wages & White Lion Invs., L.L.C. v. United States Food & Drug Admin.*, 16 F.4th 1130, 1142 (5th Cir. 2021) (quoting *Texas v. EPA*, 829 F.3d 405, 433, 434 (5th Cir. 2016)); *see also R.J. Reynolds Vapor Co. v. Food & Drug Admin.*, 65 F.4th 182, 194 (5th Cir. 2023) (same); *accord Atwood Turnkey Drilling, Inc. v. Petroleo Brasileiro, S.A.*, 875 F.2d 1174, 1179 (5th Cir. 1989) (recognizing that economic loss is irreparable when it "is so great as to threaten the existence of the movant's business").

Second, "harm is irreparable where there is no adequate remedy at law, such as monetary damages." *Janvey v. Alguire*, 647 F.3d 585, 600 (5th Cir. 2011). The Fifth Circuit has long

---

[3] While the Fifth Circuit found a likelihood of success on the APA claim and therefore did not address the merits of Plaintiffs' constitutional claims, it remains the case that Plaintiffs are irreparably harmed by the ongoing loss of their constitutional rights. The impairment of constitutional freedoms "for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976).

4

recognized that financial harm is irreparable where, as here, a plaintiff cannot recover damages from a federal agency due to sovereign immunity. *Wages & White Lion*, 16 F.4th at 1142 (holding that unrecoverable costs are irreparable harm "because federal agencies generally enjoy sovereign immunity for any monetary damages"); *accord R.J. Reynolds Vapor Co.*, 65 F.4th at 194 (finding in an APA challenge that plaintiff's harm was irreparable for preliminary injunction purposes where "[t]here [was] no suggestion . . . that [the plaintiff] could overcome the FDA's sovereign immunity to recover costs"); *see also* 5 U.S.C. § 702 (permitting relief "other than money damages"). To that end, "'complying with a regulation later held invalid almost *always* produces the irreparable harm of nonrecoverable compliance costs.'" *Texas v. EPA*, 829 F.3d at 433 (quoting *Thunder Basin Coal Co. v. Reich*, 510 U.S. 200, 220–21 (1994) (Scalia, J., concurring in part and in the judgment)). Under this line of authority, a plaintiff's "lack of a 'guarantee of eventual recovery' is [a] reason that its alleged harm is irreparable." *Wages & White Lion*, 16 F.4th at 1142 (quoting *Alabama Ass'n of Realtors v. Dep't of Health & Hum. Servs.*, 141 S. Ct. 2485, 2489 (2021)).

Plaintiffs have established irreparable harm under each of these lines of authority.

***Maxim Defense.*** The Final Rule has already directly, severely, and irreparably impacted Plaintiff Maxim Defense's business, which consists in substantial part of selling items targeted by the Final Rule.[4] Fourth Declaration of David Dahl in Support of Plaintiffs' Supplemental Preliminary Injunction Brief ("Fourth Dahl Decl."), ¶¶ 4–5. Maxim Defense is the second largest stabilizing brace manufacturer in the United States. *Id.*, ¶ 5. Stabilizing braces comprised about

---

[4] In connection with this brief, Plaintiffs have submitted a further declaration from David Dahl, Maxim Defense's Chief Operating Officer and Executive Vice President of Manufacturing, which supplements his three previous declarations in support of Plaintiffs' motion for a preliminary injunction. *See* ECF Nos. 36-2, 38-1, 50-1.

59% of Maxim Defense's annual non-firearm sales in 2022, which made up over $5 million in sales, and braced pistols comprised about 74% of its annual firearm sales in 2022, which also made up over $5 million in sales. *Id.*, ¶ 4. Maxim Defense's reputation extends to the veteran and Tier 1/special operations community, including those who are disabled and rely on Maxim Defense's braces and braced pistols to safely operate their firearms. *Id.*, ¶ 5.

Before the publication of the Final Rule, Maxim Defense sold stabilizing braces in all 50 states, and sold braced pistols into all available states, subject to any state-law restrictions on such firearms. Fourth Dahl Decl., ¶ 5. These products were sold through several different channels: Maxim Defense sold its stabilizing braces direct to consumers on its website; to OEM firearm manufacturers that use Maxim Defense's stabilizing brace on their own firearms; and to various dealers, distributors, and retailers across the United States. *Id.*, ¶ 6 As to its braced pistols, Maxim Defense sold directly to consumers online (subject to the transaction being processed through an FFL); and to dealers, distributors, and other licensed FFL retailers so that those retailers could then carry and sell Maxim Defense's products. *Id.*

*Direct to Consumer*. Before the Final Rule, Maxim Defense sold stabilizing braces and braced pistols through its website direct to consumers. Fourth Dahl Decl., ¶ 7. Because stabilizing braces are not regulated as a "firearm," they can be shipped direct to consumers in all 50 states. *Id.* Braced pistols, on the other hand, must first be transferred and shipped to an FFL to facilitate the transaction by completing the federally-mandated background check and delivering the firearm to the consumer. *Id.* The Final Rule effectively shut down the market for these transactions. *Id.* There is essentially zero demand for stabilizing braces now that the product may subject ordinary consumers to regulation under the NFA—the regulatory uncertainty and threat of criminal liability has undermined consumer confidence in the legality of stabilizing braces. *Id.* Maxim Defense's

consumers could face severe criminal penalties for possessing a stabilizing brace, particularly since they could be charged with constructive possession of an unregistered short-barreled rifle (or "SBR"). *Id.* And the Final Rule, of course, has upended the market for braced pistols, which are now reclassified as SBRs and subject to the NFA's onerous provisions.

*OEM Firearm Manufacturers*. A significant portion of Maxim Defense's stabilizing brace sales were made to firearm manufacturers who install Maxim Defense's braces onto their own firearms and then sell a braced version of the pistol on the market. Fourth Dahl Decl., ¶ 8. For example, Daniel Defense has equipped its DDM4 pistol with Maxim Defense's PDW brace, which it then sold as a DDM4 PDW model braced pistol. *Id.* These manufacturers sold products equipped with Maxim Defense braces throughout the United States. *Id.* Nearly all of Maxim Defense's major OEM customers discontinued their stabilizing brace orders because of the Final Rule. *Id.* Eleven of these manufacturers have confirmed that they will resume ordering braces from Maxim Defense if the Agencies are enjoined from enforcing the Final Rule against the industry and its customers. *Id.*

*Distributors and Retailers*. Maxim Defense also sold its stabilizing braces and braced pistols to seven different distributors, who in turn sold that inventory to retailers and firearms dealers for sale to consumers throughout the United States. Fourth Dahl Decl., ¶ 9. The company also sells its products directly to larger retailers (such as such as Modern Warriors in St. George, Utah), who then sell Maxim Defense products in their stores and online to consumers throughout the country. *Id.* Because of the Final Rule, these channels of commerce have also dried up. *Id.*

The Final Rule has destroyed each of these channels of commerce: the market for the products subject to the Final Rule has evaporated. Maxim Defense had several outstanding orders that were canceled or held due to the impact of the Final Rule, and the company ceased all sales

of its braced pistols on January 31, 2023. Fourth Dahl Decl., ¶ 10. Maxim Defense has been unable to fulfill orders for hundreds of thousands of dollars' worth of product that it can no longer transfer to buyers because of the Final Rule, and the company had manufacturing orders for thousands of braces that have been canceled and more than $1 million in materials that it purchased in anticipation of its sales in 2023 that it can no longer use for their intended purpose. *Id.* Should nothing change, Maxim Defense will not be able to sustain its business and it will be stripped of the goodwill that it has developed over the course of the last decade as a manufacturer of stabilizing braces and braced pistols. *Id.*

When Plaintiffs first sought relief earlier year, Maxim Defense had already seen a multi-million-dollar loss in year-over-year sales and projected that it would lose millions of dollars in sales over the ensuing months based on its inability to meet pending orders and satisfy outstanding commitments to its manufacturers. ECF No. 36-2, Dahl Decl. ¶¶ 10–13; ECF No. 38-1, Supp. Dahl Decl. ¶¶ 3–6, 8–9; ECF No. 50-1, Third Dahl Decl., ¶¶ 5–6. At that time, Maxim Defense had already laid off several employees and anticipated that it would lose the ability to continue to employ as much as 50% of its current staff, with imminent layoffs on the horizon. Dahl Decl. ¶ 14; Supp. Dahl Decl. ¶¶ 7–8; Third Dahl Decl., ¶ 4.

The last six months have wrought precisely what Maxim Defense feared. The Final Rule has devastated the financial core of Maxim Defense's business. Fourth Dahl Decl., ¶ 11. The company's gross revenues for 2022 were approximately $15 million. *Id.* Through August 15, the company's year-to-date revenue is approximately $4 million (comprised mostly of products not covered by the Final Rule). *Id.* Maxim Defense has lost approximately $3 million in year-over-year sales for braced pistol sales, and projects that the total loss for this product category will be over $5 million by the end of 2023. *Id.* The company has lost approximately $3.4 million in

stabilizing brace sales and expects this loss to exceed $4.5 million for the year. *Id.* To offset these losses, one of Maxim Defense's founders contributed nearly $2 million in capital earlier this year to keep the company afloat. *Id.*

The Final Rule has forced Maxim Defense to drastically reduce its workforce: It has laid off 15 employees; slashed pay by 15% across-the-board; and lost an additional three employees because of the pay reduction. Fourth Dahl Decl., ¶ 12. The company's workforce is now roughly half of what it was on January 1 of this year. *Id.*

Maxim Defense has established irreparable harm. Maxim Defense's entire business is structured around the production and sale of stabilizing braces and braced pistols. The Final Rule functionally destroys any viable market for these products, which constitute the vast majority of its revenue and have accounted for millions of dollars of sales every year. *See* Fourth Dahl Decl., ¶¶ 4. 6–13. Not only does the Final Rule "threaten[] the very existence of [its] business," sovereign immunity prevents Maxim Defense from recovering damages resulting from the Defendants' APA violations. *Wages & White Lion*, 16 F.4th at 1142.

The Final Rule guts Maxim Defense's business by subjecting its core products to onerous regulation under the NFA—effectively shutting it out of the market. This type of market-wide impact is irreparable. In *VanDerStok v. Garland*, 625 F.Supp.3d 570, 582–84 (N.D. Tex. 2022), this Court held that a regulation reclassifying the plaintiff's products as a "firearm" inflicted irreparable harm because it choked off the direct-to-consumer market for the plaintiff's products. The impact here is even more stark: The Final Rule has destroyed each of the channels of commerce Maxim Defense relied on to sell stabilizing braces and braced pistols. The market for the products subject to the Final Rule has been vaporized. Fourth Dahl Decl., ¶¶ 6–13.

This Court has recognized in the closely analogous *VanDerStok* case that it is no answer for the federal government to say that Maxim Defense can protect its business by "simply complying" with the Final Rule while this litigation is pending. *VanDerStok*, 625 F.Supp.3d at 583. Again, "complying with a regulation later held invalid almost always produces the irreparable harm of nonrecoverable compliance costs." *Id*. (cleaned up) (citations omitted). And "compliance" here—submitting to the Final Rule's requirements by *not* selling brace products as it had prior to the Final Rule—has already caused Maxim Defense to suffer millions of dollars in unrecoverable losses. Maxim has plainly shown irreparable injury.

***Individual Plaintiffs.*** Plaintiffs Mock and Lewis (the "Individual Plaintiffs"), too, face irreparable harm in the form of nonrecoverable compliance costs. *Texas v. EPA*, 829 F.3d at 433. Both face the choice of either subjecting themselves to the NFA's heightened requirements against their wishes, destroying or divesting themselves of their constitutionally protected property, or facing criminal prosecution and prison. And while Defendants may try to brush this harm aside as de minimis, the Fifth Circuit has left no doubt that the Individual Plaintiffs' harm is sufficient to warrant preliminary injunctive relief. "[N]onrecoverable costs of complying with a putatively invalid regulation typically constitute irreparable harm," *Rest. L. Ctr. v. United States Dep't of Lab.*, 66 F.4th 593, 597 (5th Cir. 2023), and "[w]hen determining whether injury is irreparable, 'it is not so much the magnitude but the irreparability that counts.'" *Texas v. EPA*, 829 F.3d at 433–34 (quoting *Enter. Int'l, Inc. v. Corporacion Estatal Petrolera Ecuatoriana*, 762 F.2d 464, 472 (5th Cir. 1985)). Furthermore, this Court has acknowledged that "a plaintiff's purported choice to comply—or else—with a challenged government dictate, as evidenced by the plaintiff's decision to desist from engaging in the regulated activity, is adequate to establish irreparable harm." *VanDerStok v. Garland*, 633 F.Supp.3d 847, 857 (N.D. Tex. 2022).

Plaintiffs Mock and Lewis currently lawfully possess firearms that will likely subject them either to potential criminal liability or to costly and burdensome requirements under the Final Rule. *See* ECF No. 36-4, Mock Decl., ¶¶ 5–11; ECF No. 36-3, Lewis Decl., ¶¶ 5–10.[5] Moreover, because the Final Rule's 120-day non-enforcement period has concluded, if Plaintiffs Mock and Lewis are not covered by an injunction, they will have no choice but to destroy or divest themselves of their constitutionally protected property. If the existing injunction is not extended, the moment that the injunction dissolved, Plaintiffs Mock and Lewis would potentially be in possession of unregistered SBRs, according to the Final Rule, without any non-enforcement guarantee from the Agencies. *See* Final Rule, 88 Fed. Reg. at 6,481 ("After the 120-day registration period following publication of this rule, registration of previously made or manufactured weapons with a 'stabilizing brace' that constitute NFA firearms will not be permitted. The Department at that time may take enforcement action against any person in possession of an affected firearm that is a short-barreled rifle for which a registration has not been submitted.").

Only after destroying or divesting themselves of their constitutionally protected property could Plaintiffs Mock and Lewis then seek Defendants' permission to newly build an NFA-regulated firearm. In that instance, they would be required to subject themselves to NFA registration requirements including purchasing and submitting passport photos and fingerprints, which costs are unrecoverable, and will be required to disclose sensitive personal information. Mock Decl., ¶¶ 6–9; Lewis Decl., ¶¶ 5–8. Once registered, their constitutionally protected firearms will be forever included on a national registry—without any legal mechanism allowing them to unregister their firearms. Further, they will be subjected to numerous delays imposed by the

---

[5] Paradoxically, among the burdens that come from compliance are the need to submit a background check for property they already own and passed a background check to purchase. *See* Mock Decl. ¶ 7; Lewis Decl. ¶ 6.

Agencies that will, among other things, burden their ability to travel interstate with their constitutionally protected firearm. Mock Decl., ¶¶ 6–9; Lewis Decl., ¶¶ 5–8. And, for the first time, they will be exposed to greater criminal liability for even an accidental violation of federal firearm laws because of the impact of the NFA. Mock Decl., ¶¶ 7–9; Lewis Decl., ¶¶ 6–8.

The Final Rule's alternative bases for individuals' compliance—destroying or surrendering their braced pistols (*see* Final Rule, 88 Fed. Reg. at 6,481)—further demonstrates the irreparable injury associated with compliance. Even if the government didn't destroy the weapons, it is doubtful that the government would return them following this litigation—at least without additional litigation to force such a return.

Faced with these regulatory requirements and the possibility of criminal liability, these Plaintiffs and similarly situated firearm owners around the Nation will simply avoid purchasing or keeping braced pistols. The Individual Plaintiffs have established irreparable harm.

***Firearms Policy Coalition.*** Plaintiff FPC's members will sustain irreparable injury in the absence of preliminary relief as well, since many of its members (including Mock and Lewis) lawfully possess firearms that will likely subject them either to potential criminal liability or to costly burdensome requirements under the Final Rule and many of its corporate members (including Maxim Defense) will be negatively impacted in their inability to continue what have been lawful business practices for the past decade. *See* ECF No. 36-1, Combs Decl., ¶¶ 3–10. Since FPC has standing to pursue this action as a representative of its members, it is appropriate "consider whether the . . . members of the organizations would suffer irreparable harm in the absence of an injunction." *N. Carolina State Conf. of the NAACP v. Raymond*, 981 F.3d 295, 311 n.9 (4th Cir. 2020); *see also, e.g., Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*, 886 F.3d 803, 822 (9th Cir. 2018) (National Wildlife Federation established irreparable harm to its interests

as an organization based on representative harm to its members); *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011) (organization established irreparable harm based on impacts to its members); *Sierra Club v. Trump*, 963 F.3d 874, 895 (9th Cir. 2020) (same); *E. Bay Sanctuary Covenant v. Garland*, 994 F.3d 962, 984 (9th Cir. 2020) (organization suffered irreparable injury where agency rule "harm[ed] their mission," including through diversion of resources).

FPC has hundreds of thousands of members throughout the country. Combs Decl., ¶ 7. Its membership includes many individuals (like Plaintiffs Mock and Lewis) who are impacted by the Final Rule, which regulates the braced pistols and stabilizing braces they already own and restricts their ability to obtain those products without complying with the NFA's requirements. *Id.*, ¶ 9. FPC's many commercial members—including Maxim Defense—have had their business practices upended by the Final Rule, which has caused them to suffer extreme losses and lost profits that may drive them out of business entirely. *Id.*, ¶ 10.

In sum, Plaintiffs have suffered and continue to face irreparable harm if injunctive relief is not granted.

## B.   The Balance Of The Equities And The Public Interest Favor Injunctive Relief.

The third and fourth factors—the balance of harms and weighing the public interest— "merge when the Government is the opposing party." *Nken*, 556 U.S. at 435; *Mock*, 2023 WL 4882763, at *11. When considering these factors, "courts 'must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief.'" *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 24 (2008) (quoting *Amoco Prod. Co. v. Village of Gambell*, 480 U.S. 531, 542 (1987)).

These factors tip decisively in Plaintiffs' favor. For one thing, the Fifth Circuit has repeatedly held that the public has a strong interest in ensuring the federal government acts within lawful bounds. "It is of highest public importance that federal agencies follow the law." *R.J. Reynolds Vapor Co.*, 65 F.4th at 195. So while the public interest favors "having governmental agencies abide by the federal laws that govern their existence and operations," "'[t]here is generally no public interest in the perpetuation of unlawful agency action.'" *State v. Biden*, 10 F.4th at 560 (quoting *League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016)); *see also Wages & White Lion*, 16 F.4th at 1143 (same).

This is no abstract matter. Manufacturers and retailers like Maxim Defense are imperiled by the Final Rule. Granting a sufficiently broad preliminary injunction serves the public interest by preserving the *status quo ante* long enough for Maxim Defense to obtain "a meaningful decision on the merits," *Canal Auth. Of Fla.*, 489 F.2d at 576, otherwise it may very well be forced out of business while litigation drags on. *See Meis v. Sanitas Serv. Corp.*, 511 F.2d 655, 656 (5th Cir. 1975) ("[T]he purpose of a preliminary injunction is always to prevent irreparable injury so as to preserve the court's ability to render a meaningful decision on the merits."). There is no benefit to enforcing a Final Rule that prevents Maxim Defense from engaging in freedoms it lawfully enjoyed for nearly a decade and puts it out of business before it can prove its case. And of course, the Final Rule imposes serious burdens on individuals like Plaintiffs Mock and Lewis, and on FPC's members throughout the Nation.

Defendants, on the other hand, will not suffer significant harm by maintenance of the decade-long status quo regarding what constitutes a "rifle" while this Court considers the merits of the Final Rule. In their previous briefing before this Court and in the Fifth Circuit, the Agencies have not identified any significant harm that would result from an injunction. Indeed, the Final

Rule itself contained a delay in enforcement. Final Rule, 88 Fed. Reg. at 6,553 ("The Department, in its enforcement discretion, has determined that current possessors of these affected firearms have until 120 days after this rule is published to take the necessary actions, as described in this rule, to comply with Federal law to avoid civil and criminal penalties."). The government "cannot suffer harm from an injunction that merely ends an unlawful practice." *Open Communities All.*, 286 F.Supp.3d at 179 (citation omitted). Granting a preliminary injunction during the pendency of this litigation serves the public interest by allowing the Court to provide clarity on the validity of the Final Rule while "ensur[ing] the status quo is maintained so the legal system can resolve [an] important dispute." *City of Dallas, Texas v. Hall*, 2008 WL 11350041, at *3 (N.D. Tex. July 28, 2008).

**C.      The Court Should Universally Enjoin The Defendants From Enforcing The Final Rule Given The Nature of the Claims Being Asserted and the Difficulty of Crafting a Narrower Injunction that Would Truly Maintain the *Status Quo Ante*.**

A universal injunction barring Defendants from enforcing the Final Rule is necessary to preserve Plaintiffs' "status or rights" while the litigation is pending and aligns with the final relief—vacatur—available to them on the merits. In the alternative, an injunction should continue what the Fifth Circuit put in place: Barring enforcement as to the Individual Plaintiffs and their family members; FPC's active members; and Maxim Defense and all of Maxim Defense's downstream customers (including all direct consumer purchasers and all intermediary distributors, dealers, retailers, and OEM purchasers of Maxim Defense stabilizing braces and braced pistols that still must comply with federal firearms law, as well as their customers).

1.      Under the APA, Congress has expressly authorized courts to "issue all necessary and appropriate process to postpone the effective date of an agency action or *to preserve status or rights pending conclusion of the review proceedings*[,]" 5 U.S.C. § 705 (emphasis added) ("Section 705"). The APA thus establishes that the Court may enter wholesale relief against *any* enforcement

of a challenged regulation pending the outcome of litigation. Indeed, this becomes even clearer when viewed against the *final* remedy authorized by the APA, which is wholesale vacatur of a rule; *i.e.*, a ruling that would "hold unlawful and set aside agency action, findings, and conclusions[.]" 5 U.S.C. § 706. To remedy an APA violation, "vacatur of an agency action is the default rule in this Circuit." *Cargill v. Garland*, 57 F.4th 447, 472 (5th Cir. 2023) (en banc) (citations omitted); *see also District of Columbia v. U.S. Dep't of Agric.*, 444 F.Supp.3d 1, 48–54 (D.D.C. 2020) (holding that a universal injunction in the APA context "is consistent with 'established principles of equitable discretion'"); *Nat'l Mining Ass'n v. U.S. Army Corps of Eng'rs*, 145 F.3d 1399, 1409 (D.C. Cir. 1998) (in APA cases, "the ordinary result is that the rules are vacated—not that their application to the individual petitioners is proscribed*"*) (internal quotation marks omitted).

Preliminary relief under the APA must also account the scope of final relief the Plaintiffs may achieve. To "preserve status or rights" in a suit that could lead to vacatur of the challenged rule entirely, the Court must be entitled to enjoin any enforcement of the rule during the pendency of a lawsuit. Courts have long recognized that preliminary relief under Section 705 properly may extend to ordering the defendant agency to cease enforcement of a challenged rule altogether. *See Nat'l Fed'n of Indep. Bus. v. Perez*, No. 16-cv-00066, 2016 WL 3766121, at *46 (N.D. Tex. June 27, 2016) (holding, in the preliminary injunction context, that "a nationwide injunction is appropriate" in a "facial challenge" under the APA); *Franciscan All., Inc. v. Burwell*, 227 F.Supp.3d 660, 695 (N.D. Tex. 2016) ("A nationwide injunction is appropriate when a party brings a facial challenge to an agency action under the APA," and issuing a nationwide preliminary

injunction).[6] This provision "authorize[s] relief from agency action for any person otherwise subject to the action, not just as to plaintiffs." *District of Columbia v. U.S. Dep't of Agric.*, 444 F.Supp.3d at 48. Accordingly, Section 705 "'authorizes courts to stay agency [action] pending judicial review,' not just to enjoin their application to the injured parties before the court." *Rai v. Biden*, 567 F.Supp.3d 180, 202 (D.D.C. 2021) (citation omitted). And this includes "the power to compel agency inaction when necessary 'to preserve status or rights pending conclusion' of the action." *Id.* (citation omitted).

Because this Court has the final authority to set aside a rule completely, it must follow that the Court has the authority to preliminarily enjoin a rule to the same extent. "[I]f a court can ultimately 'set aside' a rule for everyone once it reaches the merits, then the APA plainly authorizes the court to issue a *preliminary* injunction that bars the enforcement of the contested rule against anyone pending its merits decision on whether to vacate the rule." Mila Sohoni, The Power to Vacate a Rule, 88 GEO. WASH. L. REV. 1121, 1126 (2020); *see also id.* at 1158 ("Modern courts reviewing agency action under the APA are therefore on firm footing when they issue universal preliminary injunctions against rules to preserve the status quo pending judicial review."). This is consistent with the Supreme Court's longstanding recognition that "injunctions should be crafted

---

[6] As one district court explained, "[n]ationwide preliminary injunctive relief guarantees that a rule shown likely to be proven unlawful does not become effective, providing complete relief to the plaintiffs while the rule's legality is finally adjudicated" because "[o]nce that 'egg has been scrambled,' 'restor[ing] the status quo ante' will be considerably more disruptive." *District of Columbia v. U.S. Dep't of Agric.*, 444 F.Supp.3d at 49 (quoting *Sugar Cane Growers Co-op. of Fla. v. Veneman*, 289 F.3d 89, 97 (D.C. Cir. 2002)); *see also id.* (collecting cases affirming universal preliminary injunctions halting agency action); *Whitman-Walker Clinic, Inc. v. U.S. Dep't of Health & Hum. Servs.*, 485 F.Supp.3d 1, 61–62 (D.D.C. 2020) (reviewing authority "confirm[ing] the propriety of nationwide injunctions in APA cases" and issuing nationwide preliminary injunction where a party-limited injunction "would not provide Plaintiffs with any meaningful relief, let alone 'complete relief'"). In other words, "[n]ationwide relief at the preliminary stage also ensures that complete relief remains available to the plaintiffs after that final adjudication." *District of Columbia v. U.S. Dep't of Agric.*, 444 F.Supp.3d at 49.

to 'provide complete relief to the plaintiffs.'" *Mock*, 2023 WL 4882763, at \*20 (quoting *Califano*, 442 U.S. at 702).

In *Nevada v. United States Department of Labor*, for example, the Eastern District of Texas reviewed a final rule issued by the Department of Labor that sought to "modernize and streamline the existing overtime regulations for executive, administrative, and professional employees." 218 F.Supp.3d 520, 524 (E.D. Tex. 2016). After determining that the rule likely exceeded the scope of defendants' authority, predominately because it departed from the plain meaning of the authorizing statute, the court turned to the scope of the injunction. *Id*. at 527–33. It explained that the rule applied "to all states," so that harm will "extend[] nationwide" if the injunction does not protect everyone, regardless of their location. *Id*. at 534. Broadly applicable injunctions have also been granted in this District where an agency's final rule has general applicability nationwide and the court has determined the rule is likely unlawful. *See Texas v. United States*, 201 F.Supp.3d 810, 836 (N.D. Tex. 2016); *Nat'l Fed'n of Indep. Bus.*, 2016 WL 3766121, at \*46.

The Fifth Circuit has approved this practice, specifically in the context of preliminary injunctions issued pursuant to APA challenges. "[T]he Constitution vests the District Court with 'the judicial Power of the United States.' That power is not limited to the district wherein the court sits but extends across the country. It is not beyond the power of a court, in appropriate circumstances, to issue a nationwide injunction." *Texas v. United States*, 809 F.3d 134, 188 (5th Cir. 2015) (quoting U.S. CONST. Art. III, § 1). And "[a]n injunction . . . is not necessarily made overbroad by extending benefit or protection to persons other than prevailing parties in the lawsuit—even if it is not a class action—if such breadth is necessary to give prevailing parties the relief to which they are entitled." *Prof. Ass'n of Coll. Educators, TSTA/NEA v. El Paso Cnty. Cmty. Coll. Dist.*, 730 F.2d 258, 273–74 (5th Cir. 1984).

18

So too here: The Final Rule plainly applies nationwide. The Final Rule confirms that its "intent . . . is to . . . ensure consistent application of the statutory definition of 'rifle.'" Final Rule, 88 Fed Reg. at 6,502. And the record, including the supplemental declarations submitted herewith, demonstrate the nationwide havoc the Final Rule has wrought on the sellers and purchasers of the brace products that the Final Rule seeks to regulate. Given the nationwide scope of the harm imposed by the Final Rule, an injunction prohibiting the Defendants from enforcing the Final Rule is appropriate—and indeed necessary—to "preserve [Plaintiffs'] status [and] rights" here.

2.      Separate and apart from the APA context, basic "equitable principles" confirm that a universal injunction is appropriate given the nationwide scope of the Defendants' overreach, the nationwide scope of the Plaintiffs' operations, and the integrated nature of the already-heavily-regulated firearms market. *Feds for Med. Freedom v. Biden*, 63 F.4th 366, 387 (5th Cir. 2023) (en banc). In *Feds for Medical Freedom*, the Fifth Circuit affirmed a universal preliminary injunction against the Biden Administration's vaccine mandate executive order to "maintain the status quo" where an associational plaintiff had thousands of members "spread across every State in the Nation," and the Court was confronted with a nationwide policy that warranted "consistency" in enforcement, rather than "piecemeal" resolution to those affected. *Id.* at 387–88.

Here too, issuing a universal injunction is necessary to most closely preserve, during this litigation, the status quo that held prior to publication of the Final Rule. Before ATF published the Final Rule, the market for stabilizing braces and braced pistols extended throughout the nation.[7] As the Fourth Dahl Declaration demonstrates, Maxim Defense sold its brace products in every state. Maxim Defense sold directly to consumers in all 50 states through its website. It sold to

---

[7] And, of course, FPC's hundreds of thousands of members are spread across the country. Combs Dec., ¶ 7.

seven distributors throughout the nation who, in turn, sold Maxim Defense's products to retailers in every state. Likewise, Maxim Defense sold braces directly to eleven OEM manufacturers who incorporated them into braced pistols sold throughout the United States. Fourth Dahl Decl., ¶¶ 6–9.

The record shows that Maxim Defense's ability to avoid irreparable harm by transacting business in the products subject to the Final Rule at anywhere close to the levels it experienced prior to the Final Rule cannot be revived by an injunction simply extending to Maxim Defense and its downstream customers. The supplemental declarations submitted herewith confirm that an injunction applying only to Maxim Defense and all of its downstream sellers and purchasers would likely afford only *theoretical* relief because the market for the products regulated under the Final Rule is completely broken at the moment.[8] *See* Fourth Dahl Decl., ¶¶ 10–113; Clark Decl., ¶¶ 5–11; Irslinger Decl., ¶¶ 4–7. It will not fully reopen for Maxim Defense unless and until the millions of persons affected by the Final Rule get assurance from the judicial branch that they will not face prosecution for engaging in the acts proscribed by the Final Rule. Fourth Dahl Decl., ¶¶ 14–17; Clark Decl., ¶¶ 10–11; Irslinger Decl., ¶¶ 7–8.

Furthermore, a universal injunction ensures predictability and stability while this litigation proceeds by maintaining the regulatory status quo. *Feds. For Med. Freedom*, 63 F.4th at 388 ("piecemeal enforcement" would "undermine[] rather than support[] the Government's purported interest in" regulatory consistency). Here, the Government's stated "intent of th[e] rule is to . . . ensure consistent application of the statutory definition of 'rifle.'" Final Rule, 88 Fed Reg. at 6,502. Nationwide relief serves that end: Piecemeal adjudication—and, therefore, piecemeal

---

[8] To be clear, Maxim Defense does not seek such an advantage through the injunction; rather, it seeks an orderly and fair chance to survive, pending the ultimate determination that Defendants' Final Rule must be vacated.

enforcement—of the Final Rule's legality "would invite chaos." *District of Columbia v. U.S. Dep't of Agric.*, 444 F.Supp.3d at 52. Indeed, "the federal government would be expected to prefer nationwide relief in a case like this one, as an order staying or enjoining the Final Rule everywhere serves the important interest of uniformity in administration" of a federal regulation of broad applicability. *Id*.

If only Maxim Defense and its downstream customers are covered, we would be left with the incongruous prospect of retail shelves being stocked with Maxim Defense's braced pistols (which would not require registration as SBRs under the NFA) offered next to other manufacturers' braced pistols (which would require registration as SBRs). Just as in *Feds for Medical Freedom*, "limiting . . . relief to only [the parties] would prove unwieldy and would only cause more confusion." 63 F.4th at 388. In short, meaningful relief for Maxim Defense hinges on the Final Rule not being enforced against anyone.

The evidence shows there is little, if any, practical benefit to an injunction limited to the parties or even to all of the downstream customers of Maxim Defense. Piecemeal litigation of this national issue, with the threat of criminal sanction looming over all who dare to purchase and sell the products covered by the Final Rule, invites needless further chaos. Given the practical realities of the heavily-regulated firearms trade, Maxim Defense's nationwide scope of distribution, FPC's national scope, and the national scope of the Final Rule, the Court should issue a preliminary injunction preventing the Defendants from enforcing the Final Rule against anyone in the United States.

3.    Alternatively, the preliminary injunction should continue to, at a minimum, protect not just the Individual Plaintiffs, FPC's members, and Maxim Defense but should *also* continue cover Maxim Defense's downstream customers (including all direct consumer purchasers and all

intermediary distributors, dealers, retailers, and OEM purchasers of Maxim Defense stabilizing braces and braced pistols that still must comply with federal firearms law, as well as their customers). As noted above, Maxim Defense understands that the Fifth Circuit's injunction covers these downstream customers. If there is any doubt or ambiguity about that coverage, this Court should remove that doubt and plainly enjoin the Defendants from enforcing the Final Rule against all such persons and entities.

Maxim Defense's status as a manufacturer in the NFA's regulatory environment means that an injunction limited to only Maxim Defense will not afford it *any* practical relief: Maxim Defense would not be able to put its braced pistols into the stream of commerce because the distributors, dealers, and retailers, not to mention the ultimate customers, would become felons for possessing unregistered SBRs under the Final Rule. Fourth Dahl Decl., ¶ 15; *see Mock*, 2023 WL 4882763, at *4 (describing the penalties for violating the NFA and GCA). If only Maxim Defense is covered by an injunction, then as soon as it attempts to transfer a braced pistol to another FFL, that FFL would immediately be in possession of an unregistered SBR, since that FFL would not be covered under a narrow injunction, and that FFL would then be exposed to civil and criminal liability. Fourth Dahl Decl., ¶ 16; *see id.*, ¶¶ 6–9 (describing the stream of commerce for the company's braced pistols and stabilizing braces). Moreover, it is unlikely that FFL could even legally receive the item since it would be transferred off Maxim Defense's FFL records as a pistol but would have to be received by the other FFL as an SBR. *See id.*, ¶ 17. And, of course, an FFL that does not have an ATF-issued Special Occupational Tax license cannot receive a transferred NFA item. *See* 18 U.S.C. § 923(a) (separate licensing requirement for NFA transactions); 26 U.S.C. § 5801 (Special Occupational Tax for NFA transactions).

Given the multifaceted stream of commerce for Maxim Defense's products, the company's nationwide network of consumers, and the heavily regulated nature of the firearms trade, Maxim Defense can only get relief (albeit partial) if the Final Rule is enjoined as to all of Maxim Defense's downstream customers in every state: Consumers who purchase products from Maxim Defense's website are spread throughout all 50 states; the OEM manufacturers who equip their firearms with Maxim Defense's products sell to consumers throughout the nation; the distributors, dealers, and retailers who purchase, stock, and sell Maxim Defense's stabilizing braces and braced pistols (including those pistols manufactured by other entities bearing Maxim Defense stabilizing braces) into the market; and the FFLs who serve as intermediaries for the transfer and sale of Maxim Defense products are likewise spread across the country. *See* Fourth Dahl Decl., ¶¶ 14–17.

While this relief would only be partial, it is merited if the Court does not issue a universal injunction.

### III. CONCLUSION

Defendants have brought the need for a universal or nationwide injunction upon themselves. It is the Defendants that decided to transmute the status of braced pistols in every state by decree, that unlawfully sought to make the Final Rule immediately applicable, and that decided to retroactively change their decade-long position and treat all braced pistols as if they are and have always been short-barreled rifles—all without complying with the APA. As shown above, the nationwide scope of the Final Rule and the nationwide scope of the harm it has caused Maxim Defense, its customers, and FPC's members justify this Court granting a universal preliminary injunction. And in the APA context, Section 705 grants this Court express authority to "issue all necessary and appropriate process . . . to preserve status or rights pending conclusion of the review proceedings." 5 U.S.C. § 705. Accordingly, to prevent the suffering and irreparable injury that will

23

immediately befall lawful gun owners, businesses, and manufacturers absent such an injunction, Plaintiffs request that Defendants be enjoined from enforcing the Final Rule as to any person or entity, which would be the result required by a vacatur if Plaintiffs prevail on the merits.

Alternatively, and at the very least, the injunction should be maintained to prevent enforcement of the Final Rule against the Individual Plaintiffs and their family members; Maxim Defense and all of its downstream customers (including all direct consumer purchasers and all intermediary distributors, dealers, retailers, and OEM purchasers of Maxim Defense stabilizing braces and braced pistols that still must comply with federal firearms law, as well as their customers); and all of FPC's active members. While Plaintiffs understand the injunction to cover all of the intermediaries between Maxim Defense and their end customers, the industry needs clarity.

In the event the Plaintiffs do not ultimately prevail in this case, they request that Defendants be delayed from implementing the Final Rule and its reclassification of braced pistols until 120 days after a final judgment and mandate is issued by this Court.

24

Dated: August 18, 2023

                                             Respectfully submitted,

/s/ Bradley A. Benbrook                R. Brent Cooper (TX Bar No. 04783250)
Bradley A. Benbrook** (CA Bar No. 177786)    Benjamin D. Passey (TX Bar No. 24125681)
Stephen M. Duvernay** (CA Bar No. 250957)   COOPER & SCULLY, P.C.
BENBROOK LAW GROUP, P.C.             900 Jackson Street, Suite 100
701 University Avenue, Suite 106          Dallas, Texas  75202
Sacramento, California  95825            Telephone: (214) 712-9500
Telephone: (916) 447-4900               Telecopy: (214) 712-9540
Telecopy: (916) 447-4904               brent.cooper@cooperscully.com
brad@benbrooklawgroup.com            ben.passey@cooperscully.com
steve@benbrooklawgroup.com

                                             Cody J. Wisniewski* (CO Bar No. 50415)
FPC ACTION FOUNDATION
5550 Painted Mirage Road, Suite 320
Las Vegas, NV  89149
Telephone: (916) 378-5785
Telecopy: (916) 476-2392
cwi@fpchq.org

*Admitted *pro hac vice*
**Application for admission *pro hac vice* pending

*Attorneys for Plaintiffs*

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that, on August 18, 2023, a true and correct copy of the foregoing document and all supporting documents filed concurrently therewith were served via the Court's CM/ECF system to all counsel of record.

<div style="margin-left: 40%;">

/s/ Bradley A. Benbrook
Bradley A. Benrbook

</div>