## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## FORT WORTH DIVISION

| | |
|---|---|
| WILLIAM T. MOCK; *et al.*,<br><br>       *Plaintiffs*,<br><br> v.<br><br>MERRICK GARLAND, in his official<br>capacity as Attorney General of the United States;<br>*et al.*,<br><br>       *Defendants*. | Civil Action No. 4:23-cv-00095-O |

## FOURTH DECLARATION OF DAVID DAHL IN SUPPORT OF PLAINTIFFS' SUPPLEMENTAL PRELIMINARY INJUNCTION BRIEF

I, David Dahl, declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the following statements are true and correct to the best of my knowledge:

1. I am over 18 years of age, competent to testify, and have personal knowledge of the matters stated herein.

2. I am the Chief Operating Officer and Executive Vice President of Manufacturing of Maxim Defense Industries, LLC ("Maxim Defense") and have held those positions since 2018 I have worked for Maxim Defense, in some capacity, since 2015.

3. Maxim Defense is a firearms and firearms accessories manufacturer and retailer in good standing, registered in the State of Florida, and based in St. Cloud, Minnesota. Maxim Defense has had sales within the Northern District of Texas, including within this Division.

4. Maxim Defense specializes in the manufacture and sale of the stabilizing braces and pistols equipped with stabilizing braces ("braced pistols") that are at issue in this lawsuit. Maxim Defense's stabilizing braces are designed, manufactured, and intended to allow individuals

to fire large and heavy pistols better and more safely by stabilizing the pistol on the operator's forearm. Stabilizing braces comprised about 59% of Maxim Defense's annual non-firearm sales in 2022, which made up over $5 million in sales. Braced pistols comprised about 74% of its annual firearm sales in 2022, which also made up over $5 million in sales.

5.      Maxim Defense has established a reputation and customer base for its stabilizing braces and its braced pistols. Maxim Defense is the second largest stabilizing brace manufacturer in the United States. Maxim Defense's reputation extends to the veteran and Tier 1/special operations community, including those that are disabled and rely on Maxim Defense's braces and braced pistols to safely operate their firearms. Maxim Defense has previously sold stabilizing braces in all 50 states, and sold braced pistols into all states, subject to any state-law restrictions on such firearms.

6.      Prior to the publication of the Final Rule at issue in this case, Maxim Defense sold its stabilizing braces and braced pistols through several different channels. Maxim Defense sold its stabilizing braces direct to consumers on its website; to OEM firearm manufacturers that use Maxim Defense's stabilizing brace on those manufacturer's firearms; and to various dealers, distributors, and retailers across the United States. As to its braced pistols, Maxim Defense sold directly to consumers online (subject to the transaction being processed through a Federal Firearms Licensee ("FFL")); and to dealers, distributors, and other licensed FFL retailers so that those retailers could then carry and sell Maxim Defense's products. The Final Rule has destroyed each of these channels of commerce: the market for the products subject to the Rule has evaporated.

7.      Before the Final Rule, Maxim Defense sold stabilizing braces and braced pistols direct to consumers through its website. Because stabilizing braces are not regulated as a "firearm," they can be shipped direct to consumers in all 50 states. Braced pistols, on the other hand, must be

transferred and shipped to an FFL to facilitate the transaction by completing the background check and delivering the firearm to the consumer. The Final Rule effectively shut down the market for these transactions. There is essentially zero demand for stabilizing braces now that the product may subject ordinary consumers to regulation under the NFA. I have learned through many communications with distributors and dealers that the regulatory uncertainty and threat of criminal liability has undermined consumer confidence in the legality of stabilizing braces. The Final Rule could subject Maxim Defense's consumers to severe criminal penalties for possessing a stabilizing brace, particularly since they could be charged with constructive possession of a short-barreled rifle. And the Final Rule, of course, has all but barred the sale of stabilized pistols as non-NFA items, given they are now reclassified as short-barreled rifles.

8.     A significant portion of Maxim Defense's stabilizing brace sales were made to firearm manufacturers who install Maxim Defense's braces onto their own firearms and then sell a braced version of the pistol on the market. For example, Daniel Defense has equipped its DDM4 with Maxim Defense's PDW Brace, which it then sold as a DDM4 PDW model braced pistol. These manufacturers sold products equipped with Maxim Defense braces throughout the United States. Nearly all of Maxim Defense's major OEM customers discontinued their stabilizing brace orders because of the Final Rule. All eleven of these manufacturers Maxim Defense works with have confirmed that they will resume ordering braces if ATF is broadly enjoined from enforcing the Final Rule against the industry and its customers.

9.     Maxim Defense also sold its stabilizing braces and braced pistols to seven different distributors, who in turn sold that inventory to retailers and firearms dealers for sale to consumers throughout the United States. The company also sells its products directly to larger retailers (such as Modern Warriors in St. George, Utah) who then sell Maxim Defense products in their stores

and online to consumers throughout the country. Because of the Final Rule, these channels of commerce have also dried up: Distributors and retail dealers have been reluctant to order and stock Maxim Defense products as they are primarily in the pistol brace category. They have informed Maxim Defense that they are unwilling to take the risk associated with complying with the Final Rule as their customers are confused to how to interpret the rule's restrictions.

10.     The Final Rule's new requirements, and its effective destruction of the stabilizing brace and braced pistol market, has and will continue to directly, severely, and irreparably impact Maxim Defense's business. As detailed in my previous declarations, Maxim Defense had several outstanding orders that were canceled or held due to the impact of the Final Rule, and the company ceased all sales of its braced pistols on January 31, 2023. Maxim Defense has been unable to fulfill orders for hundreds of thousands of dollars' worth of product that it can no longer transfer to buyers because of the Final Rule, and the company had manufacturing orders for thousands of braces that have been canceled and more than $2 million in materials that it purchased in anticipation of its sales in 2023 that it can no longer use for their intended purpose. Should nothing change, Maxim Defense will not be able to sustain its business and it will be stripped of the goodwill that it has developed over the course of the last decade as a manufacturer of pistol braces and braced pistols.

11.     The Final Rule has devastated the financial core of Maxim Defense's business. The company's gross revenues for 2022 were approximately $15 million. Through August 15, the company's year-to-date revenue is approximately $4 million (comprised mostly of products not covered by the Final Rule). Maxim Defense has lost approximately $3 million in year-over-year sales for braced pistol sales, and projects that the total loss for this product category will be over $5 million by the end of 2023. The company has lost approximately $3.4 million in stabilizing

brace sales and expects this loss to exceed $4.5 million for the year. To offset these losses, one of Maxim Defense's founders contributed nearly $2 million in capital earlier this year to keep the company afloat.

12.     The Final Rule has forced Maxim Defense to drastically reduce its workforce. In February, the company had to terminate five of its staff members as a direct result of the financial losses caused by the Final Rule. In April, Maxim Defense laid off an additional seven employees and reduced all employees' wages by 15 percent. And just last week the company laid off another three employees. Three more employees have left because of the pay reduction. In total, these 18 departures have left Maxim Defense with roughly half of the total workforce it had on January 1 of this year. If the Final Rule is not continued to be enjoined, with a clear scope of the injunction, these layoffs will continue.

13.     If the Final Rule is not enjoined, Maxim Defense's only hope of avoiding bankruptcy is moving into different product lines, but the Final Rule has hindered the company's ability to raise the money needed for such diversification. Indeed, because of the financial strain wrought by the Final Rule, Maxim Defense has been unable to pay for hundreds of thousands of dollars in past inventory—the company has accounts payable that are six months' past due. This has strained Maxim Defense's relationships with its suppliers and compromised the company's ability to obtain new capital to purchase any firearm parts to allow it to survive. These efforts have come nowhere close to offsetting the enormous harm to Maxim Defense's business stemming directly from the Final Rule.

14.     I understand that, if the Court enjoins the Final Rule, it will have to consider the appropriate scope of an injunction. It is my understanding that the Fifth Circuit's current injunction covers the distributors, OEM manufacturers, retailers, and individual customers buying braces and

braced pistols in Maxim Defense's downstream chain of commerce. As demonstrated above, however, the existing injunction has not been sufficient to allow Maxim Defense to continuing transacting business at the level it did before the Final Rule. Given customers' fear of prosecution under the Final Rule, the multifaceted stream of commerce for Maxim Defense's products, the company's nationwide network of consumers, and the heavily regulated nature of the firearms trade, Maxim Defense can only get relief if the Final Rule is enjoined as to all persons and entities.

15.     Maxim Defense's status as a manufacturer in the NFA's regulatory environment means that an injunction limited to only Maxim will not afford it any practical relief: Maxim would not be able to put its braced pistols into the stream of commerce because the dealers, distributors, and retailers, not to mention the ultimate customers, would be subject to criminal liability for possessing unregistered SBRs under the Final Rule.

16.     If only Maxim Defense is covered by an injunction, then as soon as it attempts to transfer a braced pistol to another FFL, that FFL would immediately be in possession of an unregistered short-barreled rifle, since that FFL would not be covered under a narrow injunction, and that FFL would then be exposed to civil and criminal liability. Moreover, it is unlikely that FFL could even legally receive the item since it would be transferred off Maxim Defense's FFL records as a pistol but would have to be received by the other FFL as a short-barreled rifle. Furthermore, an FFL that does not have a Special Occupational Tax license cannot receive a transferred NFA item.

17.     Consider the breadth of parties engaged in the nationwide stream of commerce for Maxim Defense's products: There are the company's direct consumers; the OEM manufacturers who equip their firearms with Maxim Defense's products (and the consumers who purchase those products); the distributors and end-retailers who purchase and sell Maxim Defense products into

the market (and their consumers); and the FFLs who serve as intermediaries for the transfer and sale of Maxim Defense products. These parties are spread across all 50 states. Although I believe that Maxim Defense's customers and intermediaries are currently covered under the Fifth Circuit injunction, the company cannot receive even partial relief unless the scope of the injunction is clear. Should the Court keep the current injunction in place, it should remove any doubt or ambiguity about the scope of coverage by plainly enjoining Defendants from enforcing the Final Rule against all persons and entities in Maxim Defense's stream of commerce.

August 18, 2023.

_____

David Dahl
COO/EVP of Manufacturing
Maxim Defense Industries, LLC