**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION**

|  |  |
|---|---|
| WILLIAM T. MOCK; CHRISTOPHER LEWIS; FIREARMS POLICY COALITION, INC., a nonprofit corporation; and MAXIM DEFENSE INDUSTRIES, LLC,<br><br>*Plaintiffs*,<br><br>v.<br><br>MERRICK GARLAND, U.S. Attorney General, in his official capacity as Attorney General of the United States; United States Department of Justice; Bureau of Alcohol, Tobacco, Firearms, and Explosives; and STEVEN DETTELBACH, in his official capacity as the Director of the Bureau of Alcohol, Tobacco, Firearms and Explosives,<br><br>*Defendants*. | Civil Action No. 4:23-cv-00095-O |

**PLAINTIFFS' BRIEF IN SUPPORT OF THEIR**

**MOTION FOR SUMMARY JUDGMENT**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................................................. ii

INTRODUCTION ........................................................................................................................... 1

BACKGROUND .............................................................................................................................. 4

      A.     Statutory And Regulatory Background ............................................................... 4

      B.     Procedural History ............................................................................................. 10

STANDARDS OF REVIEW ......................................................................................................... 10

      A.     Summary Judgment Standard ............................................................................ 10

      B.     APA Standards ................................................................................................... 11

      C.     First Amendment Standard ................................................................................ 12

      D.     Second Amendment Standard ............................................................................ 13

      E.     Separation of Powers Standards ........................................................................ 13

ARGUMENT ................................................................................................................................. 14

I.      The Final Rule Violates The APA In Several Respects ................................................... 14

      A.     The Final Rule Is Not A Logical Outgrowth Of The Proposed Rule ................. 14

      B.     The Final Rule Exceeds the Agencies' Statutory Authority .............................. 17

      C.     The Final Rule Is Arbitrary And Capricious ..................................................... 22

      D.     The Final Rule Violates The United States Constitution ................................... 24

            1.     The Final Rule Violates The Second Amendment ................................. 25

            2.     The Final Rule Violates Due Process Because It Is Unconstitutionally Vague ...................................................................................................... 31

            3.     The Final Rule Violates The First Amendment ..................................... 33

            4.     The Final Rule Violates The Constitution's Structural Protections .......... 36

II.     If The Court Rejects Plaintiffs' APA Challenge To The Final Rule, Then The Final Rule And The NFA's Regulation Of SBRs Violate The Second Amendment ........................ 39

III.    The Court Should Vacate The Final Rule And Issue A Permanent Injunction ............... 40

CONCLUSION .............................................................................................................................. 44

CERTIFICATE OF SERVICE ...................................................................................................... 45

## TABLE OF AUTHORITIES

**Cases**

*Acadian Gas Pipeline Sys. v. FERC,*
  878 F.2d 865 (5th Cir. 1989) ............................................................................... 24

*All. for Hippocratic Med. v. U.S. Food & Drug Admin.,*
  78 F.4th 210 (5th Cir. 2023) ............................................................................... 41

*Amin v. Mayorkas,*
  24 F.4th 383 (5th Cir. 2022) ............................................................................... 11

*Amoco Prod. Co. v. Vill. of Gambell, AK,*
  480 U.S. 531 (1987) ............................................................................................ 43

*Britto v. Bureau Of Alcohol, Tobacco, Firearms & Explosives,*
  No. 2:23-cv-019-Z, 2023 WL 7418291 (N.D. Tex. Nov. 8, 2023) .......................... 1

*Caetano v. Massachusetts,*
  577 U.S. 411 (2016) ............................................................................................ 39

*Calix v. Lynch,*
  784 F.3d 1000 (5th Cir. 2015) ............................................................................. 37

*Cargill v. Barr,*
  502 F. Supp. 3d 1163 (W.D. Tex. 2020) .............................................................. 15

*Cargill v. Garland,*
  57 F.4th 447 (5th Cir. 2023) ......................................................... 17, 21, 22, 38

*Cavena v. Renaud,*
  2021 WL 2716432 (N.D. Tex. June 30, 2021) ...................................................... 11

*Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.,*
  467 U.S. 837 (1984) ............................................................................................ 38

*Citizens United v. Fed. Election Comm'n,*
  558 U.S. 310 (2010) ............................................................................................ 36

*Contender Farms, LLP v. U.S. Dep't of Agric.,*
  779 F.3d 258 (5th Cir. 2015) ............................................................................... 37

*CSX Transp., Inc. v. Surface Transp. Bd.,*
  584 F.3d 1076 (D.C. Cir. 2009) ........................................................................... 15

*Data Mktg. P'ship, LP v. United States Dep't of Labor,*
  45 F.4th 846 (5th Cir. 2022) ......................................................................... 17, 41

*District of Columbia v. Heller,*
  554 U.S. 570 (2008) ..................................................................................... passim

*Driftless Area Land Conservancy v. Valcq,*
  16 F.4th 508 (7th Cir. 2021) ............................................................................... 41

*Encino Motorcars, LLC v. Navarro,*
  579 U.S. 211 (2016) ............................................................................................ 24

*FCC v. Fox Television Stations, Inc.*,
 567 U.S. 239 (2012)..................................................................................... 31

*Fed. Commc'ns Comm'n v. Prometheus Radio Project*,
 141 S. Ct. 1150 (2021)........................................................................... 12, 23

*Franciscan All., Inc. v. Becerra*,
 47 F.4th 368 (5th Cir. 2022) .................................................................. 41, 43

*Gulf Fishermens Ass'n v. Nat'l Marine Fisheries Serv.*,
 968 F.3d 454 (5th Cir. 2020)....................................................................... 37

*Gundy v. United States*,
 139 S. Ct. 2116 (2019).................................................................................. 37

*Hardin v. ATF*,
 65 F.4th 895 (6th Cir. 2023) ......................................................................... 22

*Harmon v. Thornburgh*,
 878 F.2d 484 (D.C. Cir. 1989)..................................................................... 41

*Heller v. District of Columbia*,
 670 F.3d 1244 (D.C. Cir. 2011)................................................................... 28

*Hoffman Estates v. Flipside, Hoffman Estates, Inc.*,
 455 U.S. 489 (1982)..................................................................................... 31

*Huawei Techs. USA, Inc., v. FCC*,
 2 F.4th 421 (5th Cir. 2021) ..................................................................... 11, 15

*Idaho Farm Bureau Fed'n v. Babbitt*,
 58 F.3d 1392 (9th Cir. 1995) ....................................................................... 14

*Long Island Care at Home, Ltd. v. Coke*,
 551 U.S. 158 (2007)..................................................................................... 15

*Loving v. United States*,
 517 U.S. 748 (1996)..................................................................................... 13

*Lujan v. Nat'l Wildlife Fed'n*,
 497 U.S. 871 (1990)..................................................................................... 41

*McDonald v. City of Chicago*,
 561 U.S. 742 (2010)..................................................................................... 30

*Mock v. Garland*,
 75 F.4th 563 (5th Cir. 2023) ................................................................. passim

*Monsanto Co. v. Geertson Seed Farms*,
 561 U.S. 139 (2010)................................................................................ 42, 43

*Moore v. Hannon Food Serv., Inc.*,
 317 F.3d 489 (5th Cir. 2003) ....................................................................... 37

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
 463 U.S. 29 (1983)....................................................................................... 12

*Murdock v. Pennsylvania*,
  319 U.S. 105 (1943) ................................................................................ 29

*Nat'l Inst. of Fam. & Life Advocs. v. Becerra*,
  138 S. Ct. 2361 (2018) ........................................................................... 36

*New York State Rifle & Pistol Association v. Bruen*,
  142 S. Ct. 2111 (2022) ..................................................................... passim

*People v. Yanna*,
  824 N.W.2d 241 (Mich. Ct. App. 2012) ................................................. 39

*Perez v. Mortg. Bankers Ass'n*,
  575 U.S. 92 (2015) .................................................................................. 23

*Porter v. Califano*,
  592 F.2d 770 (5th Cir. 1979) ............................................................ 12, 25

*R.A.V. v. City of St. Paul*,
  505 U.S. 377 (1992) ................................................................................ 34

*Reed v. Town of Gilbert*,
  576 U.S. 155 (2015) ..................................................................... 13, 33, 34

*Rogers v. Bromac Title Servs., L.L.C.*,
  755 F.3d 347 (5th Cir. 2014) .................................................................. 10

*Sackett v. EPA*,
  598 U.S. 651 (2023) ................................................................................ 31

*Sessions v. Dimaya*,
  138 S. Ct. 1204 (2018) ........................................................................... 31

*Shamloo v. Miss. State Bd. of Trustees of Insts. of Higher Learning*,
  620 F.2d 516 (5th Cir. 1980) .................................................................. 31

*Shell Offshore Inc. v. Babbitt*,
  238 F.3d 622 (5th Cir. 2001) .................................................................. 11

*Smith v. Goguen*,
  415 U.S. 566 (1974) ................................................................................ 31

*Terral River Serv., Inc. v. SCF Marine Inc.*,
  20 F.4th 1015 (5th Cir. 2021) ................................................................ 11

*Tex. Ass'n of Mfrs. v. U.S. Consumer Prod. Safety Comm'n*,
  989 F.3d 368 (5th Cir. 2021) .................................................................. 15

*Tex. Pipeline Ass'n v. FERC*,
  661 F.3d 258 (5th Cir. 2011) ............................................................ 13, 37

*Texas v. Bureau of Alcohol, Tobacco, Firearms & Explosives*,
  No. 6:23-cv-00013, 2023 WL 7116844 (S.D. Tex. Oct. 27, 2023) ........... 1

*Texas v. EPA*,
  389 F. Supp. 3d 497 (S.D. Tex. 2019) .................................................... 12

*Turner v. Lt. Driver,*
   848 F.3d 678 (5th Cir. 2017) ........................................................................ 34

*United States v. Bass,*
   404 U.S. 336 (1971)............................................................................... 21, 38

*United States v. Davis,*
   139 S. Ct. 2319 (2019) ................................................................................. 31

*United States v. Playboy Ent. Grp., Inc.,*
   529 U.S. 803 (2000) ............................................................................... 13, 33

*United States v. Rahimi,*
   61 F.4th 443 (5th Cir. 2023) ........................................................................ 26

*United Steel v. Mine Safety & Health Admin.,*
   925 F.3d 1279 (D.C. Cir. 2019) ................................................................... 17

*VanDerStok v. Garland,*
   __ F.4th __, 2023 WL 7403413 (5th Cir. Nov. 9, 2023) ................................. passim

*Watterson v. Bureau of Alcohol, Tobacco, Firearms & Explosives,*
   No. 4:23-cv-00080, 2023 WL 6534999 (E.D. Tex. June 7, 2023) ........................... 2

*West Virginia v. EPA,*
   142 S. Ct. 2587 (2022)....................................................................... 13, 18, 37

*Youngstown Sheet & Tube Co. v. Sawyer,*
   343 U.S. 579 (1952)...................................................................................... 37

**Statutes**

18 U.S.C. § 921(a)(30)........................................................................... 4, 5, 8, 18

18 U.S.C. § 921(a)(30)(A) ............................................................................... 38

18 U.S.C. § 921(a)(7).......................................................................... 4, 18, 37

18 U.S.C. § 921(a)(8).................................................................................. 18, 37

18 U.S.C. 921(a)(7) ........................................................................................ 16

26 U.S.C. § 5811 ............................................................................................ 4

26 U.S.C. § 5812 ............................................................................................ 4

26 U.S.C. § 5845(a)(3)-(4)............................................................................... 4

26 U.S.C. § 5845(a)(3)-(4), (e) ........................................................................ 4

26 U.S.C. § 5845(a)(3)–(4), (e)....................................................................... 19

26 U.S.C. § 5845(a)(4).................................................................................... 19

26 U.S.C. § 5845(c) ............................................................................... 4, 5, 18

26 U.S.C. § 5845(e) ......................................................................................... 4

5 U.S.C. § 553(b) ..................................................................................... 11, 15

5 U.S.C. § 553(b)(3) ...................................................................................... 14

5 U.S.C. § 553(c) ................................................................................................ 14

5 U.S.C. § 706(2) ................................................................................................ 40

5 U.S.C. § 706(2)(A) ...................................................................................... 12, 23

5 U.S.C. § 706(2)(A)–(D) ................................................................................... 14

5 U.S.C. § 706(2)(b) ............................................................................................. 2

5 U.S.C. § 706(2)(B) ...................................................................................... 12, 24

5 U.S.C. § 706(2)(C) ...................................................................................... 11, 18

5 U.S.C. § 706(2)(D) .......................................................................................... 11

Gun Control Act of 1968, Pub. L. No. 90-618, 82 Stat. 1213 ................................. 4

National Firearms Act of 1934, Pub. L. No. 73-474, 48 Stat. 1236 ........................ 4

**Other Authorities**

ATF, Common Weapon Platforms with Attached 'Stabilizing Brace' Designs That Are Short-Barreled Rifles (2023) ................................................................ 16

ATF, RIN 1140-AA55, Factoring Criteria for Firearms with Attached "Stabilizing Braces": Final Regulatory Impact Analysis and Final Regulatory Flexibility Analysis (2023) ...................... 9

Bill Battles, *Magnum Research BFR .30-30 Win. Bisley Revolver*, ON-TARGET MAGAZINE (Nov. 2017) ..................................................................... 20

Johnathan Mitchell, *The Writ-of-Erasure Fallacy*, 104 VA. L. REV. 933 (2018) ........................................................................ 41

Letter from ATF to Sergeant Joe Bradley (Mar. 5, 2014), https://perma.cc/U57F-ERT2 ........... 19

Letter from John R. Spencer, Firearms Tech. Branch Chief, U.S. Dep't of Just., Bureau of Alcohol, Tobacco, Firearms & Explosives, #3311/2013-0172, (Nov. 26, 2012), https://tinyurl.com/2z7pz2v6 .............................................................. 7

Mila Sohoni, *The Power to Vacate a Rule*, 88 GEO. WASH. L. REV. 1121 (2020) ....................................................... 41

U.S. Patent No. 8,869,444 B2 col. 3 ll. 22-23, col. 5 ll. 52-53 (issued Oct. 28, 2014), https://tinyurl.com/mr3esfhu .......................................................... 5, 19

William J. Krouse, CONG. RES. SERV., *Handguns, Stabilizing Braces, and Related Components* (Apr. 19, 2021) ................................................................. 26

**Regulations**

27 CFR § 478.11 .......................................................................................... 16, 42

27 CFR § 479.11 .......................................................................................... 16, 42

Factoring Criteria for Firearms with Attached 'Stabilizing Braces' ("Proposed Rule"), 86 Fed. Reg. 30,826 (June 10, 2021) ................................................ 2, 5, 15, 19

Factoring Criteria for Firearms with Attached Stabilizing Braces (the "Final Rule"), 88 Fed. Reg. 6,478 (Jan. 31, 2023) ................................................ passim

**Constitutional Provisions**

U.S. Const. Art. I, § 1 ................................................................................................. 13, 36

U.S. Const. Art. II, § 3 ................................................................................................ 13, 36

## INTRODUCTION

Since 2012, the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") consistently advised gun owners that pistols equipped with stabilizing braces would not be treated as "short-barreled rifles" that had to be registered under the National Firearms Act ("NFA"). In 2022, ATF issued a Final Rule that suddenly purported to turn 99% of the more than 3 million braced pistols in America into NFA-regulated rifles—and turn otherwise-law-abiding owners of such braced pistols into felons if they didn't destroy the braced pistols, surrender them to the ATF, or submit to the NFA's onerous regulations.[1] "ATF cannot legislate," however, so Plaintiffs brought this case to stop this abuse. *VanDerStok v. Garland*, __ F.4th __, 2023 WL 7403413 *8 (5th Cir. Nov. 9, 2023).

The Fifth Circuit has catalogued many reasons why the Final Rule cannot stand: It "vests the ATF with complete discretion to use a subjective balancing test to weigh six opaque factors on an invisible scale." *Mock v. Garland*, 75 F.4th 563, 584 (5th Cir. 2023). The Final Rule's "six-part test provides no meaningful clarity about what constitutes an impermissible stabilizing brace," *id.* at 585, such that "it is nigh impossible for a regular citizen to determine what constitutes a braced pistol," *id.* at 584. Multiple courts have issued preliminary injunctions or stays of varying scope against enforcement of the Final Rule after finding that it likely violated the Administrative Procedure Act ("APA").[2]

---

[1] Factoring Criteria for Firearms with Attached Stabilizing Braces (the "Final Rule"), 88 Fed. Reg. 6,478 (Jan. 31, 2023).

[2] *See, e.g.*, *Britto v. Bureau Of Alcohol, Tobacco, Firearms & Explosives*, No. 2:23-cv-019-Z, 2023 WL 7418291, at *5 (N.D. Tex. Nov. 8, 2023) (enjoining Final Rule "in its entirety"); *Texas v. Bureau of Alcohol, Tobacco, Firearms & Explosives*, No. 6:23-cv-00013, 2023 WL 7116844, at *12 (S.D. Tex. Oct. 27, 2023) (issuing preliminary injunction extending to individual plaintiff and organizational plaintiff's members based on the Fifth Circuit's decision in *Mock*); *Watterson v. Bureau of Alcohol, Tobacco, Firearms & Explosives*, No. 4:23-cv-00080, 2023 WL 6534999, at

Here, the Fifth Circuit found that ATF and the Department of Justice ("DOJ") (collectively, the "Agencies") violated the APA's procedural requirements for notice and comment because the Final Rule was not a logical outgrowth of the Proposed Rule.[3] *Mock*, 75 F.4th at 583–86. Plaintiffs' summary judgment motion should therefore be granted, and this Court should vacate the Final Rule because it was adopted "without observance of the procedure required by law." 5 U.S.C. § 706(2)(D); *Cargill v. Garland*, 57 F.4th 447, 472 (5th Cir. 2023) (en banc) ("[V]acatur of an agency action is the default rule in this Circuit.").

While the logical outgrowth theory is a sufficient basis to enter judgment in Plaintiffs' favor, Plaintiffs move for summary judgment on each of the counts in the First Amended Petition and Complaint to preserve their ability to defend the Court's judgment on appeal. *Keelan v. Majesco Software, Inc.*, 407 F.3d 332, 339–40 (5th Cir. 2005).

The Final Rule violates the APA in multiple respects beyond the logical-outgrowth flaw. The Agencies exceeded their statutory authority under the NFA by treating braced pistols as if they were rifles, despite the fact that they cannot possibly meet the statutory definition of a rifle established by Congress: Once again, "ATF has essentially rewritten the law." *VanDerStok*, __F.4th __, 2023 WL 7403413 *12. And the Agencies acted arbitrarily when they failed to consider important aspects of the problems presented and caused by the Final Rule.

The Final Rule also violates several constitutional protections, requirements, and principles.[4] The Final Rule violates the Second Amendment because it lacks sufficient historical

---

*2 (E.D. Tex. June 7, 2023) (issuing preliminary injunction to individual plaintiff pending decision in *Mock*).

[3] Factoring Criteria for Firearms with Attached 'Stabilizing Braces' ("Proposed Rule"), 86 Fed. Reg. 30,826 (June 10, 2021).

[4] Itself also a violation of the APA. 5 U.S.C. § 706(2)(b).

support to survive the test set forth in *New York State Rifle & Pistol Association v. Bruen*, 142 S. Ct. 2111 (2022). The Final Rule is also unconstitutionally vague because it fails to give understandable notice to regulated persons, who are left guessing as to what the Agencies' subjective six-factor test requires. Further, the Final Rule violates the First Amendment by restricting and chilling speech based on both the speaker and the content. Finally, by legislating where Congress chose not to, the Agencies violated both the Delegation Doctrine and the Take Care Clause that are core constitutional structural protections against administrative overreach.

It is time for the Final Rule to be interred once and for all. Plaintiffs respectfully request that this Court vacate the Final Rule and enjoin its enforcement.

Alternatively, if this Court were to find the Final Rule to be an appropriate exercise of the Agencies' power through the APA (it is not), then the NFA's onerous and ahistorical regulation of short-barreled rifles ("SBRs"), which are commonly possessed by law-abiding individuals for lawful purposes, violates the Second Amendment.

**BACKGROUND**

A.    **Statutory And Regulatory Background**

This Court is familiar with the statutory and regulatory background giving rise to this litigation, which has been recounted extensively in litigation over Plaintiffs' motion for stay of agency action and/or preliminary injunction. *Mock*, 75 F.4th at 567–77; ECF No. 40, March 30, 2023 Opinion & Order on Plaintiffs' Motion for Preliminary Injunction, at 1–5; ECF No. 92, Oct. 2, 2023 Opinion & Order on Plaintiffs' Motion for Preliminary Injunction, at 1–6. Plaintiffs briefly restate that background here.

The National Firearms Act of 1934, Pub. L. No. 73-474, 48 Stat. 1236 (codified at 26 U.S.C. § 5801 et seq.) and the Gun Control Act of 1968, Pub. L. No. 90-618, 82 Stat. 1213 ("GCA") (codified as amended at 18 U.S.C. § 921 et seq.), treat handguns and pistols—which the GCA defines as firearms with "a short stock" designed to be fired with one hand, 18 U.S.C. § 921(a)(30)—differently from rifles, which are "designed or redesigned, made or remade, and intended to be fired from the shoulder," 26 U.S.C. § 5845(c); 18 U.S.C. § 921(a)(7). Pistols and handguns are not subject to the more onerous obligations and requirements of the NFA, but many rifles are. 26 U.S.C. § 5845(a)(3)-(4), (e).

The NFA imposes severe taxes, burdens, delays, and restrictions upon the acquisition, possession, transfer, and lawful use of the arms it regulates. 26 U.S.C. §§ 5811 ($200 tax), 5812 (other burdens).[5] Pistols are expressly excluded from NFA restrictions and obligations. 26 U.S.C. § 5845(e). SBRs, however, are covered by the NFA. *Id.* § 5845(a)(3)-(4).

---

[5] Such firearms cannot be transferred or possessed, for example, without first obtaining approval from the Secretary of the ATF. NFA-registered firearms are also subject to limits on travel and must be stored differently than other firearms as a matter of federal law.

An SBR is an NFA-regulated "firearm" defined as "a rifle having a barrel or barrels of less than 16 inches in length; [or] a weapon made from a rifle if such weapon as modified has an overall length of less than 26 inches or a barrel or barrels of less than 16 inches in length[.]" *Id.* A "rifle" is defined by the NFA as "a weapon designed or redesigned, made or remade, and intended to be fired from the shoulder." *Id.* § 5845(c). Though "pistol" is not defined in the NFA, the GCA defines a "handgun" as "a firearm which has a short stock and is designed to be held and fired by the use of a single hand." 18 U.S.C. § 921(a)(30).

This case involves the Agencies' attempt to reclassify NFA-exempt braced pistols as NFA-restricted SBRs. Stabilizing braces assist all people, including those having disabilities or limited strength or mobility, with the safe and comfortable one-handed firing of pistols.[6] As explained in the patent for the original stabilizing brace, stabilizing braces do so by attaching to a pistol on one end and wrapping around the wrist or forearm on the other end to "permit[] a user to handle and support a handgun without straining the user's arm, hand, or wrist" by "more evenly distribut[ing]" the weight of the handgun "through the user's hand, wrist, and forearm."[7] Braced pistols are thus *designed* to be fired with one hand—and the patent illustrates the way that braced pistols attach to the forearm.[8]

---

[6] Proposed Rule, 86 Fed. Reg. at 30,827 ("[T]he brace concept was inspired by the needs of combat veterans with disabilities who still enjoy recreational shooting but could not reliably control heavy pistols without assistance."); *see also Mock*, 75 F.4th at 566 ("The stabilizing brace was intended to attach to the forearm and, according to the licensee, to permit disabled and weaker persons to fire pistols more easily."); *id.* at 571 (when SB Tactical first submitted its stabilizing brace to the ATF in 2012, it explained "that the brace was designed so that disabled persons could fire heavy pistols more safely and comfortably").

[7] *See* U.S. Patent No. 8,869,444 B2 col. 3 ll. 22-23, col. 5 ll. 52-53 (issued Oct. 28, 2014), https://tinyurl.com/mr3esfhu.

[8] *Id.* at figs. 1, 2 & 3.



The Final Rule itself demonstrates that stabilizing braces facilitate more secure firing with one hand with these images.[9]



2012 submission of original "stabilizing brace" attached to an AR-type pistol

Prior to the issuance of the Final Rule, ATF had never regulated braced pistols as NFA-regulated SBRs. To the contrary, in 2012, ATF issued a letter ruling in response to the question

---

[9] Final Rule, 88 Fed. Reg. at 6,483.

6

whether the addition of a brace "would convert a firearm in a manner that would cause it to be classified as a 'rifle' and thus a 'firearm'" under the NFA. Letter from John R. Spencer, Firearms Tech. Branch Chief, U.S. Dep't of Just., Bureau of Alcohol, Tobacco, Firearms & Explosives, #3311/2013-0172, (Nov. 26, 2012), https://tinyurl.com/2z7pz2v6. ATF determined that "the submitted forearm brace, when attached to a firearm, does not convert that weapon to be fired from the shoulder and would not alter the classification of a pistol or other firearm." *Id.* This ruling reinforced the widespread understanding that stabilizing braces do not subject pistols to NFA regulation. ATF reiterated similar guidance in 2015 and 2017, *see Mock*, 75 F.3d at 571–72. And in 2019, "ATF asserted in criminal prosecutions that 'ATF letters do correctly state that they consider a firearm with a pistol brace to not be a rifle under the NFA for purposes of the NFA.'" *Id.* at 572 (citing Sentencing Hr'g Tr. at 38, *United States v. Kamali*, No. 3:18-cr-00288 (D. Conn. Sept. 30, 2019), ECF No. 110).

The Agencies' Final Rule upended this regime, however, and attempted to erase the line between a non-NFA braced pistol and an NFA-regulated SBR.[10] The Final Rule amended the federal regulatory definitions of "rifle" to include an indeterminate, open-ended, six-factor test for deciding whether a braced pistol was designed and intended to be fired from the shoulder, and thus was an NFA-regulated "rifle." Final Rule, 88 Fed. Reg. at 6,574–75. Those factors are:

> (i) Whether the weapon has a weight or length consistent with the weight or length of similarly designed rifles;
>
> (ii) Whether the weapon has a length of pull,[11] measured from the center of the trigger to the center of the shoulder stock or other rearward accessory, component or attachment (including an adjustable or telescoping attachment with the ability to

---

[10] Reclassifying a pistol as a rifle would likely create a "short-barreled" rifle since pistols typically have barrels less than 16 inches long. Thus, as ATF itself noted, "approximately 99% of pistols with stabilizing braces" would be classified as "rifles" under the Final Rule. *Mock*, 75 F.4th at 574 (citation omitted).

[11] The "length of pull" is the distance between the trigger to the butt of the firearm.

lock into various positions along a buffer tube, receiver extension, or other attachment method), that is consistent with similarly designed rifles;

(iii) Whether the weapon is equipped with sights or a scope with eye relief that require the weapon to be fired from the shoulder in order to be used as designed;

(iv) Whether the surface area that allows the weapon to be fired from the shoulder is created by a buffer tube, receiver extension, or any other accessory, component, or other rearward attachment that is necessary for the cycle of operations[12];

(v) The manufacturer's direct and indirect marketing and promotional materials indicating the intended use of the weapon; and

(vi) Information demonstrating the likely use of the weapon in the general community.

*Id.* The Final Rule also listed several pages of firearms that may be covered if they are configured with a stabilizing brace.[13]

Under the Final Rule, the only difference between an NFA-regulated SBR and an NFA-exempt pistol is the addition of the stabilizing brace or any other item that the Agencies believe could serve a similar function. The images below, for example, are both NFA-exempt pistols that have short stocks and are "designed to be held and fired by the use of a single hand." 18 U.S.C. § 921(a)(30). But once configured with (or even merely possessed alongside) a brace (or anything that could serve as one), the Final Rule treats both as SBRs even though the brace exists specifically to facilitate single-handed firing.

---

[12] The "cycle of operations" is the process taken "to expel a projectile by the action of an explosive." Final Rule, 88 Fed. Reg. at 6,485. A buffer tube, like that included in the image *infra*, at 9, on the right, is necessary for the cycle of operations for that firearm.

[13] *Id.* at 6,514–18, 6,535–37.

8



By contrast, a rifle is designed and intended to be fired with two hands; the firearm is stabilized by resting the stock on the rear of the firearm against the shoulder and holding the second hand in front of the trigger.

In short, despite having advised the public for several years that braced pistols were not SBRs under the NFA, the Final Rule announced that, under its new definition of an SBR, 99% of the 3 million braced pistols in America—and potentially millions of other pistols that might be combined with a formal or informal "brace"—would now be considered SBRs that immediately became subject to the NFA's harsh restrictions. *See Mock*, 75 F.4th at 572 ("As of 2023, the ATF estimates there are about 3 million pistol braces in circulation (with 7 million at the high end).") (citing ATF, RIN 1140-AA55, Factoring Criteria for Firearms with Attached "Stabilizing Braces": Final Regulatory Impact Analysis and Final Regulatory Flexibility Analysis 18 (2023)). And ATF itself confirmed "that approximately 99% of pistols with stabilizing braces would be classified as [SBRs]" under the Final Rule. *Id.* at 574.

Furthermore, under the Final Rule, the Agencies now consider it unlawful for pistol owners to possess *any* item that could serve as a brace (or stock) under the discretionary, non-exhaustive six-factor test, even if not actually attached to a pistol, given the risk of being charged with constructive possession of an unregistered SBR. The Final Rule thus effectively regulates all arms with a barrel of less than 16 inches to which one could theoretically attach a homemade brace constructed from common household items, or any other device that the Agencies deem to meet

their new, indeterminate test. The Final Rule went into effect upon publication for everyone—including manufacturers and dealers—but the Agencies chose not to enforce it for 120 days for individual gun owners. Final Rule, 88 Fed. Reg. at 6,478, 6,553. That grace period has since expired.

## B.    Procedural History

Plaintiffs sued the Agencies the same day the Agencies published the Final Rule. ECF No. 1. Plaintiffs filed an Amended Petition seven days later, ECF No. 13, and promptly sought a preliminary injunction or a stay of the rule under 5 U.S.C. § 705 (or both), ECF No. 33. This Court denied Plaintiffs' motion on March 30, 2023, ECF No. 40, and Plaintiffs appealed the same day, ECF No. 43.

On August 1, 2023, the Fifth Circuit reversed. *Mock v. Garland*, 75 F.4th 563 (2023). It held that Plaintiffs had established a likelihood of prevailing on their claim that the Final Rule failed the APA's logical-outgrowth test and remanded the case for this Court's consideration of the remaining preliminary injunction factors. *Id.* at 583–88. On remand, the Court issued an order granting Plaintiffs' motion for a preliminary injunction. ECF No. 92.

Plaintiffs now seek summary judgment on their claims that the Final Rule violates the APA and the United States Constitution.

## STANDARDS OF REVIEW

## A.    Summary Judgment Standard

Summary judgment is proper where, as here, "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Rogers v. Bromac Title Servs., L.L.C.*, 755 F.3d 347, 350 (5th Cir. 2014) (quoting Fed. R. Civ. P. 56(a)). "However the movant

'need not negate the elements of the nonmovant's case.'" *Terral River Serv., Inc. v. SCF Marine Inc.*, 20 F.4th 1015, 1018 (5th Cir. 2021) (citation omitted).

Summary judgment is a common method for resolving disputes under the APA, where the district court sits as an appellate tribunal. *See Amin v. Mayorkas*, 24 F.4th 383, 391 (5th Cir. 2022) ("[W]hether an agency's decision is arbitrary [or] capricious is a legal question that the court can usually resolve on the agency record."). When evaluating APA challenges on summary judgment, courts apply the APA standards of review. *See Shell Offshore Inc. v. Babbitt*, 238 F.3d 622, 627 (5th Cir. 2001) (in reviewing grant of summary judgment, the general standard is the APA); *Cavena v. Renaud*, 2021 WL 2716432, at \*1 (N.D. Tex. June 30, 2021) ("[S]ummary judgment is the proper mechanism for deciding, as a matter of law, whether an agency's action is supported by the administrative record and consistent with the APA standard of review," and "the court applies the standard of review from the APA." (citations omitted)).

## B.   APA Standards

A reviewing court shall "hold unlawful and set aside agency action, findings, and conclusions found to be . . . in excess of statutory jurisdiction, authority, or limitations, or short of statutory right[.]" 5 U.S.C. § 706(2)(C).

A reviewing court shall also "hold unlawful and set aside agency action" promulgated "without observance of procedure required by law." 5 U.S.C. § 706(2)(D). "Legislative" agency rules must be provided for notice and comment. *See* 5 U.S.C. § 553(b). A final rule, to the extent that it differs from the proposed rule, must be a "logical outgrowth" of the proposed rule, or the agency has not provided sufficient notice to allow for adequate comment. *See Huawei Techs. USA, Inc., v. FCC*, 2 F.4th 421, 447 (5th Cir. 2021) ("Notice suffices if it is a logical outgrowth of the proposed rule, meaning the notice must adequately frame the subjects for discussion such that the

11

affected party should have anticipated the agency's final course in light of the initial notice.") (internal quotations and citations omitted). Similarly, "[t]he most critical factual material that is used to support the agency's position on review must have been made public in the proceeding and exposed to refutation." *Texas v. EPA*, 389 F. Supp. 3d 497, 505 (S.D. Tex. 2019) (internal quotation and citation omitted).

Next, a reviewing court shall set aside agency action that is "arbitrary, capricious, . . . or otherwise not in accordance with law[.]" 5 U.S.C. § 706(2)(A). The "arbitrary-and-capricious standard requires that agency action be [both] reasonable and reasonably explained." *Fed. Commc'ns Comm'n v. Prometheus Radio Project*, 141 S. Ct. 1150, 1158 (2021). An agency action was not reasonable if the agency "has relied on factors which Congress has not intended it to consider" or "entirely failed to consider an important aspect of the problem." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.* ("*State Farm*"), 463 U.S. 29, 43 (1983); *see also Amin*, 24 F.4th at 391 ("[W]hether an agency's decision is arbitrary [or] capricious is a legal question that the court can usually resolve on the agency record.").

Finally, courts must set aside agency action that is "contrary to constitutional right [or] power." 5 U.S.C. § 706(2)(B). "The intent of Congress in 5 U.S.C. § 706(2)(B) was that courts should make an independent assessment of a citizen's claim of constitutional right when reviewing agency decision-making." *Porter v. Califano*, 592 F.2d 770, 780 (5th Cir. 1979); *see id.* at 781 (reasoning that deferring to agency rulings when evaluating constitutional claims would be error).

## C.   **First Amendment Standard**

"If a statute regulates speech based on its content, it must be narrowly tailored to promote a compelling Government interest. . . . If a less restrictive alternative would serve the Government's purpose, the legislature must use that alternative." *United States v. Playboy Ent.*

*Grp., Inc.*, 529 U.S. 803, 813 (2000). "As we consider a content-based regulation, the answer should be clear: The standard is strict scrutiny." *Id.* at 814. "[S]trict scrutiny applies either when a law is content based on its face or when the purpose and justification for the law are content based[.]" *Reed v. Town of Gilbert*, 576 U.S. 155, 166 (2015).

### D.    Second Amendment Standard

If the Second Amendment's text covers an individual's conduct, the Constitution presumptively protects that conduct. *Bruen*, 142 S. Ct. at 2129–30. In such a situation, "[t]he government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." *Id.* In other words, it is the Agencies' burden to "affirmatively prove that its firearm regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms." *Id.* at 2127.

### E.    Separation of Powers Standards

Article I of the Constitution grants Congress the sole authority to craft legislation and create law. *See* U.S. CONST. Art. I, § 1. On the other hand, the President, and by extension, the Executive Branch departments under his purview, "shall take Care that the Laws be faithfully executed." U.S. CONST. Art. II, § 3. This separation of powers is "a basic principle of our constitutional scheme" under which "one branch of the Government may not intrude upon the central prerogatives of another." *Loving v. United States*, 517 U.S. 748, 757 (1996). This limitation means agencies "cannot manufacture statutory ambiguity with semantics to enlarge their congressionally mandated border." *Tex. Pipeline Ass'n v. FERC*, 661 F.3d 258, 264 (5th Cir. 2011). If agencies are given authority to create a legislative rule, that authority requires "a *clear delegation*" from Congress. *West Virginia v. EPA*, 142 S. Ct. 2587, 2616 (2022) (emphasis added).

**ARGUMENT**

**I.     The Final Rule Violates The APA In Several Respects**

The Final Rule violates the APA because it is not a logical outgrowth of the Proposed Rule, exceeds the Agencies' statutory authority, is arbitrary and capricious, and violates rights and powers protected and established under the U.S. Constitution. 5 U.S.C. § 706(2)(A)–(D). Each of these would independently be enough for this Court to vacate the Final Rule. Taken together, they demonstrate blatant disregard for the obligations placed upon them by Congress when promulgating rules and regulations that operate to impose potential criminal penalties on law-abiding Americans.

**A.     The Final Rule Is Not A Logical Outgrowth Of The Proposed Rule**

This Court has already ruled that "the controlling law of this case posits that Plaintiffs have demonstrated, *a fortiori*, an *actual* success on the merits of their APA challenge to the Final Rule." ECF No. 92, Op. & Order on Preliminary Injunction, at *6 (citing *Mock*, 75 F.4th at 578, 586 (holding that "the Final Rule fails the logical-outgrowth test and violates the APA" and "therefore must be set aside as unlawful").

The APA requires federal agencies to provide the public with a meaningful opportunity to comment on the elements of proposed rules and the materials that undergird the proposed rule. *See, e.g.*, 5 U.S.C. § 553(c); *Idaho Farm Bureau Fed'n v. Babbitt*, 58 F.3d 1392, 1404 (9th Cir. 1995). The APA ensures this by requiring that whenever an agency seeks to promulgate, amend, or repeal a regulation it must first issue a "notice of proposed rule making . . . in the Federal Register"—which must include, inter alia, "either the terms or substance of the proposed rule or a description of the subjects and issues involved." 5 U.S.C. § 553(b)(3). A corollary of this requirement is that "the final rule the agency adopts must be a logical outgrowth of the rule

14

proposed." *Long Island Care at Home, Ltd. v. Coke*, 551 U.S. 158, 174 (2007) (cleaned up). The baseline is that a notice of proposed rulemaking is inadequate if it does not "indicate[] that the [agency] was contemplating a particular change" that appears in the final rule. *CSX Transp., Inc. v. Surface Transp. Bd.*, 584 F.3d 1076, 1081–82 (D.C. Cir. 2009); *see also Tex. Ass'n of Mfrs. v. U.S. Consumer Prod. Safety Comm'n*, 989 F.3d 368, 382 (5th Cir. 2021). Adequate notice ensures that those who will be affected can "anticipate[] the agency's final course." *Huawei Techs. USA, Inc.*, 2 F.4th at 447 (cleaned up). As the Fifth Circuit summarized here: "[t]he logical-outgrowth rule requires the [Proposed Rule] to provide 'fair notice' of the eventual Final Rule." 75 F.4th at 583 (citing *Tex. Ass'n of Mfrs. v. U.S. Consumer Prod. Safety Comm'n*, 989 F.3d 368, 381 (5th Cir. 2021)).[14] In short, the "[Proposed Rule] must 'adequately frame the subjects for discussion such that the affected party should have anticipated the agency's final course in light of the initial notice.'" *Id.* (quoting *Huawei Techs. USA, Inc.*, 2 F.4th at 421)).

In the June 2021 Proposed Rule here, ATF declared it needed to address the sale of "accessories . . . marketed as 'stabilizing braces' that may be attached to a weapon platform for the purpose of circumventing the GCA and NFA prohibitions on the sale, delivery, transportation, or unregistered possession and taxation of 'short-barreled rifles.'" Proposed Rule, 86 Fed. Reg. at 30,827. ATF proposed to accomplish that goal by instituting a worksheet-based system to classify whether a braced firearm qualified as a "rifle" under the NFA. *See Mock*, 75 F.4th at 573–74. This would be done by assigning point values to certain design criteria, then making a determination based on a firearm's total point value. *Id.*

---

[14] "Legislative" agency rules such as the Final Rule here must be publicized for notice and comment. *See* 5 U.S.C. § 553(b). The Fifth Circuit explained in detail why the Final Rule is legislative in nature. *Mock*, 75 F.4th at 578–83 (adopting and reviewing the five factors identified in *Cargill v. Barr*, 502 F. Supp. 3d 1163, 1184 (W.D. Tex. 2020)).

After receiving "overwhelmingly negative" comments on the Proposed Rule, *Mock*, 75 F.4th at 573, ATF issued a radically different Final Rule in January 2023. Whereas "the Worksheet was the focal point of the entire Proposed Rule," *id.* at 583, that "approach was abandoned entirely" in the Final Rule. *Id.* Instead, the Final Rule redefined "rifle" in 27 CFR §§ 478.11 and 479.11 to now state that the statutory term "designed or redesigned, made or remade, and intended to be fired from the shoulder," 18 U.S.C. 921(a)(7), includes:

> [A] weapon that is equipped with an accessory, component, or other rearward attachment (*e.g.*, a "stabilizing brace") that provides surface area that allows the weapon to be fired from the shoulder, provided other factors . . . indicate that the weapon is designed, made, and intended to be fired from the shoulder.

Final Rule, 88 Fed. Reg. at 6,480. The Final Rule identified a list of six such "other factors," including objective design features (total weight, length of pull, type of sight/scope and other accessories) and subjective criteria (the manufacturer's marketing materials and "[i]nformation" demonstrating a weapon's "likely use" by the community). *Id.*

"ATF theorized that under this new definition of 'rifle,' approximately 99% of pistols with stabilizing braces would be classified as rifles. *Mock*, 75 F.4th at 574 (citing ATF, RIN 1140-Aa55, Factoring Criteria For Firearms With Attached "Stabilizing Braces": Final Regulatory Impact Analysis And Final Regulatory Flexibility Analysis 21 (2023)). Moreover, as the Fifth Circuit emphasized, the extremely popular "AR-type firearm with an SB-Mini accessory, determined to be a braced pistol under the Proposed Rule, now appears to be adjudicated as an SBR under the Final Rule." *Id.* at 575 (citing ATF, Common Weapon Platforms with Attached 'Stabilizing Brace' Designs That Are Short-Barreled Rifles 8–9 (2023)). Anyone choosing to continue possessing one of the 99% of existing braced pistols—rather than pursuing the Final Rule's stated options of destroying them, surrendering them to the ATF, or registering them as an

SBR under the NFA, Final Rule, 88 Fed. Reg. at 6,570—would be subject to criminal prosecution. Final Rule, 88 Fed. Reg. at 6,498.

Furthermore, there is a such a radical discrepancy between the Proposed Rule's worksheet-based system and the Final Rule's indeterminate test that the public (including Plaintiffs) were not given adequate notice or the ability to comment on the substance of the Final Rule. The Fifth Circuit correctly held that "because the Final Rule bears almost no resemblance in manner or kind to the Proposed Rule, the Final Rule fails the logical-outgrowth test and violates the APA." *Mock*, 75 F.4th at 578. In short:

> Nothing in the Proposed Rule put the public on notice that the Worksheet would be replaced with a six-factor test based on almost entirely subjective criteria. Nor was the public, which criticized the subjective nature of the purportedly objective criteria of Worksheet 4999 and its overbreadth, *see, e.g.*, Final Rule at 6513–14, 6521–22, 6527, 6529–30, put on notice that not only would the ATF change the criteria, but it also would make the criteria so expansive as to subject an estimated 99% of stabilizing braces on the market to enhanced regulations and increase the economic effect of the Rule by over $100 million.

*Id*. at 583–84 (footnote omitted).

Thus, as the Fifth Circuit concluded, "it is relatively straightforward that the Final Rule was not a logical outgrowth of the Proposed Rule, and the monumental error was prejudicial." *Id.* at 586. Accordingly, the Court should enter judgment in Plaintiffs' favor and vacate the Final Rule and regulatory redefinition of "rifle." *Cargill v. Garland*, 57 F.4th 447, 472 (5th Cir. 2023); *see also Data Mktg. P'ship, LP v. United States Dep't of Labor*, 45 F.4th 846, 859–60 (5th Cir. 2022); *accord United Steel v. Mine Safety & Health Admin.*, 925 F.3d 1279, 1287 (D.C. Cir. 2019) ("The ordinary practice is to vacate unlawful agency action.").

## B.     The Final Rule Exceeds the Agencies' Statutory Authority

The Final Rule, which redefines the term "rifle" to encompass what the NFA's plain terms exclude, is an impermissible reading of the plain limits of the statute. The APA requires courts to

"hold unlawful and set aside agency action . . . found to be . . . in excess of statutory . . . authority." 5 U.S.C. § 706(2)(C). The Fifth Circuit recently examined ATF's rulemaking authority in an analogous context in *VanDerStok v. Garland*, where it struck down ATF's 2022 rule redefining what constitutes a "frame or receiver" under the GCA. __ F.4th __, 2023 WL 7403413. Its summary of the governing legal principles is instructive here. To determine whether the Agencies "exceeded [their] statutory authority," the Court turns to the "plain language of the statute." *Id.* at *5–6. "In statutory interpretation disputes, a court's proper starting point lies in a careful examination of the ordinary meaning and structure of the law itself." *Id.* at *6 (quoting *Food Mktg. Inst. v. Argus Leader Media*, 139 S. Ct. 2356, 2364 (2019)). And "[o]nly where the statutory text shows that ATF has 'clear congressional authorization' to enact a regulation can such a regulation withstand judicial scrutiny." *Id.* (citation omitted). As the Supreme Court stated in *West Virginia*, "[a]gencies have only those powers given to them by Congress, and enabling legislation is generally not an open book to which the agency may add pages and change the plot line." 142 S. Ct. at 2609 (cleaned up).

The NFA defines a "rifle," as relevant here, as a "weapon designed or redesigned, made or remade, and intended to be fired from the shoulder." 26 U.S.C. § 5845(c). The GCA has a nearly identical definition. 18 U.S.C. § 921(a)(7). A short-barreled rifle is defined as "a rifle having one or more barrels less than sixteen inches in length and any weapon made from a rifle (whether by alteration, modification, or otherwise) if such weapon, as modified, has an overall length of less than twenty-six inches." 18 U.S.C. § 921(a)(8). On the other hand, the GCA defines a "handgun" as "(A) a firearm which has a short stock and is designed to be held and fired by the use of a single hand; and (B) any combination of parts from which a firearm described in subparagraph (A) can be assembled." 18 U.S.C. § 921(a)(30). Thus, ATF is without authority to treat braced pistols as if

they were ever rifles because they do not fit the relevant and specific statutory definitions established by Congress.[15]

A braced or stabilized pistol—like any other handgun—is designed to be held and fired by a single hand and is thus exempt from the NFA. 26 U.S.C. § 5845(a)(3)–(4), (e). Indeed, the very point of a stabilizing brace is to *facilitate* the one-handed operation of a pistol. That the brace, which is fitted to the tail end of the firearm, is designed to attach to the forearm belies any suggestion in the Final Rule that braced pistols are designed to be fired from the shoulder, even if such a brace *might* be fired from the shoulder contrary to its design. U.S. Patent No. 8,869,444 B2, Forearm-Gripping Stabilizing Attachment For A Handgun (Oct. 28, 2014); *see also* Proposed Rule, 86 Fed. Reg. at 30,827 (discussing the submission of "forearm brace" designed to "help a shooter 'stabilize' his or her arm to support single-handed firing"); Final Rule, 88 Fed. Reg. at 6,482 ("ATF's previous classifications had analyzed whether 'brace' devices could effectively be used on the forearm for single-handed firing (as the manufacturer claimed)."). Indeed, the *possibility* of shoulder-firing no more makes a braced pistol a rifle than does the potential to fire a true rifle with one hand convert it into a pistol.[16] For this reason, the Agencies' repeated claim that

---

[15] Despite lacking statutory authority, in promulgating the Final Rule, ATF asserted that it would exercise "enforcement discretion" to allow owners of braced pistols to "reconfigure" their firearms by removing a stabilizing brace without falling under the NFA's coverage even though such firearms would "become a 'weapon made from a rifle.'" 88 Fed. Reg. at 6,558; *see* 26 U.S.C. § 5845(a)(4). As addressed fully in this section, ATF lacks the authority to treat braced pistols as if they were rifles in the first place, and thus those arms could not be statutorily treated as weapons "made from a rifle," even if modified.

[16] The Agencies' earlier attempt to replace actual design intent with what they incorrectly describe as "objective" factors ignores their own long-held position that manufacturers' intent trumps any potential for contrary use. *See, e.g.*, Letter from ATF to Sergeant Joe Bradley (Mar. 5, 2014), https://perma.cc/U57F-ERT2 ("[F]iring a pistol from the shoulder would not cause the pistol to be reclassified as an SBR . . . . Further, certain firearm accessories such as [a popular] Stability Brace have not been classified by [ATF] as shoulder stocks and, therefore, using the brace improperly does not constitute a design change. Using such an accessory improperly would not change the classification of the weapon per Federal Law.").

the mere *possibility* of a pistol being used contrary to its plain design and intent is enough to convert it into an NFA-regulated SBR only highlights the impermissible statutory deviation of the Final Rule.

Worse still, the Final Rule's new multi-factor analysis only further removes the Final Rule from the statutory inquiry of whether a braced pistol is designed to be fired by the use of a single hand or from the shoulder. For example, although one identified factor is "weight . . . consistent with the weight . . . of similarly designed rifles," Final Rule, 88 Fed. Reg. at 6,480, weight may be similar for a large caliber handgun as for a similar caliber rifle and is irrelevant to the question of shoulder-firing in any event.[17] And the Final Rule even places weight on indirect statements made by manufacturers or the conduct of third parties. The plain text of the NFA and GCA do not encompass subjective statements from a manufacturer or third parties, nor do they include discretionary, undefined factors to assess all *potential* uses of a firearm. The statutory emphasis is on the actual design of the firearm and the intent of the manufacturer. Because braced pistols are expressly and overtly designed to facilitate one-handed—not shouldered—firing, the plain text of the NFA unambiguously excludes braced pistols from its reach and restrictions. As in *VanDerStok*, the Final Rule here "improperly rewrites and expands the GCA [and the NFA] where Congress clearly limited" them with the definitions it chose through the legislative process. __ F.4th __, 2023 WL 7403413, at *8. There, the Fifth Circuit reiterated that ATF lacks authority to usurp Congress' policymaking authority through expansive rulemaking that departs from the statutory text: "Where the statutory text does not support ATF's proposed alterations, ATF cannot step into

---

[17] For example, the Magnum Research BFR revolver in .30-30 Winchester weighs 5.5 pounds when loaded. *See* Bill Battles, *Magnum Research BFR .30-30 Win. Bisley Revolver*, ON-TARGET MAGAZINE (Nov. 2017), https://www.ontargetmagazine.com/2017/11/magnum-research-bfr-30-30-win-bisley-revolver/3/ (last visited Feb. 21, 2023).

Congress's shoes and rewrite its words," because "the heavy burden [of determining the nation's public policy] falls squarely on Congress." *Id.* at *11.

As if the departure from the statute were not enough, the Final Rule is also infirm because it carries the possibility of criminal penalties. "[B]ecause of the seriousness of criminal penalties, and because criminal punishment usually represents the moral condemnation of the community, legislatures . . . should define criminal activity." *United States v. Bass*, 404 U.S. 336, 348 (1971). "[T]he question of Congress's delegating legislative power to the Executive in the context of criminal statutes raises serious constitutional concerns." *Cargill*, 57 F.4th at 472.

And in the context of a statute imposing criminal liability, fundamental principles of statutory interpretation and the equally fundamental due process and separation of powers concerns driving the rule of lenity forbid the Agencies' efforts to broaden the reach of the definition of "firearm" or "rifle" in this manner. *Cargill*, 57 F.4th at 469–71. "While agencies may enact regulations under a penal statute that result in criminal liability, the agencies must always look to statutory authority to sanction their actions. Only Congress can actually criminalize behavior." *VanDerStok*, __ F.4th __, 2023 WL 7403413, at *11. Thus, even if the text of the NFA somehow allowed the content of the Final Rule with its attendant criminal penalties (it does not), the rule of lenity would operate to nullify it. "[A]mbiguity concerning the ambit of criminal statutes should be resolved in favor of lenity." *Cargill*, 57 F.4th at 469 (citation omitted). A statute is ambiguous if, after a court has "availed [itself] of all traditional tools of statutory construction," the Court is left to "guess at its definitive meaning" among several options. *Id.* (cleaned up). In those circumstances involving ambiguous criminal statutes, the Court is "bound to apply the rule of lenity." *Id.* at 471. So even if this Court were to find that the statutory definition of a "rifle" is ambiguous enough to include a braced pistol, that is far from the most obvious reading of the

21

statute—as shown by a decade of agency interpretations reaching the exact opposite result. *See* ECF No. 36, Prelim. Inj. Br. At 6–8 (summarizing past interpretations).

In *Cargill*, moreover, the Fifth Circuit cited ATF's change of position on the status of bump-stocks as a reason deny deference to ATF's new interpretation. 57 F.4th at 468. Likewise, the Sixth Circuit cited "ATF's own flip-flop in its position," regarding bump stocks, as evidence of the NFA's ambiguity. *Hardin v. ATF*, 65 F.4th 895, 898 (6th Cir. 2023). This Court should do the same here by looking to the Agencies' past interpretations as evidence that the Agencies' newfound interpretation, if not plainly wrong, at best demonstrates ambiguity. If the Agencies can—consistent with the statute's text—reach two conflicting conclusions about what the language requires, then the statutory language is hopelessly ambiguous, and the Rule of Lenity applies.

In short, the Agencies exceed their authority by regulatorily treating pistols as if they were rifles, despite the fact that braced pistols do not meet the statutory definition of a rifle established by Congress. Such "precise wording demands precise application." *VanDerStok*, __ F.4th __, 2023 WL 7403413, at *11. The Final Rule purports to establish a regulation to "guide" the Agencies' administration of the NFA and GCA, but instead regulates new items Congress explicitly left out of any reasonable definition of rifle and would grant the Agencies new, additional authority in excess of that proposed, considered, debated, or passed by Congress. The Agencies have attempted to regulate firearms and firearm parts that Congress explicitly left out of the statute and impose felony charges for violations. The Final Rule thus exceeds the Agencies' congressionally established jurisdiction and authority.

### C.      The Final Rule Is Arbitrary And Capricious

The Agencies failed to engage in reasoned decision-making and thus acted arbitrarily when they failed to consider important aspects of the problems presented and caused by the Final Rule,

departed from earlier longstanding regulatory guidance, employed vague standards, and excluded relevant costs and reliance interests.

The APA provides that a reviewing court shall set aside agency action that is "arbitrary, capricious, . . . or otherwise not in accordance with law[.]" 5 U.S.C. § 706(2)(A). The "arbitrary-and-capricious standard requires that agency action be [both] reasonable and reasonably explained." *Prometheus Radio Project*, 141 S. Ct. at 1158. An agency action was not reasonable if the agency "has relied on factors which Congress has not intended it to consider" or "entirely failed to consider an important aspect of the problem." *State Farm*, 463 U.S. at 43. Moreover, "[a]n agency must consider and respond to significant comments received during the period for public comment." *Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92, 96 (2015).

Here, in addressing comments to the Proposed Rule, the Agencies did not address the various ways in which the Final Rule will harm disabled individuals seeking to exercise their Second Amendment protected rights. From the beginning, stabilizing braces have been enormously helpful to those with physical disabilities. And while the Final Rule takes pains to explain that it would not violate the Americans with Disabilities Act, because it allegedly does not deny a benefit or access to a program, its focus on the narrow legal issue of the ADA instead of the overall impact on physically disabled individuals gives lip service to the statutory rights of disabled Americans without actually considering how they will be directly impacted by the Rule, including the Final Rule's impact on their Second Amendment protected rights. *See* Final Rule, 88 Fed. Reg. at 6,508–6,509.

In addition, the Agencies' change in its longstanding position that braced pistols were not SBRs demonstrates that the Final Rule's new interpretation is not consistent with the statutory language. "When an agency changes its existing position, it . . . must at least display awareness

23

that it is changing position and show that there are good reasons for the new policy," and an "unexplained inconsistency in agency policy" supports the conclusion that agency action is arbitrary and capricious. *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 221, 222 (2016) (citation omitted); *see also Acadian Gas Pipeline Sys. v. FERC*, 878 F.2d 865, 868 (5th Cir. 1989) ("[A]ny departure from past interpretations of the same regulation must be adequately explained and justified.").

Moreover, the Final Rule fails to adequately consider the Supreme Court's opinions in *Heller*, *Caetano*, and *Bruen*. In promulgating a Final Rule that directly impacts constitutionally protected firearms that are in common use, the Agencies should have engaged in the court-mandated text and history analysis. Instead, the Final Rule merely pays lip service to *Bruen*. And, as Plaintiffs have demonstrated below, *infra* § I(D)(1), the Final Rule violates the Second Amendment.

Furthermore, the Final Rule is arbitrary and capricious given the vague standards set forth in the six-factor test. The factors inexplicably lack precision and allow ATF to cherry-pick third parties' actions in its subjective and discretionary analysis that is supposed to be tied to the question of shouldering. *See supra*, § I(A); *Mock*, 75 F.4th at 585–86.

Lastly, the cost-benefit analysis that ATF concedes the statute requires is arbitrary because it excludes obvious costs and reliance interests—including all costs and interests associated with every brace sold since 2020—and fails to quantify its purported benefits.

In sum, the Final Rule is arbitrary and capricious in violation of the APA.

### D.   The Final Rule Violates The United States Constitution

A violation of the Constitution is always a violation of the APA. Indeed, courts must set aside agency action that is "contrary to constitutional right [or] power." 5 U.S.C. § 706(2)(B). "The

24

intent of Congress in 5 U.S.C. § 706(2)(B) was that courts should make an independent assessment of a citizen's claim of constitutional right when reviewing agency decision-making." *Porter*, 592 F.2d at 780; *see id.* at 781 (reasoning that deferring to agency rulings when evaluating constitutional claims would be error).

The Final Rule violates the Constitution in several respects: (1) it violates the Second Amendment; (2) it is too vague to provide adequate notice of what the law requires, violating the Constitution's guarantee of due process; (3) it restricts and chills speech based on its content and speaker, violating the First Amendment; and (4) by usurping Congress's legislative power, it violates the Delegation Doctrine and the Take Care Clause.

### 1.    The Final Rule Violates The Second Amendment

As this Court recognized when ruling on Plaintiffs' motion for a preliminary injunction, there is no serious question that the Final Rule regulates conduct that falls within the plain text of the Second Amendment. ECF No. 92 at 17–19. Braced pistols, however categorized under the Final Rule, are plainly bearable arms. *District of Columbia v. Heller*, 554 U.S. 570, 581 (2008) (citing 1771 legal dictionary definition of "arms" as "any thing that a man wears for his defence, or takes into his hands, or useth in wrath to cast at or strike another") (citation omitted). "Just as the First Amendment protects modern forms of communications, and the Fourth Amendment applies to modern forms of search, the Second Amendment extends, prima facie, to *all instruments that constitute bearable arms*." *Heller*, 554 U.S. at 582 (citations omitted); *see also Bruen*, 142 S. Ct. at 2132. The Second Amendment's text unquestionably extends to braced pistols or short-barreled rifles.[18]

---

[18] Braced pistols are certainly in common use throughout the Nation. By the Agencies' own estimate, there are at least 3 million stabilizing braces and braced pistols owned by law-abiding

Accordingly, Plaintiffs' proposed course of conduct—keeping and bearing their braced pistols for lawful purposes—is "'presumptively protect[ed]' by the Second Amendment." ECF No. 92 at 19–22; *see also Mock*, 75 F.4th at 588 (Willett, J., concurring) ("[P]rotected Second Amendment 'conduct' likely includes making common, safety-improving modifications to otherwise lawfully bearable arms.").

That presumption can only be overcome if the Agencies meet their burden of "affirmatively prov[ing] that [their] firearms regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms" and is thus "consistent with this Nation's historical tradition of firearm regulation." *Bruen*, 142 S. Ct. at 2126–27; *accord United States v. Rahimi*, 61 F.4th 443, 453, 455 (5th Cir. 2023), cert. granted No. 22-915, 143 S. Ct. 2699 (June 30, 2023). Here, however, that analysis has already been performed. *Heller* identified only one aspect of our history sufficiently analogous to, and therefore capable of justifying, a broad ban or sweeping regulation of a category of arms: the history of restricting "dangerous and unusual weapons" not "in common use at the time." *Bruen*, 142 S. Ct. at 2128 (quoting *Heller*, 554 U.S. at 627). Because the Supreme Court already has derived this principle from the historical record, no further historical analysis is needed. As the Solicitor General recently explained to the Supreme Court, "once you have the principle locked in . . . then I don't it's necessary to effectively repeat that same historical analogical analysis." Tr. Of Oral Argument at 55, *United States v. Rahimi*, No. 22-915 (Nov. 7, 2023). Here, the Agencies cannot show that braced pistols fit within the dangerous and unusual principle. Indeed, the Court has correctly observed that braced pistols are in common

---

individuals for lawful purposes. Final Rule, 88 Fed. Reg. at 6,560. But that number is likely higher. *See* William J. Krouse, CONG. RES. SERV., *Handguns, Stabilizing Braces, and Related Components* 2 (Apr. 19, 2021), https://bit.ly/3yKPSlt ("[U]nofficial estimates suggest that there are between 10 and 40 million stabilizing braces and similar components already in civilian hands.").

use, ECF No. 92 at 17-19, so *Heller* establishes that they cannot be subject to the NFA's sweeping restrictions.[19]

Even if the Agencies' effort to analogize to history is indulged, the Agencies cannot meet their burden. The only statutes identified by the Agencies in opposition to the preliminary injunction and before the Fifth Circuit are outliers that do not comprise a historical *tradition* of limitation on the right to keep and bear arms. *See infra*, footnotes 20–23. For a historical law to serve as a "proper analogue" to a modern firearm regulation, the two laws must be "relevantly similar" based on "how and why the regulations burden a law-abiding citizen's right to armed self-defense." *Bruen*, 142 S. Ct. at 2132–33. "[W]hether modern and historical regulations impose a comparable burden on the right of armed self-defense and whether that burden is comparably justified are 'central' considerations when engaging in an analogical inquiry." *Id.* at 2133 (citations omitted). To carry its burden, "the government [must] identify a well-established and representative" tradition of analogous regulation, and "courts should not 'uphold every modern law that remotely resembles a historical analogue,' because doing so 'risk[s] endorsing outliers that our ancestors would never have accepted.'" *Id.* at 2133 (citation omitted).

For starters, the few statutes the Agencies cite to attempt to support their argument come from inapposite time periods either long before or long after the Second Amendment's ratification—the unquestionably relevant period for *federal* regulations. *See infra*, footnotes 22–

---

[19] In fact, the historical record is replete with examples of common arms with barrels shorter than 16 inches that are capable of being shouldered. *See, e.g.*, David Condon, Inc., American Revolutionary War Era Exceptional French Elliptical-Bore Bronze-Barrel Flintlock Blunderbuss With Spring Bayonet (circa 1770), https://www.davidcondon.com/inventory/Antique%20Handguns/american-revolutionary-war-era-exceptional-french-elliptical-bore-bronze-barrel-flintlock-blunderbuss-with-spring-bayonet-29805; West Street Antiques, Twigg Flintlock Rifled Pistol Carbine (circa 1775), https://antiquearmsandarmour.com/products/twigg-flintlock-rifled-pistol-carbine-rare-sn-8546.

24. *Bruen* affirmed that post-Founding Era regulations are relevant only to the extent they *confirm* traditions from the Founding, so courts must "guard against giving postenactment history more weight than it can rightly bear." 142 S. Ct. at 2136. Thus, any consideration of post-Founding Era historical regulations is limited to determining whether such regulations *confirm* a founding-era tradition. *Bruen*, 142 S. Ct. at 2136, and 19th-century laws that regulated firearms in a manner that broke with Founding Era traditions cannot possibly establish a "tradition" that could narrow the scope of the Second Amendment's protection, particularly in the case of a federal statute. *Bruen*, 142 S. Ct. at 2137 ("'[P]ost-ratification adoption or acceptance of laws that are *inconsistent* with the original meaning of the constitutional text obviously cannot overcome or alter that text.'") (quoting *Heller v. District of Columbia*, 670 F.3d 1244, 1274 n.6 (D.C. Cir. 2011) (Kavanaugh, J., dissenting)).

The Agencies' cited statutes also fail to serve as viable analogues to the Final Rule by falling short on the "how" and "why" metrics that are "central" to *Bruen*'s analogical analysis. For example, the Agencies have cited 17th- and 18th-century militia laws allowing militia officers to ensure that militiamen had the requisite arms (but did not *restrict* such arms), ignoring those parts of colonial statutes that *required* individuals to have stabilizing rests for their muskets;[20] 19th-century laws requiring firearms be tested before being sold to ensure that the barrel would not explode;[21] several laws over the course of nearly 250 years (from 1651 to 1899) requiring "[l]icenses or inspection" for random activities ranging from gunpowder exportation to participating in "sporting" activities—including one from Hawaii three decades before it was a

---

[20] ECF No. 37, Prelim. Inj. Opp. Br. at 28 n.17 (citing 1775-1776 Mass. Acts 18; Act of Apr. 3, 1778, ch. 33, 1778 N.Y. Laws 65).

[21] ECF No. 37, Prelim. Inj. Opp. Br. at 28 n.18 (citing Laws of the Commonwealth of Massachusetts from November 28, 1780 to February 28, 1807, at 259-61 (1807); Laws of the State of Maine 546 (1830)).

U.S. territory;[22] and several state taxation statutes from the 19th century.[23] None of these laws impose comparable burdens on Second Amendment protected rights to the burdens imposed by the Final Rule, which requires registration and taxation of commonly owned arms. And beyond just "registration," owners of NFA firearms are subject to additional onerous and ongoing compliance requirements, enhanced criminal penalties designed to discourage transactions in firearms, and a $200 tax. The Final Rule also imposes harsh post-registration requirements through the NFA's restrictions on the transportation, storage, and use of firearms. Those substantial restrictions go well beyond registration and limit a person's ability to keep and bear braced pistols.

Furthermore, the government cannot "impose a charge for the enjoyment of a right granted by the federal constitution." *Murdock v. Pennsylvania*, 319 U.S. 105, 113 (1943). No court would ever uphold a statute that required an X (formerly Twitter) user to pay the government $200, be placed on a government database before accessing the service, and comply with numerous restrictions on X-enabled electronic devices. Nor would any court uphold a requirement that those

---

[22] ECF No. 37, Prelim. Inj. Opp. Br. at 29 nn. 19–21 (citing Colonial Laws of Massachusetts Reprinted from the Edition of 1672, at 126 (1890); 2 General Laws of Massachusetts from the Adoption of the Constitution to February 1822, at 199 (1823); 15 The Public Records of the Colony of Connecticut 191 (1890); Laws of the State of New Hampshire; with the Constitutions of the United States and of the State Prefixed 277 (1830); An Act to Provide a License for the Sale of Pistols or Pistol Cartridges within the Limits of this State, § 1, 1890 S.C. Acts 653; Act of Apr. 1, 1881, ch. XCVI, § 1, 1881 Ark. Acts 191, 191 (codified at Ark. Code. Ann. ch. 48 § 1498 (1894)); Act of Apr. 12, 1871, ch. XXXIV, § 1, 1871 Tex. Gen. Laws 25, 25 (codified at 1879 Tex. Crim. Stat. 24); Act of Mar. 13, 1872, ch. 100, § 62, 1872 Kan. Sess. Laws 210, 210 (codified at Kan. Gen. Stat. § 1003 (1901)); Act of Dec. 2, 1875, § 1, 1876 Wyo. Sess. Laws 352, 352; Act of Mar. 26, 1879, ch. CLXXXVI, § 1, 1879 Tenn. Pub. Acts 231, 231; An Act to License the Carrying of Fowling Pieces and other Fire-Arms, 1870 Haw. Sess. Laws 26, §§ 1-2; Act of Feb. 15, 1899, ch. 19, § 14, 1899 Wyo. Sess. Laws 27, 32-33.

[23] ECF No. 37, Prelim. Inj. Opp. Br. at 29 nn. 22–23 (citing An Act About Powder Money, 1759-1776 N.H. Laws 63; The Statutes at Large of Pennsylvania, ch. 1857, §§ 1-12, 346-51 (James T. Mitchell & Henry Flanders comps. 1911); Joseph Abram Walker, The Revised Code of Alabama 169 § 10 (Reid & Screws, State Printers, 1867); Act of Feb. 24, 1844, ch. 1, § 1, 1844 Miss. Laws 57-59; Act of Feb. 21, 1867, ch. CCCXVII, §§ 1-8, 1867 Miss. Laws 412; Revenue, ch. 34, § 23(4), 1857 N.C. Sess. Laws 34; County Bonds, Taxes, Etc. tit. VI, 1866 Ga. Laws 27-28.

subject to a search pay $200—and be placed on a registry—to invoke the Fourth Amendment's warrant requirement. Considering these comparable conditions and restrictions illustrate the Final Rule's burden on the exercise of constitutionally protected rights. As the Supreme Court has cautioned, the right to keep and bear arms cannot be treated as a "second-class right, subject to an entirely different body of rules than the other Bill of Rights guarantees." *Bruen*, 142 S. Ct. at 2156 (quoting *McDonald v. City of Chicago*, 561 U.S. 742, 780 (2010) (plurality opinion)). In short, the Agencies' historical laws fail *Bruen*'s "how" test.

The Agencies' historical statutes fall short on *Bruen*'s "why" metric as well. Colonial regulations requiring the inspection and proving of firearms were intended to ensure that the firearms functioned as intended. The Final Rule's burdens are imposed for a different purpose altogether: The government here does not seek to regulate the quality of stabilizing braces or braced pistols, but rather to control (and discourage) the ownership of commonly owned firearms. While the Agencies also cite a few stray laws requiring a license to sell firearms and ammunition, the burdens imposed by such licensing laws are manifestly distinguishable from the burdens imposed by the Final Rule. Plaintiffs have not challenged the Agencies' general authority to license commercial firearms dealers.

Even if all of this were not so, both *Heller* and *Bruen* hold that a few outlier laws are inadequate, *see Heller*, 554 U.S. at 632; *Bruen*, 142 S. Ct. at 2142, and the outlier laws cited by the Agencies do not enlighten the scope of the *right* as understood at the Founding. *See Bruen*, 142 S. Ct. at 2143-46, 2154 & n.28.

The Final Rule and its redefinition of the regulatory definition of "rifle" that purports to grant ATF the authority to regulate constitutionally protected pistols in an utterly ahistorical manner thus violates the Second Amendment.

### 2. The Final Rule Violates Due Process Because It Is Unconstitutionally Vague

The many uncertainties relating to how the Final Rule will be enforced illustrate why the Final Rule should be invalidated as void for vagueness. The vagueness doctrine states that "[a] law is unconstitutionally vague if people of common intelligence must guess at its meaning and differ as to its application." *Shamloo v. Miss. State Bd. of Trustees of Insts. of Higher Learning*, 620 F.2d 516, 523 (5th Cir. 1980). This limitation is grounded in principles of fair notice and the "twin constitutional pillars of due process and separation of powers." *United States v. Davis*, 139 S. Ct. 2319, 2325 (2019). Accordingly, a law is unconstitutionally vague if it is "so standardless that it invites arbitrary enforcement," or if it "fails to give ordinary people fair notice of the conduct it punishes." *Beckles v. United States*, 580 U.S. 256, 262 (2017) (citation omitted). Laws must provide fair notice to citizens of the conduct the laws proscribe so as to "guard[] against arbitrary or discriminatory law enforcement[.]" *Sessions v. Dimaya*, 138 S. Ct. 1204, 1212 (2018); *accord FCC v. Fox Television Stations, Inc.*, 567 U.S. 239, 253 (2012); *VanDerStok*, __ F.4th __, 2023 WL 7403413, at *21.

The need for clarity is heightened when laws attach criminal consequences. *See Davis*, 139 S. Ct. at 2323. "Where a penal statute could sweep so broadly as to render criminal a host of what might otherwise be considered ordinary activities," the Supreme Court has "been wary about going beyond what Congress certainly intended the statute to cover." *Sackett v. EPA*, 598 U.S. 651, 681 (2023) (cleaned up). And if statutes governing "ordinary activities" require heightened clarity, *id.*, then statutes that "threaten[] to inhibit the exercise of constitutionally protected rights" require even greater clarity. *Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 499 (1982); *see also Smith v. Goguen*, 415 U.S. 566, 572–73 (1974).

31

Just as in *VanDerStok*, the Agencies' "approach violates the Fifth Amendment and its guarantee of fair notice," particularly because the Final Rule's test "produces 'more unpredictability and arbitrariness than the Due Process Clause tolerates.'" __ F.4th __, 2023 WL 7403413, at *20 (Oldham, J., concurring) (quoting *Dimaya*, 138 S. Ct. at 1215). The Final Rule is unconstitutionally vague because it, and the Agencies' promised application of the underlying statutes, provide no meaningful clarity on what constitutes an impermissible stabilizing brace or what other items may convert a pistol into a rifle under the Final Rule's multi-factor test. The multi-factor test incorporates both so-called "objective design features" and "other factors," the latter of which are inherently subjective. Final Rule, 88 Fed. Reg. at 6,500. Worse, included in "other factors" are actions by third parties such as the "manufacturer's direct and indirect marketing and promotional materials" and how a firearm is used by others. Final Rule, 88 Fed. Reg. at 6,480. Such statements or actions are not necessarily knowable to the end user, endangering the principle of proper notice. While a manufacturer's direct statements to purchasers might be tracked, the Final Rule's subjective factors also include "indirect" statements and "[i]nformation demonstrating the likely use of the weapon in the general community[,]" thus criminalizing law-abiding gun owners based on the statements and actions of unknown, unaffiliated, and uncontrollable third parties. Final Rule, 88 Fed. Reg. at 6,479.

Here, the Fifth Circuit recognized that the Final Rule puts the regulated community in an untenable position because it "vests the ATF with complete discretion to use a subjective balancing test to weigh six opaque factors on an invisible scale." *Mock*, 75 F.4th at 584. Under the six-factor test, "it is nigh impossible for a regular citizen to determine what constitutes a braced pistol and . . . whether a specified braced pistol requires NFA registration." *Id.* at 584–85. The vagueness inherent in the Final Rule's approach violates the Constitution's Due Process protections. The

32

Final Rule's vagueness, moreover, was illustrated by congressional testimony from the Director of ATF himself: Even he was unsure about what the Final Rule actually requires. *See* Texas MIPA Br., *supra*, at 3 (ECF No. 43) (explaining the ways ATF's director got the Final Rule wrong before Congress).

In short, the Agencies' adoption of an indeterminate six-factor test to determine whether a particular braced pistol is a rifle lends itself to arbitrary enforcement and puts Plaintiffs and other gun owners in an impossible position. As in *VanDerStok*, the Final Rule's "test provides no guidance to anyone," __ F.4th __, 2023 WL 7403413, at *21 (Oldham, J., concurring), and is therefore unconstitutionally vague.

### 3.    The Final Rule Violates The First Amendment

The Final Rule violates the First Amendment. "If a statute regulates speech based on its content, it must be narrowly tailored to promote a compelling Government interest. . . . If a less restrictive alternative would serve the Government's purpose, the legislature must use that alternative." *Playboy Ent. Grp., Inc.*, 529 U.S. at 813. "As we consider a content-based regulation, the answer should be clear: The standard is strict scrutiny." *Id.* at 814. "[S]trict scrutiny applies either when a law is content based on its face or when the purpose and justification for the law are content based[.]" *Reed*, 576 U.S. at 166.

The Final Rule violates the First Amendment by allowing the Agencies to more stringently regulate firearms based on statements made by manufacturers such as Plaintiff Maxim Defense and other third parties. Specifically, the Final Rule uses the speech of manufacturers, purchasers, and third parties to determine whether a particular object converts a pistol into an SBR, effectively penalizing such speech and thus chilling it.

Regulations that chill or compel speech, like outright prohibitions on speech, "abridge" the freedom protected by the Free Speech Clause. *See R.A.V. v. City of St. Paul*, 505 U.S. 377, 382 (1992) ("The First Amendment generally prevents government from proscribing speech . . . because of disapproval of the ideas expressed."). The Fifth Circuit has thus recognized that "the First Amendment goes beyond protection of the press and the self-expression of individuals to prohibit government from limiting the stock of information from which members of the public may draw." *Turner v. Lt. Driver*, 848 F.3d 678, 688 (5th Cir. 2017) (cleaned up). "Content-based laws—those that target speech based on its communicative content—are presumptively unconstitutional and may be justified only if the government proves that they are narrowly tailored to serve compelling state interests." *Reed*, 576 U.S. at 163.

By using their speech against them, the Final Rule impermissibly chills speech based on the speech's content and is subject to—and fails—strict scrutiny. Furthermore, the vagueness described above likewise demonstrates that the Final Rule will chill the exercise of First and Second Amendment protected rights. Even though some speech may be the basis for criminal liability—solicitation of a crime or incitement, for example—any vague standard that threatens to chill more speech than strictly necessary is unconstitutional. For example, statements by third parties that a firearm designed and intended to be fired with one hand *could* be used differently and *could* be fired from the shoulder are certainly protected speech but risk converting NFA-exempt pistols into NFA-regulated SBRs under the Final Rule—without any actual change to the firearm.

There is no compelling state interest in regulating manufacturer, purchaser, and third-party speech about stabilizing braces given the Agencies have permitted the sale and advertisement of stabilizing braces and braced pistols for over a decade. The government cannot now claim an

34

overwhelming need to regulate these arms—and speech about them—after sitting on its hands for so long. Nor can the Agencies establish a compelling interest by pointing to vague statements such as ATF having "traced numerous firearms equipped with a 'stabilizing brace' in connection with crimes in recent years." Final Rule, 88 Fed. Reg. at 6,508.[24] Just like the Second Amendment protected right to bear arms "is the very *product* of an interest balancing by the people," *Heller*, 554 U.S. at 635 (emphasis in original), the Agencies cannot point to harms they claim come from First Amendment activities as a justification for regulating those activities.[25] The Agencies previously suggested a generic substantial interest in the proper enforcement of the NFA. ECF No. 37, Prelim. Inj. Opp. Br. at 39. That claim begs the question of NFA coverage and, as shown above, the Final Rule does not *enforce* the NFA, but unconstitutionally *supersedes* the NFA with the Agencies' own policy judgment.

The Final Rule also fails the tailoring required under strict scrutiny because there are less restrictive means of furthering the Agencies' asserted interests. Even the Proposed Rule's Worksheet 4999—which ignored speech altogether—was more narrowly tailored than the Final Rule. The Agencies could have avoided speech restrictions in the Final Rule as well by relying solely on the objective physical aspects of a firearm or brace. That manufacturers and purchasers will instead be subject to the vagaries of the Agencies' interpretation of marketing statements, some of which many purchasers may not even have seen or heard, confirms that the Final Rule will chill far more speech than necessary to address any supposed government interests.

---

[24] Such statements do not even claim that such braced pistols were fired from the shoulder rather than by one hand. Indeed, they simply reflect a *policy* dislike for braced pistols that highlights the Final Rule's legislative nature.

[25] The narrow fighting words, true threat, or incitement exceptions plainly do not apply here.

In addition to creating uncertainty and chilling speech, the government violates the First Amendment when it regulates speech "based on the identity of the speaker." *See Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 340 (2010). "Speaker-based laws run the risk that the state has left unburdened those speakers whose messages are in accord with its own views." *Nat'l Inst. of Fam. & Life Advocs. v. Becerra*, 138 S. Ct. 2361, 2378 (2018) (cleaned up). The "First Amendment stands against attempts to disfavor" not only certain "viewpoints," but also certain "subjects." *Citizens United*, 558 U.S. at 340. The Final Rule explicitly disfavors certain viewpoints and speakers—manufacturers—as it decrees that "manufacturers' direct and indirect marketing and promotional materials" will be scrutinized by regulators in some unknowable way. Final Rule, 88 Fed. Reg. at 6,511.

The Final Rule's singling out of manufacturers impermissibly creates a speaker-based law that discourages any manufacturer speech that might lead the Agencies to declare those products to be SBRs (and their customers to be felons). By targeting such speech in their attempt to regulate stabilizing bracers, the Agencies thus unconstitutionally regulate speech "based on the identity of the speaker." *Citizens United*, 558 U.S. at 340.

Because the Final Rule is both a content- and speaker-based restriction on speech that cannot pass strict scrutiny, it violates the First Amendment.

### 4. The Final Rule Violates The Constitution's Structural Protections

The Final Rule also violates the Constitution's structural protections. Article I of the Constitution grants Congress the sole authority to craft legislation and create law. *See* U.S. CONST. Art. I, § 1. On the other hand, the President, and by extension, the Executive Branch departments under his purview, "shall take Care that the Laws be faithfully executed." U.S. CONST. Art. II, § 3. "In the framework of our Constitution, the President's power to see that the laws are faithfully

executed refutes the idea that he is to be a lawmaker." *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 587 (1952). This separation of powers is "a basic principle of our constitutional scheme" under which "one branch of the Government may not intrude upon the central prerogatives of another." *Loving*, 517 U.S. at 757.

As the Fifth Circuit has explained, this limitation means agencies "cannot manufacture statutory ambiguity with semantics to enlarge their congressionally mandated border." *Tex. Pipeline Ass'n*, 661 F.3d at 264. If agencies are given authority to create a legislative rule, that authority requires "a *clear delegation*" from Congress. *West Virginia*, 142 S. Ct. at 2616 (emphasis added). This is necessary to guard against the "flight of power from the legislative to the executive branch" by agency efforts to expand their regulatory and prosecutorial reach. *Gundy v. United States*, 139 S. Ct. 2116, 2142 (2019) (Gorsuch, J., dissenting).[26]

Here, the statutory text defines an SBR as "a rifle having one or more barrels less than sixteen inches in length and any weapon made from a rifle (whether by alteration, modification, or otherwise) if such weapon, as modified, has an overall length of less than twenty-six inches." 18 U.S.C. § 921(a)(8). This incorporates the statutory definition of "rifle," which is "a weapon designed or redesigned, made or remade, and intended to be fired from the shoulder . . ." 18 U.S.C. § 921(a)(7). In contrast, a "handgun" is "a firearm which has a short stock and is designed to be

---

[26] The clear-delegation requirement refutes the idea that agencies can answer questions "left unresolved" in a statute "merely because a statute's 'authors did not have the forethought expressly to contradict any creative contortion that may later be constructed to expand or prune its scope.'" *Calix v. Lynch*, 784 F.3d 1000, 1005 (5th Cir. 2015) (quoting *Moore v. Hannon Food Serv., Inc.*, 317 F.3d 489, 497 (5th Cir. 2003)). Indeed, it forbids courts from "presum[ing] that a power is delegated if Congress does not expressly withhold it, as then agencies would enjoy virtually limitless hegemony, a result plainly out of keeping with *Chevron* and quite likely with the Constitution as well." *Contender Farms, LLP v. U.S. Dep't of Agric.*, 779 F.3d 258, 269 (5th Cir. 2015) (internal citation omitted); *see also Gulf Fishermens Ass'n v. Nat'l Marine Fisheries Serv.*, 968 F.3d 454, 461 (5th Cir. 2020).

held and fired by the use of a single hand[.]" 18 U.S.C. § 921(a)(30)(A). This is not the sort of ambiguous language that would indicate "Congress has delegated policy-making responsibilities" to the Agencies. *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 865 (1984); *see also Cargill*, 57 F.4th at 458. And the Final Rule's new factor analysis is not only detached from the ultimate question of whether the weapon is designed to be fired from the shoulder or from a single hand, it actively ignores it. The factors in the Final Rule thus are unrelated to the statute's language.

As if the departure from the statute were not enough, the Final Rule is also constitutionally infirm because it carries the possibility of criminal penalties. "[B]ecause of the seriousness of criminal penalties, and because criminal punishment usually represents the moral condemnation of the community, legislatures . . . should define criminal activity." *Bass*, 404 U.S. at 348. "[T]he question of Congress's delegating legislative power to the Executive in the context of criminal statutes raises serious constitutional concerns." *Cargill*, 57 F.4th at 472. And in the context of a statute imposing criminal liability, fundamental principles of statutory interpretation and the equally fundamental due process and separation of powers concerns driving the rule of lenity forbid the Agencies' efforts to broaden the reach of the definition of "firearm" or "rifle" while ignoring the definition of "handgun" and the common meaning of "pistol or revolver" even if this Court were to conclude that the statutory definition of a "firearm" or a "rifle" were ambiguous enough to include a braced pistol. *Cargill*, 57 F.4th at 469–71; *accord VanDerStok*, __ F.4th __, 2023 WL 7403413, at *11 (federal "agencies must always look to statutory authority to sanction their actions" because "[o]nly Congress can actually criminalize behavior").

In short, the Final Rule purports to create new law, gives the Agencies new power over new items not regulated by statute, and carries the possibility of criminal sanctions. For these

reasons, it exceeds executive authority and violates the Delegation Doctrine and the Take Care
Clause.

## II.    If The Court Rejects Plaintiffs' APA Challenge To The Final Rule, Then The Final Rule And The NFA's Regulation Of SBRs Violate The Second Amendment

Alternatively, if this Court allows the Final Rule to stand, then the Final Rule and the NFA
are thus unconstitutional given they regulate commonly owned and possessed—and
constitutionally protected—arms (whether referred to as braced pistols or short-barreled rifles)
more stringently than allowed for based on the text and history of the Second Amendment.
Moreover, as demonstrated above, the required historical work has already been done here. In
*Heller*, the Supreme Court held that the Second Amendment protected the right to "keep and bear"
"those [Arms] 'in common use at the time.'" *Heller*, 554 U.S. at 627. "That limitation is fairly
supported by the historical tradition of prohibiting the carrying of 'dangerous and unusual
weapons.'" *Id*. This Court's task is therefore a simple one: it must merely determine whether these
weapons are "dangerous and unusual." "[T]his is a conjunctive test: A weapon may not be banned
unless it is *both* dangerous *and* unusual." *Caetano v. Massachusetts*, 577 U.S. 411, 417 (2016)
(Alito, J., concurring). A firearm that is in common use for lawful purposes, by definition, does
not fall within this category and cannot be regulated outside of the historical scope of regulation
allowable under the Second Amendment. *Bruen*, 142 S. Ct. at 2143.

There can be no question that the arms at issue, whether braced pistols or short-barreled
rifles, are in common use, and thus not both "dangerous *and* unusual." As of 2012, "[h]undreds of
thousands of Tasers and stun guns ha[d] been sold to private citizens" who "may lawfully possess
them in 45 States." *Caetano*, 577 U.S. at 420 (Alito, J., concurring) (quoting *People v. Yanna*, 824
N.W.2d 241, 245 (Mich. Ct. App. 2012)). Those hundreds of thousands of stun guns were deemed
by Justice Alito to constitute "in common use" in *Caetano*. If the Agencies are correct and braced

pistols are actually short-barreled rifles, then, based on the Agencies' own estimate, there are at least 3 million more short-barreled rifles that are owned by law-abiding individuals for lawful purposes. *See* Final Rule, 88 Fed. Reg. at 6,560.[27] Just as hundreds of thousands of stun guns constituted "in common use" in *Caetano*, millions of braced pistols or short-barreled rifles should be considered to constitute "in common use" here. Notably, the Agencies do not dispute comments that there are "millions of 'braces' in use[,]" Final Rule, 88 Fed. Reg. at 6,566, or that braced pistols are "commonly used by millions of law-abiding Americans for various reasons[,]" Final Rule, 88 Fed. Reg. at 6,556.

Even if the Agencies argue that the historical work is not done here, despite *Heller*, *Caetano*, and *Bruen*, the burden is still on the Agencies to demonstrate that their laws and regulations are sufficiently analogous to an allowable historical regulation of Arms at the time of the ratification of the Second Amendment. *See Bruen*, 142 S. Ct. at 2130. But here, the Agencies cannot meet their burden for all of the reasons discussed above, *supra* § I(D)(1).

## III.  The Court Should Vacate The Final Rule And Issue A Permanent Injunction

Because the Final Rule violates the APA it should be vacated in its entirety: The APA directs that courts court "shall . . . hold unlawful and set aside agency action" that is in excess of statutory authority, arbitrary and capricious, or without observance of procedure. 5 U.S.C. § 706(2). To that end, the Fifth Circuit has explained that "[u]nder prevailing precedent, § 706 'extends beyond the mere non-enforcement remedies available to courts . . . as it empowers courts

---

[27] According to the ATF's own report, there were 532,725 registered short-barreled rifles possessed throughout the country as of May 2021. *Firearms Commerce in the United States – Annual Statistical Update 2021*, ATF, 15–17 Ex. 8, https://www.atf.gov/firearms/docs/report/2021-firearms-commerce-report.

[27] Due to high consumer demand for short-barreled rifles and more efficient electronic application forms, there are likely more than that registered today.

to set aside—*i.e.*, *formally nullify* and revoke—an unlawful agency action." *Data Mktg. P'ship, LP*, 45 F.4th at 859 (quoting Johnathan Mitchell, *The Writ-of-Erasure Fallacy*, 104 Va. L. Rev. 933, 950 (2018)) (emphasis added). Accordingly, "[t]he default rule is that vacatur is the appropriate remedy" for unlawful agency action. *Id*. Indeed, "[v]acatur is the only statutorily prescribed remedy for a successful APA challenge to a regulation." *Franciscan All., Inc. v. Becerra*, 47 F.4th 368, 374–75 (5th Cir. 2022).

Vacatur under the APA is not Plaintiff-focused but rather rule-focused; the effect of vacatur is to rid a rule entirely of legal force. "When a reviewing court determines that agency regulations are unlawful, the ordinary result is that the rules are vacated—not that their application to the individual petitioners is proscribed." *Harmon v. Thornburgh*, 878 F.2d 484, 495 n.21 (D.C. Cir. 1989); *see also Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 913 (1990) (Blackmun, J. dissenting) ("In some cases the 'agency action' will consist of a rule of broad applicability; and if the plaintiff prevails, the result is that the rule is invalidated, not simply that the court forbids its application to a particular individual."); *All. for Hippocratic Med. v. U.S. Food & Drug Admin.*, 78 F.4th 210, 254 (5th Cir. 2023) ("Upon a successful APA claim, vacatur effectively rescinds the unlawful agency action."); *Driftless Area Land Conservancy v. Valcq*, 16 F.4th 508, 522 (7th Cir. 2021) ("Vacatur . . . retroactively undoes or expunges a past state action.").[28] However phrased, the net result is that "set[ing] aside" unlawful agency action through vacatur wipes it from the books.

---

[28] *See also* Mila Sohoni, *The Power to Vacate a Rule*, 88 Geo. Wash. L. Rev. 1121, 1178 (2020) ("The assumption that universal vacatur is, at a minimum, *authorized* by the APA is a basic proposition shared by *both* sides of the debate . . . the disagreement between the two sides has been entirely over the question whether universal vacatur is *required* by the APA. Yet it is to that logically antecedent question—is universal vacatur even authorized?—that the debate has now, oddly, regressed.").

Because vacatur is *the* statutorily prescribed remedy for APA violations, a court must vacate first *and then* determine whether other remedies are still necessary. As the Supreme Court explained in *Monsanto Co. v. Geertson Seed Farms*, it is only after a rule is vacated that courts determine whether "recourse to the additional and extraordinary relief of an injunction [is] warranted." 561 U.S. 139, 166 (2010). As explained below, an injunction is warranted here, but that relief supplements and does not supplant vacatur.

At bottom, this Court's task is straightforward because the Final Rule amended two discrete Code of Federal Regulations provisions to redefine "rifle." Specifically, it amended:

- 27 CFR § 478.11 to amend the definition of "rifle" by adding paragraphs (1) and (2).

- 27 CFR § 479.11 to amend the definition of "rifle" by adding paragraphs (1) and (2).

Final Rule, 88 Fed. Reg. at 6,574–6,575. The Final Rule along with both of these regulatory amendments should be vacated.

Furthermore, injunctive relief is necessary to secure complete relief given the Agencies' assertion that they have "interpretative" authority under the NFA to treat braced pistols as SBRs and that the Final Rule merely announces its position to the public. Final Rule, 88 Fed. Reg. at 6,478 ("[T]his rule does not impose any new legal obligations on owners of 'stabilizing braces' at all, as any obligations for these owners result only from the NFA and the [Gun Control Act]. Instead, this rule merely conveys more clearly to the public the objective design features and other factors that indicate a weapon is in fact a firearm or short-barreled rifle under the relevant statutes."); *id.* at 6,480 ("This revised definition reflects the Department's understanding of the best interpretation of the statute . . . ."); *see also* Br. for Appellees 15–16, *Mock v. Garland*, Fifth Circuit Case No. 23-10319, ECF No. 117-1 (June 15, 2023) (asserting that the Final Rule "explains

. . . ATF's understanding of the best interpretation of the NFA" and represents "ATF's articulation of its view of the best understanding of the statute").

To that end, Plaintiffs further request that the Court issue a permanent injunction enjoining Defendants from implementing, enforcing, or otherwise applying the Agencies interpretation of the NFA's definition of "rifle" as set forth in the Final Rule, such that it includes braced pistols. The same factors that justified entering a preliminary injunction favor entering a permanent injunction here since "[t]he standard for a preliminary injunction is essentially the same as for a permanent injunction with the exception that the plaintiff must show a likelihood of success on the merits rather than actual success." *Amoco Prod. Co. v. Vill. of Gambell, AK*, 480 U.S. 531, 546 n.12 (1987). And the Fifth Circuit has recognized that injunctive relief may be used to complement vacatur in an APA challenge. *See Franciscan All.*, 47 F.4th at 377–80. A permanent injunction is appropriate to the extent that the "less drastic remedy" of vacatur is insufficient to "redress [Plaintiffs'] injury." *Monsanto Co.*, 561 U.S. at 166. As with the preliminary injunction, the permanent injunction should extend to the Plaintiffs in this case: individual plaintiffs and their family members; Firearms Policy Coalition, Inc. and all of its members; and Maxim Defense and any of its downstream customers (including all direct consumer purchasers and all intermediary distributors, dealers, retailers, and OEM purchasers of Maxim Defense products, and any of their respective customers).

**CONCLUSION**

For the reasons set for the above, the Court should grant Plaintiffs' motion for summary judgment, vacate the Final Rule and its amendment of 27 CFR §§ 478.11 and 479.11, and enter a permanent injunction against Defendants from enforcing their "interpretation" of federal law contained in the Final Rule against Plaintiffs.

Dated: November 14, 2023

<table>
<tr><td></td><td>Respectfully submitted,</td></tr>
<tr><td>
/s/ Bradley A. Benbrook<br>
Bradley A. Benbrook* (CA Bar No. 177786)<br>
Stephen M. Duvernay* (CA Bar No. 250957)<br>
BENBROOK LAW GROUP, P.C.<br>
701 University Avenue, Suite 106<br>
Sacramento, California  95825<br>
Telephone: (916) 447-4900<br>
Telecopy: (916) 447-4904<br>
brad@benbrooklawgroup.com<br>
steve@benbrooklawgroup.com
</td><td>
R. Brent Cooper (TX Bar No. 04783250)<br>
Benjamin D. Passey (TX Bar No. 24125681)<br>
COOPER & SCULLY, P.C.<br>
900 Jackson Street, Suite 100<br>
Dallas, Texas  75202<br>
Telephone: (214) 712-9500<br>
Telecopy: (214) 712-9540<br>
brent.cooper@cooperscully.com<br>
ben.passey@cooperscully.com<br>
<br>
Cody J. Wisniewski* (CO Bar No. 50415)<br>
FPC ACTION FOUNDATION<br>
5550 Painted Mirage Road, Suite 320<br>
Las Vegas, NV  89149<br>
Telephone: (916) 378-5785<br>
Telecopy: (916) 476-2392<br>
cwi@fpchq.org<br>
<br>
*Admitted *pro hac vice*<br>
<br>
*Attorneys for Plaintiffs*
</td></tr>
</table>

**CERTIFICATE OF SERVICE**

I hereby certify that, on November 14, 2023, a true and correct copy of the foregoing document and all supporting documents filed concurrently therewith were served via the Court's CM/ECF system to all counsel of record.

/s/ Bradley A. Benbrook
Bradley A. Benbrook