**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION**

|  |  |
|---|---|
| WILLIAM T. MOCK, *et al.*,<br><br>      *Plaintiffs*,<br><br>    v.<br><br>MERRICK B. GARLAND, *et al.*,<br><br>      *Defendants*. | Civil Action No. 4:23-cv-95-O |

**MEMORANDUM IN OPPOSITION TO
PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND IN SUPPORT OF
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

# TABLE OF CONTENTS

INTRODUCTION .................................................................................................................1

BACKGROUND ..................................................................................................................2

    I.      Statutory and Regulatory Background .................................................................2

    II.     ATF's Pre-Rule Classifications of and Guidance Regarding Brace-equipped
          Weapons ..............................................................................................................3

    III.    The Rule .............................................................................................................7

    IV.    This Lawsuit and Other Litigation Challenging the Rule ...................................10

LEGAL STANDARDS ......................................................................................................11

ARGUMENT ....................................................................................................................11

    I.      The Tax Anti-Injunction Act bars Plaintiffs' claims. ........................................11

    II.     The Rule properly interprets the statutory definition of "rifle." .......................13

    III.    The Rule is not arbitrary or capricious. ............................................................18

    IV.    Logical Outgrowth ............................................................................................22

          A.     The Rule is not subject to notice-and-comment requirements...............22

          B.     The Rule is a logical outgrowth of the proposed rule. ..........................25

          C.     Any error in ATF's process was harmless...........................................28

    V.     Neither the Rule nor the NFA violates the Second Amendment. .......................30

          A.     Braces are not bearable arms protected by the Second Amendment. ..................30

          B.     Short-barreled rifles are dangerous and unusual weapons.....................31

          C.     Taxation and registration of short-barreled rifles does not implicate the
                Second Amendment. ............................................................................33

          D.     Historical tradition of firearm regulation supports the Rule and the NFA...........34

    VI.    The Rule is not unconstitutionally vague............................................................39

    VII.   The Rule is otherwise constitutional..................................................................43

    VIII.  Any relief should be narrowly tailored to redress plaintiffs' injuries. ................45

i

    A.       Universal vacatur of the Rule is unwarranted.................................................................46

    B.       Plaintiffs are not entitled to their proposed injunction............................................49

CONCLUSION.................................................................................................................................50

# TABLE OF AUTHORITIES

## Cases

*Agnew v. Gov't. of the Dist. of Columbia,*
  920 F.3d 49 (D.C. Cir. 2019) ..........................................................................................42

*All. For Hippocratic Med. v. FDA,*
  78 F.4th 210 (5th Cir. 2023) ...........................................................................................22

*Am. Transfer & Storage Co. v. Interstate Commerce Com.,*
  719 F.2d 1283 (5th Cir. 1983) ........................................................................................25

*Babbitt v. Sweet Home Ch. of Cmtys. for a Great Or.,*
  515 U.S. 687 (1995) ........................................................................................................18

*Basiardanes v. City of Galveston,*
  682 F.2d 1203 (5th Cir. 1982) ........................................................................................40

*Bennett v. Spear,*
  520 U.S. 154 (1997) ........................................................................................................23

*Bevis v. City of Naperville,*
  85 F.4th 1175 (7th Cir. 2023) .........................................................................................37

*Bezet v. United States,*
  714 F. App'x 336 (5th Cir. 2017) .............................................................................. 12, 34

*Bloomberg L.P. v. SEC,*
  45 F.4th 462 (D.C. Cir. 2022) .........................................................................................49

*Bob Jones Univ. v. Simon,*
  416 U.S. 725 (1974) ........................................................................................................12

*British Caledonian Airways, Ltd. v. C.A.B.,*
  584 F.2d 982 (D.C. Cir. 1978) ........................................................................................25

*Britto v. ATF,*
  2023 WL 7418291 (N.D. Tex. Nov. 8, 2023) .................................................................11

*Caetano v. Massachusetts,*
  577 U.S. 411 (2016) .................................................................................................. 18, 31

*Calix v. Lynch,*
  784 F.3d 1000 (5th Cir. 2015) ........................................................................................43

*Cargill v. Barr,*
  502 F. Supp. 3d 1163 (W.D. Tex. 2020) ........................................................................43

*Cargill v. Garland,*
  57 F.4th 447 (5th Cir. 2023) .................................................................................. 17, 46, 48

*Catawba Cnty. v. EPA,*
  571 F.3d 20 (D.C. Cir. 2009) .................................................................................. 43, 45

*Central S.W. Servs., Inc. v. EPA,*
  220 F.3d 683 (5th Cir. 2000) .................................................................................. 46, 49

*Chem. Mfrs. Ass'n v. EPA,*
  870 F.2d 177 (5th Cir. 1989) .................................................................................. 25

*CIC Servs., LLC v. IRS,*
  593 U.S. 209 (2021) .............................................................................................. 13

*City of Arlington v. FCC,*
  668 F.3d 229 (5th Cir. 2012) .................................................................................. 28

*City of Austin v. Reagan Nat'l Advert. of Austin, LLC,*
  142 S. Ct. 1464 (2022) ......................................................................................... 45

*City of Columbus v. Trump,*
  453 F. Supp. 3d 770 (D. Md. 2020) ........................................................................ 44

*Contender Farms, LLP v. USDA,*
  779 F.3d 258 (5th Cir. 2015) .................................................................................. 43

*District of Columbia v. Heller,*
  554 U.S. 570 (2008) .............................................................................. 18, 30, 31, 32

*Doe I v. Landry,*
  909 F.3d 99 (5th Cir. 2018) .................................................................................. 45, 46

*Draper v. Healey,*
  827 F.3d 1 (1st Cir. 2016) ..................................................................................... 20

*eBay Inc. v. MercExchange, L.L.C.,*
  547 U.S. 388 (2006) .............................................................................................. 49

*Encino Motorcars, LLC v. Navarro,*
  579 U.S. 211 (2016) .................................................................................. 19, 20, 21

*FCC v. Fox Television Stations, Inc.,*
  556 U.S. 502 (2009) .............................................................................................. 19

*FCC v. Prometheus Radio Proj.,*
  592 U.S. 414 (2021) .............................................................................................. 18

*Feds for Medical Freedom v. Biden*,
  63 F.4th 366 (5th Cir. 2023)..................................................................................47

*Firearms Regul. Accountability Coal., Inc. v. Garland*,
  2023 WL 5942365 (D.N.D. 2023) ....................................................................*passim*

*Flight Training Int'l, Inc. v. FAA*,
  58 F.4th 234 (5th Cir. 2023)...................................................................22, 23, 24

*Flora v. U.S.*,
  357 U.S. 63 (1958) ..............................................................................................12

*Friends of Iwo Jima v. Nat'l Cap. Planning Comm'n*,
  176 F.3d 768 (4th Cir. 1999)...............................................................................28

*Gadhave v. Thompson*,
  2023 WL 6931334 (N.D. Tex. Oct. 19, 2023)....................................................11

*Gill v. Whitford*,
  138 S. Ct. 1916 (2018).........................................................................................46

*Grayned v. City of Rockford*,
  408 U.S. 104 (1972).......................................................................................21, 42

*Grupo Mexicano de Desarrollo, S.A. v. All. Bond Fund, Inc.*,
  527 U.S. 308 (1999).............................................................................................47

*Guedes v. ATF*,
  356 F. Supp. 3d 109 (D.D.C. 2019) .....................................................................18

*Guedes v. ATF*,
  920 F.3d 1 (D.C. Cir. 2019)...........................................................................24, 29

*Hardy v. Panola Cnty. Sheriff's Dep't*,
  2007 WL 496339 (N.D. Miss. Feb. 12, 2007) ....................................................44

*Harris Cty. v. CarMax Auto Superstores Inc.*,
  177 F.3d 306 (5th Cir. 1999) ...............................................................................40

*Health Ins. Ass'n of Am., Inc. v. Shalala*,
  23 F.3d 412 (D.C. Cir. 1994) ...............................................................................24

*Herrera v. Raoul*,
  2023 WL 3074799 (N.D. Ill. Apr. 25, 2023)......................................................37

*Hoctor v. U.S. Dep't of Agric.*,
  82 F.3d 165 (7th Cir. 1996) .................................................................................24

*Hollis v. Lynch*,
  827 F.3d 436 (5th Cir. 2016) ............................................................................30, 32, 33

*Hotze v. Burwell*,
  784 F.3d 984 (5th Cir. 2015) ..................................................................................11, 13

*Huawei Techs. USA, Inc. v. FCC*,
  2 F.4th 421 (5th Cir. 2021) ...........................................................................................25

*Huddleston v. United States*,
  415 U.S. 814 (1974) .........................................................................................................3

*Inc. v. MercExchange, L.L.C.*,
  547 U.S. 388 (2006) .......................................................................................................49

*John Doe #1 v. Veneman*,
  380 F.3d 807 (5th Cir. 2004) .......................................................................................49

*Kolender v. Lawson*,
  461 U.S. 352 (1983) .......................................................................................................40

*Lane v. Holder*,
  703 F.3d 668 (4th Cir. 2012) .......................................................................................34

*Las Ams. Immigrant Advoc. Ctr. v. Biden*,
  571 F. Supp. 3d 1173 (D. Or. 2021) .........................................................................43

*Lewis v. Casey*,
  518 U.S. 343 (1996) .......................................................................................................49

*Linn v. Chivatero*,
  714 F.2d 1278 (5th Cir. 1983) .....................................................................................12

*Lomak Petroleum, Inc. v. FERC*,
  206 F.3d 1193 (D.C. Cir. 2000) ..................................................................................11

*Lomont v. O'Neill*,
  285 F.3d 9 (D.C. Cir. 2002) ......................................................................................2, 6

*Louisiana v. Becerra*,
  20 F.4th 260 (5th Cir. 2021) ........................................................................................47

*Madsen v. Women's Health Ctr., Inc.*,
  512 U.S. 753 (1994) .......................................................................................................47

*Maracich v. Spears*,
  570 U.S. 48 (2013) .........................................................................................................17

*Mid Continent Nail Corp. v. U.S.*,
    846 F.3d 1364 (Fed. Cir. 2017) ................................................................................26

*Miller v. Garland*,
    2023 WL 3692841 (E.D. Va. 2023) ................................................................*passim*

*Mistretta v. United States*,
    488 U.S. 361 (1989) .....................................................................................................43

*Mock v. Garland*,
    2023 WL 2711630 (N.D. Tex.) .........................................................................*passim*

*Mock v. Garland*,
    75 F.4th 563 (5th Cir. 2023) ............................................................................*passim*

*Mock v. Garland*,
    2023 WL 6457920 (N.D. Tex. 2023) .................................................................10, 22

*Monsanto Co. v. Geerston Seed Farms*,
    561 U.S. 139 (2010) ...............................................................................................48, 50

*Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
    463 U.S. 29 (1983) .................................................................................................18, 19

*MRC Energy Co. v. U.S. Citizenship & Immigr. Servs.*,
    2021 WL 1209188 (N.D. Tex. Mar. 31, 2021) ...........................................................11

*Muscarello v. U.S.*,
    524 U.S. 125 (1998) .....................................................................................................17

*New York State Rifle & Pistol Association v. Bruen*,
    597 U.S. 1 (2022) ....................................................................................18, 34, 35, 39

*Nicopure Labs, LLC v. FDA*,
    944 F.3d 267 (D.C. Cir. 2019) ...................................................................................45

*Patterson v. Rawlings*,
    287 F. Supp. 3d 632 (N.D. Tex. 2018) ......................................................................44

*PDK Lab'ys Inc. v. DEA*,
    438 F.3d 1184 (D.C. Cir. 2006) .................................................................................42

*Pension Benefit Guar. Corp. v. LTV Corp.*,
    496 U.S. 633 (1990) .....................................................................................................19

*Perez v. Mortg. Bankers Ass'n*,
    575 U.S. 92 (2015) .................................................................................................22, 24

*PMC, Inc. v. Sherwin-Williams, Co.*,
    151 F.3d 610 (7th Cir. 1998)....................................................................................50

*Posters 'N' Things, Ltd. v. U.S.*,
    511 U.S. 513 (1994) .......................................................................................... 15, 42

*Presser v. Illinois*,
    116 U.S. 252 (1886) ..............................................................................................36

*Romag Fasteners, Inc. v. Fossil, Inc.*,
    140 S. Ct. 1492 (2020).........................................................................................17

*S. Terminal Corp. v. EPA*,
    504 F.2d 646 (1st Cir. 1974).................................................................................26

*Scott v. Schedler*,
    826 F.3d 207 (5th Cir. 2016) ................................................................................50

*Second Amend. Found., Inc. v. ATF*,
    2023 WL 7490149 (N.D. Tex. 2023) ..........................................................*passim*

*Sig Sauer, Inc. v. Brandon*,
    826 F.3d 598 (1st Cir. 2016) ................................................................................15

*Swann v. Charlotte-Mecklenburg Bd. of Ed.*,
    402 U.S. 1 (1971) .................................................................................................49

*Teixeira v. Cnty. Of Alameda*,
    873 F.3d 670 (9th Cir. 2017).................................................................................36

*Tex. Democratic Party v. Abbott*,
    961 F.3d 389 (5th Cir. 2020) ................................................................................40

*Tex. Gun Rts., Inc. v. ATF*,
    2023 WL 8352316 (N.D. Tex. Oct. 4, 2023).......................................................11

*Tex. State LULAC v. Elfant*,
    52 F.4th 248 (5th Cir. 2022).................................................................................44

*Tex. Voters Alliance v. Dallas Cty.*,
    495 F. Supp. 3d 441 (E.D. Tex. 2020).................................................................22

*Tex. Workforce Comm'n v. U.S. Dep't of Educ.*,
    973 F.3d 383 (5th Cir. 2020) ................................................................................15

*Texas v. ATF*,
    2023 WL 7116844 (S.D. Tex. 2023) ....................................................................11

*Texas v. EPA,*
   983 F.3d 826 (5th Cir. 2020) ...................................................................42

*Texas v. Johnson,*
   491 U.S. 397 (1989) ...............................................................................45

*Texas v. Lyng,*
   868 F.2d 795 (5th Cir. 1989) ...................................................................29

*Texas v. United States,*
   50 F.4th 498 (5th Cir. 2022) ...................................................................48

*Trump v. Hawaii,*
   138 S. Ct. 2392 (2018) ...........................................................................47

*U.S. v. Al-Azhari,*
   2020 WL 7334512 (M.D. Fla. Dec. 14, 2020) .........................................30

*U.S. v. Barbeau,*
   2016 WL 1046093 (W.D. Wash. Mar. 16, 2016) .....................................31

*U.S. v. Bradley,*
   2023 WL 2621352 (S.D. W. Va. Mar. 23, 2023) .....................................36

*U.S. v. Clintwood Elkhorn Mining Co.,*
   553 U.S. 1 (2008) ...................................................................................11

*U.S. v. Cox,*
   906 F.3d 1170 (10th Cir. 2018) ..................................................12, 30, 31

*U.S. v. Dangleben,*
   2023 WL 6441977 (D.V.I. Oct. 3, 2023) ................................................35

*U.S. v. Davis,*
   139 S. Ct. 2319 (2019) ...........................................................................17

*U.S. v. Delauder,*
   2023 WL 5658924 (N.D. W. Va. Aug. 31, 2023) ...................................34

*U.S. v. Freed,*
   401 U.S. 601 (1971) ...............................................................................36

*U.S. v. Gilbert,*
   286 F. App'x 383 (9th Cir. 2008) ......................................................31, 32

*U.S. v. Golding,*
   332 F.3d 838 (5th Cir. 2003) ...................................................................32

*U.S. v. Gonzalez,*
   2011 WL 5288727 (D. Utah Nov. 2, 2011) ...............................................................32

*U.S. v. Gresham,*
   118 F.3d 258 (5th Cir. 1997) ......................................................................................12

*U.S. v. Hasson,*
   2019 WL 4573424 (D. Md. Sept. 20, 2019) ...............................................................30

*U.S. v. Hayes,*
   555 U.S. 415 (2009) ...................................................................................................15

*U.S. v. Holton,*
   639 F. Supp. 3d 704 (N.D. Tex. 2022) ......................................................................37

*U.S. v. Howard,*
   766 F.3d 414 (5th Cir. 2014) ......................................................................................40

*U.S. v. Johnson,*
   632 F.3d 931 (5th Cir. 2011) ...............................................................................28, 29

*U.S. v. Libertad,*
   2023 WL 4378863 (S.D.N.Y. July 7, 2023) ..............................................................36

*U.S. v. Majid,*
   2010 WL 5129297 (N.D. Ohio Dec. 10, 2010) .........................................................32

*U.S. v. Miller,*
   307 U.S. 174 (1939) ...................................................................................................31

*U.S. v. Miller,*
   2023 WL 6300581 (N.D. Tex. Sept. 27, 2023) .........................................................31

*U.S. v. Munchel,*
   2023 WL 2992689 (D.D.C. Apr. 18, 2023) ...............................................................42

*U.S. v. Padgett,*
   2023 WL 3483929 (D. Alaska Jan. 4, 2023) .............................................................36

*U.S. v. Rose,*
   695 F.2d 1356 (10th Cir. 1982) .................................................................................16

*U.S. v. Ross,*
   458 F.2d 1144 (5th Cir. 1972) ...................................................................................12

*U.S. v. Royce,*
   2023 WL 2163677 (D.N.D. Feb. 22, 2023) ..............................................................31

*U.S. v. Rush,*
   2023 WL 403774 (S.D. Ill. Jan. 25, 2023) ............................................................31

*U.S. v. Saleem,*
   2023 WL 2334417 (W.D.N.C. Mar. 2, 2023) ......................................................34

*U.S. v. Stepp-Zafft,*
   733 F. App'x 327 (8th Cir. 2018) .......................................................................31

*U.S. v. Syverson,*
   90 F.3d 227 (7th Cir. 1996) ...............................................................................15

*U.S. v. Texas,*
   143 S. Ct. 1964 (2023) .................................................................................46, 47

*U.S. v. Williams,*
   553 U.S. 285 (2008) ...........................................................................................42

*United States v. Thompson/Center Arms Co.,*
   504 U.S. 505 (1992) .............................................................................................2

*United Steelworkers of Am., AFL-CIO-CLC v. Schuylkill Metals Corp.,*
   828 F.2d 314 (5th Cir. 1987) .............................................................................27

*VanDerStok v. Garland,*
   86 F.4th 179 (5th Cir. 2023) .............................................................................46

*Vill. of Hoffman Ests. v. Flipside, Hoffman Ests., Inc.,*
   455 U.S. 489 (1982) ...........................................................................................41

*Ward v. Rock Against Racism,*
   491 U.S. 781 (1989) ...........................................................................................20

*Wash. St. Grange v. Wash. State Republican Party,*
   552 U.S. 442 (2008) ...........................................................................................40

*Whitaker v. Thompson,*
   353 F.3d 947 (D.C. Cir. 2004) .........................................................................45

*Youngstown Sheet & Tube Co. v. Sawyer,*
   343 U.S. 579 (1952) ...........................................................................................44

*ZeniMax Media Inc. v. Oculus VR LLC,*
   2018 WL 4078586 (N.D. Tex. June 27, 2018) ...................................................50

## Federal Statutes

5 U.S.C. § 553 .................................................................................................................22

5 U.S.C. § 702 .................................................................................................................46

5 U.S.C. § 706 .................................................................................................................46

18 U.S.C. § 921 ...........................................................................................................*passim*

18 U.S.C. § 922 ..................................................................................................................3

18 U.S.C. § 926 ..................................................................................................................3

26 U.S.C. § 5801 ................................................................................................................2

26 U.S.C. § 5845 ........................................................................................................*passim*

26 U.S.C. § 6511 ..............................................................................................................12

26 U.S.C. § 7421 ..............................................................................................................11

26 U.S.C. § 7801 ................................................................................................................3

## State Statutes

11 R.I. Gen. Laws Ann. § 11-47-8(b) ............................................................................33

Ala. Code § 13A-11-63(a) ..............................................................................................33

Alaska Stat. Ann § 11.61.200(c) .....................................................................................33

Ariz. Rev. Stat. Ann. § 13-3101(B) ...............................................................................33

Cal. Penal Code § 16590 .................................................................................................33

Colo. Rev. Stat. Ann. § 18-12-102(1) ............................................................................33

D.C. Code Ann. § 7-2502.02 ..........................................................................................33

Fla. Stat. Ann. § 790.221(1)-(3) .....................................................................................33

Ga. Code Ann § 16-11-122 .............................................................................................33

Haw. Rev. Stat. Ann. § 134-8 .........................................................................................33

Ill. Comp. Stat. Ann § 24-1(a)(7)(ii) .............................................................................33

Iowa Code Ann § 724.1C ...............................................................................................33

La. Stat. Ann. § 40:1785 ................................................................................................33

Md. Code Ann., Pub. Safety § 5-203.............................................................................33

Mich. Comp. Laws Ann. § 750.224b .............................................................................33

Mo. Ann. Stat. § 571.020 ...............................................................................................33

Mont. Code Ann. § 45-8-340 .........................................................................................33

N.C. Gen. Stat. Ann. § 14-288.8 ....................................................................................33

N.D. Cent. Code Ann. § 62.1-02-03 ..............................................................................33

N.J. Stat. Ann. § 2C:39-3(b)...........................................................................................33

N.Y. Penal Law § 265.00(3)(c) ......................................................................................33

Neb. Rev. Stat. Ann. § 28-1203 .....................................................................................33

Nev. Rev. Stat. Ann. § 202.275 ......................................................................................33

Ohio Rev. Code Ann. § 2923.17 .....................................................................................33

Okla. Stat. Ann. tit. 21, § 1289.18(B) ............................................................................33

Or. Rev. Stat. Ann. § 166.272(1) ....................................................................................33

S.C. Code Ann. § 16-23-250...........................................................................................33

Tex. Penal Code Ann. § 46.05(a)(1)(C)..........................................................................33

Va. Code Ann. § 18.2-303.1 ...........................................................................................33

Wash. Rev. Code Ann. § 9.41.190(4) .............................................................................33

Wis. Stat. Ann. § 941.28(2)-(4) ......................................................................................33

**Rules**

Federal Rule of Civil Procedure 5 ..................................................................................52

**Legislative Materials**

H.R. Rep. No. 83-1337 (1954) ........................................................................................37

27 Stat. 116 (1892) .........................................................................................................37

**Regulations**

27 C.F.R. § 478 ..............................................................................................3, 8, 10, 23

27 C.F.R. § 479 ..............................................................................................3, 8, 10, 23

28 C.F.R. § 0.130 ...........................................................................................................3

*Factoring Criteria for Firearms With Attached "Stabilizing Braces"*
   86 Fed. Reg. 30826 (June 10, 2021) ........................................................8, 25, 26, 27

*Factoring Criteria for Firearms With Attached "Stabilizing Braces"*
   88 Fed. Reg. 6478 (Jan. 31, 2023) ....................................................................*passim*

**Other Authorities**

2 General Laws of Mass. from the Adoption of the Constitution to February 1822 (1823) ........ 36, 37

15 The Public Records of the Colony of Connecticut 191 (1890) ................................... 36, 37

1775-1776 Mass. Acts 18 ............................................................................................35

Act of Apr. 3, 1778, ch. 33, 1778 N.Y. Laws 65 ...........................................................35

Act of Dec. 7, 1866, No. 41, § 1, Ga. Laws 27 .............................................................38

Act of Dec. 9, 1882, No. 18, § 2(18), 1882 Ga. Laws 34 ..............................................38

Act of Dec. 11, 1886, No. 4, sec. 5, § 17, 1886–87 Ala. Laws 31 .................................38

Act of Dec. 12, 1888, No. 190, § 21(25), 1888–89 Ala. Laws 185................................39

Act of Dec. 20, 1820, § 3, 1820 Ala. Acts 10 ...............................................................38

Act of Dec. 22, 1884, No. 52, § 2(18), 1884–85 Ga. Laws 20......................................38

Act of Feb. 7, 1867, ch. 244, § 1, 1867 Miss. Laws 327 ..............................................38

Act of Feb. 10, 1838, No. 24, § 1, 1838 Fla. Acts 36....................................................38

Act of Feb. 10, 1852, No. 1, § 1, 1851–1852 Ala. Laws 3 ...........................................38

Act of Feb. 17, 1885, No. 337, sec. 2, 1884–85 Ala. Laws 601....................................38

Act of Feb. 19, 1867, No. 260, § 10, 1866–1867 Ala. Laws 259..................................38

Act of Feb. 21, 1867, ch. 317, § 2, 1867 Miss. Laws 412 ............................................38

Act of Feb. 26, 1867, sec. 1, schedule A, class 3, § 14, 1866–67 N.C. Sess. Laws 95...........................38

Act of Feb. 28, 1887, No. 221, sec. 2, 1888–89 Ala. Laws 530.....................................39

Act of Jan. 8, 1781, ch. XII, § 13, 1781 N.J. Laws 39 .................................................35

Act of Jan. 28, 1851, ch. 121, § 5, 1850–1851 N.C. Sess. Laws 241..........................38

Act of Mar. 2, 1631, act LVI, 1631 Va. Acts 175........................................................35

Act of Mar. 9, 1891, ch. 327, § 44, 1891 N.C. Sess. Laws, Priv. Laws 1413 ...............39

Act of Mar. 13, 1883, ch. 49, § 153, 1883 Cal. Stat. 93...............................................38

Act of Mar. 28, 1889, sec. 1, 86 Ohio Laws 164 ........................................................38

Ala. Code § 629(28) (1887) .......................................................................................39

Ala. Code § 494(15) (Wade Keyes, *et al.*, comps., Montgomery, Barrett & Brown 1877)....................38

Ala. Rev. Code § 434(10) (Joseph Abram Walker comp., Birmingham, Reid & Screws, State
   Printers 1867) ........................................................................................................38

An Act for the Inspection of Gunpowder,
   1776–1777 N.J. Laws 6 (1776)...............................................................................38

"An Act for the better regulating of the Militia of this Province,"
   1747, McCord, *Statutes at Large,* 9:647................................................................35

Colonial Laws of Mass. Reprinted from the Edition of 1672 (1890)........................... 36, 37

Gen. Tax Act for 1887 and 1888, § 2(18), 1886 Ga. Laws 14.....................................39

Gen. Tax Act for 1889 and 1890, No. 123, § 2(17), 1888 Ga. Laws 19 .....................39

Ill. Stat. Ann. Crim. ch. 38, ¶ 38 (1885) ...................................................................37

Laws of the Commonwealth of Mass. from November 28, 1780 to February 28, 1807 (1807).........36

Laws of the State of Maine 546 (1830) ......................................................................36

Laws of the State of New Hampshire; with the Constitutions of the United States and of the
   State Prefixed 277 (1830)................................................................................ 36, 37

*NFA Handbook* (Apr. 2009),
   https://perma.cc/P3NL-G35G .................................................................................3

Miss. Code ch. 8, art. 16, § 1 (1848) (effective Feb. 4, 1844)......................................38

*Records of the Colony of Rhode Island and Providence Plantations, In New England,* 2:196
   (John Russell Bartlett, ed., Providence: A. Crawford Greene and Brother vol. 2, 1857)..................35

Revenue, ch. 25, § 27(15), 1858–1859 N.C. Sess. Laws 28 .......................................................38

Revenue, ch. 34, § 23(4), 1857 N.C. Sess. Laws 34 ................................................................38

Robert H. Churchill, "Gun Regulation, the Police Power, and the Right to Keep Arms in Early
    America: The Legal Context of the Second Amendment,"
    25 Law & Hist. Rev. 139 (2007) ...................................................................................35

S.C. Rev. Stat. § 490 (1894) ......................................................................................................38

St. Paul, Minn., Ordinances no. 895, § 2 (1889) ........................................................................39

## INTRODUCTION

For nearly a century, Congress has regulated short-barreled rifles, weapons it deemed uniquely dangerous and prone to criminal misuse. Federal law defines a "rifle" as a rifle-bored weapon that is "designed," "made," and "intended" to be "fired from the shoulder." 26 U.S.C. § 5845(c). When a rifle has a barrel shorter than 16 inches, it is a short-barreled rifle subject to certain regulatory requirements under the National Firearms Act ("NFA") and the Gun Control Act ("GCA").

Over the last decade, firearm manufacturers have sold short-barreled weapons equipped with devices commonly referred to as "stabilizing braces." These devices are typically designed to attach to the rear end of a pistol made with a rifle receiver but no buttstock. And although manufacturers claim that stabilizing braces are intended to wrap around a shooter's forearm to assist with single-handed firing, manufacturers often design braces to imitate traditional shoulder stocks and market them as a way to convert pistols into shoulder-fired weapons. The result has been the widespread evasion of federal controls on the manufacture and possession of short-barreled rifles.

In response, the Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF") promulgated a rule that explains when a weapon equipped with a stabilizing brace is a short-barreled rifle under the NFA and the GCA. *Factoring Criteria for Firearms With Attached "Stabilizing Braces,"* 88 Fed. Reg. 6478 (Jan. 31, 2023) ("Rule"). And to provide guidance to the regulated community, the Rule outlined the type of evidence that ATF considers when determining whether a particular brace-equipped weapon is designed, made, and intended to be fired from the shoulder, and is thus a rifle under federal law.

Plaintiffs challenge this routine rulemaking under the APA. But the Tax Anti-Injunction Act bars their claims, which seek relief that would obstruct the collection of the NFA's tax. And even if this Court had jurisdiction to entertain Plaintiffs' claims, none should survive scrutiny, as the Rule is consistent with the NFA, reasonably explained, procedurally compliant, and constitutionally sound. The Court should therefore grant summary judgment in Defendants' favor on all of Plaintiffs' claims.

# BACKGROUND

## I.     Statutory and Regulatory Background

**1.** The National Firearms Act of 1934, as amended, 26 U.S.C. §§ 5801–5872, imposed various requirements on persons possessing or engaged in the business of selling certain types of firearms and other weapons. Seeking to curtail the criminal misuse of firearms, *Lomont v. O'Neill*, 285 F.3d 9, 11 (D.C. Cir. 2002), the NFA targeted particularly dangerous and easily concealable weapons that "could be used readily and efficiently by criminals," H.R. Rep. No. 83-1337, at A395 (1954). To that end, the Act defined eight categories of "firearms" that fall under its purview. *See* 26 U.S.C. § 5845(a)(1)–(8).

Among the "firearms" the NFA regulates are weapons commonly referred to as short-barreled rifles— *i.e.*, "a rifle having a barrel or barrels of less than 16 inches in length" or "a weapon made from a rifle if such weapon as modified has an overall length of less than 26 inches or a barrel or barrels of less than 16 inches in length." *Id.* § 5845(a)(3), (4); *U.S. v. Thompson/Center Arms Co.*, 504 U.S. 505, 517 (1992) (plurality op.) ("[The NFA's] regulation of short-barreled rifles" targets "a concealable weapon" "likely to be used for criminal purposes."). The Act defines "rifle" to mean any

> weapon designed or redesigned, made or remade, and intended to be fired from the shoulder and designed or redesigned and made or remade to use the energy of the explosive in a fixed cartridge to fire only a single projectile through a rifled bore for each single pull of the trigger . . . .

26 U.S.C. § 5845(c). These short-barreled rifles must be registered in the National Firearms Registration and Transfer Record to a person entitled to possess the firearm. *Id.* § 5841. They also are subject to making and transfer taxes, *id.* §§ 5811, 5821, and must be approved by the Attorney General before they are made or transferred, *id.* §§ 5812, 5822. Moreover, any person engaged in the business of importing, manufacturing, or dealing in NFA firearms must register with the Attorney General and pay a special occupational tax (or "SOT"). *Id.* §§ 5801, 5802.

**2.** In 1968, Congress enacted the Gun Control Act, as amended, 18 U.S.C. §§ 921–931, to comprehensively regulate the manufacture and distribution of firearms and ammunition.

Acknowledging the inadequacy of federal controls over "the widespread traffic in firearms," and motivated by concerns that "the ease with which firearms could be obtained" had "contributed significantly to the prevalence of lawlessness and violent crime" in the country, *Huddleston v. U.S.*, 415 U.S. 814, 824 (1974), the GCA increased federal controls for persons engaging in the business of importing, manufacturing, or dealing in firearms. *See, e.g.*, 18 U.S.C. §§ 922–923.

Among these were specific controls on the interstate transport of short-barreled rifles and the obligation of Federal Firearms Licensees ("FFL") to receive approval from the Attorney General before their sale. *Id.* § 922(a)(4), (b)(4). The Act defined "short-barreled rifle" to mean any "rifle having one or more barrels less than sixteen inches in length and any weapon made from a rifle (whether by alteration, modification, or otherwise) if such weapon, as modified, has an overall length of less than twenty-six inches." *Id.* § 921(a)(8). The GCA's definition of "rifle" mirrored the NFA's. *Id.* § 921(a)(7).

**3.** Congress has vested in the Attorney General the authority to prescribe rules and regulations to administer and enforce the NFA and the GCA. 18 U.S.C. § 926(a); 26 U.S.C. §§ 7801(a)(2)(A), 7805(a). The Attorney General has delegated that responsibility to ATF, 28 C.F.R. § 0.130, which has promulgated regulations implementing both statutory schemes, *see* 27 C.F.R. parts 478, 479.

Although not statutorily required, ATF invites manufacturers and members of the public to submit weapons or other devices to ATF for a classification of whether the weapon or device qualifies as a "firearm" under the NFA. *NFA Handbook* § 7.2.4 (Apr. 2009), https://perma.cc/P3NL-G35G. The classification process enables ATF to provide manufacturers and individual possessors with "the agency's official position concerning the status of [a] firearm[] under Federal firearms laws." *Id.* § 7.2.4, 7.2.4.1. ATF has made clear, however, that "classifications are subject to change if later determined to be erroneous or impacted by subsequent changes in the law or regulations." *Id.* § 7.2.4.1.

## II.   ATF's Pre-Rule Classifications of and Guidance Regarding Brace-equipped Weapons

In the last decade, ATF has received numerous classification requests for weapons equipped

with various types of so-called "stabilizing braces." 88 Fed. Reg. at 6482. Manufacturers often design these devices to attach to the rear end of a heavy pistol made with a rifle receiver but no buttstock—*e.g.*, a pistol variant of an AR- or AK-type rifle. *Id.* at 6518. And though some manufacturers have claimed that stabilizing braces are meant to attach to or rest against a shooter's forearm, these devices often replicate characteristics of a shoulder stock and are frequently marketed by manufacturers and used by individuals to enable a shooter to shoulder a firearm. *Id.* at 6479, 6527–29, 6544–47. So to determine whether a particular brace-equipped weapon falls within the statutory definition of a short-barreled rifle, 26 U.S.C. § 5845(a)(3), (4); 18 U.S.C. § 921(a)(8), ATF must determine, *inter alia*, whether the weapon, as configured, is "designed or redesigned, made or remade, and intended to be fired from the shoulder," and is therefore a rifle, 26 U.S.C. § 5845(c); 18 U.S.C. § 921(a)(7).



Figures 1 & 2: Comparing heavy pistols equipped with a stabilizing brace (top) to firearms equipped with a traditional shoulder stock (bottom). *See* 88 Fed. Reg. at 6494; Admin. Record ("AR") 477.

ATF first encountered this type of device in 2012, when it received a classification request regarding a prototype of a "forearm brace" designed to slip onto an AR-15-type pistol's buffer tube. 88 Fed. Reg. at 6482; AR 1. The device's design was modest, constructed of foam-type rubber flaps and two Velcro straps. AR 1, 3. According to the requester, the device was designed to assist individuals with limited strength or mobility due to a disability with single-handed firing of an AR-15 pistol. *Id.* Based on its evaluation of the materials submitted, ATF concluded that the particular brace, when configured with an AR-15 pistol, would not convert that firearm into a weapon designed or

intended to be fired from the shoulder and would not alter the weapon's classification. *Id.* at 5. ATF did not publicly explain, however, the criteria it applied in reaching that conclusion.

Over the next several years, ATF received an increasing number of classification requests for weapons equipped with new types of stabilizing braces of varying designs. 88 Fed. Reg. at 6479. But unlike the 2012 prototype, these newer brace designs began to include characteristics common to shoulder stocks. *Id.*; *see also, e.g., id.* at 6528–29 (comparing two braces to similarly designed shoulder stocks); *id.* at 6528 (noting that a manufacturer listed a brace as a firearm's "stock type"); *id.* at 6503, 6547. Given their stock-like function and design, ATF soon became aware that some braces were being widely marketed by manufacturers and used by individuals to fire weapons from the shoulder. *E.g., id.* at 6479, 6503, 6505, 6527, 6546–47. Accordingly, as early as 2014, ATF determined that multiple weapons configured with different braces were short-barreled rifles subject to the NFA. *Id.* at 6484; AR 18–21 (Nov. 2014), 22–25 (Nov. 2014); *see also* AR 54–57 (Nov. 2015), 70–91 (Jan. 2016).

Yet the agency's early classification letters did not apply a standard set of criteria to determine whether a brace-equipped weapon was designed, made, and intended to be fired from the shoulder, resulting in inconsistent (and occasionally incorrect) guidance regarding how a stabilizing brace might affect a weapon's classification. 88 Fed. Reg. at 6501–02. For example, some early classification letters and guidance suggested that whether a brace-equipped weapon was a short-barreled rifle depended (at least in part) on an individual's actual, intended, or incidental use of the brace, as a device assisting either single-handed fire or shoulder fire. *Id.* at 6484, 6487–88. ATF also occasionally focused on the brace itself, considering whether it had been "classified as a shoulder stock," *id.* at 6484 n.26, or whether it *could* be used for single-handed fire, *id.* at 6501. But during this same period, the agency also explained in some classification letters that a weapon's classification is "based on [its] physical design characteristics," *id.* at 6502 n.81; AR 13, and classified several brace-equipped weapons as short-barreled rifles after considering, *e.g.*, whether the brace served any purpose other than to extend the

rear surface to enable shouldering, 88 Fed. Reg. at 6485, or whether the brace created a "length of pull" akin to a shoulder-fired weapon, *id.* at 6489; *see also, e.g.*, AR 18–25, 54–57, 70–72, 158.

Recognizing the inconsistencies in its early attempts to classify these novel brace-equipped weapons, ATF began to revisit its guidance and analytical framework. In 2017, the agency corrected its prior guidance that incidental shouldering could alter a weapon's classification, explaining that a classification depends principally on a weapon's physical configuration and not on a shooter's incidental use of the firearm. *Id.* at 6491. And in 2018, ATF informed classification requestors that, to properly evaluate how a stabilizing brace affects a weapon's classification, the agency would need to examine the overall configuration of the weapon with the brace attached. *Id.* at 6492; AR 224–275.

By mid-2020, ATF's classification letters reflected a focused analysis of the brace-equipped weapon's objective design features to determine whether it was designed, made, and intended to be fired from the shoulder, as the statutory definition of a "rifle" instructs. *See, e.g.*, AR 194 (a 2018 classification letter explaining that a weapon's "objective design characteristics must support" "a manufacturer's stated intent"); *id.* at 290 (a 2019 classification letter explaining: "In determining whether a firearm is 'intended' to be fired from the shoulder, ATF considers the weapon's design features and uses. While [ATF] considers a manufacturer's stated intent in classifying any product, it is not required to simply accept those statements when contradicted by objective evidence," including the weapon's "design."). For example, in March 2020, ATF received a classification request from SB Tactical for an AR-type pistol equipped with the SBA3 brace device. *Id.* at 387–413 (providing images of the submission). ATF determined that the weapon, as configured with the SBA3, was a short-barreled rifle because it possessed "objective design features" characteristic of "weapons designed and intended to be fired from the shoulder," *Id.* at 387—*e.g.*, the SBA3's similar form and function to known shoulder stocks; the SBA3's hardened rear surface area; the utilization of an AR-type receiver extension, which allowed the SBA3 to extend rearward; and the firearm's length of pull, which enabled

useful shoulder fire. 88 Fed. Reg. at 6493; *see also* AR 393, 412 (listing the objective design features ATF considered). The agency also considered marketing materials indicating that weapons equipped with the SBA3 were designed and intended to be rifles and widely used as such. AR 409–411. A few months later, ATF classified another brace-equipped pistol as a short-barreled rifle after applying this same analytical framework. 88 Fed. Reg. at 6493–94; AR 466–488 (providing images of the submission). Notably, neither manufacturer sued to challenge these classifications.

## III.   The Rule

**1.** By late 2020, although ATF had correctly focused its analysis of whether a brace-equipped weapon is designed, made, and intended to be fired from the shoulder on the weapon's objective design features, the agency acknowledged that inconsistencies in its early classification letters and guidance had confused the regulated community. 88 Fed. Reg. at 6496. Adding to the confusion, manufacturers were labeling stabilizing braces as "ATF compliant" without having submitted the particular device for classification. *Id.* at 6492. Even more problematic, ATF continued to observe that manufacturers were widely marketing and members of the public were widely using braces to create short-barreled rifles without complying with NFA requirements, *id.*, which Congress designed to reduce the criminal and violent use of uniquely dangerous and concealable weapons, *supra* 2.

Then, in March 2021, a 21-year-old individual armed with an AR-type pistol equipped with a stabilizing brace opened fire at a supermarket in Boulder, Colorado, killing ten people. This shooting came on the heels of another mass shooting in Dayton, Ohio, where a 24-year-old individual similarly armed with a brace-equipped pistol killed nine people and injured fourteen others.[1] In both instances, the shooters reportedly fired their weapons from the shoulder. 88 Fed. Reg. at 6495.

**2.** In light of its existing concerns, as well as these violent crimes evincing the exact harms that

---

[1] CNN, *10 killed in Colorado grocery store shooting*, https://perma.cc/HG5S-3NAF; USA Today, *Dayton shooter used a modified gun that may have exploited a legal loophole*, https://perma.cc/89XK-SNVR.

Congress sought to prevent when it enacted the NFA, ATF determined that it was necessary to clarify how it evaluates the classifications of brace-equipped weapons. *Id.* The agency therefore published a notice of proposed rulemaking ("NPRM") in June 2021, proposing amendments to 27 C.F.R. §§ 478.11 and 479.11 regarding the meaning of the statutory term "rifle." 86 Fed. Reg. 30826 (June 10, 2021).[2] The NPRM also proposed publishing the criteria that ATF evaluates when determining whether a brace-equipped weapon submitted for classification is designed, made, and intended to be fired from the shoulder. *Id.* The notice elicited over 230,000 public comments. 88 Fed. Reg. at 6497.

After carefully considering the voluminous public comments, *id.* at 6497–6569, ATF published the Rule in the Federal Register in January 2023. The Rule contains the following key provisions:

*Definition of the statutory term "rifle."* The Rule amended regulations issued under the NFA and the GCA that address the statutory definition of "rifle," as proposed in the NPRM. *Id.* at 6569. The amended regulations clarify that, in ATF's view, the statutory phrase "designed, redesigned, made or remade, and intended to be fired from the shoulder" includes any weapon that is equipped with an accessory, component, or other rearward attachment (*e.g.*, a stabilizing brace) that provides surface area allowing the weapon to be fired from the shoulder, provided that other factors indicate that the weapon is designed, made, and intended to be fired from the shoulder. *Id.* The other factors—which the NPRM discussed and were the subject of public comment, *id.* at 6511–13—are:

(i) whether the weapon has a weight or length consistent with the weight or length of similarly designed rifles;

(ii) whether the weapon has a length of pull, measured from the center of the trigger to the center of the shoulder stock or other rearward accessory, component or attachment (including an adjustable or telescoping attachment with the ability to lock into various positions along a buffer tube, receiver extension, or other attachment method) that is consistent with similarly designed rifles;

(iii) whether the weapon is equipped with sights or a scope with eye relief that require the weapon to be fired from the shoulder in order to be used as designed;

---

[2] In December 2020, ATF issued a notice of proposed rulemaking, *Objective Factors for Classifying Weapons with "Stabilizing Braces,"* 85 Fed. Reg. 82,516, but withdrew it weeks later, 85 Fed. Reg. 86,948.

> (iv)  whether the surface area that allows the weapon to be fired from the shoulder is created by a buffer tube, receiver extension, or any other accessory, component, or other rearward attachment that is necessary for the cycle of operations;
>
> (v)  the manufacturer's direct and indirect marketing and promotional materials indicating the intended use of the weapon; and
>
> (vi)  information demonstrating the likely use of the weapon in the general community.

*Id.* at 6569–70.

*Options for persons who may possess unregistered short-barreled rifles.* The Rule also outlined several options for persons currently possessing short-barreled rifles equipped with stabilizing braces. *Id.* at 6570–71. For example, an individual who possessed an unlicensed brace-equipped short-barreled rifle before the Rule was published could come into compliance with the NFA by:

> (i)  filing the necessary ATF form to register the firearm in the National Firearms Registration and Transfer Record by May 31, 2023;
>
> (ii)  removing the firearm from the statutory definition of "short-barreled rifle" by either (a) removing the short barrel and attaching a 16-inch or longer rifled barrel to the firearm, or (b) permanently removing and disposing of or altering the "brace" device so that it cannot be reattached to the weapon;
>
> (iii)  turning the firearm into a local ATF office; or
>
> (iv)  destroying the firearm, per ATF's published instructions.

*Id.* at 6570.

*Tax-forbearance provisions.* Under the Rule, ATF forbore certain NFA tax obligations for those who possessed brace-equipped short-barreled rifles prior to the Rule's publication. *Id.* at 6571. Individual possessors, for instance, were not subject to the $200 making tax so long as they filed the necessary ATF registration form by May 31, 2023. *Id.*

*Rescission of prior classifications.* Finally, given that not all prior classification letters issued by ATF reflected the correct understanding of the statutory definition of "rifle," the Rule rescinded all of ATF's prior classifications of brace-equipped weapons. *Id.* at 6480. These classifications are therefore

no longer valid or authoritative. *Id.* at 6569.[3]

## IV.  This Lawsuit and Other Litigation Challenging the Rule

Following the Rule's publication, Plaintiffs filed this lawsuit to challenge the Rule under the APA, Am. Compl. ¶¶ 83–234, ECF No. 13, and moved to preliminarily enjoin its enforcement shortly thereafter, ECF No. 33. This Court initially denied that motion because Plaintiffs had not shown a "substantial likelihood of success on the merits of any of their claims." *Mock v. Garland*, 2023 WL 2711630, *1 (N.D. Tex.), *reversed and remanded*, 75 F.4th 563 (5th Cir. 2023).

On appeal, a divided panel of the Fifth Circuit disagreed with that conclusion in one regard, finding it likely that Plaintiffs would succeed on their claim that the Rule violated the APA's requirement that a legislative rule be a "logical outgrowth" of an agency's proposed rule. *Mock*, 75 F.4th at 578–86. And on remand, this Court determined that Plaintiffs were entitled to a preliminary injunction and enjoined ATF for the remainder of this case from enforcing against Plaintiffs "the provisions in 27 C.F.R. §§ 478.11 and 479.11" that the Fifth Circuit found likely "unlawful." *Mock v. Garland*, 2023 WL 6457920, at *18 (N.D. Tex. 2023), *appeal filed*, No. 23-11199 (5th Cir.).

Other groups of plaintiffs have also challenged the Rule, with varying results.[4] Several courts have refused to preliminarily enjoin the Rule's enforcement, finding that the plaintiffs' challenges are unlikely to succeed. *Second Amendment Found., Inc. v. ATF (SAF)*, 2023 WL 7490149 (N.D. Tex. 2023), *appeal filed*, No. 23-11157 (5th Cir.); *Miller v. Garland*, 2023 WL 3692841 (E.D. Va. 2023), *appeal filed*, No. 23-1604 (4th Cir.); *Firearms Regul. Accountability Coal., Inc. v. Garland (FRAC)*, 2023 WL 5942365

---

[3] ATF also issued additional guidance along with the Rule, including (i) answers to frequently asked questions regarding the Rule, (ii) registration guidance, and (iii) a non-exhaustive list of common brace-equipped weapons that ATF has determined are short-barreled rifles. *See* ATF, *Factoring Criteria for Firearms with Attached "Stabilizing Braces,"* https://perma.cc/MRR9-ZBJ2.

[4] *See Britto v. ATF*, No. 2:23-cv-19 (N.D. Tex.); *Colon v. ATF*, No. 8:23-cv-223 (M.D. Fla.); *Firearms Regul. Accountability Coal., Inc. v. Garland*, No. 1:23-cv-24 (D.N.D.); *Miller v. Garland*, No. 1:23-cv-195 (E.D. Va.); *Nat'l Rifle Ass'n of Am., Inc. v. ATF*, No. 3:23-cv-1471 (N.D. Tex.); *Second Amend. Found., Inc. v. ATF*, No. 3:21-cv-116 (N.D. Tex.); *Texas v. ATF*, No. 6:23-cv-13 (S.D. Tex.); *Texas Gun Rts., Inc. v. ATF*, No. 4:23-cv-578 (N.D. Tex.); *Watterson v. ATF*, No. 4:23-cv-80 (E.D. Tex.).

(D.N.D. 2023), *appeal filed*, No. 23-3230 (8th Cir.). Yet others have granted requests for preliminary relief. *Tex. Gun Rts., Inc. v. ATF*, 2023 WL 8352316 (N.D. Tex. Oct. 4, 2023), *appeal filed*, No. 23-11204 (5th Cir.); *Texas v. ATF*, 2023 WL 7116844 (S.D. Tex. 2023), *appeal filed*, No. 23-40685 (5th Cir.); *Britto v. ATF*, 2023 WL 7418291 (N.D. Tex. Nov. 8, 2023), *appeal filed*, No. 23-11203 (5th Cir.).

## LEGAL STANDARDS

In a case challenging agency action under the APA, summary judgment "serves as the mechanism for deciding" whether the action "is supported by the administrative record and otherwise consistent with the APA standard of review." *Gadhave v. Thompson*, 2023 WL 6931334, at *1 (N.D. Tex. Oct. 19, 2023) (citation omitted). The agency resolves "factual issues to arrive at a decision that is supported by the administrative record," and the district court determines whether, as a matter of law, "the evidence in the administrative record permitted the agency to make the decision it did." *MRC Energy Co. v. U.S. Citizenship & Immigr. Servs.*, 2021 WL 1209188, at *3 (N.D. Tex. Mar. 31, 2021) (citation omitted). The entire case is thus a question of law, with the district court sitting as an appellate tribunal. *Id.* And the party challenging the agency action bears the burden of demonstrating an APA violation. *Lomak Petroleum, Inc. v. FERC*, 206 F.3d 1193, 1198 (D.C. Cir. 2000).

## ARGUMENT

### I.     The Tax Anti-Injunction Act bars Plaintiffs' claims.

Because Plaintiffs' claims seek relief that would obstruct the assessment and collection of the NFA's tax, the Tax Anti-Injunction Act ("AIA") bars their claims. The AIA provides that, generally, "no suit for the purpose of restraining the assessment or collection of any tax shall be maintained in any court by any person, whether or not such person is the person against whom such tax was assessed." 26 U.S.C. § 7421(a). That "broad and mandatory language," *U.S. v. Clintwood Elkhorn Mining Co.*, 553 U.S. 1, 12 (2008), protects "the Government's ability to collect a consistent stream of revenue, by barring litigation to enjoin or otherwise obstruct" tax collection, *Hotze v. Burwell*, 784 F.3d 984, 996

(5th Cir. 2015) (citation omitted). Consistent with this "protective purpose[]," the Fifth Circuit has "interpreted the Act broadly" to apply "not only to the assessment and collection of taxes," but also "to activities which are intended to or may culminate in" tax assessment or collection, like "suit[s] to restrain" the "collection of information that would aid in the assessment of taxes." *Linn v. Chivatero*, 714 F.2d 1278, 1282 (5th Cir. 1983) (citation omitted). The AIA thus imposes a bright-line scheme requiring parties to "pay first and litigate later." *Flora v. U.S.*, 357 U.S. 63, 75 (1958) (citation omitted).

So, rather than bringing a pre-payment challenge, a taxpayer's principal mechanism for disputing the assessment of a tax is a refund suit. And in the NFA context specifically, the maker of a firearm who wants to challenge the assessment of the NFA's tax against him must first pay the tax and then file a claim for a refund or credit with the Attorney General. 26 U.S.C. § 6511. If that claim is denied, the maker may then bring suit in federal district court to recover the sum. *Id.* § 7422. That refund-suit remedy offers a taxpayer "a full, albeit delayed, opportunity to litigate the legality" of a disputed tax. *Bob Jones Univ. v. Simon*, 416 U.S. 725, 746 (1974).

Therefore, to the extent Plaintiffs' claims seek relief that would directly restrain enforcement of the NFA's tax against any brace-equipped pistols, *e.g.*, Pls.' Br. 43 (asking to enjoin enforcement of the NFA against Plaintiffs' "braced pistols"), those claims are barred under the AIA's plain text. But even insofar as Plaintiffs' claims seek to enjoin enforcement of the NFA's other requirements, *e.g.*, *id.*, the AIA equally bars those claims because those requirements operate as part of the NFA's integrated "taxing scheme." *U.S. v. Cox*, 906 F.3d 1170, 1179 (10th Cir. 2018). The provisions surrounding the NFA's tax requirements (*e.g.*, registration; prohibition on unregistered possession) "facilitate enforcement" of the taxes themselves. *U.S. v. Gresham*, 118 F.3d 258, 261 (5th Cir. 1997). Those provisions together thus reflect "the web of regulation aiding" the NFA's tax provisions' enforcement and are "a valid exercise of the taxing power." *Id.* at 262 (citation omitted); *accord, e.g.*, *Bezet v. U.S.*, 714 F. App'x 336, 342 (5th Cir. 2017); *U.S. v. Ross*, 458 F.2d 1144, 1145 (5th Cir. 1972). The AIA thus bars

12

Plaintiffs' claims challenging the NFA's facilitative requirements—and the Rule's implementation of them—because the equitable relief that those claims seek would "obstruct the collection of taxes." *See Hotze*, 784 F.3d at 996 (quotation omitted); *accord CIC Servs., LLC v. IRS*, 593 U.S. 209, 217 (2021).

## II.    The Rule properly interprets the statutory definition of "rifle."

Plaintiffs claim that the Rule's interpretation of the NFA's definition of "rifle" exceeds ATF's statutory authority. Pls.' Br. 17–22, ECF No. 100. That's not because ATF does not have the power to issue rules that interpret terms used in the NFA—it clearly does. *See, e.g., Mock*, 2023 WL 2711630, at *4; *SAF*, 2023 WL 7490149, at *7; *FRAC*, 2023 WL 5942365, at *6–7. Instead, Plaintiffs contend that the Rule "rewrites and expands," rather than interprets, the term "rifle" to include brace-equipped pistols, a class of weapons that categorically do not meet that term's statutory definition. Pls.' Br. 2, 17–22. But Plaintiffs offer no serious interpretive analysis to support that claim. Nor do their arguments comport with the statute's text or purpose, prior judicial constructions (including this Court's), or any interpretive canon they invoke. The Rule, in contrast, reaches the correct conclusion: that a brace-equipped pistol can be a rifle, and thus a short-barreled rifle, under the NFA.

**1.** The NFA defines a short-barreled rifle as a "rifle" with a barrel less than 16 inches in length. 26 U.S.C. § 5845(a)(3). The term "rifle" is further defined to include any weapon that, *inter alia*, is "designed or redesigned, made or remade, and intended to be fired from the shoulder." *Id.* § 5845(c). But Congress provided no additional guidance for determining whether a particular weapon is designed, made, and intended to be fired from the shoulder—*i.e.*, a rifle.

So to explain how a stabilizing brace can turn a weapon into a rifle under the NFA, the Rule hews to the statute's language: A brace-equipped weapon is a rifle when it "provides surface area that allows the weapon to be fired from the shoulder" and other probative evidence indicates "that *the weapon is designed, made, and intended to be fired from the shoulder*." 88 Fed. Reg. at 6569 (emphasis added). And to clarify the proper application of this statutory design-and-intent inquiry, the Rule explains that

13

whether a weapon is intended to be fired from the shoulder cannot turn solely on a manufacturer's stated intent (which could be divorced from reality), but must be determined by evaluating objective evidence of the weapon's intended use. *Id.* at 6495. The Rule thus spells out the type of evidence that ATF finds probative in assessing whether a particular brace-equipped weapon is designed and intended to be fired from the shoulder, including the weapon's objective design features and certain information indicating its likely use. *Id.* at 6569–70.

ATF's application of the definition of "rifle" to brace-equipped weapons is consistent with the statute's text and other traditional tools of statutory interpretation. As this Court has explained, terms like "designed" and "intended" "*necessarily require*" ATF—"or anyone who would comprehend the statute's meaning—to evaluate objective weapon characteristics, and perhaps conduct, to decide whether a particular firearm is subject to the NFA" as a short-barreled rifle. *Mock*, 2023 WL 2711630, at *4 (emphasis added); *accord FRAC*, 2023 WL 5942365, at *6–7; *Miller*, 2023 WL 3692841, at *4. That is why another court in this District held that the Rule engages in "an inquiry identical to the one posed by the NFA's definitional phrase 'designed or redesigned, made or remade, and intended to be fired from the shoulder'" by evaluating objective evidence of design and intent that are "textually grounded" in the statutory definition of "rifle." *SAF*, 2023 WL 7490149, at *8.

And in this particular context, ATF's consideration of objective evidence to determine a weapon's design and intended use is not only textually grounded, but is also sensible and consistent with other markers of statutory meaning. As explained, *supra* 4, manufacturers' descriptions of brace-equipped weapons' intended use are often at odds with the weapons' design features and common use. 88 Fed. Reg. at 6479, 6503 & n.87, 6505, 6527–29, 6546–47. Though a manufacturer's description of a weapon may be relevant in determining its intended use, relying solely on that description would allow manufacturers to skirt the NFA simply by claiming that a weapon is not intended to be a short-barreled rifle, even while designing and marketing it as one. *Id.* at 6544. That would obviously

14

"frustrate Congress' manifest purpose" and render the statute a "dead letter" in many applications. *See U.S. v. Hayes*, 555 U.S. 415, 426–27 (2009). But Congress did not intend the NFA to be so toothless. *Tex. Workforce Comm'n v. U.S. Dep't of Educ.*, 973 F.3d 383, 389 (5th Cir. 2020) (instructing courts to adopt "a textually permissible interpretation that furthers rather than obstructs [a statute's] purpose").

Courts have approved of ATF's approach to determining intent in similar contexts. In *Sig Sauer, Inc. v. Brandon*, 826 F.3d 598 (1st Cir. 2016), for example, the First Circuit held that ATF properly considered the objective design features of a product to determine whether it "was 'intended only for use'" in making a silencer—*i.e.*, an NFA "firearm." 826 F.3d at 601–02; *see also, e.g., U.S. v. Syverson*, 90 F.3d 227, 232–33 (7th Cir. 1996) (looking to objective design features to make a similar determination under the NFA). The court found no reason to conclude that an objective approach to discerning intent (as opposed to relying solely on a manufacturer's stated intent) was prohibited under the NFA. *Sig Sauer*, 826 F.3d at 602. And foreshadowing ATF's analysis in the Rule, the court found it "hard to believe that Congress intended to invite manufacturers to evade the NFA's carefully constructed regulatory regime simply by asserting an intended use for a part that objective evidence in the record—such as a part's design features—indicates is not actually an intended one." *Id.* For that reason, the court noted that an objective approach to discerning intent "is a very familiar one in the law," *id.* at 601, as also recognized in other contexts, *e.g., Posters 'N' Things, Ltd. v. U.S.*, 511 U.S. 513, 517–22 (1994) (adopting an objective construction of the phrase "primarily intended . . . for use").

And aside from a brace-equipped weapon's design features, ATF also considers other objective evidence of the weapon's intended use. These include, *inter alia*, the "manufacturer's own marketing materials," "indirect marketing or promotional materials" from accessory makers and sellers, and other information indicating the general community's likely use of a particular weapon, if it evinces the manufacturer's intent with regard to that weapon. 88 Fed. Reg. at 6544. Courts have long relied on this type of evidence to discern intent as well. *See Posters 'N' Things*, 511 U.S. at 521 n.11

15

(noting that "the likely use of customers generally" can be relevant to determining whether an item is "primarily intended" for a specific "use"). Therefore, ATF's approach to answering the key statutory inquiry—*i.e.*, whether a weapon is designed, made, and intended to be fired from the shoulder—is consistent with the statute's text, its purpose, and well-established methods for discerning intent.

**2.** Plaintiffs' various arguments challenging ATF's interpretation are unpersuasive.

In attacking the Rule's substance, Plaintiffs principally maintain that, in their view, *all* "braced pistols" are "designed to be held and fired by a single hand," and thus none can be rifles under the NFA. Pls.' Br. 19. But a decade's-worth of evidence belies that *ipse dixit. Supra* 4, 14. Indeed, Plaintiffs offer little evidence to back up their counterfactual view, relying exclusively on descriptions of the original stabilizing brace prototype. But it should go without saying that evidence pertaining to a *single* brace (that hardly represents offerings in the marketplace) cannot support Plaintiffs' categorical claim regarding the design of *all* brace-equipped pistols. Moreover, even under the Rule's framework, a pistol equipped with the original brace prototype likely would not be classified as a short-barreled rifle.

Regardless, even if a particular brace-equipped pistol were designed to be fired effectively with one hand, that would not be dispositive of whether it is also designed and intended to be fired from the shoulder, and is therefore a rifle under the NFA. Indeed, Plaintiffs' argument rests on an incorrect premise—repeatedly rejected by courts—that a weapon can be a "rifle" only if designed and intended "to be fired *exclusively* from the shoulder." *U.S. v. Rose*, 695 F.2d 1356, 1357–58 (10th Cir. 1982) (emphasis added) (collecting cases). Unlike other NFA definitions, the definition of "rifle" does not include an exclusive-intent requirement. *Compare*, *e.g.*, 26 U.S.C. § 5845(b) (defining "machinegun" to include a "part designed and intended *solely* and *exclusively*" for "use in converting a weapon into a machinegun" (emphasis added)), *and id.* § 5845(a)(7) (defining "silencer" to include a "part *intended only for use* in*"* the assembly of a firearm silencer or muffler (emphasis added)), *with id.* § 5845(c) (defining "rifle" to include any weapon "designed," "made," and "intended to be fired from the shoulder"). A

16

brace-equipped pistol that is designed and intended to be fired from the shoulder is thus a rifle under the statute's plain language, regardless of whether it also allows convenient single-handed firing. *Romag Fasteners, Inc. v. Fossil, Inc.*, 140 S. Ct. 1492, 1495 (2020) (instructing courts not to "read into statutes words that aren't there," especially when the words are used "elsewhere" in the same statute).

Plaintiffs also suggest that Rule treats brace-equipped pistols as rifles based on "the mere *possibility*" that those weapons will be fired from the shoulder. Pls.' Br. 19–20. But that argument knocks down only a straw man. As the Rule explains, ATF determines whether a particular brace-equipped weapon is a rifle not based on whether it is *possible* to fire from the shoulder, 88 Fed. Reg. at 6521, 6534, but based on whether objective evidence "indicate[s] that the weapon is designed, made, and intended to be fired from the shoulder," *id.* at 6569—the focal inquiry under the statute.

Without help from traditional tools of interpretation, Plaintiffs invoke the rule of lenity. Pls.' Br. 21–22. That rule instructs courts to resolve ambiguities in a criminal statute in the defendant's favor, *U.S. v. Davis*, 139 S. Ct. 2319, 2333 (2019), only where, "after considering text, structure, history, and purpose, there remains a grievous ambiguity" in the statute that requires a court to "simply guess as to what Congress intended," *Maracich v. Spears*, 570 U.S. 48, 76 (2013) (citation omitted). But the statutory provisions here contain no grievous ambiguity for lenity to resolve. *Muscarello v. U.S.*, 524 U.S. 125, 138 (1998) ("[S]ome statutory ambiguity" does not justify "the application of [lenity]."). As explained, *supra* 13–16, traditional interpretive tools firmly support the Rule's application of the statutory definition of "rifle" to brace-equipped weapons that are designed, made, and intended to be fired from the shoulder.[5] *See Mock*, 2023 WL 2711630, at *6 (rejecting reliance on lenity). And in any

---

[5] Plaintiffs' reliance on *Cargill v. Garland*, 57 F.4th 447 (5th Cir. 2023), *cert. granted*, does not advance their argument. There, the court determined that the NFA's definition of "machinegun" was "plain" and "unambiguous," *id.* at 451, 464, obviating any need to resort to the rule of lenity. The court nonetheless proceeded to discuss how lenity would apply assuming that the statute was so ambiguous as to "provide [no] meaningful guidance" and to require the court to "guess" at its meaning. *Id.* at 469. But as already explained, no such grievous ambiguity exists in the statutory provisions at issue here. And moreover, the record contradicts

event, because lenity is properly invoked only when a criminal defendant might otherwise be convicted

under a grievously ambiguous statute, it has no application here, in a facial challenge to an agency rule.

*Babbitt v. Sweet Home Ch. of Cmtys. for a Great Or.*, 515 U.S. 687, 704 n.18 (1995).[6]

## III.   The Rule is not arbitrary or capricious.

Plaintiffs introduce a hodgepodge of arguments that the Rule is arbitrary and capricious in

violation of the APA. Pls.' Br. 22–24. But none are sufficient to invalidate the Rule on its face.

To start, Plaintiffs contend that ATF failed to consider two issues in promulgating the Rule:

(1) how the Rule "will harm disabled individuals seeking to exercise their Second Amendment" rights;

and (2) the Supreme Court's Second Amendment jurisprudence set forth in *District of Columbia v. Heller*,

554 U.S. 570 (2008), *Caetano v. Massachusetts*, 577 U.S. 411 (2016), and *New York State Rifle & Pistol*

*Association v. Bruen,* 597 U.S. 1 (2022). Pls.' Br. 23–24. "The APA's arbitrary-and-capricious standard

requires that an agency action be reasonable and reasonably explained," *FCC v. Prometheus Radio Proj.*,

592 U.S. 414, 423 (2021), and under that standard, an agency must not "*entirely fail*[] to consider an

important aspect of the problem," *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins.*

*Co.*, 463 U.S. 29, 43 (1983) (emphasis added). Here, ATF considered and reasonably explained its

position on each of these issues.

With respect to Plaintiffs' argument that ATF failed to consider the Rule's effect on disabled

individuals, the Rule cites and responds to the public comments it received on this topic. *See* 88 Fed.

Reg. at 6508–09. ATF's response focuses on the Americans With Disabilities Act and the

Rehabilitation Act of 1973, but its analysis plainly speaks to the Rule's effect on disabled individuals

more generally. *See id.* at 6509 ("[T]hus, even after issuance of this rule, persons with disabilities will

---

Plaintiffs' repeated suggestion, Pls.' Br. 21–22, that, before the Rule, ATF interpreted the NFA to categorically exclude brace-equipped pistols from the definition of "rifle," thus indicating some ambiguity. *Supra* 5–7.

   [6] While Plaintiffs suggest that ATF cannot interpret the NFA because the statute imposes criminal penalties, Pls.' Br. 21, they cite no authority for that proposition, which conflicts with myriad cases confirming ATF's interpretive authority, *supra* 13; *accord Guedes v. ATF*, 356 F. Supp. 3d 109, 129 n.3 (D.D.C. 2019).

be able to purchase and use certain 'stabilizing braces' without regulation under the NFA. Moreover, even a weapon with a 'stabilizing brace' that falls within the definition of 'firearm' in the NFA may be possessed and used if the statutory requirements are followed."). Likewise, the Rule explains ATF's position that "*Heller* and subsequent judicial decisions support [ATF's] view that the weapons regulated by the NFA, such as short-barreled rifles, were not historically protected by the Second Amendment and thus fall outside" its scope. *Id.* at 6548. The Rule also states that "[n]othing in" *Bruen* "changes this analysis," and cites Justice Kavanaugh's concurrence "reiterating *Heller*'s finding that 'dangerous and unusual weapons' are outside of the Second Amendment's protections." *Id.* The Rule therefore expresses that ATF "disagrees with commenters that this regulation violates the Second Amendment." *Id.* Thus, ATF did not leave comments unaddressed, and any contention that the Rule was somehow insufficiently robust on either score is legally incorrect. *See Pension Benefit Guar. Corp. v. LTV Corp.*, 496 U.S. 633, 656 (1990) (agency need not "consider all potentially relevant areas of law").

Plaintiffs also argue that the Rule is arbitrary insofar as it represents a "change in its longstanding position that braced pistols were not" short-barreled rifles. Pls.' Br. 23. When an agency changes its position, it must "provide [a] reasoned explanation for its action." *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009). This "ordinarily demand[s] that [the agency] display awareness that it *is* changing position"; but the agency "need not demonstrate to a court's satisfaction that the reasons for the new policy are *better* than the reasons for the old one." *Fox Television Stations*, 556 U.S. at 515. "[I]t suffices that the new policy is permissible under the statute, that there are good reasons for it, and that the agency *believes* it to be better." *Id.*; *accord Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 223 (2016) (holding rule arbitrary and capricious when agency "said almost nothing" about "the 'good reasons for the new policy'" (citation omitted)). The Rule easily satisfies this standard.

To start, contrary to Plaintiffs' characterization, prior to the Rule, ATF had not uniformly classified braced weapons as exempt from NFA regulation; as early as 2014, ATF determined that

multiple weapon-brace configurations *were* subject to the NFA. 88 Fed. Reg. at 6484; AR 18–25, 54–57, 70–91. Thus, the Rule represents ATF's shift from employing *ad hoc* analysis to classify braced weapons to a consistent analytical framework, but it does not reflect a categorical reclassification of all braced weapons, as Plaintiffs assert. Still, the Rule readily "acknowledges that this rule is a change in position from some of ATF's previous classifications or positions." 88 Fed. Reg. at 6502.

ATF also provided a thorough, reasoned explanation for changing its approach: "it is necessary for [ATF] to issue this rule to clarify the statutory definition of 'rifle'" and "inform the public of the best interpretation of the definition" in order to "guide the proper legal and factual analysis to . . . evaluat[e] whether a firearm is designed, made, and intended to be fired from the shoulder." *Id.*; *see also id.* ("[T]he intent of this rule is to resolve prior inconsistencies and ensure consistent application of the" statute.); *id.* at 6481 (explaining the Rule "prevent[s] manufacturers and individuals from violating the requirements of the NFA and GCA" and "enhances public safety by reducing the further proliferation and criminal use" of brace-equipped weapons). Additionally, the Rule recounts ATF's prior classifications, explains changes in brace designs, summarizes the rulemaking process, and responds to public comments, thereby providing a detailed explanation why the Rule is better than ATF's previous approach. *Id.* at 6482–6569; *see also Encino Motorcars*, 579 U.S. at 221 (agency action not arbitrary if explanation is "clear enough that [agency's] path may reasonably be discerned").

Plaintiffs also contend the Rule is arbitrary in light of the "vague standards set forth in the six-factor test," ironically asserting that the "factors inexplicably lack precision" without explaining how. Pls.' Br. 24. For the reasons set forth below, the Rule is not vague, *infra* 39–42. Moreover, courts have never required agencies to provide "perfect clarity and precise guidance," *Ward v. Rock Against Racism*, 491 U.S. 781, 794 (1989), in part because "words are rough-hewn tools, not surgically precise instruments," and "some degree of inexactitude is acceptable," *Draper v. Healey*, 827 F.3d 1, 4 (1st Cir. 2016) (citation omitted); *see also Grayned v. City of Rockford*, 408 U.S. 104, 110 (1972) ("[W]e can never

expect mathematical certainty from our language."). Thus, that the Rule's factors may not provide perfect guidance does not render them arbitrary. And, in fact, the adoption of more precise factors, like ones setting forth exact measurements, would undermine the Rule's goal of preventing circumvention of the NFA, as it could enable manufacturers to design around such specifications. Further, another court in this District found that the Rule's factors were sufficiently precise to withstand a vagueness challenge. *SAF*, 2023 WL 7490149 at *10 (considering surface area factor and finding that "it would be impractical, given the evolving variety of braces, to lay out a precise surface area in the" Rule); *see also id.* (considering weight or length factor and finding that while it "could have been phrased with more precise language, the law does not require perfect clarity and precise guidance" (citation omitted)).

Lastly, Plaintiffs argue that the Rule's cost-benefit analysis is arbitrary because it "excludes obvious costs and reliance interests—including all costs and interests associated with every brace sold since 2020—and fails to quantify its purported benefits." Pls.' Br. 24. As an initial matter, ATF did not justify its decision to adopt the Rule based on economic cost-benefit analysis, *see* 88 Fed. Reg. at 6572–73, and thus, because economic balancing did not inform ATF's decision to issue the Rule, any error in ATF's articulation of costs or benefits cannot render the Rule arbitrary and capricious. In any event, ATF reasonably explained the need for the Rule and articulated its benefits. For instance, the Rule ensures that ATF will use "the proper legal and factual analysis" in determining whether a braced weapon is subject to the NFA, *id.* at 6502, and an agency's decision that a new interpretation is "more consistent with statutory language" always "justif[ies] its policy change," *Encino Motorcars*, 579 U.S. at 223–24 (citation omitted). And although Plaintiffs criticize the Rule for failing to weigh the costs associated with braces sold after 2020, ATF did not have more recent information about the sales of braces. Indeed, the Rule flags that even the "most recent report" for just the number of firearms sold in 2020 was "not yet final" at the time the Rule was published in 2023; such data was thus not available

at the time the agency began public comment in 2021, 88 Fed. Reg. at 6560. Accordingly, ATF appropriately relied upon on the best-available information it had—which estimated that there were 3 million braces in circulation—but calculated the Rule's costs based on there being 7 million braces in circulation to account for uncertainty regarding the full cost of the Rule. *See* AR 48836. Likewise, the Rule expressly considered the relevant reliance interests and adopted compliance options tailored to ameliorate them. *See* 88 Fed. Reg. at 6507–08.

## IV.     Logical Outgrowth

This Court has expressed that the Fifth Circuit's decision in *Mock* signifies that Plaintiffs have already succeeded on the merits of their logical outgrowth challenge to the Rule. *Mock*, 2023 WL 6457920, at *6. But on a motion for a preliminary injunction, a plaintiff must demonstrate only a substantial likelihood of success on the merits, and "'substantial' does not mean 'certain.'" *All. For Hippocratic Med. v. FDA*, 78 F.4th 210, 242 (5th Cir. 2023); *accord Tex. Voters Alliance v. Dallas Cty.*, 495 F. Supp. 3d 441, 457 (E.D. Tex. 2020). Accordingly, now that the issue is presented for consideration on the merits, the Court should reject Plaintiffs' logical-outgrowth claim.

### A.     The Rule is not subject to notice-and-comment requirements.

To begin, "[u]nder the APA, an agency must provide the public with notice and an opportunity to comment before it issues a final, legislative rule," *Flight Training Int'l, Inc. v. FAA*, 58 F.4th 234, 240 (5th Cir. 2023), but "[n]ot all 'rules' must be issued through the notice-and-comment process." *Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92, 96 (2015). Specifically, "the notice-and-comment requirement 'does not apply' to 'interpretive rules,'" *Perez*, 575 U.S. at 96 (quoting 5 U.S.C. § 553(b)(A)), which are "issued by an agency to advise the public of the agency's construction of the statutes and rules which it administers," *id.* at 97 (citation omitted), and "explain what an agency thinks a statute or regulation actually says," *Flight Training Int'l*, 58 F.4th at 242.

Here, the Rule was "exempt from notice and comment" because it is an interpretive rule that

simply "interpret[s] existing, substantive law." *Id.* at 241 n.5 (citation omitted); *see also Miller*, 2023 WL 3692841 at *6 (finding Rule interpretive). ATF issued the Rule to "clarify[y] the definition of 'rifle' under 27 CFR 478.11 and 479.11, as necessary to implement existing law—*i.e.*, the NFA and GCA." 88 Fed. Reg. at 6500. What's more, the Rule repeatedly states that it "does not impose any new legal obligations," but rather, "merely conveys more clearly to the public the objective design features and other factors that indicate a weapon is in fact a firearm or short-barreled rifle under the relevant statutes." *Id.* at 6478; *id.* at 6569 ("The final regulatory text for the definition of 'rifle' reflects the best interpretation of the relevant statutory provisions."). Indeed, prior to issuing the Rule, ATF had previously classified multiple weapons configured with brace devices as short-barreled rifles subject to the NFA, demonstrating that the Rule—like those classifications—was just interpreting existing, substantive law. *See* 88 Fed. Reg. at 6484; AR 18–21, 22–25, 54–57, 70–91. Thus, the Rule "clarifies, rather than creates, law"—the hallmark of an interpretive rule. *Flight Training*, 58 F.4th at 240 (citation omitted). Plaintiffs provide no evidence to the contrary. *See generally* Pls.' Br.[7]

In concluding that Plaintiffs were likely to prevail on their claim that the Rule is likely legislative, the *Mock* panel looked to whether: (1) ATF "intended to speak with the force of law"; (2) the rule was published in the Code of Federal Regulations ("CFR"); (3) ATF invoked its "general legislative authority"; (4) ATF "claimed *Chevron* deference"; and (5) the rule would "produce [ ] significant effects on private interests." *Mock*, 75 F.4th at 580 (citation omitted). But the Fifth Circuit has been clear that "[w]hat makes a rule 'legislative' is that it spawns from the agency's congressionally-delegated powers (if any) to create law," and "it is only when the agency seeks to *make substantive law* that notice and comment is required." *Flight Training*, 58 F.4th at 241 n.5 (citation omitted); *see also*

---

[7] And because the Rule does not change the scope of the statutory provisions it interprets—the source of the regulatory requirements that attach to short-barreled rifles—and thus does not determine any legal rights or impose any new legal obligations, the Rule is not final agency action challengeable under the APA. *See Bennett v. Spear*, 520 U.S. 154, 178 (1997).

*Guedes v. ATF*, 920 F.3d 1, 17–18 (D.C. Cir. 2019). Thus, the first factor is the bottom-line question a

court must answer—"whether the agency intended to speak with the force of law"—and "[c]entral to

[that] analysis is the language actually used by the agency." *Guedes*, 920 F.3d at 18.

Here, that answer is clear on the face of the Rule: ATF did not intend to speak with the force

of law. *See, e.g.,* 88 Fed. Reg. at 6501 ("[T]he rule does not create any new law; instead it simply

implements the relevant statutes based on [ATF's] best interpretation of those statutes."); *id.* at 6500

("[T]he rule is interpreting the language of the statute as written."); *id.* at 6509 ("Due to inconsistent

advice" about how braces affect classification, ATF "seeks to inform the industry and public on the

best interpretation regarding when 'a firearm is designed . . ., made . . ., and intended to be fired from

the shoulder.'"). Where an agency's intent is unclear, the remaining four factors may assist in that

determination, but this Court need not rely on such factors where ATF's intent could not be clearer.

Regardless, the other four factors offer no basis for concluding that the Rule is legislative. For

instance, there is no reason to reach that conclusion simply because ATF issued the Rule through

notice-and comment and published it in the CFR. "[T]here is nothing in the [APA] to forbid an agency

to use the notice and comment procedure in cases in which it is not required to do," *Hoctor v. U.S.

Dep't of Agric.*, 82 F.3d 165, 171–72 (7th Cir. 1996), and agencies are "free to grant additional procedural

rights in the exercise of their discretion," *Perez*, 575 U.S. at 102 (citation omitted); *see also Health Ins.

Ass'n of Am., Inc. v. Shalala*, 23 F.3d 412, 423 (D.C. Cir. 1994) (publication in CFR is just a "snippet of

evidence of agency intent"). Seeking public comment here was a particularly sensible way to engage

the regulated community given ATF's goal of providing clarity and notice to that community, and

ATF should not be penalized for affording more process than was due.

Nor do the remaining factors support that the Rule is legislative. ATF did not invoke *Chevron*

deference. *Mock*, 75 F.4th at 580. And the Rule's statement that ATF has authority to issue regulations

to administer the NFA does not suggest that ATF was intending to enact a legislative rule here. *See* 88

24

Fed. Reg. at 6481. Lastly, "[m]erely because a Rule has a wide-ranging effect does not mean that it is 'legislative' rather than interpretive." *British Caledonian Airways, Ltd. v. C.A.B.*, 584 F.2d 982, 989 (D.C. Cir. 1978)). Indeed, "the substantial impact test is illogical because every significant interpretive rule choosing between two or more interpretations of . . . a statute has an effect ('substantial impact') . . . [on] those regulated" by the statute. *Am. Transfer & Storage Co. v. Interstate Commerce Com.*, 719 F.2d 1283, 1285 n.4 (5th Cir. 1983). For this reason, the Fifth Circuit previously declared the substantial impact test "unsound," and this factor is not helpful in determining whether ATF's Rule is legislative. *Id.* Thus, the Rule is interpretive and not subject to notice-and-comment requirements.

### B.      The Rule is a logical outgrowth of the proposed rule.

Even if the Rule were legislative, it is a logical outgrowth of ATF's proposed rule. A rule satisfies the logical outgrowth requirement if the proposed rule "adequately frame[d] the subjects for discussion such that the affected party should have anticipated the agency's final course in light of the initial notice." *Huawei Techs. USA, Inc. v. FCC*, 2 F.4th 421, 447 (5th Cir. 2021) (citations omitted). This standard is satisfied if the NPRM "fairly apprises interested persons of the subjects and issues the agency is considering." *Chem. Mfrs. Ass'n v. EPA*, 870 F.2d 177, 203 (5th Cir. 1989). However, an agency is not required to "specifically identify every precise proposal which [it might] ultimately adopt as a final rule." *Id.*; *see also Huawei*, 2 F.4th at 449 (holding notice sufficient even where "NPRM did not specify the precise procedures the agency ultimately adopted").

The NPRM fairly apprised the public of the issues ATF was considering. The NPRM and Rule make clear that ATF contemplated and decided to amend the regulatory definition of rifle. *Compare* NPRM, 86 Fed. Reg. at 30826 ("[DOJ] proposes amending [ATF] regulations to clarify when a rifle is 'intended to be fired from the shoulder.' [DOJ] proposes factors ATF considers when evaluating firearms equipped with a purported 'stabilizing brace' to determine whether these weapons would be considered a 'rifle' or 'short-barreled rifle' under the [GCA or NFA]."), *with* 88 Fed. Reg. at 6478

25

("[DOJ] is amending the regulations . . . to clarify when a rifle is designed, made, and intended to be fired from the shoulder" and setting forth "objective design features and other factors that indicate a weapon is in fact a firearm or short-barreled rifle under the relevant statutes"). Courts have upheld much more drastic changes. *See Mid Continent Nail Corp. v. U.S.*, 846 F.3d 1364, 1374 (Fed. Cir. 2017) ("Courts applying the logical outgrowth doctrine have also permitted agencies to drop critical elements of proposed rules even if a resulting final rule effectively abandons an agency's initial proposal.").

Further, although the Rule did not adopt the NPRM's point system, ATF did not adopt a rule contrary to its original proposal, *Mock*, 75 F.4th at 584, as the NPRM provided notice that ATF was considering a factor-based approach and notice of those factors. The NPRM proposed amending the definition of rifle to consider "objective design features and characteristics that indicate that the firearm is designed to be fired from the shoulder," just like the Rule. NPRM, 86 Fed. Reg. at 30829. And the NPRM set forth "[f]actoring [c]riteria," just like the final rule. *Id.* at 30830. In fact, the Rule's balancing test is essentially an unweighted variation of the NPRM's approach. *See S. Terminal Corp. v. EPA*, 504 F.2d 646, 658 (1st Cir. 1974) (upholding "substantial" changes "in character with the original scheme" and "foreshadowed in proposals and comments" during rulemaking).

And contrary to *Mock*'s suggestion, the Rule did not adopt a test "based on almost entirely subjective criteria" of which the public had no notice, nor did it "[r]emov[e] all objective criteria." 75 F.4th at 583–84. The Rule looks to multiple "objective design features and factors" specifically "derived from the NPRM and proposed Worksheet 4999." 88 Fed. Reg. at 6480; *see also id.* at 6513 ("[T]his rule clarifies and simplifies the criteria from the Worksheet[.]"); *id.* at 6494 ("The factors discussed in the NPRM will, under the final rule, continue to help determine whether a weapon meets the statutory definition of a 'rifle.'"); *id.* at 6480, 6569. Indeed, ATF addressed public comments regarding the objective factors the Rule adopted, indicating that the NPRM provided adequate notice that the final rule might incorporate those factors. *E.g., id.* at 6514–21 (weight and length); *id.* at 6521–

31, 6537–41 (rear surface area); *id.* at 6533–37 (length of pull); *id.* at 6541–43 (sights and scope); *see United Steelworkers of Am., AFL-CIO-CLC v. Schuylkill Metals Corp.*, 828 F.2d 314, 318 (5th Cir. 1987) ("The comments received reflected . . . the NPRM was sufficiently descriptive of the subjects and issues involved that interested parties offered informed criticism and comments." (cleaned up)).

That the Rule also adopts two "subjective" criteria—(1) a manufacturer's direct and indirect marketing and promotional materials indicating the intended use of the weapon and (2) information demonstrating likely use of the weapon in the general community—creates no issue. Even if the NPRM did not propose these criteria, it indicated they were relevant to the statutory inquiry and would be weighed in ATF's approach. *See, e.g.,* 86 Fed. Reg. at 30828 (discussing relevance of manufacturer's marketing and advertising). For instance, the NPRM stated that its point system would be inapposite where manufacturers attempt to designate weapons as "pistols" in order to circumvent Federal law:

> While some manufacturers have recognized that there is a market advantage in designing and selling 'short-barreled rifles' as 'pistols' to customers seeking to avoid tax and registration requirements, 'stabilizing braces' are not a method by which the Federal statutes may be circumvented. Therefore, efforts to advertise, sell, or otherwise distribute 'short-barreled rifles' as such will result in a classification as a 'rifle' regardless of the points accrued on the ATF Worksheet 4999 because there is no longer any question that the intent is for the weapon to be fired from the shoulder.

*Id.* at 30834. The Rule's subjective factors are plainly aimed at this inquiry, and thus are a logical outgrowth of this piece of the NPRM. What's more, the NPRM solicited comments regarding "additional criteria that should be considered," putting the public on notice that the final rule may include criteria beyond those in the proposed rule. *Id.* at 30850.

Lastly, although the Fifth Circuit suggested the NPRM provided insufficient notice that ATF was considering alternatives that might eliminate the point system, *Mock*, 75 F.4th at 584, the NPRM also "specifically request[ed] comments on the clarity of this proposed rule and how it may be made easier to understand," 86 Fed. Reg. at 30849. Further, the NPRM included an alternative approach by which the agency would look to "[s]imple [c]riteria" and adopt "very short and simple parameters."

*Id.* at 30847. By including this potential alternative, the NPRM adequately notified the public that ATF was at least considering adopting a more streamlined approach than the point-based system.

In sum, the changes between the NPRM and the Rule evince a considered process based on the comments received. ATF weighed comments criticizing "the complexity in understanding the proposed [point system]," and accordingly decided "not [to] adopt" it. 88 Fed. Reg. at 6480. Instead, ATF "took the relevant criteria discussed in the NPRM" and "incorporated them into the rule's revised definitions of rifle," but appropriately employed a simpler alternative approach. *Id.*

**C. Any error in ATF's process was harmless.**

Lastly, Defendants respectfully disagree with the *Mock* panel that Plaintiffs have demonstrated prejudice, as required by *City of Arlington v. FCC*, 668 F.3d 229, 243 (5th Cir. 2012), merely because the Rule is not a logical outgrowth of the proposed rule. "[T]he harmless error rule requires the party asserting error to demonstrate prejudice from the error," and when a plaintiff cites a notice-and-comment problem, "the touchstone is whether it is clear that the lack of notice and comment did not prejudice the petitioner." *City of Arlington*, 668 F.3d at 243–44 (quotation omitted). But it is well-established that the aims of public comment "may be achieved in cases where the agency's decision-making process 'centered on the identical substantive claims' as those proposed by the party asserting error, even if there were APA deficiencies." *U.S. v. Johnson*, 632 F.3d 931 (5th Cir. 2011). "It follows that when a party's claims were considered, even if notice was inadequate, the challenging party may not have been prejudiced." *Id.* "[T]he party who claims deficient notice bears the burden of proving any such deficiency was prejudicial," and [i]f a party fails to carry that burden, the agency's decision must be upheld." *See Friends of Iwo Jima v. Nat'l Cap. Planning Comm'n*, 176 F.3d 768, 774 (4th Cir. 1999).

Plaintiffs have not carried their burden to demonstrate that they were prejudiced by ATF's process; in other words, Plaintiffs have not explained what they would have said regarding the final rule that they were unable to say in response to the proposed rule. *See* Am. Compl. ¶¶ 102–18

(specifying only that "the public were denied the chance to comment on the substance of the [Rule]");
Pls.' PI Br. at 29–33, ECF No. 36 (contending "the public was denied the chance to comment on the
[Rule's] substance"); Pls.' PI Reply at 6, ECF No. 38; Pls.' Br. 14–17 (providing no explanation of
prejudice). Indeed, "[t]here is no suggestion that, if given the opportunity to comment, [Plaintiffs]
would have presented an argument the [ATF] did not consider in issuing the [proposed] rule." *Johnson*,
632 F.3d at 931–32; *Texas v. Lyng*, 868 F.2d 795, 800 (5th Cir. 1989) ("[Plaintiffs] do not identify any
new information they would have submitted to the agency if given the opportunity."). And, critically,
ATF considered the claims Plaintiffs raise now. *E.g.*, 88 Fed. Reg. at 6548 (Second Amendment); *id.*
at 6550–52 (vagueness); *id.* at 6499–501 (statutory authority); *id.* at 6501–508 (APA). ATF likewise
considered comments opposing the point system generally, *id.* at 6510–13, and those opposing its
factoring criteria specifically—the same criteria from which the Rule's criteria derive, *id.* at 6513–48.

   That Plaintiffs were not prejudiced by ATF's process is even more obvious upon review of
the Firearm Policy Coalition's ("FPC") comment. *See* FPC, In the Matter of Factoring Criteria for
Firearms with Attached "Stabilizing Braces," ATF 2021R-08 (Sept. 8, 2021), attached as Exhibit A.
FPC's comment made many of the same arguments Plaintiffs raise now: that ATF lacked statutory
authority to issue the rule, *id.* at 2; that the rule granted ATF too much discretion insofar as it permitted
the agency to sidestep the point system to classify braced weapons as short-barreled rifles, *id.* 4; that
the rule's criteria were unconstitutionally vague, *id.* at 4–5; and that the rule's factors were arbitrary, *id.*
at 6; *see also supra* 26–27. Thus, any error "was not prejudicial because [ATF] nevertheless considered
the arguments [Plaintiffs have] asserted and responded to those arguments during" its process, *Johnson*,
632 F.3d at 932, and Plaintiffs have failed to carry their burden to show otherwise.

## V.    Neither the Rule nor the NFA violates the Second Amendment.

   Plaintiffs contend that the Second Amendment protects the right to keep and bear braced-
equipped pistols, and that the Rule (or, alternatively, the NFA) violates that right by subjecting those

weapons to "registration and taxation" requirements. Pls.' Br. 26, 29. That claim fails on several scores.

### A. Braces are not bearable arms protected by the Second Amendment.

First of all, the Second Amendment protects "the right to keep and bear *arms*," not optional attachments like stabilizing braces. *Heller*, 554 U.S. at 582; *accord Hollis v. Lynch*, 827 F.3d 436, 447 (5th Cir. 2016). So laws that regulate the use of firearm "accessories" or "attachments" generally do not impinge on that right. For example, the NFA regulates the making of a firearm with a "silencer."[8] Yet courts have uniformly held that, because a "silencer is a firearm accessory," "it can't be a 'bearable arm'" under the Second Amendment. *Cox*, 906 F.3d at 1186; *accord U.S. v. Al-Azhari*, 2020 WL 7334512, at *3 (M.D. Fla. Dec. 14, 2020). Indeed, "a silencer cannot, on its own, cause any harm" and "is not useful" unattached from a firearm, and "a firearm remains an effective weapon without a silencer." *U.S. v. Hasson*, 2019 WL 4573424, at *4–5 (D. Md. Sept. 20, 2019) (collecting cases).

Stabilizing braces fall outside the scope of the Second Amendment for the same reasons. Braces, like silencers, are not arms and serve no useful purpose except as attachments to firearms, as Plaintiffs appear to concede. Lewis Decl. ¶ 10, ECF No. 36-3; Mock Decl. ¶ 11, ECF No. 36-4 (conceding that each could "remove the brace on my pistol[]"). For that reason, in other challenges to the Rule, courts have held there is no constitutional right to use a stabilizing brace. Indeed, another court in this District "conclude[d] that, like silencers, stabilizing braces are not 'bearable arms' under the Second Amendment," and consequently, the weapons addressed by the Rule are not constitutionally protected. *See SAF*, 2023 WL 7490149, at *13; *accord FRAC*, 2023 WL 5942365, at *5; *Miller*, 2023 WL 3692841, at *10.  This Court should hold the same.

---

[8] A "silencer" is, *inter alia*, a device that diminishes a portable firearm's report. 18 U.S.C. § 921(a)(25).

**B.      Short-barreled rifles are dangerous and unusual weapons.**

Courts also have overwhelmingly held that short-barreled rifles are dangerous and unusual weapons that are not protected under the Second Amendment.[9] Given this consensus and the rationale for it, another court in this District declined to treat *brace-equipped* short-barreled rifles any differently. *SAF*, 2023 WL 7490149, at *14. This Court should do the same.

Indeed, shortly after the NFA's enactment, the Supreme Court rejected a Second Amendment challenge to the statute's restrictions on short-barreled shotguns. *U.S. v. Miller*, 307 U.S. 174, 178 (1939). And in *Heller*, the Court reaffirmed that conclusion, explaining that "short-barreled shotguns" are unprotected because they are "dangerous and unusual" weapons. 554 U.S. at 581, 622-25 (citation omitted). As the Courts of Appeals have repeatedly concluded, that principle applies equally to short-barreled rifles because there is "no constitutional distinction" between the two. *U.S. v. Stepp-Zafft*, 733 F. App'x 327, 329 (8th Cir. 2018) (per curiam); *Cox*, 906 F.3d at 1185; *Gilbert*, 286 F. App'x at 386.

Although this Court has found that "braced pistols" enjoy Second Amendment protections because they are "commonly used by law-abiding citizens for lawful purposes," *Mock,* 2023 WL 6457920, at *10, Defendants respectfully submit that the record and case law lead to the opposite conclusion—*i.e.*, that brace-equipped short-barreled rifles are dangerous and unusual weapons that are not constitutionally protected. *First*, as explained, the pistols that are typically equipped with stabilizing braces are not the type of compact, lightweight pistols that are the "most commonly used" firearms for self-defense. *Caetano*, 577 U.S. at 417 (Alito, J., concurring). Rather, the "pistols" commonly configured with braces are heavy, rifle-variant pistols—*e.g.*, an AR-type pistol with a rifle receiver, *supra* 4—like the ones that both Lewis and Mock allegedly possess, *see* Mock Decl. ¶ 6; Lewis

---

[9] *Cox*, 906 F.3d at 1185; *U.S. v. Gilbert*, 286 F. App'x 383, 386 (9th Cir. 2008) (similar); *U.S. v. Miller*, 2023 WL 6300581, at *3 (N.D. Tex. Sept. 27, 2023); *Miller*, 2023 WL 3692841, at *11; *FRAC*, 2023 WL 5942365, at *5; *U.S. v. Rush*, 2023 WL 403774, at *3 (S.D. Ill. Jan. 25, 2023); *U.S. v. Royce*, 2023 WL 2163677, at *3 (D.N.D. Feb. 22, 2023); *U.S. v. Barbeau*, 2016 WL 1046093, at *4 (W.D. Wash. Mar. 16, 2016).

Decl. ¶ 5. These types of pistols are not the traditional "handguns" commonly viewed as "quintessential self-defense weapon[s]." *See Heller*, 554 U.S. at 629. So, contrary to this Court's prior analysis, the widespread use of lightweight handguns should have no bearing on whether brace-equipped pistols are dangerous and unusual weapons.

*Second*, application of Circuit precedent shows that brace-equipped short-barreled rifles *are* dangerous and unusual weapons. *SAF*, 2023 WL 7490149, at *13 (holding that Rule does not implicate the Second Amendment because the brace-equipped pistols the Rule addresses "are equivalent to" short-barreled rifles, which are dangerous and unusual). In *Hollis*, the Fifth Circuit explained how courts should conduct the proper inquiries for determining whether a type of weapon—there, a machinegun, another NFA firearm—is outside the Second Amendment's ambit. 827 F.3d at 448–49.

The Fifth Circuit first looked to the fact that unlawful possession of a machinegun is a crime of violence for purposes of a sentence enhancement. *Id.* at 449 (citing *U.S. v. Golding*, 332 F.3d 838 (5th Cir. 2003)). The same is true for the unlawful possession of short-barreled rifles and other NFA firearms. *See Golding*, 332 F.3d at 843–44; *accord Hollis*, 827 F.3d at 448; 88 Fed. Reg. at 6499 (short-barreled rifles "are dangerous and unusual" because of "their concealability and their heightened ability to cause damage—a function of the projectile design, caliber, and propellant powder used in the ammunition and the ability to shoulder the firearm for better accuracy").[10]

In evaluating machineguns' commonality, the Fifth Circuit considered both (i) the "absolute number" of weapons and (ii) the number of states where they "may be lawfully possessed." *Hollis*, 827 F.3d at 449–50. Here, regardless of the precise number of braced-equipped weapons, the estimates fall short of the exemplary benchmarks that indicated widespread use in *Hollis*. *See id.* at 450. And the number of states that ban machineguns outright or unless registered (34), *id.*, is similar to the number

---

[10] *E.g., Gilbert,* 286 F. App'x at 386; *U.S. v. Gonzalez,* 2011 WL 5288727, at *5 (D. Utah Nov. 2, 2011); *U.S. v. Majid,* 2010 WL 5129297, at *1 (N.D. Ohio Dec. 10, 2010).

of states with analogous laws governing short-barreled rifles (30).[11] These laws, like those in *Hollis*, indicate that short-barreled rifles are dangerous and unusual and thus not protected under the Second Amendment. *See id.* at 451.

Plaintiffs essentially suggest that, if a new and highly dangerous weapon is not banned immediately and its use becomes widespread, then it will not qualify as "unusual" under Second Amendment analysis. But the court in *Hollis* noted that this very argument was rejected in *Heller*, *see id.* at 451, and it fails here too. The marketing of a novel accessory designed to evade existing regulations does not start a constitutional timer, wherein prohibition or other regulation is lawful only until sales hit a certain threshold. And short-barreled rifles are no less dangerous and unusual today simply because manufacturers were effective at selling "'braces' to consumers as a means of creating functional [short-barreled rifles]" intended to avoid federal controls. *Mock*, 2023 WL 6457920, at *2.

### C.   Taxation and registration of short-barreled rifles does not implicate the Second Amendment.

Plaintiffs' Second Amendment claim fails also because regulatory procedures, like the NFA's, do not infringe upon the right to bear arms. As the Fifth Circuit has explained, requirements that are part and parcel of the NFA (*e.g.*, being "photographed and fingerprinted") implicate no legally protected interest, but are "merely 'additional costs and logistical hurdles' that all citizens" must bear. *Bezet*, 714 F. App'x at 340; *accord Lane v. Holder*, 703 F.3d 668, 672–73 (4th Cir. 2012). And in this case and other challenges to the Rule, courts have held that the Second Amendment does not prohibit

---

[11] *See* Ala. Code § 13A-11-63(a); Alaska Stat. Ann § 11.61.200(c); Ariz. Rev. Stat. Ann. § 13-3101(B); Cal. Penal Code § 16590; Colo. Rev. Stat. Ann. § 18-12-102(1), (3), (5); D.C. Code Ann. § 7-2502.02; Fla. Stat. Ann. § 790.221(1)-(3); Ga. Code Ann § 16-11-122, 16-11-121(4); Haw. Rev. Stat. Ann. § 134-8; Ill. Comp. Stat. Ann § 24-1(a)(7)(ii), § 24-2(c)(7); Iowa Code Ann § 724.1C; La. Stat. Ann. § 40:1785; Md. Code Ann., Pub. Safety § 5-203; Mich. Comp. Laws Ann. § 750.224b; Mo. Ann. Stat. § 571.020; Mont. Code Ann. § 45-8-340; Neb. Rev. Stat. Ann. § 28-1203; Nev. Rev. Stat. Ann. § 202.275; N.J. Stat. Ann. § 2C:39-3(b), § 2C:39-1(o); N.Y. Penal Law § 265.00(3)(c), (d), § 265.01-b; N.C. Gen. Stat. Ann. § 14-288.8; N.D. Cent. Code Ann. § 62.1-02-03; Ohio Rev. Code Ann. § 2923.17; Okla. Stat. Ann. tit. 21, § 1289.18(B)-(E); Or. Rev. Stat. Ann. § 166.272(1)-(4); 11 R.I. Gen. Laws Ann. § 11-47-8(b); S.C. Code Ann. § 16-23-250; Tex. Penal Code Ann. § 46.05(a)(1)(C); Va. Code Ann. § 18.2-303.1; Wash. Rev. Code Ann. § 9.41.190(4); Wis. Stat. Ann. § 941.28(2)-(4).

"traditional registration and licensing requirements commonly associated with firearm ownership." *Mock*, 2023 WL 2711630, at *7; *Miller*, 2023 WL 3692841, at *11; *FRAC*, 2023 WL 5942365, at *5.

Indeed, Justice Kavanaugh explained in *Bruen* that 43 states employ concealed-carry licensing regimes that may demand "objective licensing requirements," like "fingerprinting, a background check, [and] a mental health records check," none of which violates the Second Amendment. 142 S. Ct. at 2162 (Kavanaugh, J., concurring). And the Court echoed a similar point. *Id.* at 2138 n. 9 ("[N]othing in our analysis should be interpreted to suggest the unconstitutionality" of these licensing regimes.). Likewise, the NFA's registration procedures (*e.g.*, fingerprinting and background checks) pose no constitutional problem. *E.g.*, *U.S. v. Saleem*, 2023 WL 2334417, at *11 n. 9 (W.D.N.C. Mar. 2, 2023) (noting that "the NFA's registration and taxation requirements are of the type that the Supreme Court in *Bruen* determined were permissible"); *accord U.S. v. Delauder*, 2023 WL 5658924, at *4 (N.D. W. Va. Aug. 31, 2023). Indeed, the routine procedures challenged here are especially unobjectionable because they apply only to a narrow set of particularly dangerous weapons.

### D. Historical tradition of firearm regulation supports the Rule and the NFA.

Neither the Rule nor the NFA implicates the Second Amendment. But if they did, they still are constitutional because they rest upon centuries of similar registration and taxation requirements.

The Government may justify a regulation that implicates the Second Amendment by showing "that it is consistent with the Nation's historical tradition of firearm regulation"—*i.e.*, that the regulation fits within a "historic and traditional category" of firearms regulation. *Bruen*, 142 S. Ct. at 2130. The Government can show this by pointing to "a well-established and representative historical *analogue*." *Id.* at 2133. To be analogous, historical and modern firearms regulations must be "relevantly similar," in that they impose a "comparable burden" on the right of armed self-defense that is "comparatively justified." *Id.* at 2132–33. But there need not be "a historical *twin*." *Id.* This analysis can be "nuanced," particularly in cases implicating "dramatic technological changes," where it is

34

important to remember that "[t]he regulatory challenges posed by firearms today are not always the same as those that preoccupied" those living in 1791 or 1868. *Id.* at 2132.

Plaintiffs complain that the Rule "requires registration and taxation of commonly owned arms." Pls.' Br. 29.[12] But they cite no case holding that the Second Amendment prohibits such regulations. And for good reason: Since colonial times, state and local governments have regulated firearm possession and manufacturing through taxation, registration, and similar requirements.

*Tradition of Registration.* The historical record leaves no doubt that there is a tradition analogous to the NFA's registration requirements. As early as 1631, Virginia required a regular survey of people, "arms[,] and munition" in the colony, and "door-to-door surveys of firearms were authorized in Rhode Island (1667), South Carolina (1747), and New Jersey (1781).[13] Militia members in Massachusetts also were required to have their firearms inspected (1775), with an official record documenting those inspections, and New York imposed similar requirements(1778).[14] These measures, like modern registration, ensured that the respective government had accurate and timely records of the individuals within their jurisdiction who owned firearms. *U.S. v. Dangleben*, 2023 WL 6441977, at *8 (D.V.I. Oct. 3, 2023) ("These muster and registration laws, in addition to taxes on personally held firearms, allowed the government to roughly account for and track the location of the firearms in colonial America.").

While Plaintiffs contend that militia regulations were not motivated by the same concerns animating the NFA, Pls.' Br. 28, early American states and colonies exercised their militia authority to preserve "the public peace, safety, and good order," *Presser v. Illinois*, 116 U.S. 252, 268 (1886), the

---

[12] Plaintiffs also mention other NFA "requirements," Pls.' Br. 29, but don't specify which, if any, might violate the Second Amendment.

[13] Act of Mar. 2, 1631, act LVI, 1631 Va. Acts 175; *Records of the Colony of Rhode Island and Providence Plantations, In New England*, 2:196 (Bartlett, ed., Providence: A. Crawford Greene and Brother vol. 2, 1857); "An Act for the better regulating of the Militia of this Province," 1747, McCord, *Statutes at Large*, 9:647; Act of Jan. 8, 1781, ch. XII, § 13, 1781 N.J. Laws 39, 43; Churchill, "Gun Regulation, the Police Power, and the Right to Keep Arms in Early America: The Legal Context of the Second Amendment," 25 Law & Hist. Rev. 139, 161-62 (2007) (discussing the colonial militia practice of surveying firearms owned by members of the community).

[14] 1775-1776 Mass. Acts 18; Act of Apr. 3, 1778, ch. 33, 1778 N.Y. Laws 65.

same goals the NFA advances, *U.S. v. Freed*, 401 U.S. 601, 609 (1971). In 1805, for example, Massachusetts required musket and pistol barrels manufactured in the state and offered for sale to be "proved" (inspected and marked by designated individuals) with payment of a fee to ensure their safe condition, and Maine enacted similar requirements in 1821.[15] *See U.S. v. Padgett*, 2023 WL 3483929, at *9 (D. Alaska Jan. 4, 2023) ("There was significant regulation of firearms in colonial America" like "registration and safety requirements," "designed to ensure responsible and safe gun ownership.").

In addition to conditions on the sale and possession of firearms, early American governments enacted strict regulations regarding where and to whom some firearms could be sold. The colonies of Massachusetts, Connecticut, Maryland, and Virginia "enacted laws in the first half of the [17th] century making it a crime to sell, give, or otherwise deliver firearms or ammunition to Indians." *Teixeira v. Cnty. Of Alameda*, 873 F.3d 670, 685 (9th Cir. 2017). And colonial Virginia made it a crime to "stray[] into an Indian town or more than three miles from an English Plantation[] while possessing more firearms than needed for personal use." *U.S. v. Bradley*, 2023 WL 2621352, at *5 (S.D. W. Va. Mar. 23, 2023).

Licenses or inspection were also required in certain states—Massachusetts (1651, 1809), Connecticut (1775), New Hampshire (1820)—to commercially export or sell gunpowder (like with modern ammunition).[16] *Id.* at *4 ("Early legislatures and Founders did not shy away from regulating the trade and movement of firearms."); *accord U.S. v. Libertad*, 2023 WL 4378863, at *6 (S.D.N.Y. July 7, 2023). Many of these laws were motivated largely by the same concerns animating the NFA: "controlling and tracing the sale of firearms" and "ensuring dangerous individuals did not obtain firearms." *U.S. v. Holton*, 639 F. Supp. 3d 704, 711–12 (N.D. Tex. 2022).

---

[15] Laws of the Commonwealth of Mass. from Nov. 28, 1780, to Feb. 28, 1807, 259-61 (1807); Laws of the State of Maine 546 (1830).

[16] Colonial Laws of Mass. Reprint. from the Ed. of 1672, at 126 (1890); 2 Gen. Laws of Mass. from the Adoption of the Const. to Feb. 1822, 199 (1823); 15 The Pub. Records of the Colony of Conn. 191 (1890); Laws of the State of N.H; with the Consts. of the U.S. and of the State Prefixed 277 (1830).

Later enactments also indicate a tradition of firearm registration. Illinois passed a law in 1881 requiring sellers of certain "deadly weapons" like pistols and revolvers to "keep" and have ready for inspection "at all reasonable times" "a register of all such weapons sold or given away," including the purchaser's name and age and "the purpose for which it is purchased." Ill. Stat. Ann. Crim. ch. 38, ¶ 38 (1885). And Congress passed a law (1892) governing the sale of certain weapons in the District of Columbia, requiring retailers to "keep a written register of every purchaser." 27 Stat. 116.

This history shows a long tradition of firearm regulation analogous to, or more stringent than, the NFA's registration requirements. *Herrera v. Raoul*, 2023 WL 3074799, at *10 (N.D. Ill. Apr. 25, 2023) (holding state "registration requirement" consistent with traditional firearm regulation), *aff'd sub nom. Bevis v. City of Naperville*, 85 F.4th 1175 (7th Cir. 2023). While Plaintiffs quibble with certain cited laws as either too early or too late to be relevant, Pls.' Br. 27, the regulations cited above extend from the colonial era through the founding to the late-19th century. At bottom, Plaintiffs cannot show that the NFA's registration requirements violate the Second Amendment.

*Tradition of Taxation.* Plaintiffs' claim that the Second Amendment prohibits the taxation of firearms is similarly meritless. Early American governments imposed various costs like fees and licensing on firearm and ammunition sales. *Supra* 36. And as explained, from the 1600s through the early 1900s, several colonies and states required licenses or inspection to export or sell gunpowder.[17]

Direct taxes on firearms also were common in early America. In 1820, Alabama imposed a $1 personal property tax on "pocket or side pistol[s]" and certain other weapons, revising this law while

---

[17] *See* Colonial Laws of Mass. Reprint. from the Ed. of 1672, at 126 (1890) (1651 statute requiring license to export gunpowder); 2 Gen. Laws of Mass. from the Adoption of the Const. to Feb. 1822, 198–200 (1823) (1809 statute providing for appointment of "inspector of gunpowder for every public powder magazine, and at every manufactory of gunpowder," and imposing penalties for any sale or export of gunpowder "before the same has been inspected and marked"); Laws of the State of N.H.; with the Consts. of the U.S. and of the State Prefixed 276-77 (1830) (similar); 15 The Pub. Records of the Colony of Conn. 191 (1890) (1775 law establishing that no gunpowder manufactured in the colony "shall be exported out" of the colony "without [an applicable] licence"); An Act for the Inspection of Gunpowder, ch. 6, § 1, 1776–1777 N.J. Laws 6, 6 (1776) (No person shall offer any gunpowder for sale "without being previously inspected and marked as" directed.).

maintaining taxes on certain firearms in the mid-1800s.[18] Similarly, Florida (1838) imposed a $10 per year tax on individuals openly "carrying" "pocket pistols" and certain other weapons;[19] Mississippi (1844) required a $2 tax on "dueling or pocket pistol[s]," and in 1867 the state imposed taxes on, *inter alia*, rifles and shotguns, and that same year enacted a $5 to $15 tax "on every gun and pistol" in a certain county, with refusal to pay resulting in the firearm's seizure and sale;[20] and North Carolina (1851, 1857, 1859, 1866) imposed taxes on pistols and other weapons, often with the proviso that the taxes applied only to weapons intended for private use and "used or worn about the person" in the prior year.[21] And Georgia (1866) authorized certain counties to collect a tax "on every gun or pistol, musket or rifle over the number of three kept or owned" on plantations.[22] What's more, multiple states in the 19th century imposed occupational taxes or licensure fees on businesses associated with arms-sales, such as those engaged in the retail sale of firearms, gunpowder, or ammunition. Numerous states enacted such laws, or authorized their enactment on the local level, including in Alabama, California, Georgia, Minnesota, North Carolina, Ohio, and South Carolina.[23]

*      *      *

---

[18] Act of Dec. 20, 1820, § 3, 1820 Ala. Acts 10, 10; Act of Feb. 10, 1852, No. 1, § 1, 1851–1852 Ala. Laws 3, 3; Act of Feb. 19, 1867, No. 260, § 10, 1866–1867 Ala. Laws 259, 263; Ala. Rev. Code § 434(10) (Joseph Abram Walker comp., Birmingham, Reid & Screws, State Printers 1867).

[19] Act of Feb. 10, 1838, No. 24, § 1, 1838 Fla. Acts 36, 36.

[20] Miss. Code ch. 8, art. 16, § 1 (1848) (effective Feb. 4, 1844); Act of Feb. 21, 1867, ch. 317, § 2, 1867 Miss. Laws 412, 412; Act of Feb. 7, 1867, ch. 244, § 1, 1867 Miss. Laws 327, 327.

[21] Act of Jan. 28, 1851, ch. 121, § 5, 1850–1851 N.C. Sess. Laws 241, 242–43; Revenue, ch. 34, § 23(4), 1856–1857 N.C. Sess. Laws 28, 34; Revenue, ch. 25, § 27(15), 1858–1859 N.C. Sess. Laws 28, 35; Act of Feb. 26, 1867, sec. 1, schedule A, class 3, § 14, 1866–67 N.C. Sess. Laws 95, 103.

[22] Act of Dec. 7, 1866, No. 41, § 1, Ga. Laws 27, 27–28.

[23] Ala. Code § 494(15) (Wade Keyes, *et al.*, comps., Montgomery, Barrett & Brown 1877); Act of Dec. 9, 1882, No. 18, § 2(18), 1882 Ga. Laws 34, 37; Act of Apr. 16, 1883, § 24, 80 Ohio Laws 129, 134; Act of Mar. 13, 1883, ch. 49, § 153, 1883 Cal. Stat. 93, 156; Act of Feb. 17, 1885, No. 337, sec. 2, 1884–85 Ala. Laws 601, 604; Act of Dec. 22, 1884, No. 52, § 2(18), 1884–85 Ga. Laws 20, 23; Act of Dec. 11, 1886, No. 4, sec. 5, § 17, 1886–87 Ala. Laws 31, 36; Gen. Tax Act for 1887 and 1888, § 2(18), 1886 Ga. Laws 14, 17; Act of Feb. 28, 1887, No. 221, sec. 2, 1888–89 Ala. Laws 530, 533; Ala. Code § 629(28) (1887); Act of Dec. 12, 1888, No. 190, § 21(25), 1888–89 Ala. Laws 185, 200; Gen. Tax Act for 1889 and 1890, No. 123, § 2(17), 1888 Ga. Laws 19, 22; Act of Mar. 9, 1891, ch. 327, § 44, 1891 N.C. Sess. Laws, Priv. Laws 1413, 1423; S.C. Rev. Stat. § 490 (1894); Act of Mar. 28, 1889, sec. 1, 86 Ohio Laws 164, 164; St. Paul, Minn., Ordinances no. 895, § 2 (1889).

Taken together, these laws reflect an unbroken historical tradition of American firearm regulation "relevantly similar" to that required by the NFA. *See Bruen*, 142 S. Ct. at 2133. Like colonial and state laws in the 17th, 18th, and 19th centuries, the NFA seeks to raise revenue through taxation, regulate but do not prohibit firearm ownership, and gather information on firearms and their owners. Any modest burden imposed by the NFA's regulations is thus certainly "comparable" and "comparably justified" to the numerous historical laws outlined above.

## VI.     The Rule is not unconstitutionally vague.

Plaintiffs also contend the Rule is vague in violation of due process because it provides "no meaningful clarity on what constitutes an impermissible stabilizing brace or what other items might convert a pistol into a rifle under the Final Rule's multi-factor test." Pls.' Br. 32.

Notably, this Court previously found that the Rule's factoring criteria "provide a standard . . . that tracks the statutory definition," and the Rule's approach is "comprehensible enough to put a person of ordinary intelligence on notice that their weapon may be subject to federal firearms law." *Mock*, 2023 WL 2711630, at *7. The Fifth Circuit did not reverse that conclusion, and other district courts have concluded the same. *See Mock*, 75 F.4th at 586 n.59 ("Because plaintiffs are likely to succeed on the merits of their APA challenge, it is unnecessary to address their constitutional claims."); *Miller*, 2023 WL 3692841, at *9 ("The six factors considered by ATF provide a cognizable standard by which a person can conform their conduct that aligns with the statutory definition . . . which is sufficient to survive a void for vagueness challenge."); *SAF*, 2023 WL 7490149, at *10–*11 (holding Defendants had shown the Rule is likely not vague in violation of due process).

Regardless, "[o]rdinarily, a litigant to whom a statute clearly applies lacks standing to argue that the statute is vague as to others," and here, no Plaintiff contends that they are unable to determine whether their braced weapon—or a particular weapon they sell—would be classified as an NFA firearm because of ambiguities in the Rule. *Basiardanes v. City of Galveston*, 682 F.2d 1203, 1210 (5th Cir.

39

1982); *see also Harris Cty. v. CarMax Auto Superstores Inc.*, 177 F.3d 306, 325 (5th Cir. 1999) ("[A] litigant will not be permitted to challenge a statute for imprecision if his own conduct is clearly within the core of proscribed conduct."). In fact, the individual Plaintiffs aver that they understand how their weapons would be classified under the Rule. *See* Mock Decl. ¶ 6 ("I currently possess at least one braced pistol that will newly be treated as a short-barreled rifle under the [Rule]."); Lewis Decl. at ¶ 5 (quoting same). What's more, Plaintiffs have brought a facial challenge whereby they must establish "that *no* set of circumstances exists under which the [Rule] would be valid." *Wash. St. Grange v. Wash. State Republican Party*, 552 U.S. 442, 449 (2008) (emphasis added). That Mock and Lewis acknowledge that the Rule is clear as it applies to their braced pistols not only illustrates that they lack standing to bring a vagueness claim, but that Plaintiffs' facial challenge necessarily fails, as "[t]here are at least some instances in which a reasonable person can infer meaning from the [Rule] to determine whether a brace-equipped pistol is designed, made and intended to be fired from the shoulder under the NFA." *SAF*, 2023 WL 7490149 at *11 (quotations omitted).

In any event, the Rule is not unconstitutionally vague. A rule or statute must be written "with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement." *Kolender v. Lawson*, 461 U.S. 352, 357 (1983); *accord U.S. v. Howard*, 766 F.3d 414, 428 (5th Cir. 2014). "A statute is unconstitutionally vague if it does not give a person of ordinary intelligence a reasonable opportunity to know what is prohibited." *Tex. Democratic Party v. Abbott*, 961 F.3d 389, 409 (5th Cir. 2020) (citations omitted).

The Rule provides regulated parties with ample opportunity to understand ATF's view of the NFA, and it's clearer and provides more notice than ATF's previous classification system. Prior to the Rule, ATF had not uniformly classified braced weapons or even adopted a framework for classifying braced weapons; instead, ATF issued varied classification determinations for particular weapon-brace combinations, classifying some as short-barreled rifles, *see* 88 Fed. Reg. at 6484–85; AR 18–25; 54–57,

70–91, and others as not, *see* 88 Fed. Reg at 6488, 6490, 6492. By contrast, the Rule adopts a predictable framework for classification: ATF first considers whether a weapon has surface area allowing for shoulder firing, and then weighs six additional factors to determine whether the weapon is designed, made, and intended to be fired from the shoulder. *Supra* 8–9.

In connection with the Rule, ATF also issued interim guidance documents for additional clarity. *See Vill. of Hoffman Ests. v. Flipside, Hoffman Ests., Inc.*, 455 U.S. 489, 494 n.5 (1982) (directing courts to "consider any limiting construction" an "agency has proffered" that may clarify a challenged provision). The guidance identifies weapon-brace combinations that ATF will consider short-barreled rifles. *See* ATF, *Commercially available firearms equipped with a "stabilizing brace" that are short-barreled rifles*, https://perma.cc/BK6C-BRGQ; ATF, *Common weapon platforms with attached "stabilizing brace" designs that are short-barreled rifles*, https://perma.cc/JZB3-9CUY. ATF also intends to draft classification letters to send to manufacturers formally classifying their braced weapons. Further, an individual may "request a classification determination from ATF for additional clarity." 88 Fed. Reg. at 6552; *see also Vill. of Hoffman Ests.*, 455 U.S. at 498 (relaxing vagueness test when party may clarify a regulation's meaning "by its own inquiry"). Simply put, ATF has gone beyond what the Constitution requires to ensure regulated parties understand how the Rule affects them.

Plaintiffs contend that some of the Rule's factors are "inherently subjective," Pls.' Br. 32, such as a "manufacturer's direct and indirect marketing and promotional materials indicating the intended use of the weapon," or "information demonstrating the likely use of the weapon in the general community." 88 Fed. Reg. at 6570. But these factors do not reflect the types of "wholly subjective judgments" courts have struck down as vague—such as whether conduct is "annoying" or "indecent"—and courts regularly pass on similar questions of use and intent. *U.S. v. Williams*, 553 U.S. 285, 306 (2008); *Posters 'N' Things*, 511 U.S. at 521 n.11. Further, the "mere fact that close cases can be envisioned" does not "render[] a statute vague" on its face. *Williams*, 553 U.S. at 305. "What renders

41

a statute vague is not the possibility that it will sometimes be difficult to determine whether the incriminating fact it establishes has been proved; but rather the indeterminacy of precisely what that fact is." *Id.* at 306. And indeed, in *SAF*, another court in this District considered the Rule's same factors and found that "there are at least some circumstances in which these factors have meaning and are valid," and thus, plaintiffs were not likely to succeed on their facial vagueness. 2023 WL 7490149 at *11 (relying on materials at 88 Fed. Reg. at 6494, 6546, 6506 n.94).

Lastly, Plaintiffs argue the fact that ATF has discretion to employ the six-factor balancing test creates a constitutional problem. But "[a] law may . . . require law enforcement officers to use their discretion without being unconstitutionally vague," because "[e]nforcing criminal laws necessarily 'requires the exercise of some degree of [law enforcement] judgment.'" *Agnew v. Gov't. of the Dist. of Columbia*, 920 F.3d 49, 55 (D.C. Cir. 2019) (quoting *Grayned*, 408 U.S. at 114); *see also U.S. v. Munchel*, 2023 WL 2992689, at *9 (D.D.C. Apr. 18, 2023) ("[L]aws whose application turns on subjective judgments or preferences" may violate due process, but those that "set[] an 'imprecise' but ultimately comprehensible normative standard" do not). Otherwise, agencies routinely rely on multi-factor tests, and Plaintiffs cite no authority requiring an agency's analysis to be tied to specific weights or quantified requirements. *See Texas v. EPA*, 983 F.3d 826, 839–40 (5th Cir. 2020) (upholding an agency's use of "a multi-factor balancing test" that included no "numeric thresholds"); *PDK Lab'ys Inc. v. DEA*, 438 F.3d 1184, 1194 (D.C. Cir. 2006) ("Agencies routinely employ multi-factor standards when discharging their statutory duties, and we have never hesitated to uphold their decisions when adequately explained."). Indeed, multi-factor agency analysis "must simply define and explain the criteria" applied, *Catawba Cnty. v. EPA*, 571 F.3d 20, 39 (D.C. Cir. 2009), which the Rule does in exacting detail. Thus, the Rule is not vague in all its applications such that it is unconstitutional on its face.

## VII.   The Rule is otherwise constitutional.

*Delegation and the Take Care Clause.* Plaintiffs argue that the Rule "purports to create new law"

and gives ATF "new power" over weapons "not regulated by statute," in violation of the "clear-delegation" rule and Take Care clause. Pls.' Br. 37, 38. As they clarified in prior briefing, they are not arguing that the NFA violates the nondelegation doctrine. PI Reply Br. 4; *but see* Pls.' Br. 39 (the Rule "violates the Delegation Doctrine"). Instead, they argue the Rule "exceeds" ATF's "delegated authority." PI Reply Br. 4. But these "constitutional" claims are nothing more than Plaintiffs' statutory objections dressed up in constitutional garb, and thus fail for the same reasons. *Supra* 13–18.

*Gundy* and *Contender Farms* do not show otherwise. *See* Pls. Br. n.26. Neither of these cases applied an independent "clear delegation" test for agency rulemaking authority. Rather, these cases addressed how to identify legitimate ambiguity in the context of a *Chevron* analysis. *Calix v. Lynch*, 784 F.3d 1000, 1005 (5th Cir. 2015); *Contender Farms, LLP v. USDA*, 779 F.3d 258, 269 (5th Cir. 2015). But ATF did not invoke *Chevron* either when it promulgated the Rule or later as it has defended it. *Supra* 24. And in any event, Congress clearly and expressly delegated to the Executive the authority to issue rules necessary for the NFA's and GCA's enforcement. *Supra* 13. Accordingly, numerous courts have found that the express delegations in these statutes permit legislative rulemaking. *Cargill v. Barr*, 502 F. Supp. 3d 1163, 1186 (W.D. Tex. 2020) (collecting cases), *overruled on other grounds*. And because the NFA reflects an intelligible principle, this delegation is constitutionally permissible. *See Mistretta v. U.S.*, 488 U.S. 361, 372 (1989). Thus, whether ATF's rulemaking authority is judged under Plaintiffs' "clear delegation" standard or the nondelegation doctrine, their argument fails.

Beyond the delegation issue, whether ATF's exercise of this authority "faithfully executed" these statutory schemes is a question "beyond the purview of the courts." *Las Ams. Immigrant Advoc. Ctr. v. Biden*, 571 F. Supp. 3d 1173, 1181 (D. Or. 2021) (finding no private right of action under the Take Care Clause); *City of Columbus v. Trump*, 453 F. Supp. 3d 770, 803 (D. Md. 2020) (rejecting claim for equitable relief under the Take Care Clause where it would require "court supervision over the

performance of duty by the executive branch").[24] Plaintiffs' Take Care Clause challenge therefore fails.

_First Amendment._ Plaintiffs assert that the Rule violates the First Amendment. But that claim is meritless. This Court has already held that their "free speech arguments are unavailing," _Mock_, 2023 WL 2711630, at *6, and Plaintiffs offer no reason why the Court should rethink that conclusion.

As an initial matter, to assess a plaintiff's standing for a claim of "chilled" speech, a court should ask "(1) whether the plaintiff intends to engage in a course of conduct arguably affected with a constitutional interest; (2) whether that conduct is arguably proscribed by the challenged policy; and (3) whether the threat of future enforcement is substantial." _Tex. State LULAC v. Elfant_, 52 F.4th 248, 256 (5th Cir. 2022). Plaintiffs satisfy none of these requirements.

First, while Plaintiffs generally aver that the Rule "chills" certain speech of "manufacturers and third parties," neither their motion nor complaint alleges that _Plaintiffs'_ speech has been or will be imminently chilled. Pls.' Br. 33. Where, as here, plaintiffs fail to demonstrate that their speech rights are actually affected by the challenged Government action, they lack standing to bring a First Amendment claim. _E.g._, _Patterson v. Rawlings_, 287 F. Supp. 3d 632, 641 (N.D. Tex. 2018); _Hardy v. Panola Cnty. Sheriff's Dep't_, 2007 WL 496339, at *2 n.1 (N.D. Miss. Feb. 12, 2007).

Next, Plaintiffs cannot show an intent to engage in conduct "arguably proscribed" by the Rule. _Elfant_, 52 F.4th at 256. As this Court properly held, "no speech is being proscribed here. Rather, the Rule notifies the public that the government will _listen_ to their speech to discern whether a particular weapon falls within the NFA's scope." _Mock_, 2023 WL 2711630, at *6. And the First Amendment does not prohibit the Government from simply "listen[ing] to what [Plaintiffs] say about the products

---

[24] Plaintiffs' reliance on _Youngstown Sheet & Tube Co. v. Sawyer_, 343 U.S. 579 (1952), Pls.' Br. 37, is misplaced. In _Youngstown_, the President concededly acted outside congressionally delegated authority and sought to justify his actions by reference to his inherent Article II powers. 343 U.S. at 585–87. By contrast, ATF acted here pursuant to authority that Congress's expressly delegated to the Executive Branch. _Supra_ 13.

they manufacture and purchase." *Id.*; *accord Nicopure Labs, LLC v. FDA*, 944 F.3d 267, 282–83 (D.C. Cir. 2019); *Whitaker v. Thompson*, 353 F.3d 947, 953 (D.C. Cir. 2004).

Thus, Plaintiffs lack standing to raise a First Amendment claim. But even assuming standing, the Rule would deserve intermediate, not strict, scrutiny. Strict scrutiny generally applies to "[a] law *directed* at the communicative nature of conduct," *Texas v. Johnson*, 491 U.S. 397, 406 (1989) (citation omitted), whereas intermediate scrutiny applies where a commercial regulation effects "incidental" burdens on speech, *Doe I v. Landry*, 909 F.3d 99, 108 (5th Cir. 2018).[25] Assuming *arguendo* that the Rule affects some expression, any burden would be purely incidental to ATF's classification of a weapon.[26] In this circumstance, the Government need only show that the Rule "is narrowly tailored to serve substantial governmental interests." *Landry*, 909 F.3d at 108 (citation omitted). ATF is charged with enforcing the NFA, and has a substantial interest in the statute's proper application. And the Rule explains why its analytical framework is superior to the status quo in achieving consistency and accuracy in classifications. Thus, because the Rule promotes an substantial government interest (and does so more effectively than the status quo), it cannot violate the First Amendment.

## VIII.   Any relief should be narrowly tailored to redress Plaintiffs' injuries.

Even if Plaintiffs succeed on their claims, the sweeping remedies they request are unjustified and contrary to the constitutional and equitable constraints on this Court's remedial authority.

### A.   Universal vacatur of the Rule is unwarranted.

Plaintiffs begin by asking the Court to vacate the Rule "in its entirety," rather than limit any

---

[25] Though Plaintiffs suggest that any examination of a message gives rise to a content-based speech restriction, Pls.' Br. 34, the Supreme Court recently rejected that precise argument, explaining that it is only "regulations that discriminate based on 'the topic discussed or the idea or message expressed' that are content based." *City of Austin v. Reagan Nat'l Advert. of Austin, LLC*, 142 S. Ct. 1464, 1474 (2022). Again, the Rule does not regulate any speech, let alone discriminate against speech on account of its topic.

[26] Nor does the Rule restrict speech "based on the identity of the speaker." *See* Pls.' Br. 18. As Plaintiffs concede, *id.* at 33-34, ATF considers both manufacturer materials and "information demonstrating the likely use of the weapon in the general community." 88 Fed. Reg. at 6512. The latter includes third-party magazine articles, advertisements, and reviews that exhibit the use of a brace-equipped weapon. *Id.* at 6545–48.

relief to the parties. Pls.' Br. 40–42. The Court should decline that invitation for several reasons.

*First*, Plaintiffs are mistaken that universal vacatur is *required* to remedy an APA violation. *See id.* Although Fifth Circuit precedent recognizes vacatur as an available remedy for a successful APA challenge,[27] it is a discretionary, equitable remedy that is neither automatic nor compelled upon finding an APA violation. *See, e.g., Cargill*, 57 F.4th at 472; *VanDerStok*, 86 F.4th at 196–97; *Central S.W. Servs., Inc. v. EPA*, 220 F.3d 683, 692 (5th Cir. 2000); *see also* 5 U.S.C. § 702(1) (clarifying that "nothing" in the APA affects "the power or duty" of a court to "deny relief on" any "equitable ground"). In *Cargill*, for example, the Fifth Circuit held that a rule violated the APA. But rather than reflexively vacate the rule—as one would expect if vacatur were the mandatory remedy for an APA violation—the court recognized that "a more limited remedy" than vacatur may be "appropriate," and instructed the district court on remand to determine the proper remedy, whether "injunctive, declaratory, or otherwise." 57 F.4th at 472. So contrary to Plaintiffs' argument, it is entirely appropriate for a court not to vacate agency action at all where more limited remedies would fully redress Plaintiffs' asserted injuries.

*Second*, where (as here) party-specific remedies are capable of providing plaintiffs with complete relief, any broader relief would contradict constitutional and equitable limitations on this Court's remedial authority. As this Court has explained, any remedy "must be tailored to redress" Plaintiffs' "particular injury," *Mock*, 2023 WL 6457920, at *17 (cleaned up), given that this Court's "constitutionally prescribed role is to vindicate the individual rights of the people appearing before it," *Gill v. Whitford*, 138 S. Ct. 1916, 1933–34 (2018). And traditional principles of equity reinforce that constitutional limitation, *Grupo Mexicano de Desarrollo, S.A. v. All. Bond Fund, Inc.*, 527 U.S. 308, 318-319 (1999), instructing that a remedy "be no more burdensome" to defendants "than necessary to

---

[27] Still, the APA does not mention vacatur. And there is little indication that Congress intended to create a new and radically different remedy in the form of universal vacatur by directing courts to "set aside" agency "action, findings, and conclusions," 5 U.S.C. § 706(2), as Plaintiffs suggest. *See U.S. v. Texas*, 143 S. Ct. 1964, 1980–85 (2023) (Gorsuch, J., joined by Thomas and Barrett, JJ., concurring in the judgment).

provide complete relief" to Plaintiffs, *Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753, 765 (1994); *accord Trump v. Hawaii*, 138 S. Ct. 2392, 2427 (2018) (Thomas, J., concurring) (explaining that English and early American "courts of equity" typically "did not provide relief beyond the parties to the case").

Despite these well-established principles, Plaintiffs provide no argument or evidence to prove that universal vacatur of the Rule is necessary to fully redress their asserted injuries. *See Feds for Medical Freedom v. Biden*, 63 F.4th 366, 389 (5th Cir. 2023) ("[At the merits stage], the plaintiffs will have to *prove* that whatever [relief] they request is broad enough to protect against their proven injuries and no broader."). And at any rate, that claim appears inconsistent with this Court's determination at the preliminary-injunction stage that universal relief was unwarranted and that a party-specific remedy would "afford[]" Plaintiffs "complete relief." *Mock*, 2023 WL 6457920, at *18. Plaintiffs do not contest that conclusion, nor offer any sound reason why far broader relief is necessary at final judgment. They have thus hardly demonstrated that they are entitled to the sweeping remedy of universal vacatur.

*Third*, universal vacatur of the Rule would effectively countermand other district court decisions that have denied relief to other plaintiffs challenging the Rule. *See SAF*, 2023 WL 7490149, at *20; *Miller*, 2023 WL 3692841, at *12; *FRAC*, 2023 WL 5942365, at *11. Such relief would thus not only contravene traditional limitations on this Court's remedial authority, but would also undermine basic principles of comity by providing these other plaintiffs with the very relief to which sister courts—including another court within this District—decided they likely were not entitled. *See, e.g., Louisiana v. Becerra*, 20 F.4th 260, 264 (5th Cir. 2021) ("[Where] [o]ther courts are considering [the] same issues" at the same time, "[p]rinciples of judicial restraint control" and counsel against universal remedies.); *Texas*, 143 S. Ct. at 1985 (Gorsuch, J., concurring in the judgment) (recounting the well-known systemic issues created by universal remedies that courts should, at the very least, "carefully consider . . . before granting such sweeping relief" (cleaned up)).

*Fourth*, Plaintiffs' suggestion that injunctive and declaratory relief can only "supplement[]"

vacatur, Pls.' Br. 42, stems from a misreading of *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139 (2010). There, the district court vacated an agency's decision to deregulate a crop, and then proceeded also to enjoin any partial deregulation and to enjoin planters nationwide from planting the crop. *Id.* at 156. The Supreme Court vacated both injunctions. And as to the nationwide injunction on planting specifically, the Court explained that it was unnecessary to enter additional, far-reaching injunctive relief where "a less drastic remedy"—in that case, vacatur of the agency's deregulation decision—"was sufficient to redress [the plaintiffs'] injury." *Id.* at 165–66. Plaintiffs cite that portion of *Monsanto* for the proposition that vacatur is a necessary predicate to injunctive or declaratory relief. Pls.' Br. 42. But that's a non sequitur. By vacating a nationwide injunction on the grounds that a more limited remedy provided complete relief to the plaintiffs, the Supreme Court simply applied longstanding remedial principles requiring remedies to be narrowly tailored. Consistent with that teaching, this Court should decline to enter universal vacatur in this case because party-specific relief (*i.e.*, "a less drastic remedy" here) would fully redress Plaintiffs' asserted injuries. *See Monsanto*, 561 U.S. at 165–66; *Cargill*, 57 F.4th at 472 (explaining that "a more limited remedy" than vacatur may remedy an APA violation).

*And finally*, Plaintiffs' argument ignores that some APA violations should be corrected by an equitable remedy that the Fifth Circuit has described as "remand without vacatur." *See, e.g.*, *Texas v. U.S.*, 50 F.4th 498, 529 (5th Cir. 2022). Such relief is "generally appropriate when there is at least a serious possibility that the agency will be able to substantiate its decision given an opportunity to do so" and where vacatur would be "disruptive." *See id.* (citation omitted). For example, if this Court were to find that ATF failed to comply with the APA's notice-and-comment requirements in promulgating the Rule, or that ATF did not adequately explain its actions, that would at most justify an instruction to cure the asserted failure without granting additional relief. That approach would accord with established equitable principles by not "needlessly disrupting" the regulated community that the Rule seeks to benefit by returning it to a regime without generally applicable guidelines, the absence of

48

which would risk creating confusion among regulated parties. *See Bloomberg L.P. v. SEC*, 45 F.4th 462, 477–78 (D.C. Cir. 2022); *accord Central & S.W. Servs.*, 220 F.3d at 692 (declining to vacate a rule because "it would be disruptive" to "the regulated community").

### B. Plaintiffs are not entitled to their proposed injunction.

In addition to universal vacatur of the Rule, Plaintiffs request a permanent injunction preventing Defendants from "implementing, enforcing, or otherwise applying" ATF's "interpretation of the NFA's definition of 'rifle'" with regard to *any* "braced pistols." Pls.' Br. 43. But Plaintiffs have failed to justify their proposed injunction, which is too vague to be understood at any rate.

As an initial matter, Plaintiffs have not demonstrated that ATF's interpretation of the term "rifle" is invalid as applied to *all* "braced pistols," *supra* 13–18—which would have to be the case if this Court were to go so far as to enjoin ATF from treating *any* "braced pistol" as a rifle, no matter its design or intended use. The propriety and form of an equitable remedy are determined by "the nature of the violation" established. *Swann v. Charlotte-Mecklenburg Bd. of Ed.*, 402 U.S. 1, 16 (1971); *accord Lewis v. Casey*, 518 U.S. 343, 357 (1996) ("The remedy must . . . be limited to the inadequacy that produced the injury in fact that the plaintiff has established."). Yet Plaintiffs' proposed injunction is predicated on an alleged legal error they failed to prove. *John Doe #1 v. Veneman*, 380 F.3d 807, 819 (5th Cir. 2004) ("[A]n injunction is necessarily overbroad" where "it exceeds the extent of the violation established.").

In any event, Plaintiffs have not satisfied the equitable factors necessary to permit entry of a permanent injunction. *See eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006) ("[A] plaintiff seeking a permanent injunction must satisfy a four-factor test before a court may grant such relief."). To justify their proposed injunction, Plaintiffs needed to make a clear showing that (i) they will suffer irreparable harm without the injunction, (ii) other available remedies are inadequate, (iii) the balance of equities tips in their favor, and (iv) the injunction would serve the public interest. *Monsanto*, 561 U.S. at 156–67. But they failed to address, let alone establish, *any* of these prerequisites to injunctive

relief, thus precluding issuance of their proposed injunction. *Id.* at 158; *accord ZeniMax Media Inc. v. Oculus VR LLC*, 2018 WL 4078586, at *1 (N.D. Tex. June 27, 2018) ("Failure to sufficiently establish any one of the four factors requires" denial of a "request for an injunction." (citation omitted)).

Even setting all that aside, enjoining ATF from applying its interpretation of the statutory definition of "rifle" to any so-called "braced pistols," Pls.' Br. 43, would contravene Rule 65(d)'s requirement that an injunction "'state its terms specifically' and 'describe in reasonable detail' the conduct restrained or required," *Scott v. Schedler*, 826 F.3d 207, 211 (5th Cir. 2016) (citation omitted). That's because the term "braced pistols," though a useful shorthand, has no inherent or definitive meaning and is unaccompanied by a delimiting definition that would enable someone to "ascertain . . . exactly" the weapons to which it refers. *See id.* In fact, it is not even clear from Plaintiffs' proposed injunction *who* gets to decide what is (and what is not) a "braced pistol" and *how* that determination must be made. ATF could thus only guess at what such an order restrains. *See id.* at 212 ("Rule [65(d)] was designed to prevent uncertainty and confusion" for those facing injunctive orders and to avoid "contempt citation[s]" based "decree[s] too vague to be understood." (citation omitted)). And if history is any lesson, one should expect that some members of the firearm industry would seek to exploit an injunction premised on such an ambiguous term to circumvent federal firearm regulations. *Supra* 3–7. Therefore, Plaintiffs' proposed injunction is "hopelessly vague," *see PMC, Inc. v. Sherwin-Williams, Co.*, 151 F.3d 610, 619 (7th Cir. 1998), as it does not "clearly define" the particular conduct that it would proscribe, as Rule 65 requires, *see Scott*, 826 F.3d at 211–14 (citation omitted).

## CONCLUSION

The Court should grant summary judgment in Defendants' favor on all of Plaintiffs' claims.

Dated: December 18, 2023          Respectfully submitted,

BRIAN M. BOYNTON
*Principal Deputy Assistant Attorney General*

BRIGHAM J. BOWEN

50

Assistant Branch Director

*/s/ Jody D. Lowenstein*
JODY D. LOWENSTEIN (MT Bar No. 55816869)
MICHAEL DREZNER (VA Bar No. 83836)
TAYLOR PITZ (CA Bar No. 332080)
FAITH E. LOWRY (TX Bar No. 24099560)
Trial Attorneys
U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L Street NW
Washington, DC 20005
Phone: (202) 598-9280
Email: jody.d.lowenstein@usdoj.gov

*Attorneys for Defendants*

51

**CERTIFICATE OF SERVICE**

On December 18, 2023, I electronically submitted the foregoing document with the Clerk of Court for the U.S. District Court, Northern District of Texas, using the Court's electronic case filing system. I hereby certify that I have served all parties electronically or by another manner authorized by Federal Rule of Civil Procedure 5(b)(2).

                                        */s/ Jody D. Lowenstein*
                                        JODY D. LOWENSTEIN
                                        Trial Attorney
                                        U.S. Department of Justice