**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION**

| | |
|---|---|
| WILLIAM T. MOCK; CHRISTOPHER LEWIS; FIREARMS POLICY COALITION, INC., a nonprofit corporation; and MAXIM DEFENSE INDUSTRIES, LLC, | |
| *Plaintiffs*, | |
| v. | |
| MERRICK GARLAND, U.S. Attorney General, in his official capacity as Attorney General of the United States; UNITED STATES DEPARTMENT OF JUSTICE; BUREAU OF ALCOHOL, TOBACCO, FIREARMS AND EXPLOSIVES; and STEVEN DETTELBACH, in his official capacity as the Director of the Bureau of Alcohol, Tobacco, Firearms and Explosives, | Civil Action No. 4:23-cv-00095-O |
| *Defendants*. | |

<u>**PLAINTIFFS' CONSOLIDATED REPLY BRIEF IN SUPPORT OF THEIR MOTION**</u>

<u>**FOR SUMMARY JUDGMENT AND IN OPPOSITION TO DEFENDANTS' MOTION**</u>

<u>**FOR SUMMARY JUDGMENT**</u>

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................. ii

INTRODUCTION .............................................................................................................. 1

ARGUMENT ..................................................................................................................... 2

I.     The Anti-Injunction Act Does Not Apply To This Suit Because Plaintiffs' APA Challenge To The Final Rule Has (At Most) A Tangential And Incidental Impact On The NFA's Regulatory Tax ........................................................................................ 2

II.    The Fifth Circuit's Logical Outgrowth Ruling Is Binding On This Court ........................ 7

III.   The Agencies Exceeded Their Authority When Redefining "Rifle" To Include Braced Pistols .............................................................................................................. 9

IV.   The Final Rule Is Arbitrary And Capricious ................................................................ 12

     A.    Failure To Consider Important Aspects Of Regulation ....................................... 12

     B.    Failure To Adequately Support A Change In Longstanding Agency Position ..... 13

     C.    The Final Rule's Impossibly Vague Standards .................................................... 14

V.    The Final Rule Violates The Second Amendment ...................................................... 15

     A.    Plaintiffs' Proposed Conduct Is Covered By The Second Amendment Because Braced Pistols And Stabilizing Braces Are "Arms" Protected By The Second Amendment .......................................................................................... 15

     B.    Braced Pistols And Stabilizing Braces Are Not "Dangerous And Unusual" ....... 17

     C.    The Final Rule Is Not Consistent With The Nation's Historical Tradition Of Firearm Regulation ........................................................................................... 19

          1.    Registration Requirements ......................................................................... 19

          2.    Taxation Requirements .............................................................................. 21

     D.    If The Final Rule Stands, Then Final Rule And The NFA's Regulation Of SBRs Violate The Second Amendment ................................................................ 22

VI.   The Final Rule Is Void For Vagueness ....................................................................... 22

VII.  The Final Rule Violates The First Amendment And The Constitution's Structural Protections ........................................................................................................... 24

     A.    First Amendment ............................................................................................. 24

     B.    Structural Protections ...................................................................................... 27

SCOPE OF RELIEF ......................................................................................................... 28

VI.   This Court Should Issue The "Default" Remedy Of Vacating The Final Rule, And It Should Issue An Injunction To Provide Complete Relief To Plaintiffs ......................... 28

     A.    This Is Not A "Rare" Case Where Departure From The "Default" Rule Of Vacatur Is Justified ........................................................................................... 28

     B.    A Permanent Injunction Is Necessary To Supplement Vacatur And Provide Complete Relief For The Agencies' Unlawful Action ......................................... 32

CONCLUSION ................................................................................................................. 34

CERTIFICATE OF SERVICE ........................................................................................... 35

i

## TABLE OF AUTHORITIES

**Cases**

*Alliance for Hippocratic Med. v. U.S. Food & Drug Admin.*,
   78 F.4th 210 (5th Cir. 2023) ................................................................. 8, 29

*Allina Health Servs. v. Sebelius*,
   746 F.3d 1102 (D.C. Cir. 2014) ................................................................ 30

*Am. Great Lakes Ports Ass'n v. Schultz*,
   962 F.3d 510 (D.C. Cir. 2020) .................................................................. 30

*Babbitt v. Sweet Home Chapter of Communities for a Great Oregon*,
   515 U.S. 687 (1995) .................................................................................. 11

*Bezet v. United States*,
   714 Fed. App'x 336 (5th Cir. 2017) ........................................................ 17

*Bond v. United States*,
   564 U.S. 211 (2011) .................................................................................. 28

*Caetano v. Massachusetts*,
   577 U.S. 411 (2016) .................................................................................. 17

*Cargill v. Garland*,
   57 F.4th 447 (5th Cir. 2023) ........................................................... 1, 11, 29

*Cent. & S. W. Servs., Inc. v. U.S. E.P.A.*,
   220 F.3d 683 (5th Cir. 2000) ................................................................... 29

*Chamber of Commerce of United States v. United States Sec. & Exch. Comm'n*,
   85 F.4th 760 (5th Cir. 2023) ................................................................... 12

*Chamber of Commerce of United States v. United States Sec. & Exch. Comm'n*,
   88 F.4th 1115 (5th Cir. 2023) ................................................................. 29

*CIC Servs., LLC v. IRS*,
   593 U.S. 209 (2021) .......................................................................... passim

*Citizens for Resp. & Ethics in Wash. v. Trump*,
   302 F. Supp. 3d 127 (D.D.C. 2018) ........................................................ 28

*Cohen v. United States*,
   650 F.3d 717 (D.C. Cir. 2011) .................................................................. 2

*Colautti v. Franklin*,
   439 U.S. 379 (1979) .................................................................................. 24

*Collins v. Yellen*,
   141 S. Ct. 1761 (2021) .............................................................................. 28

*Competitive Enter. Inst. v. U.S. Dep't of Transp.*,
   856 F.2d 1563 (D.C. Cir. 1988) ............................................................... 25

*Data Mktg. P'ship, LP v. United States Dep't of Lab.*,
   45 F.4th 846 (5th Cir. 2022) ............................................................. 14, 29

*Dep't of Homeland Sec. v. Regents of the Univ. of California*,
   140 S. Ct. 1891 (2020) .............................................................................. 13

*Direct Marketing Ass'n v. Brohl*,
   575 U.S. 1 (2015) ......................................................................... 1, 3, 4, 6

*District of Columbia v. Heller*,
   554 U.S. 570 (2008) ........................................................................... 15, 17

*Doe I v. Landry*,
    909 F.3d 99 (5th Cir. 2018) ........................................................................ 26, 27
*Duncan v. Bonta*,
    2023 WL 6180472 (S.D. Cal. Sept. 22, 2023) ................................................... 16
*Duncan v. Bonta*,
    83 F.4th 803 (9th Cir. 2023) ........................................................................... 16
*Enochs v. Williams Packing & Navigation Co.*,
    370 U.S. 1 (1962)............................................................................................ 6
*Esquivel-Quintana v. Lynch*,
    810 F.3d 1019 (6th Cir. 2016) ........................................................................ 11
*F.C.C. v. Fox Television Stations, Inc.*,
    556 U.S. 502 (2009)........................................................................................ 13
*FCC v. Prometheus Radio Project*,
    592 U.S. 414 (2021)................................................................................. 12, 14
*Feds for Medical Freedom v. Biden*,
    63 F.4th 366 (5th Cir. 2023) ........................................................................... 30
*Firearms Regulatory Accountability Coalition, Inc. v. Garland*,
    D.N.D. Case No. 1:23-cv-0024-DLH-CRH, 8th Cir. Case No. 23-3230 ............... 18
*Franciscan Alliance, Inc. v. Becerra*,
    47 F.4th 368 (5th Cir. 2022) ...................................................................... 29, 31
*Frein v. Pa. State Police*,
    47 F.4th 247 (3d Cir. 2022) ........................................................................... 16
*Gaalla v. Brown*,
    460 F. App'x 469 (5th Cir. 2012) ...................................................................... 8
*Gundy v. United States*,
    139 S. Ct. 2116 (2019)..................................................................................... 9
*Hanson v. D.C.*,
    2023 WL 3019777 (D.D.C. Apr. 20, 2023)......................................................... 16
*Heartland Reg'l Med. Ctr. v. Sebelius*,
    566 F.3d 193 (D.C. Cir. 2009) ......................................................................... 30
*Hibbs v. Winn*,
    542 U.S. 88 (2004)........................................................................................... 2
*Hollis v. Lynch*,
    827 F.3d 436 (5th Cir. 2016) ........................................................................... 18
*Johnson v. United States*,
    576 U.S. 591 (2015)........................................................................................ 24
*Kolender v. Lawson*,
    461 U.S. 352 (1983)........................................................................................ 24
*Korte v. Sebelius*,
    735 F.3d 654 (7th Cir. 2013) ............................................................................ 2
*Lane v. Holder*,
    703 F.3d 668 (4th Cir. 2012) ........................................................................... 17
*Las Americas Immigrant Advoc. Ctr. v. Biden*,
    571 F. Supp. 3d 1173 (D. Or. 2021) ................................................................. 28
*Linn v. Chivatero*,
    714 F.3d 1278 (5th Cir. 1983) .......................................................................... 5

iii

*Louisiana v. Becerra*,
    20 F.4th 260 (5th Cir. 2021) .................................................................................. 31

*Loving v. United States*,
    517 U.S. 748 (1996) ............................................................................................... 27

*Lujan v. Nat'l Wildlife Fed'n*,
    497 U.S. 871 (1990) ............................................................................................... 32

*Marsh v. Or. Nat. Res. Council*,
    490 U.S. 360 (1989) ............................................................................................... 14

*Maryland Shall Issue, Inc. v. Moore*,
    86 F.4th 1038 (4th Cir. 2023) .............................................................................. 16

*Mock v. Garland*,
    2023 WL 2711630 (N.D. Tex. March 30, 2023) ............................................... 26

*Mock v. Garland*,
    75 F.4th 563 (5th Cir. 2023) ........................................................................ passim

*N.L.R.B. v. Bell Aerospace Co. Div. of Textron*,
    416 U.S. 267 (1974) ............................................................................................... 13

*Nat'l Mining Ass'n v. U.S. Army Corps of Eng'rs*,
    145 F.3d 1399 (D.C. Cir. 1998) .......................................................................... 31

*New York State Rifle & Pistol Ass'n v. Bruen*,
    597 U.S. 1 (2022) .......................................................................................... passim

*NFIB v. Sebelius*,
    567 U.S. 519 (2012) ................................................................................................. 9

*O.A. v. Trump*,
    404 F. Supp. 3d 109 (D.D.C. 2019) ................................................................... 32

*R.A.V. v. City of St. Paul*,
    505 U.S. 377 (1992) ............................................................................................... 25

*Reed v. Town of Gilbert*,
    576 U.S. 155 (2015) ............................................................................................... 25

*Royal Ins. Co. of Am. v. Quinn-L Capital Corp.*,
    3 F.3d 877 (5th Cir. 1993) ...................................................................................... 8

*Sackett v. EPA*,
    598 U.S. 651 (2023) ............................................................................................... 23

*Sec'y of State of Md. v. Joseph H. Munson Co.*,
    467 U.S. 947 (1984) ............................................................................................... 26

*Smiley v. Citibank (S. Dakota), N.A.*,
    517 U.S. 735 (1996) ............................................................................................... 13

*Staples v. United States*,
    511 U.S. 600 (1994) ............................................................................................... 10

*Tex. Pipeline Ass'n v. FERC*,
    661 F.3d 258(5th Cir. 2011) ............................................................................... 28

*Tex. Voters Alliance v. Dallas Cty.*,
    495 F. Supp. 3d 441 (E.D. Tex. 2020) ................................................................. 8

*Texas v. United States*,
    50 F.4th 498 (5th Cir. 2022) ......................................................................... 29, 30

*Texas v. United States*,
    809 F.3d 134 (5th Cir. 2015) .............................................................................. 31

*Turner v. Lt. Driver*,
    848 F.3d 678 (5th Cir. 2017) ................................................................. 25

*United States v. Gresham*,
    118 F.3d 258 (5th Cir. 1997) ................................................................... 6

*United States v. Harrison*,
    654 F. Supp. 3d 1191 (W.D. Okla. 2023) ............................................. 20

*United States v. Lee*,
    358 F.3d 315 (5th Cir. 2004) ............................................................. 7, 8

*United States v. Matthews*,
    312 F.3d 652 (5th Cir. 2002) ............................................................. 7, 8

*United States v. O'Brien*,
    391 U.S. 367 (1968) ............................................................................. 27

*United States v. Rahimi*,
    61 F.4th 443 (5th Cir. 2023) ......................................................... 18, 20

*United States v. Teel*,
    691 F.3d 578 (5th Cir. 2012) ................................................................. 7

*United States v. Wills*,
    40 F.4th 330 (5th Cir. 2022) ................................................................. 8

*United Steel, Paper & Forestry, Rubber Mfg., Energy, Allied Indus. & Serv. Workers Int'l Union
    v. Mine Safety & Health Admin.*,
    925 F.3d 1279 (D.C. Cir. 2019) ........................................................... 29

*Util. Air Regul. Grp. v. EPA*,
    573 U.S. 302 (2014) ............................................................................. 28

*VanDerStok v. Garland*,
    86 F.4th 179 (5th Cir. 2023) ......................................................... 14, 29

*Vill. of Hoffman Ests. v. Flipside, Hoffman Ests., Inc.*,
    455 U.S. 489 (1982) ....................................................................... 23, 24

*Virginia State Bd. of Pharmacy v. Virginia Citizens Consumer Council, Inc.*,
    425 U.S. 748 (1976) ............................................................................. 25

*Virginia v. Am. Booksellers Ass'n, Inc.*,
    484 U.S. 383 (1988) ............................................................................. 26

*Ward v. Rock Against Racism*,
    491 U.S. 781 (1989) ............................................................................. 27

*Whitman v. United States*,
    574 U.S. 1003 (2014) ........................................................................... 11

*Wright v. New Jersey*,
    469 U.S. 1146 (1985) ........................................................................... 23

*Youngstown Sheet & Tube Co. v. Sawyer*,
    343 U.S. 579 (1952) ............................................................................. 27

**Statutes**

26 U.S.C. § 5845(a)(5) ................................................................................ 9

26 U.S.C. § 5845(e) .................................................................................... 9

26 U.S.C. § 7421(a) .................................................................................... 2

5 U.S.C. § 706(2)(B) ................................................................................. 26

**Other Authorities**

H.R. Rep. No. 73-1780 (1934)..................................................................................... 10

S .Rep. No. 1444 (1934) .............................................................................................. 10

## INTRODUCTION

The ultimate resolution of this motion—and, therefore, this case—is straightforward. The Court has already recognized that the Fifth Circuit's ruling establishes "that Plaintiffs have demonstrated, *a fortiori*, an *actual* success on the merits of their APA challenge to the Final Rule." ECF No. 92, Oct. 2, 2023 Opinion & Order on Plaintiffs' Motion for Preliminary Injunction, at 10; *see Mock v. Garland*, 75 F.4th 563, 578–86 (5th Cir. 2023). Law of the case bars Defendants' efforts to relitigate what the Fifth Circuit has already decided. Accordingly, summary judgment must be entered in Plaintiffs' favor. And because the Final Rule is invalid, Fifth Circuit precedent compels that the Final Rule be vacated. *Cargill v. Garland*, 57 F.4th 447, 472 (5th Cir. 2023). And fortunately, unlike other Administrative Procedure Act ("APA") litigation before this Court, the Final Rule here only addresses a single subject matter, and thus can—and should—be vacated in its entirety. A permanent injunction is also necessary and appropriate to complement vacatur to provide Plaintiffs complete relief from the Agencies' efforts to treat braced pistols as if they are short-barreled rifles ("SBRs") even if the Final Rule is vacated.

The Agencies' various arguments cannot avoid this result. The Agencies offer one new theory that the Anti-Injunction Act ("AIA") bars jurisdiction over the case because the National Firearms Act imposes a $200 "transfer tax" on all firearm transactions that are properly within its coverage, and the Final Rule would massively expand that coverage. The AIA does not apply here, principally because the relief sought in this case is not directed at "the acts of assessment, levy, and [tax] collection themselves." *Direct Marketing Ass'n v. Brohl*, 575 U.S. 1, 12 (2015). Rather, Plaintiffs seek vacatur of the Final Rule and an injunction preventing Defendants from enforcing or implementing the Final Rule. This suit contests the validity of the Final Rule under the APA; the relief requested does not target the NFA's transfer tax. And the United States Supreme Court has rejected the premise of the Agencies' theory: the AIA's "limit on injunctions . . . is not keyed to all activities that may improve [the government's] ability to assess and collect taxes" or that may "facilitate" the collection of a tax. *CIC Servs., LLC v. IRS*, 593 U.S. 209, 217 (2021) (cleaned

1

up). This case has (at most) a tangential and incidental impact on the government's taxing power, so the AIA has no application here.

Plaintiffs have separately moved for summary judgment on each of the additional counts in their complaint to preserve their ability to defend the Court's judgment on appeal. Defendants fare no better responding to those arguments, which are dispensed with in detail below.

The Court should enter judgment in Plaintiffs' favor on all claims, vacate the Final Rule, and issue a complementary permanent injunction enjoining Defendants from treating braced pistols as "rifles" subject to the NFA.

## ARGUMENT

**I.      The Anti-Injunction Act Does Not Apply To This Suit Because Plaintiffs' APA Challenge To The Final Rule Has (At Most) A Tangential And Incidental Impact On The NFA's Regulatory Tax.**

The Agencies lead with the new argument that the Anti-Injunction Act deprives the Court of jurisdiction over this dispute. Because the National Firearms Act imposes a $200 tax on covered firearms, the government's theory goes, this suit is covered by the AIA because Plaintiffs' challenge to the Final Rule implicates the NFA's regulation of SBRs.

The AIA provides: "[N]o suit for the purpose of restraining the assessment or collection of any tax shall be maintained in any court by any person, whether or not such person is the person against whom such tax was assessed." 26 U.S.C. § 7421(a). The AIA serves "twin purposes": "It responds to 'the Government's need to assess and collect taxes as expeditiously as possible with a minimum of preenforcement judicial interference'; and it 'require[s] that the legal right to the disputed sums be determined in a suit for refund.'" *Hibbs v. Winn*, 542 U.S. 88, 103 (2004) (citations omitted). Courts have long recognized that the AIA "does not reach 'all disputes tangentially related to taxes.'" *Korte v. Sebelius*, 735 F.3d 654, 670 (7th Cir. 2013) (quoting *Cohen v. United States*, 650 F.3d 717, 727 (D.C. Cir. 2011)). To decide whether the AIA applies, "a court must look to the 'primary purpose' of the lawsuit," and it will not bar a suit that has only an "incidental" effect on taxes. *Pendleton v. Heard*, 824 F.2d 448, 451 (5th Cir. 1987) (citation

2

omitted). The "purpose" of a lawsuit is measured by "the claims brought and injuries alleged," with particular attention to "the 'relief requested.'" *CIC Services*, 593 U.S. at 217–18 (2021).

The AIA does not apply here because this is not a dispute about taxes. Plaintiffs contest the legality of the Final Rule under the APA, and the principal relief requested in the First Amended Complaint is "[h]olding unlawful and setting aside the Final Rule," "[v]acatur of the Final Rule," and "enjoining Defendants from enforcing and/or implementing the Final Rule." ECF No. 13, First Am. Compl., at 74. The Prayer does not mention the word "tax" or otherwise refer to payment of a tax. Likewise, the Proposed Order submitted with this motion asks that the Final Rule be vacated and that Defendants be "enjoined from implementing, enforcing, or otherwise applying the [NFA]'s definition of 'rifle' as interpreted by Defendants in the Final Rule." ECF No. 100-1.

The Supreme Court's analysis in *Direct Marketing* demonstrates why the AIA does not apply. In *Direct Marketing*, the Supreme Court allowed plaintiffs to challenge a Colorado statute imposing a duty on out-of-state retailers to report untaxed sales to Colorado residents so that state regulators could then collect a tax. The Court reasoned that the Tax Injunction Act—construed harmoniously with the AIA[1]—is directed at "the acts of assessment, levy, and collection themselves, and enforcement of the notice and reporting requirements is none of these." 575 U.S. at 12. The Supreme Court recently confirmed as much in *CIC Services*, where it reasoned that the AIA's "limit on injunctions . . . is 'not keyed to all activities that may improve [the government's] ability to assess and collect taxes,'" but "is instead 'keyed to the acts of assessment [and] collection themselves.'" 593 U.S. at 217 (quoting *Direct Marketing*, 575 U.S. at 11, 12). As a result, plaintiffs' challenge in *Direct Marketing* to "ordinary reporting duties" was not prohibited by the anti-injunction statute even though those statutory requirements "would 'facilitate collection of taxes.'" *Id.* (quoting *Direct Marketing*, 575 U.S. at 12).

---

[1]     The Tax Injunction Act is a federal statute modeled after the Anti-Injunction Act that is directed at state, rather than federal, taxes. The Supreme Court has construed the identical terms of the two anti-injunction statutes harmoniously. *See Direct Marketing*, 575 U.S. at 8; *CIC Services*, 593 U.S. at 216 n.1.

This challenge is even further removed from "acts of assessment [and] collection" than the claims in *Direct Marketing*. Plaintiffs challenge the Final Rule's effort to bring millions of firearm owners into the NFA's onerous registration requirements for the first time by *sua sponte* reclassifying millions of NFA-exempt braced pistols as if they were NFA-regulated SBRs—hardly an "ordinary reporting dut[y.]" The mere fact that the "information gathering" associated with such registration might "facilitate collection of taxes" does not trigger application of the AIA. *CIC Services*, 593 U.S. at 216–17 (quoting *Direct Marketing*, 575 U.S. at 8, 12). Likewise, "a suit cannot be understood to 'restrain' the 'assessment, levy or collection' of a . . . tax if it merely inhibits those activities." *Direct Marketing*, 575 U.S. at 14 (quoting the Tax Injunction Act, 28 U.S.C. § 1341). That is the case here: Plaintiffs' requested injunctive relief does not "stop[] 'assessment, levy or collection'" of taxes, *id.*, because the federal government remains free to collect the NFA's transfer tax on all firearms properly within its coverage.

The Supreme Court's reasoning in *CIC Services* bolsters this conclusion. Plaintiffs there brought an APA challenge to an IRS notice imposing an information-reporting requirement that was backed by tax and criminal penalties. 593 U.S. at 211, 212–15. The IRS claimed that the suit was barred under the AIA because an injunction would prevent the agency from assessing tax penalties under the notice. *Id.* at 215. The Supreme Court disagreed. The Court highlighted "three aspects of the regulatory scheme" that illustrated why the purposes of plaintiff's suit was not to "restrain[] the assessment or collection of a tax." *Id.* at 219–23. Specifically: (1) the notice "impose[d] affirmative reporting obligations" that "inflict[ed] costs separate and apart from the statutory tax penalty"; (2) the notice's rule and tax penalty were "several steps removed from each other"; and (3) "violation of the [n]otice [was] punishable not only by a tax, but by separate criminal penalties" that "practically necessitate[d] a pre-enforcement, rather than a refund, suit." *Id.* These considerations cut in Plaintiffs' favor here.

First, as in *CIC Services*, Plaintiffs' suit targets the legality of an administrative rule that imposes costs and obligations that are "separate and apart from" and "exceed, or even dwarf" the tax imposed by the broader regulatory scheme. 593 U.S. at 220. Specifically, the Final Rule

requires owners of stabilizing braces and braced pistols to either modify their firearms to remove them from the NFA's coverage or destroy them.[2] ECF No. 92, Oct. 2, 2023, Opinion & Order on Plaintiffs' Motion for Preliminary Injunction, at 4–5; 88 Fed. Reg. at 6,570. The NFA's $200 tax comes into play only as part of its registration regime for covered firearms. Plaintiffs' challenge is necessarily antecedent to that regime: The purpose of their lawsuit is not to avoid the NFA's tax; rather, it challenges the Agencies' effort to reclassify the subject firearms in the first instance. To the extent that the lawsuit would protect braced pistol owners from the Final Rule's attempt to subject them to the NFA's tax for the first time *ever*, that would be "the suit's after-effect, not its substance." *CIC Services*, 593 U.S. at 220. Second, the transfer tax is "several steps removed"— and, indeed, does not inevitably flow—from the Final Rule's classification regime because it is no longer even relevant in this case since the non-enforcement period has expired. *Id.* There is no avenue available to braced pistol owners today to register those arms under the NFA. And third, violation of the Final Rule's dictates subjects the Individual Plaintiffs and the entire regulated community to criminal penalties that provide no practical option for them to pay the transfer tax now and sue later. *See id.* at 222.

CIC Services and Direct Marketing have abrogated the cases on which the Agencies rely. The opposition cites the statements in *Linn v. Chivatero*, 714 F.3d 1278 (5th Cir. 1983), that the AIA applies "not only to the assessment and collection of taxes, but to 'activities which are intended to or may culminate in the assessment or collection of taxes' as well," including "the collection of information that would aid in the assessment of taxes." *Id*. at 1282. As shown above, *CIC Services* and *Direct Marketing* expressly reject these concepts. *CIC Services*, 593 U.S. at 217 ("[t]he statute's limit on injunctions . . . is 'not keyed to all activities that may improve [the government's] ability to assess and collect taxes,'" but "is instead 'keyed to the acts of assessment

---

[2]     During the Agencies' self-proclaimed non-enforcement period, owners could have also registered their firearms under the NFA or turned them over to the ATF. Now that the non-enforcement period has ended, an individual would be subject to criminal penalty if they tried to register a firearm that the Agencies determine to be an SBR *after* that individual was already in possession of the firearm.

[and] collection themselves'") (quoting *Direct Marketing*, 575 U.S. at 12); *id*. at 216–17 ("Information gathering" . . . is "a phase of tax administration procedure that occurs before assessment [or] collection.") (quoting *Direct Marketing*, 575 U.S. at 8).

Nor can the Agencies claim that the AIA applies based on the statement in *United States v. Gresham*, 118 F.3d 258, 261 (5th Cir. 1997)—a criminal case that did not even discuss the AIA—that the NFA's taxation component "facilitate[s] enforcement" of the regulatory scheme. Agency Br. at 12. On that score, *Direct Marketing* expressly rejected the Court of Appeals' conclusion that the Tax Injunction Act is triggered by a suit targeting any activity "intended to facilitate collection of taxes," 575 U.S. at 12, holding instead that the act "is not keyed to all activities that may improve a State's ability to assess and collect taxes." *Id.* at 11. *CIC Services* likewise observed that "[a] reporting requirement is not a tax; and a suit brought to set aside such a rule is not one to enjoin a tax's assessment or collection. That is so even if the reporting rule will help the IRS bring in future tax revenue." 593 U.S. at 216. The same is true here: Plaintiffs' suit against the Final Rule is not one to enjoin the "assessment or collection" of the NFA's transfer tax, even if the Final Rule would sweep in additional revenue by dramatically expanding the statute's reach.

In any event, even if the Agencies were correct regarding the AIA's scope in general, Plaintiffs' claims here fall within an exception permitting injunctive relief for plaintiffs who show that they will "suffer irreparable injury if collection [of the tax] were effected" and that "it is clear that under no circumstances could the [government] ultimately prevail." *Enochs v. Williams Packing & Navigation Co.*, 370 U.S. 1, 7 (1962). Both of these factors are met here: This Court has already reviewed at length how the Final Rule inflicts irreparable harm on Plaintiffs, ECF No. 92, Oct. 2, 2023 Opinion & Order on Plaintiffs' Motion for Preliminary Injunction, at 10–34, and the Fifth Circuit's ruling establishes "that Plaintiffs have demonstrated, *a fortiori*, an *actual* success on the merits of their APA challenge to the Final Rule," *id.* at 10.

In sum, Plaintiffs' suit does not trigger the AIA.

6

**II.      The Fifth Circuit's Logical Outgrowth Ruling Is Binding On This Court.**

Defendants seek to relitigate the Fifth Circuit's decision in this case by claiming that it only

held that Plaintiffs have a "substantial" likelihood of success on the merits rather than actual

success. Agency Br. at 22; *see id.* at 22–29 (restating the Agencies' merits argument that has been

considered and rejected by the Fifth Circuit). Law of the case bars the Agencies' arguments.

Indeed, this Court has already ruled that Plaintiffs have established "actual success" on the

logical outgrowth claim based on the Fifth Circuit's ruling:

> Plaintiffs were first required to demonstrate that they are substantially likely to
> succeed on the merits of one of their claims. *Daniels Health Servs.*, 710 F.3d at
> 582. "[A]n appellate court's decision of a legal issue . . . establishes the law of the
> case and must be followed in all subsequent proceedings in the same case."
> *Carnival Leisure Indus., Ltd. v. Aubin*, 53 F.3d 716, 718–19 (5th Cir. 1995).
> Following the Fifth Circuit's decision, the controlling law of this case posits that
> Plaintiffs have demonstrated, *a fortiori*, an *actual* success on the merits of their
> APA challenge to the Final Rule. *See Mock*, 75 F.4th at 578, 586 (holding that "the
> Final Rule fails the logical-outgrowth test and violates the APA" and "therefore
> must be set aside as unlawful"). The Court wholesale adopts that conclusion as its
> own as well.

ECF No. 92, Oct. 2, 2023 Opinion & Order on Plaintiffs' Motion for Preliminary Injunction, at

10.

As the Court recognized, the Fifth Circuit's ruling is binding under "[t]he law of the case

doctrine," which "posits that ordinarily 'an issue of fact or law decided on appeal may not be

reexamined either by the district court on remand or by the appellate court on subsequent appeal.'"

*United States v. Lee*, 358 F.3d 315, 320 (5th Cir. 2004) (quoting *United States v. Matthews*, 312

F.3d 652, 657 (5th Cir. 2002)); *see also United States v. Teel*, 691 F.3d 578, 582 (5th Cir. 2012)

(Under the law-of-the case doctrine, "the district court on remand, or the appellate court on a

subsequent appeal, abstains from reexamining an issue of fact or law that has already been decided

on appeal."). "The doctrine covers issues decided expressly and by necessary implication," *United*

*States v. Wills*, 40 F.4th 330, 334 (5th Cir. 2022), and it may be disregarded only in certain enumerated "exceptional circumstances," *Lee*, 358 F.3d at 320.[3]

The Fifth Circuit's decision squarely considered and rejected each of the Agencies' arguments as a matter of law. *Mock*, 75 F.4th at 578–83 (holding that the Final Rule is legislative, and not interpretive); *id.* at 583–86 (holding that "it is relatively straightforward that the Final Rule was not a logical outgrowth of the Proposed Rule, and the monumental error was prejudicial"). Defendants cannot dodge that fact just because it was a preliminary injunction appeal. *See, e.g.*, *Royal Ins. Co. of Am. v. Quinn-L Capital Corp.*, 3 F.3d 877, 880–81 (5th Cir. 1993) (on decisions of law, "[a]s in any other interlocutory appeal, our decision constitutes law of the case" in a preliminary injunction appeal); *Gaalla v. Brown*, 460 F. App'x 469, 476 (5th Cir. 2012) ("[C]onclusions of law made by a court of appeals regarding a preliminary injunction become the law of the case, and binding on that court in further proceedings.").

The only authority the Agencies cite to set up their argument that the logical outgrowth issue remains open to debate is the straightforward (but very different) concept that a plaintiff must show a "substantial" likelihood of success to obtain a preliminary injunction and, in that context, "'substantial' does not mean 'certain.'" Agency Br. at 22 (quoting *Alliance for Hippocratic Med. v. U.S. Food & Drug Admin.*, 78 F.4th 210, 242 (5th Cir. 2023), and citing *Tex. Voters Alliance v. Dallas Cty.*, 495 F. Supp. 3d 441, 456 (E.D. Tex. 2020)). But in *Alliance for Hippocratic Medicine*, the Fifth Circuit was explaining that a plaintiff may obtain a preliminary injunction by "present[ing] a substantial case on the merits," and need not "prove 'its entitlement to summary judgment'" in order to secure relief. *Id.* (citation omitted). The court did not, as the Agencies would have it, endorse the practice of casting aside appellate preliminary injunction rulings on remand.

---

[3]      Specifically, a court can depart from the law-of-the-case doctrine where: "(1) The evidence at a subsequent trial is substantially different; (2) there has been an intervening change of law by a controlling authority; and (3) the earlier decision is clearly erroneous and would work a manifest injustice." *Matthews*, 312 F.3d at 657. The Agencies have not even attempted to invoke any of these exceptions, which of course do not apply here.

In short, the law of the case doctrine bars reconsideration of the Fifth Circuit's conclusion that the Final Rule was not a logical outgrowth of the Proposed Rule, such that it is unlawful.

## III. The Agencies Exceeded Their Authority When Redefining "Rifle" To Include Braced Pistols.

Plaintiffs explained how the Agencies' redefinition of the term "rifle" exceeds the agency's congressionally limited authority to interpret the NFA. MSJ Br. at 17–22. The Agencies' primary response is to recite at length its view of how the Final Rule operates. Agency Br. at 13–16. The point of this exercise, in essence, is to argue that the Final Rule is appropriate because braced pistols are sufficiently similar to rifles that they should be treated the same. This ignores the plain language of the NFA, the overriding statutory structure, and Congress' express intent in excluding pistols from the NFA's reach.

The NFA and the Gun Control Act regulate rifles with short barrels and weapons made from rifles. MSJ Br. at 18–19 (reviewing statutory definitions). By contrast, pistols and revolvers are expressly exempted from the NFA. 26 U.S.C. § 5845(e), (a)(5). The Agencies are therefore incorrect to claim that the Final Rule "hews to the [NFA's] language," Agency Br. at 13, because the statutes are not directed at pistols equipped with stabilizing braces that are designed and intended to be held and fired by a single hand. If someone remakes a pistol into a rifle by swapping a brace (not designed or intended to be fired from the shoulder) for a stock (designed and intended to be fired from the shoulder), then the firearm would become a short-barreled rifle. But a brace is not a stock, no matter how the Agencies now try to conflate the two. In short, braced pistols are exempt from the NFA's plain language.

The textual conclusion here is consistent with the manifest congressional intent to deliberately exclude handguns from the NFA's reach. While "the best evidence of Congress's intent is the statutory text," *NFIB v. Sebelius*, 567 U.S. 519, 544 (2012), statutory interpretation "determines meaning by looking not to isolated words, but to text in context, along with purpose and history," *Gundy v. United States*, 139 S. Ct. 2116, 2126 (2019). These factors all point in Plaintiffs' favor. Congress enacted the NFA in response to the proliferation of "machine gun[s]"

and "sawed-off guns" favored by "gangster[s]." H.R. Rep. No. 73-1780 (1934). Handguns were explicitly omitted from the statute. The Senate Report explained that "limiting the [NFA] to the taxing of sawed-off guns and machineguns is sufficient at this time," and that it was "not thought necessary to go so far as to include pistols and revolvers and sporting arms." S .Rep. No. 1444 (1934); *see also* H.R. Rep. No. 73-1780 (1934) (noting that "pistols and revolvers and sporting arms" would be "without any restriction"); *Staples v. United States*, 511 U.S. 600, 626 (1994) ("[W]hen Congress originally enacted the [NFA], it limited the coverage . . . to a relatively narrow category of weapons such as submachineguns and sawed-off shotguns—weapons characteristically used only by professional gangsters like Al Capone, Pretty Boy Floyd, and their henchmen."). When Congress later enacted the GCA, it chose a similar path: Subjecting "short-barreled rifles" (but not "handguns") to heightened regulations.

The proof is in the Final Rule's impact. For over a decade, ATF issued rulings that classified stabilizing braces and braced pistols as outside of the NFA's reach. The Agencies try to sidestep the sweeping nature of the Final Rule's change by arguing (without evidentiary support) that "a pistol equipped with the original brace prototype would likely not be classified as" an SBR under the Final Rule. Agency Br. at 16. ATF's own analysis suggests otherwise: "[A]pproximately 99% of pistols with stabilizing braces" would be classified as "rifles" under the Final Rule. *Mock*, 75 F.4th at 574 (citation omitted).[4]

The Agencies dismiss as a "straw man" the fact that, under the Final Rule, a braced pistol being used contrary to its plain design and intent—that is, a "possibility" that a braced pistol could be fired from the shoulder—is enough to convert it into an NFA-regulated SBR. Agency Br. at 17. But that accurately describes the rule's impact and approach. This much is admitted by ATF: The Final Rule recites that the "Department believes that the final rule should likewise account for the *possibility* that factors other than objective design features may affect a weapon's classification,"

---

[4]     It is remarkable that after issuing a 98-page Final Rule and 38 pages of additional interim guidance ATF still cannot say one way or another whether that prototype is covered by the Final Rule or not. This illustrates perfectly that the Final Rule's vagueness renders it an arbitrary and capricious exercise of the Agencies' authority. *See* § IV(C), *infra*.

including the ATF's analysis of subjective criteria. 88 Fed. Reg. at 6,498 (emphasis added). Indeed, how could it be otherwise if 99% of braced pistols have suddenly become "rifles" under the Final Rule?

Even if this Court disagrees with Plaintiffs as to the plain meaning of the NFA and GCA, those statutes must still be interpreted in Plaintiffs' favor under the rule of lenity. The Agencies' only answer to Plaintiff's reliance on the rule of lenity to resolve any statutory ambiguity against criminalizing behavior is to reiterate their argument that the statute is not "grievously ambiguous." Agency Br. at 17. Setting aside whether that is the correct standard for triggering lenity in this context,[5] the Agencies cannot legitimately deny the "grievousness" of the statutory ambiguity here when it is they who have reversed course on ten years of statutory guidance to radically re-interpret the statute: with no change in the statute, suddenly 99% of all braced pistols have become "rifles." Moreover, the fact that the Agencies are still attempting to explain to this Court what firearms are or are not impacted by the Final Rule after hundreds of pages of briefing further demonstrates the ambiguity. *Cargill* confirms that it does not matter for these purposes that Plaintiffs believe the statute is not ambiguous. *See* 57 F.4th at 451, 464 (concluding the statutory definition of "machinegun" was "plain" and "unambiguous"), and 471 ("Assuming the definition of machinegun is ambiguous, we are bound to apply the rule of lenity.").

The Agencies also rely on *Babbitt v. Sweet Home Chapter of Communities for a Great Oregon*, 515 U.S. 687, 690 (1995), to claim that lenity does not apply in an APA challenge. Agency Br. at 18.[6] Controlling precedent disagrees. In *Cargill*, the Fifth Circuit explained that "[t]he rule

---

[5]    *See Cargill*, 57 F.4th at 469 ("The Supreme Court does not appear to have decided which of these standards governs the rule of lenity.").

[6]    On this point in particular *Babbitt*'s validity has long been called into question. "The best that one can say . . . is that in *Babbitt* [ ] [the Court] deferred, with scarcely any explanation, to an agency's interpretation of a law that carried criminal penalties . . . . *Babbitt*'s drive-by ruling, in short, deserves little weight." *Whitman v. United States*, 574 U.S. 1003 (2014) (Scalia, J., joined by Thomas, J., respecting the denial of certiorari); *see also Esquivel-Quintana v. Lynch*, 810 F.3d 1019, 1030–31 (6th Cir. 2016) (Sutton, J., concurring in part and dissenting in part) ("Whatever this footnote [in *Babbitt*] and its inscrutable reference to facial challenges meant then, cases since *Babbitt* have not followed" the conclusion that the rule of lenity does not apply to an agency interpretation of a statute with criminal consequences).

of lenity . . . prevents the possibility whereby Congress passes an ambiguous criminal statute, only to be interpreted later by a federal agency." 57 F.4th at 470. There, the "rule of lenity demand[ed]" that the court resolve any potential statutory ambiguity in favor of the plaintiff when construing the NFA and GCA. *Id.* at 471. The same path is appropriate here.

The Agencies exceed their authority by regulatorily treating pistols as if they were rifles, despite the fact that braced pistols do not meet the statutory definition of a rifle established by Congress.

## IV.    The Final Rule Is Arbitrary And Capricious.

The Agencies' adoption of the Final Rule was arbitrary and capricious for three reasons: the Agencies failed to consider commenters' concerns, reversed a longstanding position without meaningful explanation, and drafted a rule with vague standards.

### A.    Failure To Consider Important Aspects Of Regulation.

In response to Plaintiffs' evidence that the Agencies did not adequately consider the concerns of disabled individuals or the Supreme Court's Second Amendment precedents, the Agencies simply point to the parts of the Federal Register where those issues arise. Agency Br. at 18–19. But the fact that the Agencies acknowledged these issues generally does not insulate the Final Rule from arbitrary-and-capricious review. Rather, an agency "must show that it has 'reasonably considered the relevant issues and reasonably explained the decision.'" *Chamber of Commerce of United States v. United States Sec. & Exch. Comm'n*, 85 F.4th 760, 774 (5th Cir. 2023) (quoting *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021)). The arbitrary-and-capricious standard "requires the agency to consider all relevant factors raised by the public comments and provide a response to significant points within." *Id.* (citation omitted). As the Agencies more or less acknowledge, the Final Rule does not meaningfully address the impact that it will have on disabled individuals apart from its brief discussion of ADA compliance and noting that disabled individuals could still purchase and possess braced pistols subject to their regulation under the NFA. *See* Agency Br. at 18–19. Likewise, the fact that the Final Rule pays lip service to

12

*Heller* is not a "reasonable" consideration of the serious Second Amendment questions raised by the Final Rule, particularly in light of the clarified test prescribed by *Bruen*.

**B.      Failure To Adequately Support A Change In Longstanding Agency Position.**

The Agencies' sudden change in its longstanding position that braced pistols are not SBRs demonstrates that the Final Rule is arbitrary and capricious, particularly since it "does not take account of legitimate reliance on prior interpretation." *Smiley v. Citibank (S. Dakota), N.A.*, 517 U.S. 735, 742 (1996); *see id.* (citing *N.L.R.B. v. Bell Aerospace Co. Div. of Textron*, 416 U.S. 267, 295 (1974), which held agency action was appropriate in part because it was "not a case in which some new liability is sought to be imposed on individuals for past actions which were taken in good-faith reliance on Board pronouncements"); *Dep't of Homeland Sec. v. Regents of the Univ. of California*, 140 S. Ct. 1891, 1913 (2020) ("When an agency changes course . . . it must be cognizant that longstanding policies may have engendered serious reliance interests that must be taken into account." (cleaned up)). While the Final Rule both acknowledges the ATF's change in position and explains the agency's rationale, its explanation is wholly conclusory. *See*, *e.g*., 88 Fed. Reg. at 6,481 (contending the Final Rule "prevent[s] manufacturers and individuals from violating the requirements of the NFA and GCA").

The Final Rule also takes no steps to address the rule's impact on the millions of Americans who own braced pistols that would now be subject to the NFA's harsh restrictions. The record shows that ATF's "prior policy has engendered serious reliance interests," which therefore "must be taken into account" when the agency changes course. *F.C.C. v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009). In *VanDerStok*, Judge Oldham highlighted the harsh consequences of deficient rulemaking in the firearm context, particularly where past agency practice has built up substantial reliance: "[L]aw-abiding Americans (and the law-abiding gun companies that serve them) rely on longstanding regulatory certainty to avoid falling afoul of federal gun laws. But if ATF can destroy that certainty, it hopes law-abiding Americans will abandon tradition rather than risk the ruinous felony prosecutions that come with violating the new, nebulous, impossible-to-

13

predict Final Rule." *VanDerStok v. Garland*, 86 F.4th 179, 197 (5th Cir. 2023) (Oldham, J., concurring).

Ignoring the substantial reliance built over the past decade renders the Final Rule arbitrary and capricious. And the Agencies' only response—that the Final Rule was not adopted "based on an economic cost-benefit analysis," Agency Br. at 21—effectively concedes this point. There are other substantial noneconomic reliance interests that the Final Rule fails to consider. Most notably, the impact on the Second Amendment protected rights of those who possessed stabilizing braces and braced pistols based on ATF's longstanding and consistent determinations that they were not subject to the NFA. The Final Rule brushes this aside, claiming in conclusory fashion that "the alleged reliance interest is minimal" because of "the options provided for compliance with the relevant statutes." 88 Fed. Reg. at 6,508. These "options" for "compliance," of course, functionally eviscerate the regulated community's reliance interest: They were told to either comply with the NFA (and all of its attendant regulatory burdens), or modify, surrender, or destroy their property.

### C.    The Final Rule's Impossibly Vague Standards.

The Fifth Circuit repeatedly emphasized how the Final Rule's vague standards are problematic: It "vests the ATF with complete discretion to use a subjective balancing test to weigh six opaque factors on an invisible scale." *Mock*, 75 F.4th at 584. The Final Rule's "six-part test provides no meaningful clarity about what constitutes an impermissible stabilizing brace," *id.* at 585, such that "it is nigh impossible for a regular citizen to determine what constitutes a braced pistol," *id.* at 584. And Plaintiffs separately explained how the Final Rule's many uncertainties require that it be invalidated as void for vagueness. MSJ Br. at 31–33; *see also* § VI, *infra*. Those same considerations show that the Agencies did not "act[] within a zone of reasonableness," *Prometheus Radio Project*, 592 U.S. at 423, and "evince[] 'a clear error of judgment.'" *Data Mktg. P'ship, LP v. United States Dep't of Lab.*, 45 F.4th 846, 855–56 (5th Cir. 2022) (citing *Marsh v. Or. Nat. Res. Council*, 490 U.S. 360, 378 (1989)).

14

V.     **The Final Rule Violates The Second Amendment.**

     A.     **Plaintiffs' Proposed Conduct Is Covered By The Second Amendment Because Braced Pistols And Stabilizing Braces Are "Arms" Protected By The Second Amendment.**

As this Court has already recognized, Plaintiffs' proposed course of conduct—keeping and bearing their braced pistols for lawful purposes—is "'presumptively protect[ed]' by the Second Amendment." Oct. 2, 2023 Opinion & Order on Plaintiffs' Motion for Preliminary Injunction, at 19–22; *see also Mock*, 75 F.4th at 588 (Willett, J., concurring). The Agencies trot out several arguments to evade this straightforward conclusion. None of them are convincing.

The Agencies first claim that firearm "accessories" or "attachments" like stabilizing braces are not protected by the Second Amendment's text. Agency Br. at 30. This argument fails on multiple levels.

The text of the Second Amendment reads: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. CONST. amend. II. In *Heller*, the Supreme Court construed the word "arms" in the Second Amendment to mean "[w]eapons of offence, or armour of defence," or "any thing that a man wears for his defence, or takes into his hands, or useth in wrath to cast at or strike another." *District of Columbia v. Heller*, 554 U.S. 570, 581 (2008) (citations omitted). And in *Bruen*, the Court reaffirmed that these definitions control textual analysis of the Second Amendment, further noting that "even though the Second Amendment's definition of 'arms' is fixed according to its historical understanding, that general definition covers modern instruments that *facilitate* armed self-defense." *New York State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1, 29 (2022)

(emphasis added). And both *Heller* and *Bruen* confirmed that the "Second Amendment extends, prima facie, to all instruments that constitute bearable arms, even those that were not in existence at the time of the founding." *Heller*, 554 U.S. at 582; *Bruen*, 597 U.S. at 29.

The text of the Second Amendment covers the Final Rule, which regulates firearms, not just components. The Final Rule purports to recategorize millions of firearms of a certain configuration (*i.e.*, braced pistols) through agency action. That is not a regulation of "accessories"

or "attachments"—it is an arms regulation. Even the Agencies admit that the legal status of braces has not changed, and they are not independently regulated by the Final Rule. It is firearms with or possessed alongside anything that could be attached to the firearm that would allow it to be more easily fired from the shoulder—a dramatic expansion of federal *firearms* law in this Nation.[7]

But even if this Court were to focus solely on the brace, the Agencies' argument is still deeply flawed. To regulate any firearm component or accessory (such as a magazine, sights, barrel, or ammunition) is to regulate the firearm itself. *See, e.g.*, *Hanson v. D.C.*, 2023 WL 3019777, at *6 (D.D.C. Apr. 20, 2023) (collecting Circuit Court cases holding that magazines are "arms" under the Second Amendment); *Duncan v. Bonta*, 2023 WL 6180472, at *7–9 (S.D. Cal. Sept. 22, 2023) (rejecting argument that magazines are firearm accessories and not "arms" protected by the Second Amendment). A contrary conclusion would allow the government to chip away at the Second Amendment by regulating any firearm component or accessory. Indeed, "[w]ithout protection of the components that render a firearm operable, like magazines, the Second Amendment right would be meaningless. After all, constitutional rights 'implicitly protect those closely related acts necessary to their exercise.' If not, then States could make an easy end-run around the Second Amendment by simply banning firearm components, such as magazines and ammunition." *Duncan v. Bonta*, 83 F.4th 803, 813 (9th Cir. 2023) (Nelson, J., dissenting from order granting stay pending appeal) (citation omitted). A contrary conclusion also would be contrary to the plain text of the Second Amendment, which states that the right to keep and bear arms shall not be *infringed*. At the Founding, to infringe meant not only to destroy but also to hinder. *Maryland Shall Issue, Inc. v. Moore*, 86 F.4th 1038, 1044 n.8 (4th Cir. 2023), *reh'g en banc granted* 2024 WL 124290 (4th Cir. Jan. 11, 2024); *Frein v. Pa. State Police*, 47 F.4th 247, 254 (3d Cir. 2022). Restricting a component that affects the way a firearm is used (like a pistol brace) hinders a person's ability to use that firearm.

---

[7]     This is exactly why Plaintiffs also argue the Final Rule chills the exercise of Second Amendment protected rights, because it will discourage people from possessing a pistol that may be combined with anything in their home to magically transform the pistol into a rifle in the eyes of the Agencies under the Final Rule.

This Court recognized that this case implicates the Second Amendment in ruling on the preliminary injunction. ECF No. 92, Oct. 2, 2023 Opinion & Order on Plaintiffs' Motion for Preliminary Injunction, at 20–22 (holding "that the proposed 'conduct' of the FPC members—*i.e.*, possessing and using a stabilizing braced pistol for enhanced self-defense capabilities in the home and in public—is 'presumptively protect[ed]' by the Second Amendment from the interference of disagreeing restrictions in the Final Rule.").[8] There is no reason to revisit that conclusion at the summary judgment stage.

### B.   Braced Pistols And Stabilizing Braces Are Not "Dangerous And Unusual."

In arguing that braced pistols are "dangerous and unusual" weapons outside of the Second Amendment's protection, the Agencies fail to engage with the Supreme Court's commands regarding weapons in common use. *Heller* explains that the Second Amendment protects the right to "keep and bear" "those [Arms] 'in common use at the time.'" 554 U.S. at 627. "That limitation is fairly supported by the historical tradition of prohibiting the carrying of 'dangerous and unusual weapons.'" *Id.* Determining whether a weapon is "dangerous and unusual" "is a conjunctive test: A weapon may not be banned unless it is *both* dangerous *and* unusual." *Caetano v. Massachusetts*, 577 U.S. 411, 417 (2016) (Alito, J., concurring). A firearm that is in common use for lawful purposes, by definition, does not fall within this category and cannot be regulated outside of the historical scope of regulation allowable under the Second Amendment. *Bruen*, 597 U.S. at 47.

The Agencies do not—and cannot—dispute that braced pistols are in common use throughout the Nation. Indeed, the Final Rule itself acknowledges that there are at least 3 million stabilizing braces and braced pistols owned nationwide. 88 Fed. Reg. at 6,560; *see* MSJ Br. at 25–

---

[8]   The Agencies separately argue that the Second Amendment is not "implicate[d]" here because the NFA's requirements are akin to licensing requirements. But this ignores *Bruen*'s various acknowledgements that burdensome regulations can operate to violate the Second Amendment. *See, e.g.*, *Bruen*, 597 U.S. at 38 n.9. Plaintiffs' position is that the NFA's onerous regulatory regime does just that. The Agencies' attempted reliance on *Bezet v. United States*, 714 Fed. App'x 336 (5th Cir. 2017), and *Lane v. Holder*, 703 F.3d 668 (4th Cir. 2012), should be rejected since those cases pre-date *Bruen* and have accordingly been superseded. *Bezet* in particular relied on the infamous "two-step" analysis that *Bruen* expressly rejected and is no longer good law.

26 n.18 (citing 2021 Congressional Research Service estimate of "between 10 and 40 million stabilizing braces . . . in civilian hands"). This Court was therefore correct in holding "that braced pistols regulated under the Final Rule are commonly used by law-abiding citizens for lawful purposes."[9] ECF No. 92, Oct. 2, 2023, Opinion & Order on Plaintiffs' Motion for Preliminary Injunction, at 19.

Rather than confront the facts, the Agencies focus their argument entirely on SBRs generally, not the braced pistols and stabilizing braces targeted by the Final Rule. And after reframing the issue, the Agencies engage in yet more sleight of hand to make SBRs appear to be "unusual": They rely on a pre-*Bruen* challenge to the NFA's and CGA's machinegun restrictions and claim that the Fifth Circuit set numerical "benchmarks" for unusualness. Agency Br. at 32–33 (citing *Hollis v. Lynch*, 827 F.3d 436, 449–50 (5th Cir. 2016)).[10] This argument flounders for multiple reasons.

First, the Fifth Circuit did not set a "benchmark" for the raw number of arms that must be possessed to trigger Second Amendment protection. And, in any event, the millions of braced pistols and stabilizing braces covered by the Final Rule dwarfs the 175,977 machineguns the court considered in *Hollis*. 827 F.3d at 449.

Second, while the Agencies are correct to note that *Hollis* considered the number of states where a weapon could lawfully be possessed to be relevant in the "unusualness" analysis, 827 F.3d at 450, they are incorrect to rely on the number of states that restrict possession of SBRs in general, because those states do not all necessarily treat braced pistols as SBRs like the Final Rule does. *See* Agency Br. at 32–33 & n.11 (arguing that 30 states regulate SBRs).[11] Whatever weight these

---

[9]   To be sure, Plaintiffs separately established that SBRs in general do not qualify as "dangerous and unusual" weapons. MSJ Br. at 39–40.

[10]   Because *Bruen* "fundamentally changed [the Fifth Circuit's] analysis of laws that implicate the Second Amendment," *Hollis* is now "obsolete." *United States v. Rahimi*, 61 F.4th 443, 450–51 (5th Cir. 2023) (cleaned up).

[11]   While many states may regulate SBRs on their own terms, it is notable that 25 states are currently challenging the Final Rule's validity in separate litigation. *Firearms Regulatory Accountability Coalition, Inc. v. Garland*, D.N.D. Case No. 1:23-cv-0024-DLH-CRH, 8th Cir. Case No. 23-3230.

states' restrictions of weapons commonly understood as SBRs should have, braced pistols and stabilizing braces are *not* restricted throughout the country. Rather, they are commonly possessed for lawful purposes throughout the Nation and are subject to regulation for the first time only because of the Final Rule.

### C.    The Final Rule Is Not Consistent With The Nation's Historical Tradition Of Firearm Regulation.

Because the text of the Second Amendment covers the proposed course of conduct here (the possession of stabilizing braces, braced pistols, or short-barreled rifles for lawful purposes such as self-defense), Plaintiffs' conduct is "presumptively protect[ed]" and the government bears the burden of proving the Final Rule's constitutionality. *Bruen*, 597 U.S. at 17. As shown below, the Agencies have not "demonstrat[ed] that [the Final Rule] is consistent with the Nation's historical tradition of firearm regulation." *Id.* at 24.

#### 1.    Registration Requirements.

The Agencies first identify six colonial-era militia regulations, but they fail both *Bruen*'s "how" and "why" metrics. First, the "how" of these regulations are different: Taking a survey of what arms and ammunition colonial Americans already possess or inspecting militia members' arms to ensure their proper function is different in kind than the NFA's gatekeeping restrictions on the possession of regulated arms. Second, these laws serve an entirely different "why": Each was directed at ensuring that colonial militia were adequately and appropriately armed, not at dissuading individuals from acquiring certain arms. The Final Rule and NFA are explicitly designed to disarm or heavily regulate a particular class of firearm that the government disfavors based on unfounded assumptions about dangerousness.

The Agencies' half-hearted attempt to analogize the Final Rule to two "proving" laws in Massachusetts and Maine fail as well. Those laws subjected all muskets and pistols to an inspection and discharge test overseen by a state-appointed "prover" to ensure that firearms operated safely before they could be sold. The proving laws imposed a far lesser burden on Second Amendment protected rights than the Final Rule and NFA: Massachusetts did not prescribe any particular

19

features or specifications for firearms to be sold in the state. Rather, manufacturers needed only prove that the firearm operated as intended (*i.e.*, passed a basic objective firing test). The laws did not otherwise constrict ownership or possession of firearms. So both the "how" and the "why" are absent. That aside, two laws, standing alone, is insufficient to establish a tradition. *See Bruen*, 597 U.S. at 46 (doubting that three colonial restrictions suffice to show a tradition). Because these rare prover laws stand alone, they are not a "well-established and representative historical analogue"—relying on them here would "risk[] endorsing [an] outlier[]." *Id.* at 30.

The Agencies illustrate how bare the historical record is by turning to four colonial laws restricting the sale of firearms and ammunition to Native Americans, claiming that these laws are evidence of "strict regulations regarding where and to whom some firearms could be sold." Agency Br. at 36. Because these laws were discriminatory and targeted a small subset of the population, they should be left in the dustbin of history, not used as tools to restrict rights in the modern day. *Cf. Bruen*, 597 U.S. at 58 (cautioning against reliance on laws where prosecutions were directed only against "black defendants who may have been targeted for selective or pretextual enforcement"). Moreover, at the time, Native Americans were not considered to be among "the People" protected under the Constitution, and thus Colonial Era law aimed at them are no guide as to how the Constitution should be interpreted to apply to "the People" today. "Laws that disarmed slaves, Native Americans, and disloyal people may well have been targeted at groups excluded from the political community—*i.e.*, written out of 'the people' altogether—as much as they were about curtailing violence or ensuring the security of the state. Their utility as historical analogues is therefore dubious, at best." *Rahimi*, 61 F.4th at 457; *see also United States v. Harrison*, 654 F. Supp. 3d 1191, 1216 (W.D. Okla. 2023) ("Indians . . . were . . . generally not considered to be a part of the political community protected by the Second Amendment."). These laws do nothing to show that the Final Rule is consistent with the Nation's historical tradition of firearm regulation.

Three states requiring licenses to commercially export gunpowder likewise tell us nothing about the constitutionality of the Final Rule or NFA. Even if these laws were motivated by general

public safety concerns, *see* Agency Br. at 36, such commercial regulations are fundamentally different in kind from restricting who may possess a particular firearm or firearm accessory. And, of course, a small smattering of laws is not sufficiently widespread to be "well-established." *See Bruen*, 597 U.S. at 46 (doubting that three colonial restrictions are enough to establish a tradition of banning public carry).

Finally, the Agencies point to two laws from the late 19th century requiring the registration of certain firearms. Agency Br. at 37. These laws are obviously not representative, and they come too late to inform the meaning of the Second Amendment. *Bruen*, 597 U.S. at 35–36.

In short, the Agencies have failed to meet their burden of showing that there is a historical tradition of firearm registration requirements to justify the Final Rule and NFA.

### 2.    Taxation Requirements.

The historical regulations the Agencies attempt to analogize as a "tradition" of taxation fare no better. The Agencies start off with four colonial regulations focused on the inspection and sale of gunpowder. Agency Br. at 37 & n.17. Even if this meager collection of gunpowder laws were sufficient to be considered "well-established"—and they are not—they fail *Bruen*'s "how" and "why" tests. On the "how" side, these were quality control laws that restricted the commercial sale of gunpowder both through inspection requirements and by requiring vendors to be licensed. The Final Rule, by contrast, burdens the *possession* of a class of weapons writ large. The gunpowder regulations also serve a distinctly different "why": These colonial regulations were enacted to ensure that gunpowder sold to the public met basic quality standards. The Final Rule, by contrast, is motivated by the Agencies' desire to push braced pistols out of the market. At bottom, the gunpowder regulations have nothing in common with the Final Rule.

The Agencies next identify a handful of 19th century laws from six states imposing taxes on certain firearms. Agency Br. at 38 & nn.18–22. These outlier laws do not impose "comparable burdens" to the Final Rule's reclassification of braced pistols. Beyond registration and taxation, owners of NFA firearms are subject to additional onerous and ongoing compliance requirements; enhanced criminal penalties designed to discourage transactions in firearms; and harsh restrictions

21

on the transportation, storage, and use of NFA-regulated firearms. Those substantial restrictions far exceed the burden imposed by the 19th-century taxation laws.

The Agencies also identify several post-Reconstruction laws imposing occupational taxes or licensing fees on businesses in the firearms trade. Agency Br. at 38. & n.23. *Bruen* casts doubt on the utility of these sources. 597 U.S. at 36–37; *see id.* at 66 ("late-19th-century evidence cannot provide much insight into the meaning of the Second Amendment when it contradicts earlier evidence"); *id.* at 83 (Barrett, J., concurring) (the Court's ruling "should not be understood to endorse freewheeling reliance on historical practice from the mid-to-late 19th century to establish the original meaning of the Bill of Rights."). Little needs to be said about this collection of regulations: Laws that impose standard commercial operating taxes and fees on firearms vendors are not relevantly similar to the Final Rule.

### D. If The Final Rule Stands, Then Final Rule And The NFA's Regulation Of SBRs Violate The Second Amendment.

Plaintiffs have also asserted an alternative claim under the Second Amendment directed at the NFA's regulation of SBRs if the Court determines that the Final Rule is valid. *See* MSJ Br. at 39–40. The Agencies have failed to meet their burden under *Bruen* for the same reasons discussed above. And, if the arms at issue are SBRs, as the Agencies assert, then SBRs are even *more* commonly owned by law-abiding individuals for lawful purposes such as self-defense, given the overall number would include both the number of currently registered SBRs and the number of braced pistols in circulation.

*   *   *

The Agencies have failed to meet their burden of showing that the Final Rule "is consistent with the Nation's historical tradition of firearm regulation." *Bruen*, 597 U.S. at 17.

### VI. The Final Rule Is Void For Vagueness.

The Fifth Circuit already acknowledged that the Final Rule puts the regulated community in an impossible situation: It "vests the ATF with complete discretion to use a subjective balancing test to weigh six opaque factors on an invisible scale." *Mock*, 75 F.4th at 584. As a result, "it is

22

nigh impossible for a regular citizen to determine what constitutes a braced pistol and . . . whether a specified braced pistol requires NFA registration." *Id.* at 584–85. While some factors may be (somewhat) comprehensible in a vacuum, the six-factor test, taken as a whole, is not. The Final Rule includes inherently subjective factors, including the "manufacturer's direct and indirect marketing and promotional materials" and how a firearm is used by others. Final Rule, 88 Fed. Reg. at 6,480. How are regulated parties supposed to track such actions taken by third parties?

The Agencies respond with a host of points that miss the core issue: They claim that the Final Rule is better than the previous classification (Agency Br. at 40–41); that any vagueness should be excused because the ATF has issued some interim guidance and plans to issue more (*id.* at 41);[12] the Final Rule's squishy six-factor test is not as bad as other unconstitutional schemes that were "wholly subjective" (*id.*); and that the Final Rule is not vague in every application (*id.* at 42).

None of this addresses the Final Rule's fundamental problem: It provides no meaningful clarity *to the public* on what constitutes an impermissible stabilizing brace or what other items may convert a pistol into a rifle. And the Agencies ignore the fact that the Final Rule attaches criminal consequences, which heightens the need for clarity. "Where a statute imposes criminal penalties the required standard of certainty is high, and a statute that does not satisfy this requirement may be invalidated on its face 'even where it could conceivably have . . . some valid application.'" *Wright v. New Jersey*, 469 U.S. 1146, 1152 (1985) (citation omitted); *see also Sackett v. EPA*, 598 U.S. 651, 681 (2023). Clarity is essential in this instance because the Final Rule "threatens to inhibit the exercise" of Second Amendment protected rights. *Hoffman Estates*, 455 U.S. at 499.[13]

---

[12]    The Agencies also claim that the vagueness test is relaxed "when a party may clarify a regulation's meaning 'by its own inquiry.'" Agency Br. at 41 (quoting *Vill. of Hoffman Ests. v. Flipside, Hoffman Ests., Inc.*, 455 U.S. 489, 498 (1982)). This misstates the holding of *Hoffman Estates*, which applied a "less strict vagueness test" because it dealt with economic regulation, and in that context noted that regulated businesses "may have the ability to clarify the meaning of the regulation by its own inquiry, or by resort to an administrative process." 455 U.S. at 498. At the same time, the Court noted that laws that impose criminal penalties—as is the case with the Final Rule—are not subject to any relaxed test. *See id.*

[13]    The Agencies make a passing attack on the Individual Plaintiffs' standing to assert a vagueness challenge because they have each acknowledged that they have "at least one braced pistol" that is subject to the Final Rule. *See* Agency Br. at 40. But that does not mean that the

To that end, the Agencies are incorrect that Plaintiffs must show that the Final Rule is unconstitutionally vague in all of its applications. Agency Br. at 40. Vagueness concerns are aggravated when "uncertainty induced by the statute threatens to inhibit the exercise of constitutionally protected rights." *Colautti v. Franklin*, 439 U.S. 379, 390 (1979); *see also Hoffman Estates*, 455 U.S. at 499 ("[P]erhaps the most important factor affecting the clarity that the Constitution demands of a law is whether it threatens to inhibit the exercise of constitutionally protected rights."). In that light, the Supreme Court has long permitted facial challenges where, as here, "a law reaches 'a substantial amount of constitutionally protected conduct.'" *Kolender v. Lawson*, 461 U.S. 352, 358 n.8 (1983) (quoting *Hoffman Estates*). And in any event, any "supposed requirement of vagueness in all applications is not a requirement at all, but a tautology: if [the Court] hold[s] a statute to be vague, it is vague in all its applications." *Johnson v. United States*, 576 U.S. 591, 603 (2015). If what the Agencies mean is that vagueness is defeated by the existence of any brace that indisputably converts a pistol to an SBR under the Final Rule, the Agencies are incorrect: the Supreme Court's "holdings squarely contradict the theory that a vague provision is constitutional merely because there is some conduct that falls within the provision's grasp." *Id*. at 602.

## VII. The Final Rule Violates The First Amendment And The Constitution's Structural Protections.

The Agencies lump together Plaintiffs' remaining constitutional arguments, namely, that the Final Rule violates the First Amendment and the Constitution's structural protections set forth in the Take Care Clause and the related clear-delegation requirement.

### A. First Amendment.

The Final Rule violates the First Amendment by allowing the Agencies to more stringently regulate firearms based on statements made by manufacturers and other third parties, thus chilling protected speech. Regulations that chill or compel speech, like outright prohibitions on speech,

---

Individual Plaintiffs understand the rule's application to all of their arms or in every circumstance the Final Rule could be applied to them.

"abridge" the freedom protected by the Free Speech Clause. *See R.A.V. v. City of St. Paul*, 505 U.S. 377, 382 (1992) ("The First Amendment generally prevents government from proscribing speech . . . because of disapproval of the ideas expressed."). The Fifth Circuit has thus recognized that "the First Amendment goes beyond protection of the press and the self-expression of individuals to prohibit government from limiting the stock of information from which members of the public may draw." *Turner v. Lt. Driver*, 848 F.3d 678, 688 (5th Cir. 2017) (cleaned up). "Content-based laws—those that target speech based on its communicative content—are presumptively unconstitutional and may be justified only if the government proves that they are narrowly tailored to serve compelling state interests." *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015). Plaintiffs have already explained why the Final Rule cannot withstand such rigor, MSJ Br. at 33–36, and the Agencies do not attempt to argue that the regulation satisfies strict scrutiny.

Instead, the Agencies continue to downplay the ways that the Final Rule uses the speech of manufacturers, purchasers, and third parties to determine whether a particular object converts a pistol into an SBR, effectively penalizing such speech. By using their speech against them, the Final Rule impermissibly chills speech based on the speech's content and is subject to—and would fail—strict scrutiny. Furthermore, the vagueness described above likewise demonstrates that the Final Rule will chill the exercise of First- and Second-Amendment protected rights.

The Agencies try to sidestep the First Amendment claim by arguing that Plaintiffs lack standing because they haven't alleged that the Final Rule chills their speech. But this ignores the direct impact that the restrictions have on Plaintiffs, who are subject to regulation under the Final Rule's classification regime based in part on its application of the speech-based considerations. Even if that were not so, Plaintiffs would still have standing as consumers and members of the regulated community that are impacted by the Final Rule to assert their "reciprocal right to receive" unencumbered speech, because the First Amendment's protections apply "to the communication, to its source and to its recipients both." *Virginia State Bd. of Pharmacy v. Virginia Citizens Consumer Council, Inc.*, 425 U.S. 748, 756 (1976); *see also Competitive Enter. Inst. v. U.S. Dep't of Transp.*, 856 F.2d 1563, 1566 (D.C. Cir. 1988) ("It is well established that petitioners, as

listeners, can suffer injury from government regulations that prevent speakers from saying what the listeners wish to hear."). Furthermore, the relaxed standing requirements in the First Amendment context would permit Plaintiffs to challenge the rule here to avoid its chilling effect on protected speech. *See, e.g.*, *Virginia v. Am. Booksellers Ass'n, Inc.*, 484 U.S. 383, 392–93 (1988) ("[I]n the First Amendment context, '[l]itigants . . . are permitted to challenge a statute not because their own rights of free expression are violated, but because of a judicial prediction or assumption that the statute's very existence  may cause others not before the court to refrain from constitutionally protected speech or expression.'") (quoting *Sec'y of State of Md. v. Joseph H. Munson Co.*, 467 U.S. 947, 956–57 (1984)). All of this suffices for Plaintiffs to raise a First Amendment challenge in the context of the APA, which directs courts to set aside agency action that is "contrary to constitutional right [or] power." 5 U.S.C. § 706(2)(B).

The Agencies next argue that "no speech is being prescribed" by the Final Rule because the government is "simply 'listen[ing] to what [Plaintiffs say about the products they manufacture and purchase." Agency Br. at 44–45 (quoting *Mock v. Garland*, 2023 WL 2711630, at *6 (N.D. Tex. March 30, 2023)). But even though some speech may be the basis for criminal liability— solicitation of a crime or incitement, for example—any vague standard that threatens to chill more speech than strictly necessary is unconstitutional. For example, statements by third parties that a firearm designed and intended to be fired with one hand could be used differently and could be fired from the shoulder are certainly protected speech but risk converting NFA-exempt pistols into NFA-regulated SBRs under the Final Rule—without any actual change to the firearm. This regulation has a direct impact on speech.

Turning to the merits, the Agencies make no attempt to claim that the Final Rule satisfies strict scrutiny. Instead, they argue that intermediate scrutiny applies because the regulation has an "incidental" burden on speech. Agency Br. at 45 (citing *Doe I v. Landry*, 909 F.3d 99, 108 (5th Cir. 2018)). Even under that lesser test, however, the Final Rule violates the First Amendment. As before, the Agencies have asserted a generic substantial interest in the proper enforcement of the

NFA. Agency Br. at 45.[14] The Supreme Court requires that any "incidental restriction" on protected conduct "is no greater than is essential to the furtherance of that interest." *United States v. O'Brien*, 391 U.S. 367, 377 (1968). This means that the government may not choose a path that is "substantially broader than necessary to achieve [its] interest." *Landry*, 909 F.3d at 111 (quoting *Ward v. Rock Against Racism*, 491 U.S. 781, 798 (1989)). The vague standards employed by the Final Rule illustrate that it sweeps far too broadly, as shown by the numerous less restrictive means of furthering the Agencies' asserted interests. The Agencies could have avoided speech restrictions in the Final Rule as well by relying solely on the objective physical aspects of a firearm or brace. That manufacturers and purchasers will instead be subject to the vagaries of the Agencies' interpretation of marketing statements, some of which many purchasers may not even have seen or heard, confirms that the Final Rule will chill far more speech than necessary to address any supposed government interests.

The Final Rule violates the First Amendment.

**B.      Structural Protections.**

The Agencies' arrogation of authority violates structural protections inherent in the Constitution. "In the framework of our Constitution, the President's power to see that the laws are faithfully executed refutes the idea that he is to be a lawmaker." *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 587 (1952). This separation of powers is "a basic principle of our constitutional scheme" under which "one branch of the Government may not intrude upon the central prerogatives of another." *Loving v. United States*, 517 U.S. 748, 757 (1996). To that end, the Supreme Court has repeatedly "reaffirmed[ed] the core administrative-law principle that an agency may not rewrite clear statutory terms to suit its own sense of how the statute should

---

[14]      That claim begs the question of NFA coverage and, as shown above, the Final Rule does not *enforce* the NFA, but unconstitutionally *supersedes* the NFA with the Agencies' own policy judgment. In any event, there is no compelling state interest in regulating manufacturer, purchaser, and third-party speech about stabilizing braces given that the Agencies have permitted the sale and advertisement of stabilizing braces and braced pistols for over a decade. The government cannot now claim an overwhelming need to regulate these braces—and speech about them—after such a long history of contradictory action.

operate." *Util. Air Regul. Grp. v. EPA*, 573 U.S. 302, 328 (2014). As the Fifth Circuit has explained, this limitation means that agencies "cannot manufacture statutory ambiguity with semantics to enlarge their congressionally mandated border." *Tex. Pipeline Ass'n v. FERC*, 661 F.3d 258, 264 (5th Cir. 2011). That is precisely what has happened here: As set forth above, the Agencies exceeded their statutory authority in redefining "rifle" when adopting the Final Rule.

The Agencies claim that Plaintiffs have raised a non-justiciable question. Agency Br. at 43–44. Not so. "[W]henever a separation-of-powers violation occurs, any aggrieved party with standing may file a constitutional challenge." *Collins v. Yellen*, 141 S. Ct. 1761, 1780 (2021). Because "[t]he structural principles secured by the separation of powers protect the individual," justiciable injuries arise "from actions that transgress separation-of-powers limitations." *Bond v. United States*, 564 U.S. 211, 222 (2011). Litigants are "are not disabled from relying on [structural constitutional] principles in otherwise justiciable cases and controversies," such as this one.[15] *Id.* at 223. In short, these important constitutional questions are justiciable and the Court should enter judgment in Plaintiffs' favor that the Final Rule violates the Take Care Clause and related structural protections.

## SCOPE OF RELIEF

### VI.    This Court Should Issue The "Default" Remedy Of Vacating The Final Rule, And It Should Issue An Injunction To Provide Complete Relief To Plaintiffs.

#### A.    This Is Not A "Rare" Case Where Departure From The "Default" Rule Of Vacatur Is Justified.

The Agencies do not—and cannot—dispute that vacatur is the correct remedy where, as here, an agency has violated the APA as the Agencies have with the Final Rule. Instead, the

---

[15]     *Bond* is sufficient to confirm that Plaintiffs are likewise "not disabled from relying," 564 U.S. at 223, on the Take Care Clause to support their claim, even if a direct challenge may pose a more difficult question. *See, e.g.*, *Citizens for Resp. & Ethics in Wash. v. Trump*, 302 F. Supp. 3d 127, 130 (D.D.C. 2018) ("Whether claims brought directly under the Take Care Clause are even justiciable is open to debate."); *Las Americas Immigrant Advoc. Ctr. v. Biden,* 571 F. Supp. 3d 1173, 1180 (D. Or. 2021) (collecting cases concluding that whether there is a private right of action to bring a direct Take Care Clause claim is an open question).

Agencies claim that vacatur is not *required*, and ask that the Court instead consider "more limited remedies" that, they contend, "would fully redress" Plaintiffs' injuries. Agency Br. at 46.

The Agencies misconstrue controlling Fifth Circuit precedent. "[V]acatur of an agency action is the default rule in this Circuit." *Cargill*, 57 F.4th at 472. *Cargill* reiterated a long line of cases saying precisely the same thing. *See id.* (citing *Data Mktg. P'ship*, 45 F.at 859 ("The default rule is that vacatur is the appropriate remedy."); and *Franciscan Alliance, Inc. v. Becerra*, 47 F.4th 368, 374–75 (5th Cir. 2022) ("Vacatur is the only statutorily prescribed remedy for a successful APA challenge to a regulation."); *see also, e.g.*, *Chamber of Commerce of United States v. United States Sec. & Exch. Comm'n*, 88 F.4th 1115, 1118 (5th Cir. 2023) ("*Chamber of Commerce*"); *Alliance for Hippocratic Med.*, 78 F.4th at 255.

The Agencies' reliance on *Cargill* to justify a remedy short of vacatur here is unavailing. Because the parties in *Cargill* "ha[d] not briefed the remedial-scope question," the Court remanded the case for consideration of whether "a more limited remedy is appropriate." 57 F.4th at 472. But the Fifth Circuit has explained that "[d]eparting from that default rule [of vacatur] is justifiable only in 'rare cases' satisfying two conditions: *First*, there must be a 'serious possibility' that the agency will be able to correct the rule's defects on remand. *Second*, vacating the challenged action would produce 'disruptive consequences.'" *Chamber of Commerce*, 88 F.4th at 1118 (quoting *United Steel, Paper & Forestry, Rubber Mfg., Energy, Allied Indus. & Serv. Workers Int'l Union v. Mine Safety & Health Admin.*, 925 F.3d 1279, 1287 (D.C. Cir. 2019), and *Texas v. United States*, 50 F.4th 498, 529 (5th Cir. 2022)).[16]

This is not a "rare" case where departure from the "default rule" of vacatur is appropriate. On the first factor, the serious flaws in the Final Rule cannot be remedied by further consideration

---

[16]     The Fifth Circuit's decision to remand in *VanDerStok v. Garland* does not alter the correct course here. There, vacating this Court's vacatur order was necessary because it extended to the frame or receiver rule in its entirety rather than the two challenged portions of the rule. 86 F.4th 179, 198–99 (5th Cir. 2023). Vacatur of the Final Rule is appropriate here because Plaintiffs have challenged the Final Rule in its entirety. Likewise, *Cent. & S. W. Servs., Inc. v. U.S. E.P.A.*, 220 F.3d 683, 692 (5th Cir. 2000), is no help to the Agencies—it simply restates and applies the two factors identified in *Chamber of Commerce*.

by the Agencies. *See Texas v. United States*, 50 F.4th at 529 (holding vacatur was appropriate because the "deficiencies [in agency action] are severe" due to "fundamental substantive defects," such that "[t]here is no possibility that [the agency] could obviate these conflicts on remand"). Indeed, the Agencies have made no effort in past or present briefing to explain how the Final Rule's defects could be corrected.

And vacatur would not be disruptive: it would simply return the regulated community to the decade-long status quo regarding what constitutes a "rifle." *Cf. Heartland Reg'l Med. Ctr. v. Sebelius*, 566 F.3d 193, 198 (D.C. Cir. 2009) (holding that vacatur would be disruptive because it could permit hospitals to seek reimbursement for six years' worth of payments made to the government under challenged rule); *Am. Great Lakes Ports Ass'n v. Schultz*, 962 F.3d 510, 519 (D.C. Cir. 2020) ("a quintessential disruptive consequence arises when an agency cannot easily unravel a past transaction in order to impose a new outcome"). The Agencies make the backwards argument that it would be disruptive to return to the previous regime's absence of "generally applicable guidelines" because it "would risk creating confusion among regulated parties." Agency Br. at 48–49. Yet there was no confusion in the marketplace before the Final Rule given ATF's longstanding position that braced pistols were not subject to the NFA. And the Agencies' purported concern about confusion cannot be taken seriously since confusion would be guaranteed by a ruling that the Final Rule is invalid but that failed to vacate it. In other words, "[t]his is not a case in which the 'egg has been scrambled,' and it is too late to reverse course." *Allina Health Servs. v. Sebelius*, 746 F.3d 1102, 1110–11 (D.C. Cir. 2014) (citation omitted).

In short, *Chamber of Commerce* and the cases it cites outline the Fifth Circuit's conditions for the "rare" result justifying deviation from the "default" remedy of vacatur, and those conditions are not met here. The Agencies are thus simply wrong to posit a contrary rule requiring Plaintiffs to bear the burden of "prov[ing]" that the default rule of vacatur "is necessary to fully redress their asserted injuries." Agency Br. at 47. Indeed, the Agencies cite *Feds for Medical Freedom v. Biden*, 63 F.4th 366, 389 (5th Cir. 2023), for this proposition, but this was not even an APA case, so the APA's statutory default remedy was not available.

The Agencies also argue that vacatur is inappropriate in light of pending challenges to the Final Rule in other jurisdictions. Agency Br. at 47. To be sure, the Fifth Circuit has acknowledged in the preliminary injunction context that "[p]rinciples of judicial restraint" impact a court's decision to issue nationwide relief where "[o]ther courts are considering the[] same issues." *Louisiana v. Becerra*, 20 F.4th 260, 263 (5th Cir. 2021). But the Parties and this Court are no longer at the preliminary injunction stage; we are at the merits. Vacatur is not simply *an* appropriate remedy on the merits, it "is the *only* statutorily prescribed remedy for a successful APA challenge to a regulation." *Franciscan Alliance,* 47 F.4th at 374–75 (emphasis added). And *Franciscan* recognized in any event that it is appropriate for "one district court [to] make a binding judgment for the entire country," particularly where there is a need for "uniform" guidance and more limited relief would be "ineffective." *Id.* (quoting in part from *Texas v. United States*, 809 F.3d 134, 187–88 (5th Cir. 2015)). Such is the case here.[17]

In short, the Final Rule must go. The Agencies' plea for party-specific relief is inconsistent with the APA's design. In APA cases, "the ordinary result is that the rules are vacated—not that their application to the individual petitioners is proscribed." *Nat'l Mining Ass'n v. U.S. Army Corps of Eng'rs*, 145 F.3d 1399, 1409 (D.C. Cir. 1998) (internal quotation marks omitted). As Justice Blackmun explained while "writing in dissent but apparently expressing the view of all nine Justices on this question," *id.*:

> The Administrative Procedure Act permits suit to be brought by any person "adversely affected or aggrieved by agency action." In some cases the "agency action" will consist of a rule of broad applicability; and if the plaintiff prevails, the result is that the rule is invalidated, not simply that the court forbids its application to a particular individual. Under these circumstances a single plaintiff, so long as he is injured by the rule, may obtain "programmatic" relief that affects the rights of parties not before the court.

---

[17]     In their quixotic quest to evade vacatur, the Agencies also quibble with Plaintiffs' interpretation of *Monsanto Co. v. Geertson Seed Farms*, which held that courts should vacate a rule first and then determine whether "recourse to the additional and extraordinary relief of an injunction [is] warranted." 561 U.S. 139, 166 (2010). Agency Br. at 47–48. In doing so, the Agencies ignore the fundamental point that injunctive relief is *more* drastic than vacatur. *Monsanto Co.*, 561 U.S. at 165; *see, e.g.*, *Data Mktg. P'ship*, 45 F.4th at 859. At any rate, the point remains that both vacatur and supplemental injunctive relief are necessary to remedy Plaintiffs' injuries. MSJ Br. at 42–43.

*Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 913 (1990) (Blackmun, J., dissenting) (citation omitted); *see also id.* at 890 n.2 (majority opinion) (noting that the APA permits "a person adversely affected" by agency action to "affect[]" an "entire" agency program).[18]

Vacatur of the Final Rule in full, supplemented by a permanent injunction, is the only path that provides complete relief to the Plaintiffs.

### B.   A Permanent Injunction Is Necessary To Supplement Vacatur And Provide Complete Relief For The Agencies' Unlawful Action.

A permanent injunction is necessary to ensure that Plaintiffs receive complete relief given the Agencies' assertion of expansive authority to treat braced pistols as SBRs subject to NFA regulation. MSJ Br. at 42–43. The Agencies claim that Plaintiffs' requested injunction is overbroad because it could reach "all" braced pistols, and not just the ones improperly classified under the Final Rule. Agency Br. at 49. If there is any validity in this complaint, the Agencies themselves are to blame. Any vagueness in the scope of the injunction can be traced directly to the vague, subjective criteria in the Final Rule. Plaintiffs have asked only for such injunctive relief as is necessary to guard against the Agencies' continued efforts to treat braced pistols as SBRs after the Final Rule is vacated.

To a similar end, the Agencies' argument that the requested injunction is "hopelessly vague" because "the term 'braced pistols' . . . has no inherent or definitive meaning," Agency Br. at 50, is contradicted by the Agencies' efforts to regulate these firearms in the first place: The

---

[18]     One opinion of the D.C. District court highlights the oddity of the sort of limited vacatur the Agencies propose in this case:

> [T]he Court [is] at a loss to understand what it would mean to vacate a regulation, but only as applied to the parties before the Court. As a practical matter, for example, how could this Court vacate the Rule with respect to the organizational plaintiffs in this case without vacating the Rule writ large? What would it mean to "vacate" a rule as to some but not other members of the public? What would appear in the Code of Federal Regulations? Fortunately, the Court need not engage in such logical gymnastics because the language of the APA and the controlling D.C. Circuit precedent are unambiguous. The Court, accordingly, concludes that the proper remedy is to set the Rule aside, and the legal consequences of that result are not limited "to the individual" plaintiffs.

*O.A. v. Trump*, 404 F. Supp. 3d 109, 153 (D.D.C. 2019).

Agencies cannot feign ignorance after promulgating a Final Rule regulating these very products. Plaintiffs' proposed injunction would reach the Agencies' effort to regulate "stabilizing braces" on pistols (or "heavy pistols")—as those terms are repeatedly used throughout the Final Rule—as SBRs subject to the NFA.

The Agencies also claim that Plaintiffs have not established an entitlement to a permanent injunction under the familiar four-factor equitable test. Agency Br. at 49–50. But as Plaintiffs note in the opening brief, "[t]he same factors that justified entering a preliminary injunction favor entering a permanent injunction here." MSJ Br. at 43. The preliminary injunction was exhaustively briefed and considered by this Court and the Fifth Circuit; Plaintiffs have asked for a permanent injunction consistent with the grant of preliminary relief.

The requested injunction is both appropriate and necessary to provide Plaintiffs with complete relief.

**CONCLUSION**

For the reasons set for the above and in Plaintiffs' opening brief, the Court should grant Plaintiffs' motion for summary judgment; vacate, in its entirety, the Final Rule and its amendment of 27 CFR §§ 478.11 and 479.11; and enter a permanent injunction against Defendants from enforcing their "interpretation" of federal law contained in the Final Rule against Plaintiffs.

Dated: January 17, 2024

Respectfully submitted,

/s/ Bradley A. Benbrook
Bradley A. Benbrook* (CA Bar No. 177786)
Stephen M. Duvernay* (CA Bar No. 250957)
BENBROOK LAW GROUP, P.C.
701 University Avenue, Suite 106
Sacramento, California  95825
Telephone: (916) 447-4900
Telecopy: (916) 447-4904
brad@benbrooklawgroup.com
steve@benbrooklawgroup.com

R. Brent Cooper (TX Bar No. 04783250)
Benjamin D. Passey (TX Bar No. 24125681)
COOPER & SCULLY, P.C.
900 Jackson Street, Suite 100
Dallas, Texas  75202
Telephone: (214) 712-9500
Telecopy: (214) 712-9540
brent.cooper@cooperscully.com
ben.passey@cooperscully.com

Cody J. Wisniewski* (CO Bar No. 50415)
FPC ACTION FOUNDATION
5550 Painted Mirage Road, Suite 320
Las Vegas, NV  89149
Telephone: (916) 378-5785
Telecopy: (916) 476-2392
cwi@fpchq.org

*Admitted *pro hac vice*

*Attorneys for Plaintiffs*

34

## CERTIFICATE OF SERVICE

I hereby certify that, on January 17, 2024, a true and correct copy of the foregoing document and all supporting documents filed concurrently therewith were served via the Court's CM/ECF system to all counsel of record.

/s/ Bradley A. Benbrook
Bradley A. Benbrook

35